## IN IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UBIOME, INC.,[1] | Case No. 19-_____ (___) |
| Debtor. | |

## DECLARATION OF CURTIS G. SOLSVIG III IN SUPPORT OF THE
## DEBTOR'S CHAPTER 11 PETITION AND REQUESTS FOR FIRST DAY RELIEF

I, Curtis G. Solsvig III, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.    I am the Acting Chief Executive Officer (the "Acting CEO") of uBiome, Inc., the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor" or "uBiome").

2.    On or about May 24, 2019, I was originally retained by uBiome to provide financial consulting services, and on June 27, 2019,[2] I was appointed by a special committee of the board to serve as the Debtor's Acting CEO.  As a Managing Director for Goldin Associates, LLC ("Goldin"), I have more than 30 years of experience in the turnaround industry, both as a restructuring advisor and as an interim manager, including chief executive officer or chief restructuring officer.  My experience includes fiduciary and non-fiduciary roles in the restructurings or liquidations of, among others, Lily Robotics, Inc., Real Industries, Quiksilver, Borders Books, Restoration Hardware, Manischewitz Foods, Atari, Cornerstone Propane and Ports America.  I have extensive expertise in the fund management business, including portfolio

---

[1] The Debtor and the last four digits of its taxpayer identification number is: uBiome, Inc. (0019).  The Debtor's headquarters is located at 360 Langton Street, Suite 301, San Francisco, CA 94103.

[2] I officially became Acting CEO on July 10, 2019.

and financial management, fund administration and board-level supervision.  I have a Bachelor of Arts degree from Harvard College and an M.B.A. from Harvard Business School.

3.      In addition to my appointment as Acting CEO of the Debtor, Robin Chiu (a Managing Director at Goldin) and Karthik Bhavaraju (a Senior Director at Goldin) have been appointed as Acting Chief Financial Officer ("Acting CFO") and Acting Chief Operations Officer ("Acting COO"), respectively.

4.      I, in my capacity as the Debtor's Acting CEO, and the other members of the Goldin team acting as interim management for the Debtor, are familiar with the Debtor's business, financial affairs, and day-to-day operations.  Today (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Petition") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made and no committees have been appointed or designated.

5.      I submit this declaration (this "First Day Declaration") to provide an overview of the Debtor's business and this chapter 11 case (this "Chapter 11 Case") and to support the Debtor's applications and motions for "first day" relief (collectively, the "First Day Motions").  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtor's management and the Debtor's professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition.  To the

extent that any information provided herein is materially inaccurate, the Debtor will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge.  I am authorized to submit this First Day Declaration on behalf of the Debtor and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.      In addition to providing the factual support for the First Day Motions, the primary purpose of this First Day Declaration is to familiarize the Court with the Debtor, this Chapter 11 Case, and the relief sought in the First Day Motions.  This First Day Declaration is organized as follows: <u>Part I</u> provides an overview of this Chapter 11 Case; <u>Part II</u> describes the Debtor's business operations; <u>Part III</u> describes the Debtor's corporate structure; <u>Part IV</u> describes the Debtor's capital structure; <u>Part V</u> describes the events leading up to the commencement of this Chapter 11 Case; <u>Part VI</u> summarizes the overall restructuring goals the Debtor hopes to achieve by commencing this Chapter 11 Case; and <u>Part VII</u> sets forth my basis for testifying to the facts underlying and described in each of the First Day Motions.

## I.      <u>Overview of this Chapter 11 Case</u>

7.      The Debtor filed this Chapter 11 Case to provide an innovative business with a fresh start under new management, and to preserve approximately 100 jobs through a court-supervised sale process that is intended to maximize the value of the Debtor's assets for the benefit of all stakeholders.

8.      As discussed more fully below, certain business practices formulated and implemented by the Debtor's original founders have resulted in cessation of certain aspects of the Debtor's business, investigations by certain federal and state investigatory bodies (the "<u>Investigations</u>"), loss of revenue and significant potential contingent liabilities.  In recent

01:25131344.1

weeks, the Debtor has: (1) taken aggressive corrective action at the Board (as defined below) and management levels;(2) implemented various corporate governance controls; (3) relaunched certain of its business operations; (4) committed to cooperate with the Investigations, (5) mitigated the impact of the Investigations, and (6) reduced the cost structure of the Company while preserving the value for the sale process described below.

9.       The Debtor has also recently installed two new independent directors – D.J. (Jan) Baker and Spencer Wells – who are both highly qualified and esteemed fiduciaries in the restructuring community.  In addition to the installation of Messrs. Baker and Wells to the Debtor's 3-person Board of Directors, the Debtor replaced former management with myself, Ms. Chiu, and Mr. Bhavaraju to oversee and manage the Debtor's day-to-day business operations, and to assist the Debtor with formulating strategic financial and operational alternatives with the ultimate goals of optimizing the Debtor's business outlook and maximizing the Debtor's value for the benefit of all stakeholders.

10.      As described further herein, through this Chapter 11 Case and under the close supervision and direction of the new Board of Directors and acting management, the Debtor intends to undertake a restructuring and sale process to sell a streamlined, refocused, and healthy business to a bidder that will result in the maximum return possible to the Debtor's stakeholders. To this end, the Debtor has entered into a postpetition financing agreement with Silicon Valley Bank ("SVB") for a DIP Facility, funded in part through participations (collectively, the "Participations") with participant parties (the "Participants," [3] together with the DIP Lender, the

---

[3]  Attached as Exhibit E to the DIP Credit Agreement (as defined in the DIP Motion) is the Form of Participation Agreement (the "Participation Agreement"), entered into by and among the DIP Lender, on the one hand, and 8VC Fund I, L.P. and Entrepreneurs Fund I, L.P., on the other, and acknowledged and consented to by the Debtor. The Participation Agreement governs, among other things, the relationship between the DIP Lender and the Participants.

"DIP Financing Parties") pursuant to which the DIP Financing Parties will collectively provide the Debtor with up to $8 million in new money borrowings under a post-petition DIP Facility (the "DIP Facility") that will be secured by super senior priority and senior priority liens on substantially all of the Debtor's assets.  The Debtor believes that the DIP Facility will provide the necessary flexibility to allow the Debtor to run a successful sale process, preserve approximately 100 jobs, and to engage in discussions with its creditor constituencies.

11.     The Debtor's proposed path is designed to maximize the value of its business and assets, and to provide the maximum recovery possible to the Debtor's creditors.  With new management refocusing the Debtor's business model, the Debtor is poised to continue as a growing business in the hands of the successful bidder following a competitive auction process. To satisfy the case milestones set forth in the Debtor's DIP Facility, as well as to prevent deterioration in value of the Debtor's business attendant to a lengthy sale process, the Debtor seeks to consummate a sale of its business within the first 75 days of the Petition Date.

## II.     The Debtor's Business and Operations

### A.     Overview of the Debtor's Business

12.     The scientific basis for uBiome's analytical process is the DNA sequencing of the microbe, which are microscopic organisms that exist throughout nature and are present in many parts of the human body.  For example, the microbes in the gastro-intestinal ("GI") system are an essential part of the digestive process.

13.     Using advanced DNA sequencing and utilizing the world's largest microbiome database, the Debtor has historically offered a variety of products to patients and consumers to analyze the DNA of their microbiomes, including "Explorer," "SmartGut," and "SmartJane," (each as discussed more fully below).  Customers purchase mail-order kits to collect small

samples from home, complete a survey, and within a few weeks, the customer receives his or her results by email or on the web portal.

14.     The process for analyzing the sample is complex and requires detailed logging and tracking over multiple steps in the Debtor's systems.  The Debtor processes and analyzes these samples through a proprietary gene sequencing process in a "wet lab" in its San Francisco headquarters.  The wet lab sequencing results are then processed in a "dry lab" in the "cloud" using custom bioinformatics software, where identified bacteria are compared to a proprietary database of previously identified and catalogued bacteria.[4]  The bioinformatics in the dry lab also link the DNA from the sample to the body of published studies providing the association between one particular microbe and medical and wellness conditions.  This is a rapidly growing body of knowledge as researchers develop new associations.

15.     uBiome previously operated in two segments: consumer and clinical. On the consumer side, the Debtor's flagship product is its Explorer kits, which have been historically sold online for $89.99 each.  The results provided to consumers include suggestions (referred to as data stories) on matters such as diet, weight control, gut inflammation, sleep disorders, and non-dietary supplements.

16.     In the clinical diagnostic market, the Debtor's products included SmartGut, an extension of Explorer, working from a stool sample using the same wet lab technology and with enhanced bioinformatics and an expanded array of diagnostics.  Unlike Explorer, it was prescribed by a doctor and billed to the customer's insurance.  Once SmartGut was launched, it was followed by SmartJane (vaginal swab sample providing diagnoses of STD's, HPV, and other gynecological disorders) (together with SmartGut, "SmartX").  As discussed below, the Debtor

---

[4]     As the names suggest, a "wet lab" is a laboratory that tests utilizing liquid solutions or chemicals and a "dry lab" is where analytics are carried out through the bioinformatics pipeline.

suspended sales of its clinical products in response to investigations into certain business practices led by its founders.

**B.**     **History of uBiome.**

17.     In 2007 the National Institutes of Health launched the Human Microbiome Project ("HMP").  The HMP isolated over 10,000 microbial species and using DNA sequencing identified over 80% of them.  The results were published in 2012.

18.     With this knowledge, it became much easier to identify microbes in the human system.  This facilitated research on the association between a particular microbe and a medical condition.  For example, a specific abundance of one particular microbe or a group of microbes could be determined to either cause or be a byproduct of Irritable Bowel Syndrome ("IBS"), which is generally considered to be a difficult condition to diagnose.  While someone suffering the symptoms of IBS may in fact have one of several other GI disorders such as Irritable Bowel Disorder ("IBD"), if the IBS microbe was found in a stool sample, then a definitive IBS diagnosis could be made, ruling out other GI disorders.  Such a simple, non-invasive diagnostic test is far superior to a colonoscopy and other alternatives currently available to physicians.

19.     Drs. Jessica Richman and Zachary Apte (together, the "Founders") founded uBiome in 2012 to provide a product which consumers could use to monitor their gut microbes. uBiome was initially funded by crowdfunding on the Indiegogo platform.  It introduced Explorer in 2013 in much the same form as today: a kit purchased online containing a swab to take a stool sample from toilet paper, a tube into which the swab was inserted for shipment, a mailing envelope, and instructions.  The customer sent the sample to uBiome where it was analyzed, and results emailed to the customer.  The uBiome website contained information to which the customer could refer to understand his or her test results.

01:25131344.1

20.     Several important elements of the business emerged during this time:

- The major part of the research and development ("R&D") was performed in Santiago, Chile at a lab which developed wet lab processes as well as the bioinformatics of the dry lab.

- Almost all aspects of the business were handled digitally and uBiome produced its own software internally, primarily with a team of software engineers in Buenos Aires, Argentina.

- uBiome bought used lab equipment to reduce capital expenditures, resulting in substantial costs to develop processes suitable to the older equipment and significant expense to maintain the operability of the older machines.

- uBiome developed custom lab information management and automation software to run its wet lab.

21.     uBiome believed it had achieved "first mover" advantage in the space and was receiving recognition for its pioneering role.  The Founders decided to move forward with a round of outside venture capital and in 2014 raised approximately $5 million in such funding. uBiome also raised two subsequent rounds of venture financing, $17 million in 2016 and $59 million in October, 2018 ("C Round").[5]

22.     At the time of the C Round in 2018, uBiome had approximately 300 employees. It had added a new lab in Vancouver, Washington to provide additional capacity in a more modern, streamlined facility.[6]  An office in New York was also added where a number of commercial personnel were located until July 2019, when the location closed.

---

[5]     Between July 2017 and August 2018, the Debtor issued $36.4 million of convertible notes which were converted to equity in August 2018. As of the Petition Date, approximately $720,000 of convertible notes have not been converted.

[6]     The Debtor closed this facility in July, 2019.  Contemporaneously herewith, the Debtor is filing a motion to reject this lease.

01:25131344.1

8

Case 19-11938-LSS    Doc 2    Filed 09/04/19    Page 9 of 42

23.     uBiome and its non-debtor foreign affiliates (described more fully below) currently employ approximately 100 individuals, of which 35 are located in the United States, 37 in Chile and 28 in Argentina.[7]

## C.     Intellectual Property

24.     In assessing the Debtor's strategic business options, several things have become clear.  The Debtor has substantial and valuable Intellectual Property ("IP") and other commercial assets, including, among other things:

- The San Francisco lab, which is certified by both the State of California and the Center for Medicare and Medicaid Services under the Clinical Laboratory Improvement Amendments ("CLIA") regulations and accredited by the College of American Pathologists ("CAP").  Only 3% of labs in the U.S. have the CLIA and CAP designations, giving uBiome a significant competitive advantage, a path to monetize its lab capabilities, and a barrier to entry which is expensive to duplicate.

- The Santiago, Chile R&D facility and team, which has deep experience and proprietary know-how with technologies related to gene sequencing of microbial samples, bioinformatics analysis to analyze and identify associations between microbes and health conditions, developing machine-learning based analytics for medical conditions, and automatic lab processes for high volume sample testing.

- Strong medical affairs team with research expertise in various aspects of the human microbiome.

- The engineering team in Argentina with deep expertise in creating production software for biotechnology applications, and laboratory information management software integrating wet and dry lab processes.

- A strong portfolio of documented associations between specific microbes and disorders, including HPV, STD's, and IBS/IBD.

- In-house expertise in the form of trade secrets with respect to various gene sequencing technologies.

---

[7]     On July 10, 2019, uBiome terminated approximately half of the workforce, principally those no longer necessary for an Explorer-focused business, and recently closed locations in New York City and Vancouver, Washington, leaving its only U.S. office in San Francisco (with five employees working remotely).

01:25131344.1

- The largest sample data base in the industry of nearly 300,000 samples, over 8,000 of which have metadata.

- A portfolio of over 45 patents, with particular strength in wet-and dry-lab methodology and associations demonstrating the Debtor's strength with academic and corporate partners.

- A highly qualified, experienced team with deep academic training and commercial experience that would take significant time and resources to re-assemble.

- A strong reputation, despite the Investigation (as defined below), in the industry and academia for the quality of its people and capabilities.

### III.    Organizational Structure

25.    uBiome conducts its operations through a network of affiliated companies that own the various assets comprising its business.  These companies are all directly or indirectly owned by uBiome.  A copy of the uBiome organizational chart is attached hereto as Exhibit A.

26.    uBiome, Inc. is incorporated in Delaware, and directly owns non-debtor subsidiaries UBMHC1, LLC (a Delaware entity), uBiome SpA (a Chilean entity), and uBiome Chile SpA (a Chilean entity).  uBiome Chile SpA directly owns uBiome Argentina SAS and uBiome Chile Research SpA (collectively, the "Non-Debtor Subsidiaries").  The principal operational, financial, and corporate operations of the business are with uBiome, whereas the Non-Debtor Subsidiaries perform research & development and software engineering.

27.    The majority of uBiome employees in Chile are employed by uBiome Chile SpA while those in Argentina are employed by uBiome Argentina SAS.

### IV.    Capital Structure

A.    **Secured Debt Obligations as of the Petition Date.**

28.    uBiome, as borrower, and SVB, as lender, are parties to a Loan and Security Agreement, dated as of February 24, 2017 (as amended, modified, supplemented, or restated

from time to time, the "Prepetition Facility").  In total, $10.5 million was advanced between February 2017 and August, 2018.  The loans began to amortize in July, 2018.  As of the Petition Date, approximately $5.83 million remains outstanding.

29.    The Prepetition Facility's obligations are secured by first priority liens on certain of the Debtor's assets, including, but not limited to, all goods, accounts, equipment, inventory, proceeds of intellectual property, contract rights, leases, general intangibles, commercial tort claims, cash, deposit accounts and letters of credit, all as set forth in the Prepetition Facility.

**B.    Unsecured Debt**

30.    As of the Petition Date, the Debtor estimates that (other than the Contingent Liabilities, as defined and discussed below) its unsecured trade and other operational debt is approximately $3.5 million, mainly comprised of legal fees and claims held by vendors that were used for the clinical business.

31.    In addition, there are a number of contingent liabilities (collectively, the "Contingent Liabilities"), including:

- Inadvertent billings to Tricare, Medicare and Medicaid for certain tests, which may total approximately $4 million;

- Potential obligations to private pay insurers for which the Debtor has received over $10 million of refund requests related to the Debtor's prior clinical practice; and

- Potential fines for civil and criminal penalties resulting from the Investigation (as defined below).  The amounts of these fines are currently unknown.

**C.    Equity**

32.    As discussed above, the Debtor raised three rounds of venture capital financing. 8VC (as defined below) and its affiliates collectively own approximately 21.7% of uBiome's shares across two classes, Series B preferred and Series C Preferred.  In addition, Andreessen

Horowitz Fund and its affiliates own approximately 11.06% of total shares across Series A

Preferred and Series B Preferred.

33.    The Debtor also issued common shares and common class F shares.  On June 19,

2019, uBiome and the Founders entered into a stipulation and agreement, among other things,

waiving the their rights as shareholders, and, among other things, granting a proxy of their voting

rights to Eight Partners VC Fund I, L.P.  The Founders each owned approximately 10.67% of

total shares.

## V.    Events Leading to the Chapter 11 Cases

### D.    Issues Under Prior Management

34.    The Founders implemented certain business strategies with respect to the SmartX

products that were highly problematic, contained significant operational (but not scientific) flaws

and, in some instances, were of questionable legality.  These issues included improper insurance

provider billing practices, improper use of a telemedicine physician network (known as the

External Clinical Care Network), overly aggressive and potentially misleading marketing tactics,

manipulation of customer upgrade testing, and improper use of customer inducements.

Moreover, certain information presented to potential investors during the three rounds of capital

raise my have been incorrect and/or misleading.  Although uBiome believes the science and

technology behind uBiome's business model in this developing area is sound, these issues –

among others – have resulted in significant legal exposure for the Debtor.

35.    As a result of the foregoing and other problematic business practices, the Federal

Bureau of Investigation (the "FBI") opened an investigation on April 26, 2019.  The FBI and

other federal and state agencies executed a search warrant on the Debtor's San Francisco

headquarters and obtained various files, business records and hardware.  That same day, the

01:25131344.1

United States Attorney for the Northern District of California issued a subpoena to the Debtor for

certain records and documents.  Since these events, the Debtor, the Board, and the Debtor's

management and advisors have been fully cooperating with the investigating authorities,

including the U.S. Department of Justice and the Securities and Exchange Commission,

regarding their ongoing investigations.  The Debtor intends to continue its cooperation with these

authorities despite the filing of this Chapter 11 Case.

**E.      uBiome's Relaunch Under New Management**

36.      At the time the search warrant was executed, the Debtor's board of directors (the

"Board") was composed of the Founders, Kimmy Scotti, a partner of the venture capital investor

8VC Entrepreneurs Fund I, L.P. and 8VC Fund I, L.P. (together "8VC"), which was an early and

significant investor in uBiome, Witt Wisebram, an independent director and one of uBiome's

initial creators, and Dr. Joe DeRisi, M.D., a prominent researcher in the microbiome space.

37.      Within forty-eight hours of the execution of the search warrant, the three

independent Board members – Ms. Scotti, Dr. DeRisi and Mr. Wisebram – created a special

committee (the "Special Committee") to investigate the allegations described above, and

thereafter retained Milbank LLP ("Milbank") to assist and advise the Special Committee in

carrying out an investigation into these matters (the "Investigation").

38.      On April 28, 2019, the Special Committee removed the Founders from their

management roles and placed them on paid suspension pending further action by the Special

Committee, and also suspended all SmartX business operations.  In their place, on April 28,

2019, the Special Committee appointed John Rakow, the Debtor's then-current General Counsel,

as Interim Chief Executive Officer.  On or about April 28, 2019, Dr. DeRisi resigned from the

Board and the Special Committee, and on or about May 9, 2019 and Mr. Wisebram also resigned from the Board and the Special Committee.

39.     On June 19, 2019, the Founders tendered their resignations from the Board and executed a Stipulation and Agreement pursuant to which the Founders waived certain rights as majority shareholders of the Debtor and granted an 8VC affiliated entity proxy rights with respect to the Founder's shareholders rights.  Mr. Rakow continued as Interim CEO until his resignation on June 28, 2019.

40.     Under Mr. Rakow and the Special Committee, uBiome focused on fully cooperating with Milbank and the Investigation, suspended sales of the SmartX product line and all clinical products, refocused uBiome around the Explorer product line, and began preparations for a restructuring of its business.

41.     Effective July 2, 2019, the Special Committee removed each Founder as an officer, employee and/or from any other position with the Debtor and stopped compensating them.

42.     By written consents of the Board dated June 27 and July 11, 2019, I was appointed as Acting CEO, Ms. Chiu was appointed as Acting CFO and Mr. Bhavaraju was appointed as Acting COO.

43.     Pursuant to a written consent of the majority of the Debtor's shareholders dated July 11, 2019, Messrs. Baker and Wells were appointed to the Board as independent directors. Mr. Baker is a retired corporate restructuring partner of Latham & Watkins and former head of the bankruptcy and restructuring group, and Mr. Wells is a partner at DriveTrain, LLC and an experienced distressed advisor.  Both have substantial experience acting as fiduciaries and advising in distressed situations.

01:25131344.1

44.     The new Board and management team has been working diligently to explore

financial and operational alternatives and to prepare uBiome for a restructuring.  This has

included, among other things, hiring professionals, including Young Conaway Stargatt and

Taylor, LLP ("Young Conaway") as counsel and GLC Advisors & Co., LLC and GLCA

Securities, LLC (collectively, "GLC") as uBiome's investment banker.  uBiome has been

working diligently with Young Conaway to prepare for a restructuring either in or out of a

chapter 11 bankruptcy (the "Restructuring").  GLC, meanwhile, has been diligently marketing

uBiome's assets to potential interested parties in an effort to secure an investor to finance the

Restructuring, either as an investor outside of chapter 11 or to provide a debtor-in-possession

financing facility and/or to act as a stalking horse bidder in a court-supervised sale process.  With

the cooperation of the Debtor's management team, GLC has prepared and distributed

comprehensive marketing materials, identified possible investors, and participated in

management meetings with interested investors.  The management team has also maintained

close communications with SVB, the Debtor's secured lender.

45.     In addition to preparing for the Restructuring, the management team has been

assessing the Debtor's strategic business options and preparing a business plan ("Business

Plan"), which is initially focused on the launch of an upgraded Explorer product and various

near- and medium-term opportunities, including third-party partnerships.  For example, uBiome

will begin supplying the Explorer product to CVS in October of 2019 pursuant to a purchase

order agreement.

46.     In short, while the Debtor experienced a serious setback as a result of the

Investigation, the Investigation resulted from the business practices implemented by the

Founders, not bad science or bad lab practices.  The Debtor has established a new Board and a

new Business Plan, and is poised to move forward.  This Chapter 11 Case will provide the fresh start necessary to do so.

**F.        Prepetition Marketing Efforts**

47.        In its ongoing efforts to address its financial distress, the Debtor, in consultation with its professional advisors, began exploring potential transactions through which to sell all or substantially all of its business.  On July 18, 2019, the Debtor engaged GLC to commence a marketing and sale process for the Debtor's assets in an effort to preserve and maximize the value of its business for the benefit of all stakeholders.  On July 29, 2019, GLC began soliciting interest in the Debtor's assets, and in furtherance thereof, contacted approximately 180 potential purchasers (including both strategic and financial purchasers), and distributed teaser materials in connection therewith.

48.        As part of this marketing process, the Debtor and its advisors set up an extensive electronic data room with confidential business information.  The Debtor, through GLC, contacted 180 total sale parties, of which 136 were strategic acquirers and 44 were financial sponsors.  Thirteen potential purchasers who expressed an interest in acquiring all or a portion of the Debtor's assets by executing a non-disclosure agreement were provided with access to a data room along with a confidential information memorandum to perform the necessary diligence.  As a result of the marketing process, the Debtor's management met with three parties to further discuss a potential acquisition.

49.        Although the Debtor's prepetition marketing process attracted several interested parties, no party has submitted a final proposal for a sale transaction.  However, as of the Petition Date, the Debtor is engaged in active discussions with several potential bidders.  The response from interested parties has been promising.  The Debtor has an electronic data room available to

potential bidders and is in different stages of negotiations with interested parties.  Interested

parties have conducted diligence visits and have had telephonic communications with the Debtor

as recently as the week prior to the Petition Date.  Postpetition, the Debtor intends to reengage

with many potential bidders who may not have been interested in purchasing the Debtor's assets

outside of bankruptcy.  The Debtor's representatives will continue these individual contacts, as

well as "blast" electronic communications informing potentially interested parties of this Chapter

11 Case and the renewed sale efforts.  This will produce a robust, yet expedited, sale process.

The Debtor believes the DIP Facility provides sufficient liquidity to fund such process which is

likely to result in the best outcome for the estate and all stakeholders.

**G.      Efforts to Secure Financing**

50.      One of the critical elements to the Debtor's Restructuring is the availability of

financing to fund the Debtor's anticipated cash shortfalls during this Chapter 11 Case, as well as

to bridge to a sale and fund an orderly wind-down of the Debtor's estate.  With the assistance of

its advisors, beginning in July 2019, the Debtor contacted approximately 32 potential lenders to

inquire into their willingness to fund this Chapter 11 Case.  Of the potential lenders, the Debtor

executed non-disclosure agreements with five financial institutions, all of whom were provided

with diligence information and provided access to a data room to facilitate more detailed

diligence.

51.      The Debtor originally engaged with 8VC regarding a potential "DIP" financing

loan.  Through the course of negotiations, 8VC and the Debtor entered into discussions with

SVB regarding joining as a lender in the DIP financing.  After arms-length negotiations, with

each party represented by sophisticated counsel and advisors, the Debtor, as borrower, and SVB,

as lender, reached an agreement on a financing facility in the total amount of $13.83 million,

structured in two tranches.  In the first tranche, SVB will provide $1 million of new money on a super-senior secured basis, with a roll-up of 100% of the Prepetition Facility (upon entry of the Final Order) in the amount of approximately $5.83 million, and the Participants will provide $4 million on a senior secured basis (which will be junior to 50% of the Prepetition Facility and *pari passu* with the remaining 50% of the Prepetition Facility).[8]  In the event that the Debtor receives a letter of intent for the sale of its assets in form and substance acceptable to the DIP Financing Parties, and which otherwise meets the conditions specified in the DIP Financing Documents, including, for the avoidance of doubt, the Participations, within 40 days of the Petition Date, the DIP Financing Parties may agree to fund a second tranche, which will consist of up to $500,000 in new money borrowings from SVB on a super-senior secured basis, and up to $2.5 million from the Participants on a senior secured basis, the latter of which will also be junior to 50% of the Prepetition Facility and *pari passu* with the remaining 50% of the Prepetition Facility.  The Debtor believes that the DIP Facility will provide the necessary flexibility to allow the Debtor to run a successful sale process, preserve approximately 100 jobs, and to engage in meaningful discussions with its stakeholders.

52.     Accordingly, the Debtor is seeking an order through the DIP Motion (as defined below) authorizing the (a) incurrence of post-petition indebtedness through the DIP Facility, (b) granting of super senior priority and senior priority liens and super-priority administrative expenses, and (c) use of cash collateral.  I have reviewed the DIP Motion and I believe that the factual statements therein are true and correct.

53.     The DIP Facility gives the Debtor appropriate flexibility during this Chapter 11 Case.  The Debtor needs the cash available under the DIP Facility to fund ongoing operating

---

[8] The relative priorities of the Participants' $4 million in new money and the Prepetition Facility will apply regardless of whether the Court grants the roll-up as to the Prepetition Facility.

expenses as well as to bridge to a sale of the Debtor's business.  The Debtor considered whether it could operate using only the cash generated from post-petition operations, and determined that it would not be able to do so.  Without the DIP Facility, the Debtor would not be able to fund ongoing operating expenses, including payroll, on an ongoing basis, and bankruptcy-related expenses during this Chapter 11 Case.  The Debtor's ability to remain a viable operating entity until the sale is consummated depends on obtaining the interim and final relief requested in the DIP Motion.

## VI.    Expectations for Chapter 11 Case

54.    Despite the efforts of the new Board and management and the Debtor's professional advisors, the Debtor did not find a viable Restructuring alternative outside of a Court supervised process.  The principal reasons for this appear to be the potential size and uncertainties of the Contingent Liabilities.  uBiome is in the unusual position of being a "start-up" again, with established assets and business model, but with an overhang of risks not normally associated with a start-up.  Thus, it is my understanding that usual venture investors are uncomfortable with the risk overhang and the usual distressed investors are not comfortable with investing in a start-up.

55.    Simply put, uBiome needs a clean slate and a fresh start to save the business and 100 jobs.  It has therefore been determined by the Board that the best approach to preserve and realize value for the estate is to commence this Chapter 11 Case and implement a Court-supervised sale process under section 363 of the Bankruptcy Code ("363 Sale").

56.    The Debtor has negotiated a timeline for the sale of its business that I believe is sufficient, under the circumstances, to continue and finalize a robust marketing and sale process that will maximize value for all stakeholders.  Moreover, I believe the proposed sale timeline

01:25131344.1

will allow all interested parties to consider the relief sought by the Debtor at the outset of this

Chapter 11 Case and make informed decisions in connection therewith.  The anticipated sale

process will conclude on November 4, 2019, affording the Debtor more than 60 days to fully

market its business postpetition.

- <u>October 3, 2019</u> – The Court shall have entered an order approving the Bid Procedures (as defined below);

- <u>October 14, 2019</u> – The Debtor shall have secured a letter of intent from a proposed purchaser in form, substance, and on terms and conditions reasonably acceptable to the DIP Lender;

- <u>October 23, 2019</u> – The Debtor shall have received a binding Stalking Horse Bid;

- <u>October 30, 2019</u> – The Debtor shall have conducted an Auction (as defined below);

- <u>November 4, 2019</u> – The Court shall have entered an order approving the Sale; and

- <u>November 18, 2019</u> – the Sale shall have closed.

57.    Based on these considerations, uBiome and its advisors have concluded that the

best course for the estate is to move as expeditiously as possible to a consummate the 363 Sale,

and the DIP Facility has been modeled around this process.

## VII.    <u>Evidentiary Support for First Day Motions</u>[9]

58.    Concurrently with the filing of its chapter 11 petition, the Debtor has also filed

certain First Day Motions seeking relief that the Debtor believes is necessary to enable it to

operate in this Chapter 11 Case with minimal disruption and loss of productivity.  The Debtor

respectfully requests that the relief requested in each First Day Motion be granted because such

relief is a critical element in stabilizing and facilitating the Debtor's operations during the

---

[9]    Capitalized terms used but not otherwise defined in this Section VII shall have the meanings ascribed to such terms in the applicable First Day Motion.

pendency of this Chapter 11 Case.  I have reviewed each First Day Motion, and all of the facts

set forth in the First Day Motions are true and correct to the best of my knowledge and belief

based upon (a) my personal knowledge of the Debtor's operations and finances, (b) information

learned from my review of relevant documents, (c) information supplied to me by other members

of the Debtor's management team and the Debtor's advisors, and/or (d) my opinion based upon

my knowledge and experience or information I have reviewed concerning the Debtor's

operations and financial condition.  A summary of the relief requested in each First Day Motion

and the facts supporting each First Day Motion is set forth below.  The First Day Motions (each

as described in more detail below) include:

1. *Debtor's Application for Appointment of Donlin Recano & Company, Inc. as Claims and Noticing Agent* (the "156(c) Application");

2. *Debtor's Motion for Interim and Final Orders Authorizing (A) the Maintenance of the Cash Management System; (B) Maintenance of Existing Bank Accounts; (C) Continued Use of Existing Business Forms; (D) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expense Status for Postpetition Intercompany Claims, and (E) Granting Related Relief* (the "Cash Management Motion");

3. *Debtor's Motion for Entry of an Order Authorizing Payment of (A) Certain Prepetition Wages, Salaries, and Other Compensation and (B) Certain Employee Benefits and Other Associated Obligations* (the "Employee Wage Motion");

4. *Debtor's Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; (B) Approving the Debtor's Proposed Adequate Assurance of Payment for Postpetition Services; and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment* (the "Utilities Motion");

5. *Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing, but not Directing, the Debtor to Pay Certain Prepetition Taxes and Obligations, and (B) Granting Related Relief* (the "Tax Motion");

6. *Debtor's Motion for Entry of Interim and Final Orders Authorizing (A) Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With, Various Insurance Policies,*

*Including Payment of Policy Premiums and Broker Fees, and (B) Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto* (the "Insurance Motion");

7.  *Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to Pay Claims for Prepetition Customs, Shipper, Warehousemen, and Common Carrier Obligations* (the "Shippers Motion");

8.  *Debtor's Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363, 1107(a), and 1108 of the Bankruptcy Code: (I) Authorizing the Debtor to pay Certain Pre-Petition Claims of Critical Vendors and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Claims* (the "Critical Vendor Motion")

9.  *Debtor's Motion for Entry of an Order Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Applicable Privacy Rules* (the "Patient Confidentiality Motion")

10. *Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to Obtain PostPetition Secured Financing; (II) Authorizing the Use of Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Scheduling a Final Hearing* (the "DIP Motion").

## A.    The 156(c) Application

59.    In the 156(c) Application, the Debtor seeks entry of an order authorizing the

Debtor to retain Donlin, Recano & Company, Inc. ("DRC") as its Claims and Noticing Agent in

this Chapter 11 Case, including assuming full responsibility for the distribution of notices and

the maintenance, processing, and docketing of proofs of claim filed in this Chapter 11 Case.  It is

my understanding that the Debtor's selection of DRC to act as the Claims and Noticing Agent

has satisfied this Court's protocol for the Employment of Claims and Noticing Agents under 28

U.S. C. § 156(c), in that the Debtor, with the assistance of its advisors, has obtained and

reviewed engagement proposals from three other court-approved claims and noticing agents to

ensure selection through a competitive process.  Moreover, I submit, based on all engagement

proposals obtained and reviewed, that DRC's rates are competitive and reasonable given their

quality of services and expertise.  Although the Debtor has not yet filed its schedules of assets

and liabilities, it anticipates that there will be hundreds of entities to be noticed.  In view of the

number of anticipated claimants and the complexity of the Debtor's business, the Debtor submits

that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is

otherwise in the best interests of both the Debtor's estate and its creditors.

**B.**     **The Cash Management Motion**

60.     In the Cash Management Motion, the Debtor requests entry of an order

(a) authorizing the Debtor to (i) continue to use its Cash Management System (as defined below),

(ii) maintain the existing Bank Accounts, (iii) continue to use existing Business Forms,

(iv) continue to perform Intercompany Transactions, and related thereto granting administrative

expense status for postpetition Intercompany Claims, (v) in its discretion, to (A) pay any Bank

Account related fees and (B) to close or otherwise modify the terms of certain of the Bank

Accounts and open new debtor in possession accounts as may be necessary to facilitate this

Chapter 11 Case and operations, or as may otherwise be necessary to comply with the

requirements of any debtor in possession financing and/or cash collateral order entered in these

cases, and (vi) deposit funds in and withdraw funds from all Bank Accounts, subject to the same

access rights and limitations existing prior to the Petition Date, including, but not limited to,

checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other

debits and to treat the Bank Accounts for all purposes as debtor in possession accounts and

(b) granting an interim suspension of the deposit and investment requirements of section 345(b)

of the Bankruptcy Code.

61.     As described in detail in the Cash Management Motion, the Debtor's business

requires the collection, payment, and transfer of funds through numerous bank accounts.  In the

ordinary course of business and prior to the Petition Date, the Debtor maintained a centralized

cash management system (the "Cash Management System").  Like other businesses, the Debtor

01:25131344.1

designed its Cash Management System to efficiently collect, transfer, and disburse funds generated through the Debtor's operations and to accurately record such collections, transfers, and disbursements as they are made. The Debtor's financial personnel manage the Cash Management System from the Debtor's headquarters in San Francisco, California. Each general category of account is described in the Cash Management Motion and a diagram of the Cash Management System is annexed as <u>Exhibit B</u> thereto.

62.     The relief requested in the Cash Management Motion is vital to ensuring the Debtor's seamless transition into bankruptcy. Authorizing the Debtor, in its business judgment, to continue to engage in Intercompany Transactions will assist the Debtor in fulfilling its fiduciary obligations to maximize the value of the estate for all creditors. The Intercompany Transactions are essential to the continued going-concern value and survival of the Debtor's operations, as they provide the necessary funding for the Debtor's operations in South America. Accordingly, to preserve the value of these international operations, including its analytical and scientific capabilities during this critical early stage of this Chapter 11 Case, the Debtor should be authorized, in its discretion, to continue the Intercompany Transactions

63.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in this Chapter 11 Case with minimal disruption, thereby benefiting all parties in interest. Accordingly, for the reasons set forth herein and in the Cash Management Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the Cash Management Motion should be granted. Absent the relief requested in the Cash Management Motion, the Debtor and its estate would suffer immediate and irreparable harm.

C.    **The Employee Wage Motion**

64.    In the Employee Wage Motion, the Debtor requests entry of an order authorizing, but not directing, the Debtor, in its sole discretion, to, among other things, (a) pay and/or remit, as applicable, (i) the Unpaid Wage Obligations, (ii) the Unremitted Withholdings Obligations, (iii) the Unpaid PTO Obligations, (iv) the Unpaid Reimbursable Expense Obligations, (v) the Unpaid Corporate Card Expenses, (vi) the Unpaid Employee Benefits Obligations, (vii) the Unpaid Employee Insurance Coverage, (viii) any Unpaid Workers' Compensation Claims, (ix) the Unremitted 401(k) Contributions, and (x) the Unpaid Commuter Benefits (together with all costs and fees incident to the foregoing, collectively, the "Employee Obligations") and (b) continue to honor and/or collect, as applicable, (i) the Wage Obligations, (ii) the Withholding Obligations, (iii) the PTO Programs, (iv) the Reimbursement Program, (v) the Health Plans, (vi) the Employee Insurance Program, (vii) the Workers' Compensation Program, (viii) the Unpaid Workers' Compensation Claims, (ix) the 401(k) Plan, and (x) the Commuter Benefits Program (collectively, the "Employee Plans and Programs").

65.    The Employees and Independent Contractors are the lifeblood of the Debtor's business, and their value cannot be overstated.  The management, marketing, sales, and technical skills of the Employees and Independent Contractors are essential to the Debtor's ability to continue business operations during this Chapter 11 Case and maximize the value of its estate. The Employees and Independent Contractors perform critical functions for the Debtor, including, among many other things, sales, clinical operations, research and development, laboratory engineering, business development, marketing, purchasing, accounting, legal, finance, management, supervisory, billing administration, and customer service.  If the Debtor cannot assure its Employees and Independent Contractors that the Debtor will promptly pay Employee Obligations, as applicable, to the extent allowed under the Bankruptcy Code and subject to state

01:25131344.1

law, and continue to honor, as applicable, the Employee Plans and Programs, the Debtor believes

that certain Employees and Independent Contractors will likely seek employment elsewhere.

The loss of Employees and Independent Contractors at this juncture would have a material

adverse impact on the Debtor's business and ability to maximize value through the

administration of this Chapter 11 Case.

66.     The relief requested in the Employee Wage Motion is necessary for the Debtor to

be able to maintain morale and preserve creditor confidence in the Debtor's continued

operations.  Moreover, the loss of valuable Employees and the recruiting efforts that would be

required to replace such Employees would be a substantial and costly distraction at a time when

the Debtor must focus on its chapter 11 efforts.  Accordingly, I believe that the Debtor must be

able to pursue all reasonable measures to retain the Employees by, among other things,

continuing to pay the Employee Obligations and to honor the Employee Plans and Programs as

set forth in the Employee Wage Motion.

67.     Accordingly, for the reasons set forth herein and expanded on in the Employee

Wage Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the

Employee Wage Motion is in the best interests of the Debtor's estate, its creditors, and all other

parties in interest, and will enable the Debtor to continue to operate its business in this Chapter

11 Case with minimal disruption, thereby maximizing value for the estate. Absent the relief

requested in the Wage Motion, the Debtor and its estate would suffer immediate and irreparable

harm.

**D.      The Utilities Motion**

68.     In the Utilities Motion, the Debtor requests entry of interim and final orders

(a) prohibiting the Utility Providers from (i) altering, refusing, or discontinuing utility services

to, or discriminating against, the Debtor on account of any outstanding amounts for services

rendered prepetition or (ii) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services, (b) determining that adequate assurance of payment for post-petition utility services has been furnished to the Utility Providers providing services to the Debtor, and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

69.     In conjunction with its day-to-day operations, the Debtor receives traditional utility services from various Utility Providers for, among other things, electricity, water, gas, sewer, telecommunications, and other similar services at its headquarters in San Francisco (collectively, the "Utility Services").  A non-exhaustive list of the Utility Providers is annexed to the Utilities Motion as Exhibit C thereto.  The Debtor paid an average of approximately $9,620 per month on account of all Utility Services for the period of the past 12 months prior to the Petition Date.

70.     I believe and am advised that the requested relief is necessary or else the Debtor could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first few weeks of this Chapter 11 Case.  Moreover, a termination of, or disruption in, Utility Services could significantly disrupt the Debtor's business operations and shrink its revenues, thereby jeopardizing the Debtor's chances to maximize recoveries for creditors.  It is, therefore, critical that Utility Services continue uninterrupted during this Chapter 11 Case.

71.     Accordingly, for the reasons set forth herein and in the Utilities Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business during the course of this Chapter 11 Case with minimal

01:25131344.1

disruption.  Absent the relief requested in the Utility Motion, the Debtor and its estate would suffer immediate and irreparable harm.

**E.**    **The Tax Motion**

72.    In the Tax Motion, the Debtor seeks entry of an order authorizing, but not directing, the Debtor, in the exercise of its reasonable business judgment, to pay Taxes (as defined below) without regard to whether such obligations accrued or arose before or after the Petition Date.

73.    In the ordinary course of business, the Debtor (a) incurs certain tax liabilities, including sales, use, income, trust fund, transfer, franchise, real property, and personal property taxes, as well as certain local taxes on gross receipts, business license fees, and other taxes and similar obligations (collectively, the "Taxes") necessary to operate its business and (b) remits such Taxes to applicable taxing and other regulatory authorities (collectively, the "Authorities"). The Taxes may, from time to time, be the subject of an audit by the applicable Authority, and the amounts estimated as due or already paid by the Debtor may be subject to upward or downward adjustment based upon the amount that the applicable Authority ultimately claims is due.  The Debtor regularly pays the Taxes in a timely manner on a monthly, quarterly, or annual basis, in each case as required by applicable laws and regulations, and none of the Taxes the Debtor is seeking authority to pay pursuant to the Tax Motion are past-due or "catch up" Taxes.

74.    The Debtor must continue to pay the Taxes to continue its business and to avoid costly distractions during this Chapter 11 Case.  Specifically, it is my understanding that the Debtor's failure to pay the Taxes could adversely affect the Debtor's business operations and the value of its assets because the Authorities could suspend the Debtor's operations, file liens against the Debtor's assets, or seek to lift the automatic stay to pursue remedies against the Debtor.  In addition, certain Authorities may take precipitous action against the Debtor's

directors and officers for unpaid Taxes, which undoubtedly would distract those key individuals from their duties related to the Debtor's restructuring efforts during the pendency of this Chapter 11 Case.  The Debtor seeks authority to pay the Taxes that remain outstanding as of the Petition Date, in the aggregate approximate amount of up to $15,000 and future Taxes that accrue in the ordinary course of business as and when such obligations become due and owing.

75.     Accordingly, for the reasons set forth herein and in the Tax Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the Tax Motion is in the best interest of the Debtor's estate and creditors because it will enable the Debtor to continue to operate its business while this Chapter 11 Case is pending.  Absent the relief requested in the Tax Motion, the Debtor and its estate would suffer immediate and irreparable harm.

## F.     **The Insurance Motion**

76.     In the Insurance Motion, the Debtor requests entry of an order authorizing, but not directing, the Debtor to (a) maintain the Insurance Policies (as defined below) without interruption, and to renew supplement, modify, or extend (including through obtaining "tail" coverage) the Insurance Policies, or obtain new insurance policies, as needed in the ordinary course of business, and (b) honor all of its prepetition and postpetition insurance obligations, under and in connection with the Insurance Policies on an uninterrupted basis and in the ordinary course of business during the administration of this Chapter 11 Case.

77.     As described in the Insurance Motion, in the ordinary course of its business, the Debtor maintains numerous insurance policies with various Insurers that provide coverage for, among other things, directors and officers liability, employment practices liability, workers' compensation liability, cyber liability, fiduciary liability, umbrella and excess liability, property liability, crime, kidnap and ransom, commercial liability, auto liability and various other insurance programs (collectively, the "Insurance Policies"), as summarized in Exhibit B annexed

01:25131344.1

to the Insurance Motion.  The Debtor incurs a total of approximately $930,000 in the aggregate in annual premiums to cover its Insurance Policies, the majority of which were paid prior to the Petition Date.

78.     The Debtor employs AON Risk Solutions as its insurance broker (the "Broker") to assist with the procurement and negotiation of the Insurance Policies.  The Broker is compensated directly by the insurance carriers on a commission basis.

79.     The Insurance Policies are essential to preserving the value of the Debtor's business operations and its assets.  In many cases, the insurance coverage provided by the Insurance Policies is required by various regulations, laws, and contracts that govern the Debtor's business and commercial activities.

80.     Accordingly, for the reasons set forth herein and in the Insurance Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in compliance with contractual and regulatory requirements and to safeguard the value of its estate. Absent the relief requested in the Insurance Motion, the Debtor and its estate would suffer immediate and irreparable harm.

**G.     The Shippers Motion**

81.     In the Shippers Motion, the Debtor seeks entry of interim and final orders authorizing (a) the Debtor to pay certain charges and fees to the broker who processes these charges, (b) the Debtor to pay certain prepetition claims incurred for shipping and/or storing goods as necessary or appropriate to obtain the release of goods in the possession of third parties and to satisfy liens regarding amounts owed to such parties, and (c) the banks and other financial institutions at which the Debtor holds accounts to receive, process, honor, and pay checks or

01:25131344.1

electronic transfers used by the Debtor to pay the foregoing and to rely on the representations of the Debtor as to which checks are issued and authorized to be paid.

82.     The Debtor depends on the services of shippers, truckers, expediters, brokers, consolidators, and other carriers (collectively, the "Shippers") to ensure the timely shipping and delivery of product in the ordinary course of the Debtor's business. The Debtor's Explorer kits are assembled in Mexico and shipped to the United States, where they are then mailed to customers.  The Debtor also transacts with a number of other third parties that could potentially assert liens against the Debtor and its property for amounts the Debtor owes to those third parties (the "Lien Claimants," and together with the Shippers, the "Possessory Claimants").  If the Debtor does not pay the claims of the Possessory Claimants, they could assert possessory liens against the Debtor's property and refuse to deliver or release such property to the Debtor until they are paid.  Such an outcome could cause significant disruptions to the operation of the Debtor's business that would impede its ability to operate successfully during this Chapter 11 Case.  If the Debtor was required to switch to alternative vendors, it would incur significant operational disruption and likely increased costs.

83.     The Debtor proposes that, as a condition of accepting payment, a Possessory Claimant must agree to a set of conditions set forth in the Shippers Motion.  If any Possessory Claimant accepts payment and, thereafter, does not continue to provide services to the Debtor on Customary Trade Terms, then any payment of the Distribution Charges made under the relief granted in connection with the Shippers Motion to such Possessory Claimant would be deemed an unauthorized postpetition transfer under section 549 of the Bankruptcy Code and, therefore, would be avoidable and recoverable by the Debtor in cash upon written request, subject to a Possessory Claimant's right to contest such treatment and request that the Debtor schedule a

hearing on such matter.  Upon any recovery by the Debtor, the Possessory Claimant's claim would be reinstated as a prepetition claim in the amount so recovered, less the Debtor's reasonable costs in recovering such amounts.

84.     Additionally, in the ordinary course of its business, the Debtor receives a variety of Imported Products from a number of foreign countries, primarily Mexico.  Timely receipt of the Imported Products is critical to the Debtor's business operations.  In connection with the Imported Products, the Debtor may be required to pay certain charges, which include customs duties, detention and demurrage fees, tariffs, excise taxes, and other similar obligations.  If the Debtor does not pay these charges, the flow of Imported Products would likely be interrupted, depriving the Debtor of products they need to draw customers and complete orders already placed by its customers.  Therefore, payment of these charges is critical to ensure the uninterrupted flow of Imported Products.

85.     Accordingly, for the reasons set forth herein and further detailed in the Shippers Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the Shippers Motion is in the best interest of the Debtor's estate and its creditors, and should therefore be granted to enable the Debtor to retain access to critical sources of goods and avoid irreparable harm to its business operations. Absent the relief requested in the Shippers Motion, the Debtor and its estate would suffer immediate and irreparable harm.

**H.      Critical Vendor Motion**

86.     In the ordinary course of business, the Debtor engages various vendors to, among other things, supply the Debtor with certain lab materials, supplies, and other lab equipment and services, along with certain communication and billing service providers.  Although the Debtor desires to resume normal business relationships with all vendors, and all vendors and their goods

and services are important to the Debtor's businesses and operations, the immediate need to continue to provide uninterrupted service is the Debtor's foremost concern.

87.     To determine those vendors whose continued, uninterrupted provision of goods and services play a crucial role in maintaining the Debtor's operations (such vendors, collectively, the "Critical Vendors") and the aggregate prepetition amounts owed to such vendors to establish the Critical Vendor Caps (as defined herein), the Debtor, with the assistance of its advisors, have spent significant time reviewing and analyzing its books and records, consulting with operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice.

88.     As part of this process, the Debtor examined a variety of factors, including: (i) whether the vendor in question is a "sole source" provider of goods critical to the Debtor's business operations; (ii) whether certain customer engagements require the Debtor to obtain the goods or services from a particular vendor or prevent it from obtaining such goods or services from alternative sources; (iii) if a vendor is not a sole source provider, whether the Debtor can engage alternative providers to adequately meet the needs of the Debtor's clients and fulfill the Debtor's mandates on a timely, cost-effective, and consistent basis; (iv) whether the Debtor has favorable pricing and other terms with the vendors that would be lost if the Debtor was to switch to a new vendor; (v) whether the vendor is foreign and otherwise not likely to recognize or acknowledge the Debtor's chapter 11 proceeding or submit to the Court's jurisdiction; and (vi) whether a vendor meeting the standards of the foregoing (i) through (v) is likely to refuse to continue providing goods or services postpetition if its prepetition claims are not paid.

89.     Applying the criteria set forth above, the Debtor has identified a limited number of vendors as Critical Vendors, each of which provides goods or services that are essential to the

01:25131344.1

33

Debtor's operations (the "Critical Goods and Services"), and each of whom has a balance in the Debtor's centralized accounts payable system.  In some cases, there is no alternative vendor for the Critical Goods and Services.  In other cases, alternative vendors cannot supply the required Critical Goods and Services in sufficient quantity, quality, or reliability, or they are unable to supply the required Critical Goods and Services on a cost-efficient and timely basis in the appropriate geographic areas.

90.     The Debtor's failure to pay or otherwise honor the Critical Vendors' prepetition claims (the "Critical Vendor Claims") may eliminate the Debtor's access to the Critical Goods and Services.  Absent payment of the Critical Vendor Claims, the Critical Vendors may cease doing business with the Debtor or condition the provision of the Critical Goods and Services on onerous trade terms.  Any disruption in the supply of the Critical Goods and Services would materially damage the Debtor's operations and substantially impair the Debtor's restructuring efforts.

91.     Consequently, the Debtor seeks authority, but not direction, to pay Critical Vendor Claims on an interim basis in an aggregate amount not to exceed $121,000 (the "Interim Cap") and on a final basis in an aggregate amount not to exceed $181,000 (together with the Interim Cap, the "Critical Vendor Caps").  In determining the modest Critical Vendor Caps, the Debtor carefully reviewed all of its vendors to determine which vendors could meet the stringent criteria used to identify the universe of potential Critical Vendors.  Thus, the Critical Vendor Caps represent the Debtor's best estimates of how much in prepetition claims need to be paid to ensure a continued supply of Critical Goods and Services during the applicable period.

92.     Given the current state of the Debtor's business, the detailed protocol described herein for determining whether to make a Critical Vendor payment, and the risks associated with

non-payment, the Debtor submits that the Critical Vendor Caps are reasonable and appropriate

caps on the expenditure of estate funds to satisfy certain prepetition claims.  Absent the relief

requested in the Critical Vendor Motion, the Debtor and its estate would suffer immediate and

irreparable harm.

## I.    Patient Confidentiality Motion

93.    In the ordinary course of business, the Debtor has access to and receive "protected

health information" that the Debtor is required to confidentially maintain pursuant to the Health

Insurance Portability and Accountability Act of 1996[10] and corresponding privacy rules[11]

("HIPAA").  It is of paramount importance to the Debtor that protected health information be

maintained in accordance with patient expectations and HIPAA.  I am advised by counsel that

the establishment of the Privacy Procedures will balance the need to protect patient health

information pursuant to HIPAA with the need to disclose information regarding this Chapter 11

Case to the public.

## J.    DIP Motion

94.    In the DIP Motion, the Debtor seeks (a) approval, on an interim basis, of the DIP

Facility in the aggregate principal amount of up to $13.83 million , (b) authorization to grant

certain liens and super-priority administrative expense claims to the DIP Lender,

(c) authorization to use cash collateral, and (d) authorization to grant adequate protection.  The

DIP Facility is structured into two tranches.  In the first tranche, SVB will provide $1 million of

new money on a super-senior secured basis, with a roll-up of 100% of the Prepetition Facility

(upon entry of the Final Order) in the amount of approximately $5.83 million, and the

Participants will provide $4 million on a senior secured basis (which will be junior to 50% of the

---

[10] 42 Pub. L. No. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of 42 U.S.C.).

[11] 45 C.F.R. pts. 160, 164.

Prepetition Facility and *pari passu* with the remaining 50% of the Prepetition Facility).[12]  In the event that the Debtor receives a letter of intent for the sale of its assets in form and substance acceptable to the DIP Financing Parties, and which otherwise meets the conditions specified in the DIP Financing Documents, including, for the avoidance of doubt, the Participations, within 40 days of the Petition Date, the DIP Financing Parties may agree to fund a second tranche, which will consist of up to $500,000 in new money borrowings from SVB on a super-senior secured basis, and up to $2.5 million from the Participants on a senior secured basis, the latter of which will also be junior to 50% of the Prepetition Facility and *pari passu* with the remaining 50% of the Prepetition Facility.  In connection with considering the DIP Facility, the Debtor's Board created a special committee of independent directors (the "Special Board Committee") to consider the DIP Facility and its proposed terms.  On September 2, 2019, the Special Board Committee recommended approval of the DIP Facility to the entire Board, and the Board subsequently approved the DIP Facility as described herein and in the DIP Motion.

95.    Given the Debtor's prepetition capital structure, its challenging business environment, and continuing pressure on the Debtor's liquidity, it became increasingly apparent that the Debtor would need to seek relief under chapter 11 of the Bankruptcy Code and that it would require access to postpetition DIP financing and use of Cash Collateral for a chapter 11 case to succeed.  The Debtor lacks sufficient funds on hand and does not generate sufficient profits to operate its businesses and fund working capital in the ordinary course.  As a result, absent the financing proposed in the DIP Motion, the Debtor would not have access to sufficient liquidity to fund either its ongoing operations or the administration of this Chapter 11 Case.

---

[12] The relative priorities of the Participants' $4 million in new money and the Prepetition Facility will apply regardless of whether the Court grants the roll-up as to the Prepetition Facility.

96.     The Debtor's management and advisors have been working diligently to explore financial options to prepare the Debtor for the contemplated sale process.  In connection with these efforts, it is my understanding that GLC contacted approximately 32 potential DIP financing sources with financing experience that were not also prepetition lenders of the Debtor (the "Potential Third Party DIP Lenders").  Of the Potential Third Party DIP Lenders, the Debtor executed non-disclosure agreements with 5 financial institutions, each of which were provided with diligence information.  Each of these third parties were also provided access to a data room to facilitate more detailed diligence.  Despite indications of interest from current creditors and various third parties, the Debtor was unable to find any lender that was willing to provide financing on a junior basis to the Prepetition Facility or to refinance in full the existing secured debt as well as provide incremental capital to fund this Chapter 11 Case.

97.     Following discussions and negotiations with the DIP Financing Parties, the Debtor requested, and the DIP Financing Parties delivered, a proposal that would provide sufficient liquidity to permit the Debtor and its advisors to administer a value-maximizing chapter 11 case (the "DIP Lender Proposal").  The DIP Lender Proposal ultimately envisioned up to $13.83 million of senior secured DIP financing and the Prepetition Lender's consent to the use of their Cash Collateral.  The DIP Lender Proposal provides adequate liquidity given the Debtor's projected borrowing base through the Chapter 11 Case.

98.     Given the Debtor's challenging liquidity situation and the fact that no Potential Third Party DIP Lender was willing to provide financing or to refinance in full the existing secured debt as well as provide incremental capital to fund this Chapter 11 Case, the Debtor determined that the DIP Lender Proposal from the DIP Financing Participants provided the best path forward for the Debtor to maximize the value of its estate in this Chapter 11 Case.

Accordingly, the Debtor, in consultation with its advisors, engaged in extensive negotiations with the DIP Financing Parties over the terms and structure of a DIP financing facility. These negotiations were in good faith and at arm's length, with the Debtor, on the one hand, and the DIP Financing Parties, on the other hand, each represented by their own experienced and sophisticated counsel. I, alongside the rest of the Debtor's management team and professional advisors, was intimately involved throughout this process, and the Special Board Committee recommended approval of the DIP Facility upon consideration of the options before it. As a result, the Debtor was able to reach agreement with the DIP Lender to provide the DIP Facility on the most favorable terms available to the Debtor under the prevailing market conditions and in light of the Debtor's financial condition.

99.    In consultation with its professional advisors, the Debtor prepared a budget, a summary of which is to be filed with the Court in connection with the DIP Motion (the "Budget"), which reflects the Debtor's reasonable judgment as to the additional liquidity required over the specified period to keep the Debtor's business operational during this Chapter 11 Case and to permit the Debtor and its advisors sufficient time to complete the Debtor's proposed sale process. Thus, it is critical that the Debtor has access to the DIP Facility and use of Cash Collateral so it can continue to operate its business in the ordinary course, administer this Chapter 11 Case, and implement its sale strategy to preserve and maximize the value of the Debtor's' estate.

100.    The DIP Facility provides the Debtor with appropriate flexibility during this Chapter 11 Case. The Debtor needs the cash available under the DIP Facility to fund ongoing operating expenses as well as to bridge to a sale of the Debtor's business. The Debtor considered whether it could operate using only the cash generated from post-petition operations, and

determined that it could not do so.  Without the DIP Facility, the Debtor would not be able to fund ongoing operating expenses, including with respect to payroll, and bankruptcy-related expenses during this Chapter 11 Case.  The Debtor's ability to remain a viable operating entity until the time of its sale depends on obtaining the interim and final relief requested in the DIP Motion.

101.    The DIP Lender has indicated that the DIP Facility (and the credit agreement and ancillary documents governing the facility, together with the Participation Agreement) set forth the only terms under which it would agree to provide the Debtor with financing.

102.    Based on my experience, my discussions with GLC regarding alternative sources of postpetition financing , my involvement in the negotiation of the DIP Facility, and in consultation with the Debtor's professional advisors, I believe that the process undertaken by the Debtor and GLC was robust, thorough, and appropriate, and produced the most favorable financing available to the Debtor under the circumstances.  Moreover, in my opinion, it is essential that the Debtor has committed postpetition financing at the outset of this Chapter 11 Case to retain the confidence of the Debtor's customers, employees, and vendors as the Debtor continues to pursue its sale process.  I believe that the negotiated terms are the best available under the circumstances, and absent the relief requested in the DIP Motion, the Debtor and its estate would suffer immediate and irreparable harm.

01:25131344.1

In conclusion, for the reasons stated herein and in each First Day Motion, I respectfully request that each First Day Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 4, 2019

*/s/ Curtis G. Solsvig III*
Curtis G. Solsvig III
Acting Chief Executive Officer
uBiome, Inc.

**<u>EXHIBIT A</u>**

**Organizational Chart**

For Discussion Purposes Only
Privileged & Confidential

# uBiome Corporate Structure

