## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UBIOME, INC.,[1] | Case No. 19-11938 (LSS) |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION
SECURED FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL,
(III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE
AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

uBiome, Inc., the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), hereby moves the Court (this "Motion") for the entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

(i)     Authorizing the Debtor to obtain senior secured, super priority, debtor in possession financing in the aggregate principal amount of up to $13.83 million (the "DIP Financing") pursuant to the terms and conditions of the DIP Financing Documents (as defined below), including the Interim Order and the Final Order (the facility for such DIP Financing, the "DIP Facility");

---

[1] The Debtor and the last four digits of its taxpayer identification number is: uBiome, Inc. (0019). The Debtor's headquarters is located at 360 Langton Street, Suite 301, San Francisco, CA 94103.

(ii)    Authorizing the Debtor to execute, deliver, and enter into the (a) Senior Secured, Super Priority Debtor in Possession Term Loan and Security Agreement (the "DIP Credit Agreement"), substantially in the form attached as Exhibit A to the Interim Order, between the Debtor, as borrower, and Silicon Valley Bank ("SVB"), as lender (the "DIP Lender"), funded in part through participations (collectively, the "Participations") [2] with participant parties (the "Participants", together with the DIP Lender, the "DIP Financing Parties"), which Participations the Debtor will acknowledge and agree to (as to terms applicable to the Debtor and subject to the terms of the Interim Order and the Final Order, as applicable) and (b) all other agreements, documents, or instruments delivered or executed in connection with the DIP Credit Agreement, as hereafter amended, supplemented or otherwise modified from time to time, including the Budget (as defined in the Interim Order) (collectively, together with the DIP Credit Agreement, the Participations, the Interim Order, and the Final Order, the "DIP Financing Documents");

(iii)    Granting to the DIP Lender an allowed superpriority administrative expense claim in this Chapter 11 Case (as defined below) and any Successor Case (as defined in the Interim Order) on account of the DIP Financing and all obligations of the Debtor owing under, or secured by, the DIP Financing Documents (collectively, and including all "Obligations" of the Debtor as defined and described in the DIP Credit Agreement, the "DIP Obligations") subject to the priorities set forth in the Interim Order and the DIP Financing Documents;

(iv)    Granting to the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined in the Interim Order), including all property

---

[2] Attached as Exhibit E to the DIP Credit Agreement is the Form of Participation Agreement (the "Participation Agreement"), entered into by and among the DIP Lender, on the one hand, and 8VC Fund I, L.P. and Entrepreneurs Fund I, L.P., on the other, and acknowledged and consented to by the Debtor. The Participation Agreement governs, among other things, the relationship between the DIP Lender and the Participants.

constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>") subject to the priorities set forth in the Interim Order;

(v)    Authorizing the Debtor to use the proceeds of the DIP Financing in accordance with the DIP Financing Documents;

(vi)    Authorizing the continued use of Cash Collateral effective as of the Petition Date;

(vii)    Granting adequate protection to the Prepetition Lender (as defined below);

(viii)    Vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Financing Documents (including the Interim Order);

(ix)    Scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of the Final Order granting the relief requested in this Motion on a final basis and approving the form of notice with respect to the Final Hearing;

(x)    Waiving, to the extent applicable, any stay of the immediate effectiveness of the Interim Order imposed by the Bankruptcy Code, the Bankruptcy Rules or the Local Rules, such that the Interim Order shall be immediately effective upon its entry on the docket of the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>"); and

(xi)    Granting related relief.

In support of this Motion, the Debtor incorporates the statements contained in the *Declaration of Curtis G. Solsvig III in Support of the Debtor's Chapter 11 Petition and Requests for First Day Relief* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith and further respectfully state as follows:

01:25031838.8

## PRELIMINARY STATEMENT[3]

1.      The Debtor filed this Chapter 11 Case to provide an innovative business with a fresh start under new management, and to preserve approximately 100 jobs through a Court-supervised sale process that is intended to maximize the value of the Debtor's assets for the benefit of all stakeholders.  Through this Chapter 11 Case, and under the close supervision and direction of the new board of directors and acting management, the Debtor intends to undertake a sale process to sell a streamlined, refocused, and healthy business to a bidder that will result in the maximum return possible to the Debtor's stakeholders.

2.      The DIP Facility is structured into two tranches.  In the first tranche, SVB will provide $1 million of new money on a super-senior secured basis, with a roll-up of 100% of the Prepetition Facility (upon entry of the Final Order) in the amount of approximately $5.83 million, and the Participants will provide $4 million on a senior secured basis (which will be junior to 50% of the Prepetition Facility and *pari passu* with the remaining 50% of the Prepetition Facility).[4]  In the event that the Debtor receives a letter of intent for the sale of its assets in form and substance acceptable to the DIP Financing Parties, and which otherwise meets the conditions specified in the DIP Financing Documents, including, for the avoidance of doubt, the Participations, within 45 days of the Petition Date, the DIP Financing Parties may agree to fund a second tranche, which will consist of up to $500,000 in new money borrowings from SVB on a super-senior secured basis, and up to $2.5 million from the Participants on a senior secured basis, the latter of which will also be junior to 50% of the Prepetition Facility and *pari passu* with the remaining 50% of the Prepetition Facility.  The Debtor believes that the DIP Facility

---

[3] Capitalized terms not defined in the Preliminary Statement shall have the meanings given below.

[4] The relative priorities of the Participants' $4 million in new money and the Prepetition Facility will apply regardless of whether the Court grants the roll-up as to the Prepetition Facility.

will provide the necessary flexibility to allow the Debtor to run a successful sale process, preserve approximately 100 jobs, and to engage in meaningful discussions with its stakeholders.

3.      Prior to filing this Chapter 11 Case, the Debtor and its advisors, collectively, engaged with approximately 32 potential lenders, and after good faith and arm's length negotiations with the DIP Financing Parties, successfully negotiated the terms and conditions of the DIP Facility to allow the Debtor to continue normal business operations while in chapter 11, including by paying its employees and satisfying other working capital and operational requirements.  Satisfaction of these key obligations is necessary to preserve and maintain the value of the Debtor's estate while the Debtor pursues a sale of substantially all of its assets.  Accordingly, the Debtor has an immediate need to obtain postpetition or "DIP" financing and to use its limited remaining Cash Collateral and, therefore, submits that this Motion should be approved.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2.

01:25031838.8

## BACKGROUND

### I.    General

5.    On the date hereof (the "<u>Petition Date</u>"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is continuing to manage its financial affairs as debtor in possession.    No trustee, examiner, or official committee of unsecured creditors has been appointed in this chapter 11 case (this "<u>Chapter 11 Case</u>").

6.    Additional information regarding the Debtor's history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of this Chapter 11 Case can be found in the First Day Declaration.

### II.    Prepetition Secured Indebtedness

7.    The Debtor, as borrower, and SVB (in such prepetition capacity, the "<u>Prepetition Lender</u>"), as lender, are parties to a Loan and Security Agreement, dated as of February 24, 2017 (as amended, modified, supplemented, or restated from time to time, the "<u>Prepetition Facility</u>").  In total, $10.5 million was advanced between February 2017 and August, 2018, and the loans began to amortize in July 2018.  As of the Petition Date, approximately, $5.83 million remains outstanding under the Prepetition Facility.  The Prepetition Facility's obligations are secured by first priority liens on substantially all of the Debtor's assets, including, but not limited to, all goods, accounts, equipment, inventory, proceeds of intellectual property, contract rights, leases, general intangibles, commercial tort claims, cash, deposit accounts and letters of credit, all as set forth in the Prepetition Facility.

8.    The Debtor does not have any additional secured indebtedness.

01:25031838.8

## III.    Unsecured Obligations

9.    As of the Petition Date, the Debtor estimates that (other than the Contingent Liabilities, as defined and discussed below) its unsecured trade and other operational debt is approximately $3.5 million, mainly comprised of legal fees and claims held by vendors that were used for the Debtor's clinical operations.

10.    In addition, there are a number of contingent liabilities (collectively, the "Contingent Liabilities"), including:

- Inadvertent billings to Tricare, Medicare and Medicaid for certain tests, which may total approximately $4 million;

- Potential obligations arising to private pay insurers for which the Debtor has received over $10 million of refund requests related to the Debtor's prior clinical practice; and

- Potential fines for civil and criminal penalties resulting from the investigations (discussed below).  The amounts of these fines are currently unknown.

## IV.    The Debtor's Liquidity Needs and Efforts to Obtain DIP Financing

11.    The Debtor is in need of an immediate capital infusion, as it currently only has approximately $230,000 cash on hand as of the Petition Date.  As described in more detail in the First Day Declaration, certain business practices formulated and implemented by the Debtor's original founders resulted in certain aspects of the Debtor's business being discontinued, investigations by certain federal and state investigatory bodies, loss of revenue, and significant potential contingent liabilities.  In the last few months, however, the Debtor has: (1) taken aggressive corrective action at the board and management levels; (2) implemented various corporate governance controls; (3) relaunched certain of its business operations; and (4) committed to its cooperation with the applicable governmental investigations in order to shed

as much of the disruption created by these former business practices and to initiate an orderly path to maximizing the Debtor's go-forward value.

12.     The new board and management team have been working diligently to explore financial and operational alternatives.  This has included, among other things, hiring professionals, including Goldin Associates, LLC ("Goldin") to provide management services,[5] Young Conaway Stargatt and Taylor, LLP as counsel and GLC Advisors & Co., LLC and GLCA Securities, LLC (collectively, "GLC") as the Debtor's investment banker.  In the two months leading up to the Petition Date, GLC has been diligently marketing the Debtor's assets to potential interested parties in an effort to secure an investor to finance the Debtor's restructuring or sale efforts, either as an investor outside of chapter 11 or to provide a debtor-in-possession financing facility.  With the cooperation of the Debtor's management team, GLC prepared and distributed comprehensive financing and marketing materials, identified potential financing parties, and participated in management meetings with such parties.

13.     The Debtor worked with its advisors to assess potential DIP financing sources.  In connection with these efforts, beginning in July 2019, the Debtor, in consultation with its advisors, contacted approximately 32 potential third-party DIP financing sources with financing experience that were not prepetition lenders or investors to the Debtor (the "Potential Third-Party DIP Lenders").  Of the Potential Third Party DIP Lenders, the Debtor executed non-disclosure agreements with 5 financial institutions.  Each of these 5 potential lenders was provided with diligence information and access to a data room to facilitate more detailed diligence.  Despite indications of interest from various third parties, the Debtor was unable to

---

[5]  As described further in the First Day Declaration, among other management services, Goldin is providing the Debtor with (i) Curtis G. Solsvig III, to serve as Acting Chief Executive Officer, (ii) Robin Chiu, to serve as Acting Chief Financial Officer, and (iii) Karthik Bhavaraju, to serve as Acting Chief Operations Officer.

find any lender that was willing to provide financing on a junior basis to the existing secured facility or to refinance in full the existing secured debt, other than the DIP Financing Parties.

14.    At this time, the Debtor lacks sufficient funds to operate its business and continue paying its debts as they come due and, in consultation with its professionals, the Debtor evaluated the cash requirements for its business and this Chapter 11 Case.  As a result of these efforts, the Debtor has determined, upon the approval of its special committee of independent board members (the "Special Committee"), that it is necessary and essential that it enter into the DIP Facility with the DIP Lender, subject to the Participation rights of the Participants.

15.    Goldin worked with the Debtor's management and other professionals to develop and analyze the Debtor's 13-week cash flow forecasts, which take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including the effect of the chapter 11 filing on the operations of the business, fees, and interest expenses associated with the DIP Facility, professional fees, and required operational payments.  Absent approval of the DIP Facility, the Debtor will not have the liquidity to continue to operate and satisfy the administrative costs of this Chapter 11 Case and, accordingly, access thereto is necessary to avoid immediate and irreparable harm to the Debtor's estate.

16.    As set forth in the First Day Declaration, in connection with the DIP Facility, the Debtor, in consultation with its restructuring advisors, prepared a budget, a summary of which is attached to the Interim Order as Exhibit B (the "Budget"), which reflects the Debtor's reasonable business judgment as to the additional liquidity required over the specified period to keep the Debtor's business operational during this Chapter 11 Case, and to allow for sufficient time to complete the proposed sale process.

17.     The DIP Facility reflects an agreement reached among the Debtor, SVB and the Participants that will provide the Debtor with up to $13.83 million in postpetition financing if certain conditions are met.  Specifically, as previewed above, (1) SVB will provide $1 million in new money financing on a super senior secured basis, with a roll-up of 100% of the outstanding amounts of the Prepetition Facility (subject to entry of a final order) in the amount of approximately $5.83 million; and (2) the Participants will provide $4 million in new money financing on a senior priority basis (which will be junior to 50% of the Prepetition Facility and *pari passu* with the remaining 50% of the Prepetition Facility).  In addition, if the Debtor receives a letter of intent for the sale of its assets within 45 days of the Petition Date in form and substance acceptable to the DIP Financing Parties, and which otherwise meets the conditions specified in the DIP Financing Documents, including, for the avoidance of doubt, the Participations, SVB may provide up to $500,000 of new money borrowings on super senior secured priority basis, and the Participants may provide up to $2.5 million on a senior secured basis, the latter of which will be junior to 50% of the Prepetition Facility and *pari passu* with the remaining 50% of the Prepetition Facility.

18.     In sum, the Debtor, in consultation with its advisor and upon the recommendation of the Special Committee, has concluded that the DIP Facility, subject to the Participants' Participation rights, is the best financing available under the circumstances and therefore is in the best interests of the Debtor, its creditors, and other parties in interest.

## **RELIEF REQUESTED**

19.     For the reasons set forth herein, the Debtor seeks authority to enter into the DIP Financing Documents pursuant to the terms set forth in this Motion, the DIP Credit Agreement, the Interim Order and the Final Order.

01:25031838.8

## MATERIAL TERMS OF THE DIP FACILITY

20.    Bankruptcy Rule 4001(c)(1)(B) requires that a motion for authority to obtain credit list or summarize, and set out the location within the relevant documents, all material provisions of the proposed credit agreement and form of order, including interest rate, maturity, events of default, liens, borrowing limits and borrowing conditions.  Fed. R. Bankr. P. 4001(c)(1)(B).  The principal terms of the DIP Facility are as follows:[6]

| Required Disclosures | Summary of Material Terms |
|---|---|
| **Borrowers** <br> *Bankruptcy Rule 4001(c)(1)(B)* | The Borrower under the DIP Facility is uBiome, Inc. |
| **Guarantors** <br> *Bankruptcy Rule 4001(c)(1)(B)* | N/A. |
| **Administrative and Collateral Agents** <br> *Bankruptcy Rule 4001(c)(1)(B)* | N/A |
| **DIP Lender** <br> *Bankruptcy Rule 4001(c)(1)(B)* | Silicon Valley Bank, as DIP Lender, and 8VC Fund I, L.P.  and 8VC Entrepreneurs Fund I, L.P. as Participants. |
| **Commitment** <br> *Bankruptcy Rule 4001(c)(1)(B)* <br> *Local Rule 4001-2(a)(ii)* | The DIP Financing Parties will provide a senior secured, superpriority debtor in possession term loan and security agreement in the aggregate principal amount of up to $13.83 million, comprised of: (i) up to $7.33 million from the DIP Lender (including rolled up amounts), and (ii) up to $6.5 million from the Participants. |
| **Liens and Priorities** <br> *Bankruptcy Rule 4001(c)(1)(B)(i)* <br> *Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii)* | In order to secure the DIP Obligations, effectively immediately upon entry of the Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, the DIP Lender will be granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "<u>DIP Liens</u>") all prepetition and postpetition tangible and intangible property and assets, whether real or personal of the Debtor, including, without limitation, all assets and property pledged under the DIP Financing Documents, and all cash, any |

---

[6]  This summary is qualified, in its entirety, by the provisions of the DIP Credit Agreement and the Interim Order. Unless otherwise defined within this Motion, capitalized terms used within this summary only shall have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable.

investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, and all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, Shares (as defined in the DIP Credit Agreement), commercial tort claims and claims that may constitute commercial tort claims (known and unknown), books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products, and substitutions, if any, of any of the foregoing (the "<u>DIP Collateral</u>"); provided that DIP Collateral shall not include any Bankruptcy Recoveries (as defined herein), but, subject to entry of the Final Order, the DIP Collateral shall include the proceeds of any Bankruptcy Recoveries.    Notwithstanding the foregoing, DIP Collateral shall not include any contracts, license or non-residential real property lease under which the granting of the DIP Liens thereon would constitute a breach or termination thereof other than to the extent such breach or termination would be rendered ineffective pursuant to applicable law (including applicable state law or the Bankruptcy Code) but shall, in any event, include the proceeds of such contracts and licenses.    DIP Collateral shall include the economic value of the proceeds of any sale or other disposition of, and any other proceeds or products of DIP Collateral.  Interim Order ¶ 2(d).

The DIP Obligations will have superpriority administrative expense status.    Pursuant to section 364(c)(2) of the Bankruptcy Code, and subject to paragraph 2(i)(A) of the Interim Order, the DIP Liens shall be first priority perfected security interests, liens and mortgages on, all DIP Collateral (subject only to the Carve Out) not subject to valid, perfected, enforceable, and non-avoidable security interests, liens or mortgages in existence on the Petition Date (it being agreed and understood that the Final Order shall grant, to secure the DIP Obligations, a perfected security interest pursuant to this clause in any recoveries of Debtor, by settlement or otherwise, in respect of claims and causes of action to which Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of a debtor or the estate of a debtor under chapter 5 of the Bankruptcy Code ("<u>Bankruptcy Recoveries</u>"). Pursuant to section 364(c)(3) of the Bankruptcy Code, subject to paragraph 2(i)(A) of the Interim Order, the DIP Liens shall be junior security interests, liens and mortgages on all DIP Collateral (including all Prepetition Collateral subject to the Prepetition Liens on the Petition Date) that was subject to a Prior Permitted Lien in existence on the

| | |
|---|---|
| | Petition Date.  Other than as set forth in the Interim Order or in the DIP Financing Documents (including in paragraph 2(i)(A) of the Interim Order), the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in this Chapter 11 Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in this Chapter 11 Case or any Successor Case, upon the conversion of this Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or any Successor Case.  The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens. Interim Order ¶ 2(e). |
| **Term**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | The earliest of (i) the Original Maturity Date, unless extended in accordance with Sections 2.1.2 and 3.2 of the DIP Credit Agreement, in which case the Maturity Date shall be the Extended Maturity Date, if Borrower's option to extend the Original Maturity Date is properly exercised pursuant to Section 2.1.2 of the DIP Credit Agreement, (ii) the effective date of a plan of reorganization for Debtor, (iii) the date of the consummation of a Permitted Sale, and (iv) such earlier date on which the Obligations are accelerated following the occurrence of an Event of Default. DIP Credit Agreement § 13.1. |
| **Use of DIP Facility**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The proceeds of the DIP Advances shall be used solely (i) to pay interest, fees and expenses associated with the DIP Credit Agreement, (ii) for Debtor's working capital and general corporate purposes in accordance with the Budget (subject to the Variance), (iii) to pay costs and expenses associated with the Bankruptcy Case to the extent consistent with the Budget (subject to the Variance, and including professional costs incurred (including, costs incurred in respect of Case Professionals) and paid in accordance with the Budget), and (iv) with respect to the Final Roll-Up Amount, the payment of all remaining obligations outstanding at the time of the entry of the Final Order under the Prepetition SVB Facility.  In no event shall the proceeds of any DIP Advance be used to bring any claim or suit against Bank or Participants or to challenge the liens or claims of Bank or Participants; provided, however, notwithstanding anything to the contrary herein, an aggregate of $25,000 of the DIP Advances or any Carve-Out may be used by the Committee to investigate (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of Borrower owing to Bank or any Participant; and (ii) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of Bank or |

| | |
|---|---|
| | any Participant with respect thereto. Interim Order ¶2(g), 9; DIP Credit Agreement § 2.1.1(f). |
| **Entities with Interests in Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(i)* | The DIP Lender.  Interim Order, Preamble (iv). |
| **Use of Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(ii) and (iii) Local Rule 4001-2(a)(ii)* | Subject to the terms and conditions of the Interim Order, the DIP Facility, and the DIP Financing Documents and in accordance with the Budget (subject to such variances as permitted in the DIP Credit Agreement), the Debtor is authorized to use Cash Collateral until the Termination Date (as defined in the DIP Credit Agreement).  Interim Order ¶ 2(a). |
| **Interim Financing** *Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii)* | The Debtor is requesting that amounts under the DIP Facility be authorized and available upon entry of the Interim Order.  Interim Order ¶¶ 1, 3. |
| **Interest Rates** *Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii)* | 10.5% DIP Credit Agreement § 2.2(a). Immediately upon the occurrence and during the continuance of an Event of Default, all outstanding Obligations shall bear interest at a rate per annum which is two (2) percentage points (5.0%) above the rate per annum that is otherwise applicable thereto on and after to the Maturity Date (the "Default Rate").  Fees and expenses which are required to be paid by Borrower pursuant to the Loan Documents (including, without limitation, Bank Expenses) but are not paid when due shall bear interest until paid at a rate per annum equal to the highest rate applicable to the Obligations.  Payment or acceptance of the increased interest rate provided in this Section 2.2(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Bank. DIP Credit Agreement § 2.2(b). |
| **Fees** *Bankruptcy Rule 4001(c)(1)(B)* | Commitment Fee.  Bank shall be entitled to receive a non-refundable commitment fee of One Hundred Fifty Thousand Dollars ($150,000.00), which shall be deemed fully earned as of entry of the Interim Order and shall be due upon the consummation of a sale of all or substantially all of Borrower's assets. Expenses.  All Bank Expenses (including reasonable attorneys' fees and expenses, plus expenses for documentation and negotiation of this Agreement and the other Loan Documents) incurred through and after |

| | |
|---|---|
| | the Closing Date by any of the DIP Financing Parties, when due (or, if no stated due date, upon demand by Bank or the Participants, as applicable). |
| | <u>Fees Fully Earned</u>.  Unless otherwise provided in this Agreement or in a separate writing by Bank, Borrower shall not be entitled to any credit, rebate, or repayment of any fees earned by Bank pursuant to this Agreement notwithstanding any termination of this Agreement or the suspension or termination of Bank's obligation to make loans and advances hereunder. |
| | DIP Credit Agreement § 2.3. |
| **Budget**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | The use of borrowings under the DIP Facility and use of Cash Collateral will be limited in accordance with the Budget, subject to certain variances allowed by the DIP Credit Agreement.  Interim Order ¶ 8; DIP Credit Agreement § 7.6. |
| **Milestones**<br>*Bankruptcy Rule 4001(c)(1)(B)(vi)* | As a condition to the DIP Facility and the use of Cash Collateral, the Debtor must comply with certain milestones attached as a schedule to the Interim Order.  DIP Credit Agreement § 6.7. |
| **Carve-Out** | Liens and claims granted by the Interim Order are all subordinate to the following (collectively, the "<u>Carve Out</u>")<br><br>Except as otherwise provided in the Interim Order, the DIP Liens are subordinate only to the payment of the following Carve Out: (i) any unpaid fees required to be paid pursuant to Section 1930 of title 28 of the United States Code section 1930(a)(6) (the "<u>U.S. Trustee Fees</u>"), together with any interest thereon pursuant to applicable law and any fees payable to the Clerk of the Court; (ii) the fees actually earned by the Debtor's directors on account of the period prior to the delivery of a Carve Out Notice; (iii) until the issuance of a Carve-Out Notice (as defined in the Financing Order) to the extent provided for in the Budget and allowed at any time, all unpaid fees and expenses allowed by the Court of professionals or professional firms retained pursuant to section 327 or 1103, or appointed pursuant to section 363, of the Bankruptcy Code (the "<u>Case Professionals</u>") less the amount of any prepetition retainers received by such Case Professionals and not previously returned or applied to fees and expenses; and (iv) following the delivery of a Carve-Out Notice, to the extent provided for in the Budget allowed at any time, the payment of the fees and expenses of Professional Persons in an aggregate amount not to exceed $150,000 less the amount of any prepetition retainers received by such Cash Professionals and not previously returned or applied to fees and expenses (the "<u>Residual</u> |

Carve Out"). The Carve-Out excludes any fees and expenses incurred in connection with (a) any action or inaction that is in violation of, or a default under, any of the DIP Financing Documents or the Final Order, or (b) the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (x) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, including, for the avoidance of doubt, pursuant to the Participations, and/or the Prepetition Loan Obligations, (ii) the DIP Liens and/or the Prepetition Liens granted by the Debtor under the DIP Financing Documents and the Prepetition Loan Documents, or (iii) any of the DIP Financing Parties' rights under the DIP Financing Documents, including, for the avoidance of doubt, the Participations, and/or the Prepetition Lender's rights under the Prepetition Loan Documents, or (y) preventing, hindering, or delaying, whether directly or indirectly, the DIP Lender's and/or the Prepetition Lender's assertion or enforcement of the DIP Liens or Prepetition Liens or realization upon any DIP Collateral or Prepetition Collateral.

The Residual Carve Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Notice in respect of fees and expenses incurred after delivery of the Carve Out Notice. For purposes of the foregoing, "Carve Out Notice" shall mean a written notice delivered by the DIP Lender to the Debtor and its counsel, the U.S. Trustee and lead counsel to any Committee, which notice may be delivered at any time by the DIP Lender following the occurrence and continuance of any Termination Event and, in any case, shall specify that it is a "Carve Out Notice." Following delivery of a Carve Out Notice, upon the funding of the Carve Out as of the date of the Carve Out Notice, the DIP Financing Parties shall not have any further liability whatsoever for the Carve Out or any subordination in respect thereof.

Interim Order ¶ 17-18.

| | |
|---|---|
| **Waiver of Rights** *Bankruptcy Rule 4001(c)(1)(B)(viii) and (x) Local Rule 4001-2(a)(i)(B) and (C)* | Subject to entry of a Final Order, the DIP Lender and the Prepetition Lender shall each be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code and a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code. Interim Order ¶¶ 24, 27. |
| **Stipulations to Prepetition Liens and Claims** *Bankruptcy Rule 4001(c)(1)(B)(iii)* | As set forth in the Interim Order, the Debtor has acknowledged and agreed as set forth therein, to the validity, perfection, priority, amount and enforceability of the Prepetition Facility. Interim Order ¶ E. |

| Local Rule 4001-2(a)(i)(B) | |
|---|---|
| **Adequate Protection**<br>*Bankruptcy Rule 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii)* | In addition to all the existing security interests and liens previously granted to the Prepetition Lender, as adequate protection for, and to secure the payment of an amount equal to the diminution of the value of the Prepetition Collateral, due to the Debtor's sale, use, or lease of such Prepetition Collateral, and as an inducement for the Prepetition Lender to permit the Debtor's use of the Cash Collateral as provided for in the Interim Order, the Prepetition Lender is hereby granted the following adequate protection (the "Adequate Protection Obligations"), pursuant to sections 361, 363(e), 364(d)(l), and 507 of the Bankruptcy Code:<br><br>(a) Continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral (the "Adequate Protection Liens").  The Adequate Protection Liens shall be subject to the payment of the Carve Out as set forth in the Interim Order and shall otherwise be junior to the DIP Liens.  Subject to and effective upon entry of the Final Order, the Adequate Protection Liens shall be senior to all security interests in, liens on, or claims against any of the DIP Collateral other than the DIP Liens.  Except as provided in the Interim Order or in the DIP Credit Agreement, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Chapter 11 Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any Successor Case, or upon the dismissal of any of the Chapter 11 Case or any Successor Case.  The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.<br><br>(b) An allowed superpriority administrative expense claim in the Chapter 11 Case and any Successor Case (the "Prepetition Superpriority Claim").  The Prepetition Superpriority Claim shall be subject to the Carve Out as set forth in the Interim Order and shall otherwise be junior only to the DIP Superpriority Claims.  The Prepetition Superpriority Claim shall have priority over all other administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.<br><br>(c) Until the roll-up contemplated herein has occurred, the Debtor seeks |

|  | authority and direction to pay interest on $5,230,000 of the Prepetition Loan Obligations at a rate per annum equal to six percent (6%), which interest shall be payable monthly in cash and otherwise in accordance with the terms of the Prepetition Loan Documents. |
|  | (d) Payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) (the "<u>Prepetition Adequate Protection Payments</u>") of reasonable and documented legal fees and out-of-pocket expenses incurred in connection with the DIP Financing, whether arising before or after the Petition Date. The Prepetition Lender (and each of its professionals) shall not be required to comply with U.S. Trustee fee guidelines or file applications or motions with, or to obtain approval of, the Court for the payment of any of their out-of-pocket costs, fees, expenses, disbursements, and other charges. |
|  | Interim Order ¶ 7. |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | The occurrence of any of the following events, unless waived by the DIP Financing Parties in accordance with the terms of the DIP Financing Documents, constitutes an event of default: (a) the failure of the Debtor to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order, including the failure to comply with the Case Milestones, or (b) the occurrence of an "Event of Default" under section 8 of the DIP Credit Agreement. Interim Order ¶ 13; DIP Credit Agreement § 8. |
| **Waiver / Modification of Automatic Stay**<br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the Debtor to grant the liens and security interests to the DIP Lender and the Prepetition Lender contemplated by the Interim Order and the DIP Financing Documents.<br><br>Interim Order ¶ 12; DIP Credit Agreement § 8.10. |
| **Waiver / Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>*Bankruptcy Rule 4001(c)(1)(B)(vii)* | The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted in the Interim Order. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, mortgages, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, notices and other documents shall be deemed to have been |

|  | filed or recorded at the time and on the date of the commencement of the Chapter 11 Case.  The Debtor shall execute and deliver to the DIP Lender all such financing statements, mortgages, notices and other documents as the DIP Lender may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens granted pursuant to the Interim Order. The DIP Lender, in its sole discretion, may file a photocopy of the Interim Order as a financing statement with any recording officer designated to file or record financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the recording officer shall be authorized to file or record such copy of the Interim Order.  Interim Order ¶ 6. |
|---|---|
| **Roll-Up**<br>*Bankruptcy Rule 4001(c)(1)(B)(ii)*<br>*Local Rule 4001-2(a)(i)(E)* | Upon entry of the Final Order, without any further action by the Debtor or any other party, 100% of the outstanding Prepetition Loan Obligations owing to the Prepetition Lender shall constitute DIP Obligations under and as further described in the DIP Financing Documents (the "<u>DIP Roll-Up Loans</u>").  Interim Order ¶¶ F(iii), 4 |
| **Indemnification**<br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtor shall indemnify and hold harmless the DIP Financing Parties and their successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, in accordance with the DIP Financing Documents, which indemnification is hereby authorized and approved. Interim Order ¶ 29. |
| **Conditions to Borrowing**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(ii)* | The closing of the DIP Facility and extensions of credit thereunder are subject to satisfaction of usual and customary conditions precedent, including entry of the Interim Order.  DIP Credit Agreement § 3. |
| **Liens on Avoidance Actions**<br>*Bankruptcy Rule 4001(c)(1)(B)(xi)*<br>*Local Rule 4001-2(a)(i)(D)* | Subject to entry of the Final Order, the DIP Facility will be secured by first priority liens in the proceeds of any avoidance actions of the Debtor brought under Chapter 5 of the Bankruptcy Code or applicable state law equivalents.  DIP Credit Agreement § 4.2. |

## REQUIREMENTS UNDER LOCAL RULE 4001-2

21.     Local Rule 4001-2 requires that certain provisions contained in the DIP Credit Agreement be highlighted and that the Debtor provides justification for the inclusion of such highlighted provisions.   The Debtor hereby identifies and discusses the following provisions of the DIP Credit Agreement and the Interim Order.

22.     <u>Waiver of Section 506(c) of the Bankruptcy Code</u>:     Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  The Interim Order provides that the waiver of any rights under section 506(c) of the Bankruptcy Code is subject to entry of the Final Order.  Because this waiver only will be effective upon entry of the Final Order and to the extent such order so provides, the Debtor respectfully submits that parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice," but the Debtor discloses the provision out of an abundance of caution.

23.     <u>Carve-Out</u>:  Local Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by the Debtor and the professionals retained by the unsecured creditors' committee, if any, with respect to a professional fee carve out.  *See* Del. Bankr. L.R. 4001-2(a)(i)(F).  Budgeted professional fees comprise the primary component of the Carve-Out.  The Budget provides different amounts for Committee professionals and Debtor professionals.  The Debtor submits the proposed amounts are common in cases of similar size before the Court, accurately accounts for the increased administrative tasks required of Debtor professionals, and are reasonable and appropriate under the circumstances.

24.     <u>Waiver of Section 552(b)(1)</u>:  Pursuant to Local Rule 4001-2(a)(i)(H), a movant must identify any provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).  The Interim Order provides in light of the agreement to

subordinate its liens and superpriority claims to the Carve Out in the case of the DIP Lender and the Prepetition Lender's, the DIP Lender and the Prepetition Lenders are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply with respect to proceeds, product, offspring or profits of any of the DIP Collateral. *See* Interim Order at ¶ 27.  The Debtor believes that such relief is often provided, and appropriate, upon entry of the Final Order.

25.    Nonconsensual Priming: Pursuant to Local Rule 4001-2(a)(i)(G), a movant must identify any provisions that seek to prime any secured lien without the consent of that lienor.  The Debtor does not anticipate that the Interim Order or the Final Order provide for any nonconsensual priming.

26.    Roll-Up Provisions: Pursuant to Local Rule 4001-2(a)(i)(E)), a movant must identify any roll-up provisions.  Upon entry of the Final Order and closing of the DIP Facility, the total outstanding amount of the Prepetition Facility shall be replaced and refinanced by the DIP Obligations.

27.    The DIP Lender would not have agreed to provide the DIP Facility and consented to the use of Cash Collateral without the inclusion of the aforementioned provisions, each of which was heavily negotiated among the various parties.  Moreover, as discussed below, these provisions are justified under the circumstances.  Finally, the Debtor determined in its sound business judgment, upon approval by the Special Committee, that agreeing to such provisions was appropriate under the circumstances of this Chapter 11 Case to afford the Debtor immediate and much needed liquidity to fund, on the most competitive terms available, its ongoing operations and the sale process in this Chapter 11 Case.

01:25031838.8

## REQUEST FOR APPROVAL OF THE DIP FACILITY AND RELATED ACTIONS

**I.      Sections 364(c) and (d) of the Bankruptcy Code**

28.      As described above, it is essential to the success of this Chapter 11 Case that the Debtor immediately obtains access to sufficient postpetition financing and use of cash collateral.  The preservation of estate assets and the Debtor's ability to maximize value for stakeholders depends heavily upon the expeditious approval of the relief requested herein.

29.      Section 364 of the Bankruptcy Code "provides bankruptcy courts with the power to authorize postpetition financing for a Chapter 11 debtor-in-possession." *In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991).  "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend postpetition credit.'" *Id*.  Section 364(c) allows a debtor to grant postpetition credit, among other things, administrative claim status and a senior lien on unencumbered property of the estate.  Section 364(d) allows a debtor to secure postpetition credit with senior liens on encumbered property of the estate.  As discussed below, the Debtor satisfies the requirements for relief under both section 364(c) and (d) of the Bankruptcy Code in relation to the DIP Facility.  Furthermore, the Debtor's decision to enter into the proposed DIP Facility is an exercise of its sound judgment.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition financing because it "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").  For these reasons, the Debtor submits that the Court should grant the Debtor's request to enter into the DIP Facility, subject to the Participants' rights in connection therewith, pursuant to section 364(c) and (d) of the Bankruptcy Code.

## II.     Approval Under Section 364(c) of the Bankruptcy Code

30.     Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition financing on a superpriority or senior secured (non-priming) basis, or both, where the Court finds, after notice and a hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1)" of the Bankruptcy Code.  11 U.S.C. § 364(c).

31.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

> (i)     the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;
>
> (ii)    the credit transaction is necessary to preserve the assets of the estate; and
>
> (iii)   the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See, e.g.*, *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above factors and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere").

### A.     *The Debtor Was Unable to Obtain Necessary Postpetition Financing from Third-Party Sources*

32.     A debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray* v. *Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986) ("The

statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *accord In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also Pearl-Phil GMT (Far East) Ltd.* v. *Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). This is true especially when time is of the essence. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). When few lenders are likely able and willing to extend the necessary credit, let alone on advantageous terms, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB* v. *Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

33.    As described above, the Debtor engaged in a robust process to secure debtor-in-possession financing. The Debtor, with the assistance of its advisors, contacted 32

01:25031838.8

parties and explored various alternative sources of capital and financing, including the DIP

Facility.  The Debtor's efforts to seek the necessary postpetition financing within the Debtor's'

existing investors and the Prepetition Lender, as well as from other third-party sophisticated

lenders, was reasonable and sufficient and satisfy the statutory requirements of section 364(c) of

the Bankruptcy Code.  *See*, *e.g.*, *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr.

S.D.N.Y. 1992) (a debtor seeking financing under section 364(c) of the Bankruptcy Code made

an acceptable attempt to obtain less onerous financing by speaking to several lenders that denied

the loan request); *In re Ames Dep't Stores*, 115 B.R. at 40 (same).  The DIP Facility avoids the

uncertainty and costs associated with a potential priming fight.

      B.      *The DIP Facility is Necessary to Administer, Maximize and*
                   *Preserve the Assets of the Debtor's Estate*

      34.      It is essential that the Debtor obtain the proposed financing to continue the

orderly operation of its business to preserve its going-concern value pending completion of the

chapter 11 process.  Absent the financing provided by the DIP Facility, the Debtor will not have

the ability to pursue a going concern sale process, thus limiting the Debtor's ability to maximize

the value of its business.  Accordingly, the circumstances of this Chapter 11 Case necessitate

postpetition financing under section 364(c) of the Bankruptcy Code.  *See Burtch* v. *Ganz* (*In re*

*Mushroom Transp. Co., Inc.*), 382 F.3d 325, 339 (3d Cir. 2004) (observing that a debtor in

possession has a fiduciary duty to "protect and maximize" the value of its estate).

      C.      *The Terms of the DIP Facility are*
                   *Fair, Reasonable and Appropriate Under the Circumstances*

      35.      The terms and conditions of the DIP Facility must be judged by a

bankruptcy court taking into account the debtor's financial circumstances and alternatives.

*In re W. Pac. Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997) (although terms of

financing facility fees were "onerous, costly, and tough," facility was approved because it fairly

01:25031838.8

reflected the debtor's "situation and the market in which the debtor is forced to participate as a result of its financial circumstances and the deadlines it faces"); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.")..

36.    Judged from that perspective, the terms of the DIP Facility, subject to the Participations, are fair and reasonable under the circumstances**.**  The DIP Facility, together with the commitment to fund from the Participants, provides sufficient liquidity to the Debtor in its overall chapter 11 efforts because it provides the Debtor the time, a breathing spell, and the resources necessary to conduct an orderly sale of the Debtor's business, all with the overarching goal of maximizing the value of the Debtor's estate for the benefit of the Debtor's creditors and other stakeholders.  Additionally, as set forth in the First Day Declaration, the Budget will cover all anticipated administrative claims.  No other party approached by the Debtor and its advisors was willing to make a postpetition loan that was superior to the terms offered by the DIP Financing Parties.  After having engaged in arm's-length negotiations with the DIP Financing Parties through their respective counsel and other advisors, the Debtor believes that the DIP Facility is the best solution for the Debtor's immediate liquidity needs and its chapter 11 strategy.

37.    In addition, the DIP Facility does not directly or indirectly deprive the Debtor's estate or other parties in interest of possible rights and powers by restricting the services for which chapter 11 professionals may be paid.  *See In re Tenney Vill. Co.*, 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989) (denying approval of a financing facility that, among other things, did not provide a carve-out for professional fees).  Instead, the proposed DIP Facility and the proposed Interim Order provide generally that the security interests and

01:25031838.8

superpriority administrative expense claims granted to the DIP Financing Parties are subject to the Carve-Out, which provides for (a) all unpaid fees of the Clerk of the Court and the Office of the United States Trustee, (b) the fees payable to the directors of the Debtor, and (c) fees and expenses for any professional retained or appointed pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code of the Debtor and any statutory committee of unsecured creditors, subject to the cap in the Carve Out.  In *Ames Department Stores*, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to ensure that official committees and debtors' estates are adequately assisted by counsel and other professionals.  *In re Ames Dep't Stores*, 115 B.R. at 40.

38.     Likewise, the fees and charges required by the DIP Lender under the DIP Facility are well within the range of reasonableness under the circumstances.

39.     Finally, there is nothing in the DIP Facility to prevent the Debtor from considering alternative sources of financing prior to entry of the Final Order.  Should a superior alternative materialize, the Debtor, subject to repayment of all Obligations owing under the DIP Facility, may take it.

40.     For these reasons, in the Debtor's business judgment, the Debtor submits that the terms of the DIP Facility are fair and reasonable in light of the circumstances of this case.

D.     *The Roll-up Provisions are Appropriate*

41.     The provisions providing for replacement and refinancing (or "roll-up") of the Prepetition Facility (the "Roll-Up Provisions") into the DIP Obligations are necessary components of the DIP Facility.  After extensive, arm's-length negotiations, the Debtor agreed to the Roll-Up Provisions as consideration for, and solely on account of, the agreement of the Prepetition Lender to fund amounts, and provide certain other consideration to the Debtor, under the DIP Facility.  Moreover, the approval of the "roll-up" of all outstanding obligations under the

01:25031838.8

Prepetition Facility into DIP Obligations is a condition of the DIP Facility which provides numerous benefits to the estate, including enabling the Debtor to obtain financing that it urgently needs to administer this Chapter 11 Case and fund operations. Finally, because the Roll-Up Provisions are subject to the reservation of rights in paragraph 23 of the Interim Order, they will not prejudice the right of any party in interest as set forth therein. Accordingly, the Debtor has satisfied the requirements to obtain postpetition financing under the DIP Facility on a superpriority and senior secured basis.

42. "Roll-ups" of prepetition obligations are a common feature in bankruptcies, and courts in this and other jurisdictions have approved them in multiple recent cases. *In re Charming Charlie Holdings Inc.*, No. 17-12906 (Bankr. D. Del. Dec. 13, 2017) (approving in interim order the "roll-up" of all outstanding prepetition revolving obligations); *In re American Apparel, Inc.,* No. 15-12055 (Bankr. D. Del. Oct. 6, 2015) (approving in interim order the repayment in full of all outstanding amounts under the prepetition revolving credit agreement); *In re The Gymboree Corp.*, No. 17-32986 (Bankr. E.D. Va. Jun. 12, 2017) (approving in interim order the "roll-up" of all outstanding prepetition revolving obligations); *In re rue21, Inc.*, No. 17-22045 (Bankr. W.D. Pa. May 18, 2017) (approving in interim order the "roll-up" of all outstanding prepetition revolving obligations); *In re BCBG Max Azria Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. Mar. 2, 2017) (approving in interim order the "roll-up of all outstanding prepetition revolving obligations); *In re Aéropostale, Inc.* No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving in interim order the "roll-up" of all outstanding prepetition revolving obligations).

E. *The DIP Facility is in the Best*
   *Interests of the Debtor's Estate and Creditors*

43.    The Debtor believes that the approval of the DIP Facility is in the best

interests of the Debtor's estate and its creditors.  As stated above, without immediate access to

the cash collateral and the funds available under the DIP Facility, the Debtor would imminently

face a liquidity shortage and it would be forced to initiate Chapter 7 proceedings and liquidate all

of its assets.

## III.    Approval Under Section 364(d) of the Bankruptcy Code

44.    The statutory requirement for obtaining postpetition credit under

section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the

debtor in possession is "unable to obtain such credit otherwise."  *See Shaw Indus., Inc. v. First*

*Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 863, 865 (Bankr. W.D. Pa. 2003)

(where debtor made efforts by "contact[ing] numerous lenders" and was unable to obtain credit

without a priming lien, it had met its burden under section 364(d)); *In re 495 Cent. Park*, 136

B.R. at 630-31 (holding that debtor must make an effort to obtain credit without the requirement

of a priming lien but is not required to seek credit from every possible lender); *In re Dunes*

*Casino Hotel*, 69 B.R. 784, 796 (Bankr. D.N.J. 1986) (holding that the debtor had made required

efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had

attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but

that at least three such lenders were willing to advance funds secured by a superpriority lien).

45.    As fully described above, the Debtor conducted a robust solicitation

process and no other postpetition credit was available on better terms.  Through the DIP Facility,

the DIP Financing Parties will receive, pursuant to section 364(d)(1) of the Bankruptcy Code,

superpriority administrative expense claims in this Chapter 11 Case and any Successor Case, as

01:25031838.8

well as automatically perfected security interests in and liens on all of the DIP Collateral, including all Cash Collateral.

46.    Thus, the requirements of section 364(d)(1)(B) of the Bankruptcy Code have been fulfilled, to the extent applicable, and the proposed DIP Facility should be approved.

## IV.    Application of the Business Judgment Standard

> A.    *Entry into the DIP Credit Agreement*
> *is an Exercise of the Debtor's Sound Business Judgment*

47.    As described above, in the First Day Declaration, after appropriate diligence and analysis, the Debtor has concluded that the DIP Facility is the best and only option available under the circumstances.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (stating that "[c]ourts have generally deferred to a debtor's business judgment in granting section 364 financing"); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *cf. In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (stating "[t]ransactions under § 363 must be based upon the sound business judgment of the debtor or trustee.").  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

48.     The Debtor has exercised sound business judgment in determining that the DIP Facility is appropriate, and has satisfied the legal prerequisites to incur debt under the DIP Facility.  In light of the Debtor's overall circumstances and the fact that the Debtor could not obtain postpetition financing from another lending source, much less on terms superior to the DIP Facility, given the Participation commitments, the Debtor's decision to enter into the DIP Facility is a sound exercise of the Debtor's business judgment.  Accordingly, the Debtor submits that the Court should grant the Debtor authority to enter into the DIP Facility and obtain funds from the DIP Financing Parties on the basis described above, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.

## CASH COLLATERAL, PRIMING, AND ADEQUATE PROTECTION

49.     Section 363(c)(2) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)     each entity that has an interest in such cash collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

50.     The Debtor has satisfied the requirements of sections 363(c)(2) and 363(e), and should be authorized to use the Cash Collateral on the terms set forth in the Interim Order and the DIP Credit Agreement.  As discussed above, the requisite Prepetition Lender consented

to the use of the Cash Collateral as provided in the DIP Financing Documents and the Interim Order.

51.    Moreover, the Debtor has an urgent need to use its remaining Cash Collateral along with the proceeds of the DIP Facility, to honor obligations critical to its ongoing operations, including to employees, vendors, and the sale process.  Therefore, the Debtor submits that it should be authorized to use the Cash Collateral on the terms set forth in the Interim Order.

52.    In addition, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtor may incur "priming" liens under the DIP Facility if either (a) the Prepetition Lender has consented, or (b) the Prepetition Lender's interests in collateral are adequately protected.  Here, the Prepetition Lender has consented to the DIP Facility.

53.    However, in the event and to the extent that the Debtor has obligations to any party that remain outstanding that are subject to valid, perfected and non-avoidable prepetition liens on the Debtor's property, any secured party would be adequately protected.  They will receive protection against any diminution in the value of such interest caused by the

01:25031838.8

imposition of the automatic stay by having continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral.

54.    The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the collateral against diminution in the value of that interest postpetition. *See In re 495 Cent. Park*, 136 B.R. at 631 (stating that the goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11); *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (same).

55.    The means by which adequate protection can be provided are addressed in section 361 of the Bankruptcy Code, which sets forth three non-exclusive forms of adequate protection:

    i.    lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property;

    ii.    provision of additional or replacement liens to the extent the use of property results in a diminution in value of an entity's interest in property; and

    iii.    such other relief as will result in an entity realizing the indubitable equivalent of its interest in property.

11 U.S.C. § 361.  As the foregoing is neither exclusive nor exhaustive, there is a great deal of flexibility in terms of what may constitute adequate protection. *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987).  Ultimately, adequate protection is determined on a case-by-case basis in light of the particular facts and circumstances presented. *Id.* (stating that "the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis.") (citations omitted); *In re 495 Cent. Park*, 136 B.R. at 631 (stating that, "although section 361 presents some specific illustrations of adequate protection, the statute is not exclusive" and "suggests a broad and flexible definition"); *Pagano v. Cooper (In re Cooper)*, 22 B.R. 718, 720 n.3 (Bankr. E.D. Pa. 1982) ("While adequate

protection is not defined in the Bankruptcy Code, the legislative history of § 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equitable principles." (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977)); *see also* 3 COLLIER ON BANKRUPTCY ¶ 363.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (stating that, although section 361 provides examples of adequate protection, "[t]hese examples are not intended to be limiting, and the circumstances of the case will dictate the necessary relief to be given").

56.    In this Chapter 11 Case, the Debtor will provide the Prepetition Lender with Adequate Protection Liens which will be subject to the Carve Out and otherwise be junior only to the DIP Liens.  The Adequate Protection Liens will be senior to all other security interests in, liens on, or claims against any of the DIP Collateral. The Debtor submits that, under the circumstances, the foregoing would suffice as adequate protection and the Prepetition Lender clearly is more than adequately protected under the circumstances with regard to the Debtor's proposed use of cash collateral.

57.    If funds are not made available to pay essential items on an emergency basis, the value of the Debtor's assets will be eroded to the detriment of all parties in interest. On the other hand, use of limited cash collateral in accordance with the Budget, combined with the funds available under the DIP Facility, will allow the Debtor to administer, preserve and even enhance the value of the DIP Collateral.  Accordingly, there is no harm done to the Prepetition Lender's interests by the Debtor's proposed use of cash collateral and the institution of the DIP Lender's priming liens in connection therewith, and the Debtor believes that, combined with the adequate protection being provided under the Interim Order, the Prepetition Lender requires no other or further adequate protection.

01:25031838.8

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

58.     The Debtor seeks a modification of the automatic stay imposed by operation of section 362 of the Bankruptcy Code to the extent contemplated by the provisions of the DIP Credit Agreement as described above.

59.     Such stay modification provisions are customary features of postpetition financing facilities and, in the Debtor's business judgment, are reasonable under the circumstances.     Accordingly, the Debtor respectfully requests that the Court modify the automatic stay to the extent contemplated by the DIP Facility and the proposed Interim Order.

## GOOD FAITH

60.     The terms and conditions of the DIP Facility and the use of cash collateral are fair and reasonable and were negotiated by the parties in good faith and at arms' length and with the approval of the Special Committee.     Therefore, the DIP Financing Parties should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any interim or final order of the Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## REQUEST FOR HEARING AND AUTHORITY TO
## MAKE INTERIM BORROWINGS UNDER THE DIP FACILITY

61.     Pursuant to Bankruptcy Rule 4001(b), the Debtor requests that the Court conduct an interim hearing and authorize the Debtor's use of the DIP Facility and cash collateral in order to (a) maintain and finance the operations of the Debtor, and (b) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest.

62.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Fed. R. Bankr. P. 4001(c).  Upon request,

however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g.*, *In re Simasko*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); *see also In re Ames Dep't Stores*, 115 B.R. at 38.  After the fourteen (14)-day period, the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  *See, e.g.*, *In re Simasko*, 47 B.R. at 449; *In re Ames Dep't Stores*, 115 B.R. at 36.

63.    Pursuant to Bankruptcy Rule 4001(c), the Debtor respectfully requests that the Court conduct a preliminary hearing on the Motion and authorize the Debtor, from the entry of the Interim Order until the Final Hearing, to obtain access to interim borrowing under the terms contained in the DIP Facility, and to utilize cash collateral.

## SCHEDULING FINAL HEARING

64.    The Debtor respectfully requests that the Court schedule the Final Hearing for a date no later than thirty (30) days from the Petition Date, and set a deadline to object to entry of the Final Order as set forth in the proposed Interim Order.

## NOTICE

65.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtor's thirty (30) largest unsecured creditors; (v) the Securities and Exchange Commission; (vi) counsel to the DIP Lender; (vii) counsel to the Participants; (viii) all parties that have filed a financing statement asserting a lien in any of the Debtor's assets; (ix) the Prepetition Lender; (x) the Cash

01:25031838.8

Management Banks; and (xi) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court (a) enter an Interim Order substantially in the form attached hereto as Exhibit A; (b) set a date for a hearing to consider entry of the Final Order, and (c) any other relief that the Court deems just and proper.


Dated: Wilmington, Delaware          YOUNG CONAWAY STARGATT & TAYLOR, LLP
      September 4, 2019

*/s/ Andrew L. Magaziner*
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Andrew L. Magaziner (No. 5426)
Joseph M. Mulvihill (No. 6061)
Jordan E. Sazant (No. 6515)
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Proposed Counsel to the Debtor and Debtor in Possession*

01:25031838.8

**EXHIBIT A**

**Interim Order**

01:25031838.8

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UBIOME, INC.,[1] | Case No. 19-11938 (LSS) |
| Debtor. | |

## INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING

Upon the motion (the "**DIP Motion**") dated September 4, 2019 of uBiome, Inc., as debtor and debtor in possession (the "**Debtor**") in the above-referenced chapter 11 case (the "**Chapter 11 Case**"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(e), 364(d)(1), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the corresponding local rules of this District (the "**Local Rules**"), for entry of an interim order (this "**Interim Order**"):

(i)     Authorizing the Debtor to obtain senior secured, super priority, debtor in possession financing in the aggregate principal amount of up to $13,830,000.00 (the "**DIP Financing**") pursuant to the terms and conditions of the DIP Financing Documents (as defined below), including this Interim Order and the Final Order (as defined below);

(ii)     Authorizing the Debtor to execute, deliver, and enter into the (a) Senior Secured, Super Priority Debtor in Possession Term Loan and Security Agreement (the "**DIP Credit Agreement**"), substantially in the form attached as **Exhibit A** hereto, between the Debtor,

---

[1] The Debtor and the last four digits of its taxpayer identification number is: uBiome, Inc. (0019).  The Debtor's headquarters is located at 360 Langton Street, Suite 301, San Francisco, CA 94103.

as borrower, and Silicon Valley Bank, as lender (the "**DIP Lender**"), funded in part through participations (collectively, the "**Participations**") with participant parties (the "**Participants**",[2] together with the DIP Lender, the "**DIP Financing Parties**"), which Participations the Debtor will acknowledge and agree to (as to terms applicable to the Debtor) and (b) all other agreements, documents, or instruments delivered or executed in connection with the DIP Credit Agreement, as hereafter amended, supplemented or otherwise modified from time to time, including the Budget (as defined herein) (collectively, together with the DIP Credit Agreement, the Participations, this Interim Order, and the Final Order, the "**DIP Financing Documents**");

(iii)    Granting to the DIP Lender an allowed superpriority administrative expense claim in the Chapter 11 Case and any Successor Case (as defined below) on account of the DIP Financing and all obligations of the Debtor owing under, or secured by, the DIP Financing Documents (collectively, and including all "Obligations" of the Debtor as defined and described in the DIP Credit Agreement, the "**DIP Obligations**") subject to the priorities set forth herein;

(iv)    Granting to the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**") subject to the priorities set forth herein;

(v)    Authorizing the Debtor to use the proceeds of the DIP Financing in accordance with the DIP Financing Documents;

(vi)    Authorizing the continued use of Cash Collateral (as defined below) by the Debtor effective as of the Petition Date;

(vii)    Granting adequate protection to the Prepetition Lender (as defined below);

---

[2] The "Participants" consist of 8VC Fund I, L.P. and 8VC Entrepreneurs Fund I, L.P., and may include additional participant parties.

(viii)    Vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Financing Documents (including this Interim Order);

(ix)    Scheduling a final hearing (the "**Final Hearing**") to consider entry of an order (the "**Final Order**") granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing;

(x)    Waiving, to the extent applicable, any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code, the Bankruptcy Rules or the Local Rules, such that this Interim Order shall be immediately effective upon its entry on the docket of the United States Bankruptcy Court for the District of Delaware (the "**Court**"); and

(xi)    Granting related relief.

The Court having considered the DIP Motion, the *Declaration of Curtis G. Solsvig III in Support of Debtor's Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), the exhibits attached thereto, the DIP Credit Agreement, and the evidence submitted or adduced and the arguments of counsel made at the hearing on this Interim Order (the "**Interim Hearing**"); and notice of the DIP Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing having been held and concluded; and it appearing that granting the relief requested in the DIP Motion on an interim basis is necessary to avoid immediate and irreparable harm to the Debtor pending the Final Hearing, and is otherwise fair and reasonable and in the best interests of the Debtor, its estate and its creditors, and is essential for the preservation of the value of the Debtor's assets; and all objections, if any, to the entry of this Interim Order having been withdrawn,

resolved or overruled by the Court; and after due deliberation and consideration, and  good and sufficient cause appearing therefor:

**IT IS FOUND AND DETERMINED that[3]:**

A.      **Disposition**.  The DIP Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections, reservations of rights, and/or other statements with respect to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled are hereby denied and overruled on the merits.

B.      **Commencement of Chapter 11 Case**.  On September 4, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code with this Court.  The Debtor is continuing to operate its business as a debtor and debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (the "**Committee**") or chapter 11 trustee has been appointed in the Chapter 11 Case.

C.      **Jurisdiction and Venue**.  This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, and over the persons and property affected hereby. Venue for the Chapter 11 Case and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). This Court may enter a final order consistent with Article III of the United States Constitution.

D.      **Notice**. Notice of the Interim Hearing and the DIP Motion has been provided by the Debtor to (i) the Office of the United States Trustee for the District of Delaware (the "**U.S.**

---

[3] The findings and conclusions set forth herein constitute the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Trustee**"), (ii) the United States Securities and Exchange Commission, (iii) the Office of the United States Attorney for the District of Delaware, (iv) the Internal Revenue Service, (v) the Delaware Secretary of State, (vi) the Debtor's thirty (30) largest unsecured creditors (excluding insiders), (vii) counsel to the DIP Lender, (viii) counsel to the Participants, (ix) all other known holders of prepetition liens, encumbrances or security interests against the Debtor's property, (x) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (xi) any other party required to be provided notice under Local Rule 9013-l(m).  Under the circumstances, such notice of the Interim Hearing and the DIP Motion constitutes adequate and sufficient notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b), (c), and (d), and the Local Rules.

E.    **Debtor's Stipulations.**   After consultation with its attorneys and professional advisors, and without prejudice to the rights of parties-in-interest as set forth in paragraph 23 herein, the Debtor, on its behalf and on behalf of its estate, admits, stipulates, acknowledges, and agrees as follows:

(i)    **Prepetition Term Loan**.  As of the Petition Date, pursuant to that certain Loan and Security Agreement dated as of February 24, 2017 between the Debtor and Silicon Valley Bank (the "**Prepetition Lender**") (as amended, supplemented, or otherwise modified, the "**Prepetition Loan Agreement**" and, together with all other agreements, documents and instruments executed and/or delivered in connection therewith, as all of the same have been amended, supplemented, or otherwise modified at any time prior to the Petition Date, the "**Prepetition Loan Documents**"), the Debtor was indebted and liable, without defense, counterclaim, or offset of any kind, to the Prepetition Lender in the aggregate principal amount of not less than $5,830,000 (the "**Prepetition Facility**").  All obligations of the Debtor arising under

the Prepetition Loan Agreement or any other Prepetition Loan Documents, including under the Prepetition Facility, shall hereinafter be referred to collectively as the "**Prepetition Loan Obligations**".

(ii)     <u>**Prepetition Liens**</u>.   As set forth more fully in the Prepetition Loan Agreement and the DIP Motion, prior to the Petition Date, to secure the Prepetition Loan Obligations, the Debtor granted to the Prepetition Lender first priority liens (the "**Prepetition Liens**") on substantially all of the Debtor's assets, including, but not limited to, all goods, accounts, equipment, inventory, proceeds of intellectual property, contract rights, leases, general intangibles, commercial tort claims, cash, deposit accounts and letters of credit (collectively, the "**Prepetition Collateral**").

(iii)     The Debtor acknowledges that as of the Petition Date, the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Lender for fair consideration and reasonably equivalent value, (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law (including any that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Loan Agreement (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date, the "**Permitted Prior Liens**"), (c) the Prepetition Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor enforceable in accordance with the terms of the Prepetition Loan Agreement, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Loan Obligations exist, and no portion of the

Prepetition Liens or Prepetition Loan Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (e) the Debtor and its estate has no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any the Prepetition Lender or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Facility, (f) the Debtor has waived, discharged, and released any right to challenge any of the Prepetition Loan Obligations, the priority of the Debtor's obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Loan Obligations, and (g) the Prepetition Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(iv)    **Release**. Subject to entry of the Final Order, the Debtor hereby stipulates and agrees that it forever, unconditionally and irrevocably releases, discharges and acquits the Prepetition Lender and the DIP Financing Parties and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, and agents, past, present, and future, and their respective heirs, predecessors, successors, and assigns (collectively, the "**Releasees**") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every kind whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the DIP Financing, the DIP Financing Documents, the Prepetition Facility, and the Prepetition Loan Documents, and/or the transactions contemplated hereunder or thereunder

including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Lender and the Prepetition Lender; provided that the forgoing shall not release any claims against a Releasee that a court of competent jurisdiction determines results from the bad faith, gross negligence, or willful misconduct of such Releasee. The Debtor further waives and releases any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Loan Obligations and the DIP Obligations, which the Debtor now has or may claim to have, directly or indirectly against the Releasees, arising out of, connected with or relating to any and all acts, omissions, or events occurring prior to the Court entering this Interim Order.

(v) **No Control**. Neither the DIP Financing Parties nor the Prepetition Lender controls the Debtor or its properties or operations, has authority to determine the manner in which any of the Debtor's operations are conducted or is a control person or insider of the Debtor or any of its affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Financing, the DIP Financing Documents, the Prepetition Facility, and/or the Prepetition Loan Documents.

F. **Findings Regarding the DIP Financing**.

(i) **Cash Collateral**. Any and all of the Debtor's cash including cash and other amounts on deposit or maintained in any account or accounts by the Debtor, whether subject to control agreements or otherwise, and any amount generated by the collection of accounts receivable or other disposition of the Prepetition Collateral, and the proceeds of any of the foregoing, whether existing on the Petition Date or thereafter, constitute the cash collateral (within

the meaning of section 363(a) of the Bankruptcy Code) of the Prepetition Lender (the "**Cash Collateral**").

(ii)    **Need for DIP Financing and to Use Cash Collateral**. An immediate need exists for the Debtor to obtain funds from the Interim DIP Loan (as defined herein) and to use Cash Collateral in order to continue operations, fund payroll and operating expenses, and to administer and preserve the value of its estate pending the Final Hearing. The ability of the Debtor to finance its operations through the incurrence of the Interim DIP Loan and use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtor's estate, to maximize the value of the Debtor's assets for the benefit of its creditors, and to avoid immediate and irreparable harm to the Debtor, its estate and its creditors.

(iii)    **Roll-Up of Prepetition Loan Obligations**.    The replacement and refinancing (or "roll-up") of the Prepetition Loan Obligations as set forth in the DIP Financing Documents is compensation for, in consideration for, and solely on account of, the agreement of the DIP Lender (who is the Prepetition Lender) to commit to and fund the DIP Financing, and provide other consideration to the Debtor, under the DIP Financing Documents and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Loan Obligations.  The Prepetition Lender would not otherwise consent to the use of its Cash Collateral, and the DIP Lender would not be willing to provide the DIP Financing or extend credit to the Debtor thereunder without the roll-up of the Prepetition Loan Obligations into the DIP Obligations as set forth in the DIP Financing Documents.  Moreover, the replacement and refinancing of the Prepetition Facility into DIP Obligations will enable the Debtor to obtain urgently needed financing to administer this Chapter 11 Case and fund its operations.  Because the DIP Roll-Up Loans (defined below) are subject to the reservation of rights in paragraph 23 below, they will not

9

prejudice the right of any other party in interest.  All security agreements in respect of the Prepetition Loan Obligations that are refinanced shall continue in full force and effect.

(iv)    **No Credit Available on More Favorable Terms**.  The Debtor has demonstrated that it has been unable to obtain (a) adequate unsecured credit allowable either (1) under Bankruptcy Code sections 364(b) or 503(b)(1), or (2) under Bankruptcy Code section 364(c)(1), (b) adequate credit for money borrowed secured by (1) a senior lien on unencumbered assets of its estate under Bankruptcy Code section 364(c)(2), or (2) a junior lien on encumbered assets of its estate under Bankruptcy Code section 364(c)(3), or (c) secured credit under section 364(d)(1) of the Bankruptcy Code on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Interim Order.  The Debtor has likewise demonstrated that the only known source of secured credit available to the Debtor on commercial terms is the DIP Financing, and it is unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections (as defined below).

G.    **Best Financing Presently Available**.  The DIP Lender will as of the Petition Date provide the Debtor with financing solely on the terms and conditions set forth in this Interim Order (and, subject to entry by the Court, the Final Order) and the applicable DIP Financing Documents. After considering all of its alternatives, the Debtor has concluded, in an exercise of its sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of this Interim Order (and, subject to entry by the Court, the Final Order) and the DIP Financing Documents, represents the best financing presently available.

H.    **Good Cause for Immediate Entry**.  Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.  In particular, the authorization granted herein for the Debtor to enter into the DIP

Financing, to continue using Cash Collateral and to obtain interim financing is necessary to avoid immediate and irreparable harm to the Debtor and its estate.  Entry of this Interim Order is in the best interest of the Debtor, its estate, and creditors.  The terms of the DIP Financing are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

I.      **Arm's Length Negotiation; Good Faith**.  The Debtor, the DIP Financing Parties, and the Prepetition Lender have negotiated the terms and conditions of the DIP Financing and this Interim Order in good faith and at arm's length, and any credit extended and loans made to the Debtor pursuant to this Interim Order shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.  The DIP Financing Parties have acted in good faith and therefore are entitled to the good faith protections under section 364(e) of the Bankruptcy Code. The DIP Lender's claims, superpriority claims, security interests, liens, and other protections granted pursuant to this Interim Order (and, subject to entry by the Court, the Final Order) and the applicable DIP Financing Documents will not be affected by any subsequent reversal, modification, vacatur, or amendment of this Interim Order, the Final Order, or any other order, as provided in section 364(e) of the Bankruptcy Code.

J.      **Adequate Protection**.  The Prepetition Lender has acted in good faith regarding the DIP Financing and the Debtor's continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtor's estate and continued operation of its business, in accordance with the terms hereof.  The Prepetition Lender has consented to the Debtor's use of the Prepetition Collateral, including the Cash Collateral, in accordance with the

terms hereof.  The Prepetition Lender is entitled to adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to Bankruptcy Code sections 361, 363 and 364. Based on the DIP Motion, the First Day Declaration and the record presented to the Court at the Interim Hearing, as of the Petition Date the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral are fair and reasonable, reflect the Debtor's prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; provided, that nothing in this Interim Order or the other DIP Financing Documents shall prejudice, limit, or otherwise impair the rights of the Prepetition Lender to seek Court approval of new, different, or additional adequate protection.

**NOW, THEREFORE,** based upon the foregoing findings, and upon consideration of the DIP Motion and the record made before this Court with respect to the DIP Motion, including the First Day Declaration and the record created during the Interim Hearing, and with the consent of the Debtor and the DIP Financing Parties to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED AND DECREED:**

1.    **Motion Granted**. The DIP Motion is granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Credit Agreement. Any objections to the DIP Motion with respect to entry of this Interim Order to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2.    **DIP Financing Documents**.

(a)        **Approval of Entry Into DIP Financing Documents**. The DIP Financing, including the Participations, is hereby approved. The Debtor is authorized and empowered to execute and deliver the DIP Financing Documents and to incur and to perform the

DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Documents, and to execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtor under the DIP Financing Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Financing Documents. The Debtor is hereby authorized to use Cash Collateral in accordance with the terms of the DIP Financing Documents.  The Debtor is hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, indemnities and other amounts described in the DIP Credit Agreement and all other DIP Financing Documents as such become due.

(b)        **Interim Authorization to Borrow/and or Guarantee**. To enable it to continue to preserve the value of its estate during the period prior to entry of the Final Order (the "**Interim Period**") and subject to the terms and conditions of this Interim Order, upon the execution of the DIP Credit Agreement and the other DIP Financing Documents, the Debtor is hereby authorized to borrow up to a total committed amount of $3,500,000.00 under the DIP Financing Documents (the "**Interim DIP Loan**").

(c)        **Conditions Precedent**. The DIP Financing Parties shall have no obligation to make any loan or advance under the DIP Financing Documents during the Interim Period unless the conditions precedent to making such loan under the DIP Financing Documents have been satisfied in full or waived by the DIP Financing Parties in their sole discretion.

(d)        **DIP Liens**. In order to secure the DIP Obligations, effectively immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition

security interests in and liens on (collectively, the "**DIP Liens**") all prepetition and postpetition tangible and intangible property and assets, whether real or personal of the Debtor, including, without limitation, all assets and property pledged under the DIP Financing Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, and all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, Shares (as defined in the DIP Credit Agreement), commercial tort claims and claims that may constitute commercial tort claims (known and unknown), books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products, and substitutions, if any, of any of the foregoing (the "**DIP Collateral**"); provided that DIP Collateral shall not include any Bankruptcy Recoveries (as defined herein), but, subject to entry of the Final Order, the DIP Collateral shall include the proceeds of any Bankruptcy Recoveries. Notwithstanding the foregoing, DIP Collateral shall not include any contract, license or non-residential real property lease under which the granting of the DIP Liens thereon would constitute a breach or termination thereof other than to the extent such breach or termination would be rendered ineffective pursuant to applicable law (including applicable state law or the Bankruptcy Code) but shall, in any event, include the proceeds of such contracts and licenses.

"DIP Collateral" shall include the economic value of the proceeds of any sale or other disposition of, and any other proceeds or products of DIP Collateral.

(e)        **DIP Lien Priority**.  Pursuant to section 364(c)(2) of the Bankruptcy Code, subject to paragraph 2(i)(A) of this Interim Order, the DIP Liens shall be first priority perfected security interests, liens and mortgages on, all DIP Collateral (subject only to the Carve Out) not subject to valid, perfected, enforceable, and non-avoidable security interests, liens or mortgages in existence on the Petition Date (it being agreed and understood that the Final Order shall grant, to secure the DIP Obligations, a perfected security interest pursuant to this clause in any recoveries of Debtor, by settlement or otherwise, in respect of claims and causes of action to which Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of a debtor or the estate of a debtor under chapter 5 of the Bankruptcy Code ("**Bankruptcy Recoveries**")).  Pursuant to section 364(c)(3) of the Bankruptcy Code, subject to paragraph 2(i)(A) of this Interim Order, the DIP Liens shall be junior security interests, liens and mortgages on all DIP Collateral (including all Prepetition Collateral subject to the Prepetition Liens on the Petition Date) that was subject to a Prior Permitted Lien in existence on the Petition Date.  Other than as set forth herein or in the DIP Financing Documents (including in paragraph 2(i)(A) of this Interim Order), the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any Successor Case, upon the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or any Successor Case. The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code.  No lien or

interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

(f)        **Enforceable Obligations**. The DIP Financing Documents shall constitute and evidence the valid and binding obligations of the Debtor, which obligations shall be enforceable against the Debtor, its estate and any successor thereto and its creditors or representatives thereof, in accordance with their terms.

(g)        **Use of Proceeds of DIP Collateral**. From and after the Petition Date, the Debtor shall use the proceeds of the extensions of credit under the DIP Financing as set forth in the DIP Credit Agreement, this Interim Order and the Budget (subject to any variances thereto permitted by this Interim Order).

(h)        **Superpriority Administrative Claim Status**. Upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Chapter 11 Case and any Successor Case (collectively, the "**DIP Superpriority Claims**" and, together with the DIP Liens, the "**DIP Protections**") for all DIP Obligations: (i) subject only to the Carve Out, having priority over any and all administrative expense claims and unsecured claims against the Debtor or its estate in the Chapter 11 Case and any Successor Case, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code and (ii) which shall at all times be senior to the rights of the Debtor and its estate, and any successor trustee or other estate representative to the extent permitted by law.

16

(i)        **Certain Rights Relating to the Participations**.  Notwithstanding anything to the contrary contained in this Interim Order or the DIP Financing Documents, (A) the terms of this Interim Order relating to the relative priorities of the Prepetition Liens and the DIP Liens with respect to the DIP Collateral shall be subject to, and governed by, the terms of the Participations; and (B) the terms of this Interim Order relating to the payment priority of the Prepetition Lender and the DIP Financing Parties shall be subject to, and governed by, the terms of the Participations (provided, for the avoidance of doubt, that any repayment of the DIP Financing or other proceeds of DIP Collateral shall be applied first to satisfy 50% of the Prepetition Loan Obligations (or, if the roll-up contemplated herein has occurred, 50% of the DIP Roll-Up Loans) before any other DIP Obligations are satisfied from any such repayment or proceeds).

3.        **Authorization to Use Proceeds of DIP Financing**. Pursuant to the terms and conditions of this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents, and in accordance with the Budget and the variances thereto set forth in the DIP Credit Agreement, the Debtor is authorized to use the advances under the DIP Credit Agreement during the period commencing immediately after the entry of the Interim Order and terminating in accordance with Section 13 of this Interim Order.  The Debtor and the DIP Financing Parties may agree in writing to modify the Budget in their discretion at any time that the DIP Financing remains outstanding.

4.        **DIP Roll-Up Loans**.  Upon entry of the Final Order, without any further action by the Debtor or any other party, all of the outstanding Prepetition Loan Obligations owing to the Prepetition Lender shall constitute DIP Obligations under and as further described in the DIP Financing Documents (the "**DIP Roll-Up Loans**").

5.        **Authorization to Use Cash Collateral**. Pursuant to the terms and conditions of this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents, and in accordance with the Budget and the variances thereto set forth in the DIP Credit Agreement, the Debtor is authorized to use the advances under the DIP Credit Agreement during the period commencing immediately after the entry of the Interim Order; *provided*, *however*, that during the Remedies Notice Period (as defined herein), the Debtor may use Cash Collateral solely to meet payroll obligations (other than severance) and pay expenses that the DIP Financing Parties approve as critical to keeping the Debtor's business operating in accordance with the Budget, or as otherwise agreed by the DIP Financing Parties in their sole discretion, and the Carve Out shall be funded following delivery of the Carve Out Notice (as defined herein) as provided in paragraph 19 of this Interim Order.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business, or the Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents, and in accordance with the Budget.

6.        **Postpetition Lien Perfection**. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, mortgages, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and

all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Case. The Debtor shall execute and deliver to the DIP Lender all such financing statements, mortgages, notices and other documents as the DIP Lender may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens granted pursuant hereto. The DIP Lender, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file or record financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the recording officer shall be authorized to file or record such copy of this Interim Order.

7.    **Adequate Protection**.  In addition to all the existing security interests and liens previously granted to the Prepetition Lender, as adequate protection for, and to secure the payment of an amount equal to the diminution of the value of the Prepetition Collateral, due to the Debtor's sale, use, or lease of such Prepetition Collateral, and as an inducement for the Prepetition Lender to permit the Debtor's use of the Cash Collateral as provided for in this Interim Order, the Prepetition Lender is hereby granted the following adequate protection (the "**Adequate Protection Obligations**"), pursuant to sections 361, 363(e), 364(d)(l), and 507 of the Bankruptcy Code:

(a)    continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral (the "**Adequate Protection Liens**"). The Adequate Protection Liens shall be subject to the payment of the Carve Out as set forth in this Interim Order and shall otherwise be junior to the DIP Liens.  Subject to and effective upon entry of the Final Order, the Adequate Protection Liens shall be senior to all security interests in, liens on, or claims against any of the DIP Collateral other than the DIP Liens.  Except as provided herein

or in the DIP Credit Agreement, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Chapter 11 Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any Successor Case, or upon the dismissal of any of the Chapter 11 Case or any Successor Case.  The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

(b)        an allowed superpriority administrative expense claim in the Chapter 11 Case and any Successor Case (the "**Prepetition Superpriority Claim**"). The Prepetition Superpriority Claim shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise be junior only to the DIP Superpriority Claims.  The Prepetition Superpriority Claim shall have priority over all other administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.

(c)        until the roll-up contemplated herein has occurred, the Debtor is authorized and directed to pay interest on $5,230,000 of the Prepetition Loan Obligations at a rate per annum equal to six percent (6%), which interest shall be payable monthly in cash and otherwise in accordance with the terms of the Prepetition Loan Documents.

(d)        payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) of reasonable and documented legal fees and out-of-pocket

expenses incurred in connection with the DIP Financing, whether arising before or after the Petition Date.  The Prepetition Lender (and each of its professionals) shall not be required to comply with U.S. Trustee fee guideline or file applications or motions with, or obtain approval of, the Court for the payment of any of their out-of-pocket costs, fees, expenses, disbursements and other charges.

8.    **Budget**.    The budget annexed hereto as **Exhibit B** (as it may be updated periodically in accordance with this Interim Order and the DIP Financing Documents, the "**Budget**"), hereby is approved. Beginning on the second (2nd) Business Day of the week following the Petition Date, and then no later than the second (2nd) Business Day of each subsequent calendar week, the Debtor shall deliver to the DIP Financing Parties an updated, proposed Budget (each, a "**Proposed Budget**") for the following 13-week period, which shall be in form and substance satisfactory to DIP Financing Parties and certified as complete and accurate by a Responsible Officer (as defined in the DIP Credit Agreement) to the Responsible Officer's reasonable belief.  A Proposed Budget shall become the new Budget upon approval by the DIP Financing Parties (which must be in writing, including via email).  If the DIP Financing Parties reject or fail to approve a Proposed Budget, the prior approved budget shall continue in place and shall govern and the DIP Financing Parties and the Debtor shall negotiate in good faith regarding the terms of the Proposed Budget. The Debtor shall not permit the percentage variance with respect to projected disbursements in each then-current Budget to exceed (a) 10% on an individual basis of actual disbursements for a specific line item and (b) 5% on an aggregate basis of total actual disbursements, in each case, on a cumulative four-week rolling basis; *provided*, that for the first two measuring periods following the Petition Date, the percentage variance with respect to projected disbursements in each then-current Budget shall not exceed (a) 15% on an individual

basis of actual disbursements for a specific line item and (b) 10% on an aggregate basis of total actual disbursements (the "**Budget Variances**"; all references in this Interim Order and the DIP Financing Documents to "Budget" shall mean the Budget as it is subject to the Budget Variances). The Debtor shall also deliver with each updated Budget a variance report reflecting on a line item and an aggregate basis, Debtor's actual unrestricted cash receipts and cash disbursements compared to the Budget for such immediately preceding week and for the period commencing on the Petition Date through and including the end of the week immediately preceding the date of the variance report; and such variance report shall be in form and substance satisfactory to the DIP Financing Parties and certified as complete and accurate by a Responsible Officer to the Responsible Officer's reasonable belief. For the avoidance of doubt, for purposes of calculating the Budget Variances, any unused amounts set forth in the Budget for any period of determination may be carried forward and used during subsequent periods.

9.    **Reserved**.

10.    **Cash Management**. The Debtor shall maintain its cash management arrangements in a manner consistent with that described in the motion seeking entry of interim and final orders authorizing the Debtor to maintain its existing cash management system, which orders shall be in form and substance acceptable to the DIP Financing Parties.

11.    **Validity of DIP Financing Documents**. The DIP Financing Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the DIP Financing Documents as approved under this Interim Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.

12.    **Automatic Effectiveness of Liens**. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the Debtor to grant the liens and security interests to the DIP Lender and the Prepetition Lender contemplated by this Interim Order and the DIP Financing Documents.

13.    **Protection of DIP Lender's Rights**.  A "**Termination Event**" means: (i) the Debtor shall violate the terms of this Interim Order; (ii) the occurrence of an Event of Default (as defined in the DIP Credit Agreement), (iii) the Maturity Date (as defined in the DIP Credit Agreement), (iv) this Interim Order ceasing to be in full force and effect for any reason, (v) Debtor shall file, propose, or support confirmation of a chapter 11 plan that is not reasonably acceptable to the DIP Lender or Prepetition Lender, and (vi) the Debtor shall file, propose, or support any sale process for, or sell, a material portion of its assets without the prior written consent of the DIP Financing Parties, unless the proposed sale, if consummated, would pay off in full, in cash, simultaneous with the closing of such sale any obligations owed to the DIP Financing Parties and Prepetition Lender (each a "**Termination Event**").   Upon the occurrence and during the continuance of a Termination Event, unless such Termination Event is waived by the DIP Financing Parties, the DIP Financing Parties may declare (a) the commitment of the DIP Financing Parties as to the DIP Financing to be terminated, whereupon such commitments and obligation shall be terminated; (b) all DIP Obligations immediately due and owing, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtor, whereupon all DIP Obligations shall be immediately due and payable; and (c) subject to the Carve Out, that the Debtor shall have no right to use any proceeds of any DIP Financing, other than towards the satisfaction of the DIP Obligations.   Five (5) business after the delivery by the DIP Financing Parties to the Debtor or its counsel (via email or otherwise) of a written notice (the

"**Remedies Notice**") of the occurrence of a Termination Event (the "**Remedies Notice Period**"), the DIP Financing Parties may exercise all rights and remedies provided in this Interim Order and the DIP Financing Documents, as applicable, with respect to the DIP Collateral; provided, however, that during the Remedies Notice Period, the Debtor may use Cash Collateral solely to meet payroll obligations (other than severance) and pay expenses that the DIP Financing Parties approve as critical to keeping the Debtor's business operating in accordance with the Budget, or as otherwise agreed by the DIP Financing Parties in their sole discretion.  Within two business days upon the delivery of the Remedies Notice, to the extent not previously provided, the Debtor shall provide a line-by-line itemization of the Budget to the DIP Financing Parties.  The Debtor shall not consent to relief from the automatic stay by any person other than the DIP Lender to proceed against any DIP Collateral having a fair market value in excess of $50,000 without the express written consent of the DIP Financing Parties.

14. **DIP Fees and Expenses**. The Debtor is authorized and directed to pay all reasonable and documented fees and expenses of the DIP Financing Parties in connection with the DIP Financing, whether or not the transactions contemplated hereby are consummated, whether or not incurred prepetition or postpetition.  A copy of any invoice submitted by any DIP Financing Party to the Debtor for the foregoing purpose shall also be delivered contemporaneously to the U.S. Trustee and counsel to the Committee, if any (each, a "**Fee Notice**"). The DIP Financing Parties (and each of their professionals) shall not be required to comply with U.S. Trustee fee guideline or file applications or motions with, or obtain approval of, the Court for the payment of any of their out-of-pocket costs, fees, expenses, disbursements and other charges. Subject to the U.S. Trustee or a Committee, if any, filing a written objection with this Court to any such fees and expenses within five (5) days after receipt of a Fee Notice, the Debtor shall immediately pay such

invoice without further notice or request by the DIP Financing Parties.  To the extent a timely filed objection is filed by the U.S. Trustee or the Committee, if any, the Debtor shall (a) pay such portion of the fees and expenses to which no objection is interposed and (b) pay any remaining fees and expenses as ordered by the Court (or upon withdrawal or resolution of the objection). Payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination or disgorgement.

15. **Modifications of DIP Financing Documents**. The Debtor and the DIP Financing Parties are hereby authorized to implement, in accordance with the terms of the DIP Financing Documents, any modifications of the DIP Financing Documents (other than this Interim Order) that are not materially adverse to the Debtor's estate or creditors without further notice, motion, or application to, order of or hearing before, this Court.  Any material modification or amendment to the DIP Financing Documents shall only be permitted pursuant to an order of this Court (which may be sought within (3) Business Days), provided, however, that any forbearance from, or waiver of, (a) a breach by the Debtor of a covenant, representation or any other agreement or (b) a Termination Event shall not require an order of this Court.

16. **Waiver of Requirement to File Proofs of Claim**. The DIP Financing Parties and the Prepetition Lender shall not be required to file proofs of claim in the Chapter 11 Case or any Successor Case in order to maintain their respective claims for payment of the obligations under their respective loan documents. The statements of claim in respect of the DIP Obligations and the Prepetition Loan Obligations set forth in this Interim Order, together with the evidence accompanying the DIP Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

17.    **Carve Out**. Except as otherwise provided herein, the DIP Liens are subordinate only to the payment of the following (the "**Carve Out**"): (i) any unpaid fees required to be paid pursuant to Section 1930 of title 28 of the United States Code section 1930(a)(6) (the "**U.S. Trustee Fees**"), together with any interest thereon pursuant to applicable law and any fees payable to the Clerk of the Court; (ii) the fees actually earned by the Debtor's directors on account of the period prior to the delivery of a Carve Out Notice; (iii) until the issuance of a Carve Out Notice to the extent provided for in the Budget and allowed at any time, all unpaid fees and expenses allowed by the Court of professionals or professional firms retained pursuant to Section 327 or 1103, or appointed pursuant to section 363, of the Bankruptcy Code (the "**Case Professionals**") less the amount of any prepetition retainers received by such Case Professionals and not previously returned or applied to fees and expenses; and (iv) following the delivery of a Carve Out Notice, to the extent provided for in the Budget allowed at any time, the payment of the fees and expenses of Professional Persons in an aggregate amount not to exceed $150,000 less the amount of any prepetition retainers received by such Cash Professionals and not previously returned or applied to fees and expenses (the "**Residual Carve Out**").  The Carve-Out excludes any fees and expenses incurred in connection with (a) any action or inaction that is in violation of, or a default under, any of the DIP Financing Documents or the Final Order, or (b) the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (x) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, including, for the avoidance of doubt, pursuant to the Participations, and/or the Prepetition Loan Obligations, (ii) the DIP Liens and/or the Prepetition Liens granted by the Debtor under the DIP Financing Documents and the Prepetition Loan Documents, or (iii) any of the DIP

Financing Parties' rights under the DIP Financing Documents, including, for the avoidance of doubt, the Participations, and/or the Prepetition Lender's rights under the Prepetition Loan Documents, or (y) preventing, hindering, or delaying, whether directly or indirectly, the DIP Lender's and/or the Prepetition Lender's assertion or enforcement of the DIP Liens or Prepetition Liens or realization upon any DIP Collateral or Prepetition Collateral.

18.    The Residual Carve Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Notice in respect of fees and expenses incurred after delivery of the Carve Out Notice.  For purposes of the foregoing, "Carve Out Notice" shall mean a written notice delivered by the DIP Lender to the Debtor and its counsel, the U.S. Trustee and lead counsel to any Committee, which notice may be delivered at any time by the DIP Lender following the occurrence and continuance of any Termination Event and, in any case, shall specify that it is a "Carve Out Notice."  Following delivery of a Carve Out Notice, upon the funding of the Carve Out as of the date of the Carve Out Notice, the DIP Financing Parties shall not have any further liability whatsoever for the Carve Out or any subordination in respect thereof.

19.    **Carve Out Reserve**. Until the Maturity Date, the Debtor shall deposit cash on a weekly basis into an account designated by the Debtor at the DIP Lender for such purpose (the "**Carve Out Account**") in an amount equal to the "Carve Out" line item shown in the Budget for that week.  Proceeds deposited into the Carve Out Account shall be held in trust and used solely for purposes of the Carve Out in accordance with this Interim Order and the Final Order. The funds on deposit in the Carve Out Account shall be used to fund Carve Out expenses before any other funds of the Debtor may be used for such purpose. Any excess cash held in the Carve Out Account that is not used to fund Carve Out expenses in accordance with this Interim Order and Final Order, as

applicable, shall be remitted to the DIP Lender and distributed in accordance with the priorities set forth in the DIP Financing Documents (including, for the avoidance of doubt, the Participations). The DIP Lender and the Prepetition Lender shall each have a security interest in any residual interest in the Carve Out Account. The delivery of the Carve Out Notice shall (i) require the Debtor to utilize all available cash held by the Debtor to fund any deficit in the Carve Out Reserve in an amount equal to the difference between the Carve Out Reserve balance and the amount anticipated to be needed to fully fund the Carve Out (the "**Carve Out Reserve Deficit**"), and (ii) only to the extent such cash on hand is insufficient for the foregoing purpose, be deemed a draw request and notice of borrowing by the Debtor for DIP Loans (as defined in the DIP Financing Documents) under the available commitments under the DIP Financing, in an amount equal to the Carve Out Reserve Deficit (any such amounts actually advanced shall constitute DIP Loans), which amounts will be funded by the DIP Lender within two business days.

20.    A "Termination Event" shall occur if the Debtor investigates, asserts, or prosecutes (a) any claims or causes of action against any of the DIP Financing Parties arising under or related to the DIP Financing Documents, including, for the avoidance of doubt, the Participations, the Prepetition Loan Obligations, or any other financing provided to the Debtor by the Prepetition Lender, or the liens or security interests securing the obligations under any of the foregoing or to pursue a Challenge (as defined in this Interim Order); or (b) any Challenge or raise any defenses to the Prepetition Loan Obligations or the DIP Obligations. No portion of the DIP Financing, the DIP Collateral (including the Prepetition Collateral and the Cash Collateral), the Carve Out, or any disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs, or expenses incurred by any party in interest in connection with the foregoing (a) and (b) of this paragraph; provided that not more than $25,000 in the aggregate of

proceeds of any Cash Collateral or any proceeds of the DIP Financing or the DIP Collateral may be used to pay any allowed fees of the Committee, if any, or professionals retained by the Committee and incurred in connection with investigating the matters covered by the stipulations contained in recital Paragraph E of this Interim Order (the "**Investigation Budget**").

21.     Nothing herein shall be construed to obligate the DIP Financing Parties to pay any professional fees or to assure that a Debtor has sufficient funds on hand to pay any professional fees.

22.     **Payment of Compensation**. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtor or the Committee or shall affect the right of the DIP Financing Parties to object to the allowance and payment of such fees and expenses or to permit the Debtor to pay any such amounts not set forth in the Budget.

23.     **Effect of Stipulations**.

(a)           **Generally**.  The admissions, stipulations, agreements, releases, and waivers set forth in Paragraph E of this Interim Order (collectively, the "**Prepetition Lien and Claim Stipulations**") are and shall be binding on the Debtor.  In addition, the Prepetition Lien and Claim Stipulations shall be binding on any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless, and solely to the extent that, a party in interest with standing and requisite authority (other than the Debtor, as to which any Challenge (as defined below) is irrevocably waived and relinquished) (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph) challenging

the Prepetition Lien and Claim Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "**Challenge**") by no later than (a) 60 days from the date of formation of a Committee (if appointed) or (b) 75 days following the entry of the Interim Order for any other party in interest with requisite standing (the "**Challenge Deadline**"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition Lender, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.  Notwithstanding the foregoing, if a chapter 11 trustee is appointed or the Chapter 11 Case is converted to chapter 7 prior to the expiration of the Challenge Deadline, (1) the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the later of the Challenge Deadline or the tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Chapter 11 Case to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court for cause and (2) if the Committee has asserted a Challenge prior to the Challenge Deadline, the chapter 11 trustee or chapter 7 trustee will stand in the shoes of the Committee in such Challenge.

(b)        Binding Effect.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Stipulations shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Chapter 11 Case, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or

objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtor's estate.  Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Stipulations shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Stipulations is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above.  To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Lender shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Documents in defending themselves in any such proceeding as adequate protection.  If any such Challenge is timely commenced and/or sustained, the stipulations contained in recital Paragraph E shall nonetheless remain binding on the Debtor's estate, any Committee and all parties in interest, except to the extent that such stipulations were expressly challenged in such Challenge. Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any committee appointed or formed in the Chapter 11 Case, standing or authority to pursue any cause of action belonging to the Debtor or its estate, including, without limitation, any Challenges, without prior express Court approval.

24.    **Limitation on Charging Expenses Against Collateral**. Subject to entry of the Final Order, (i) no costs or expenses of administration of this Chapter 11 Case, a Successor Case or any other future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any

similar principle of law or equity and (ii) the Debtor (and any successor thereto, including any representatives thereof, including any trustee appointed in this Chapter 11 Case or any Successor Case) shall be deemed to have waived any rights, benefits or causes of action under section 506( c) of the Bankruptcy Code as they may related to or be asserted against the DIP Lender, the Prepetition Lender, the DIP Collateral or the Prepetition Collateral. Nothing contained in this Interim Order, shall be deemed a consent by the DIP Lender or the Prepetition Lender to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral or the Prepetition Collateral under 506(c) of the Bankruptcy Code or otherwise.

25.    **Payments Free and Clear**. Any and all payments or proceeds remitted to the DIP Financing Parties or the Prepetition Lender pursuant to the provisions of this Interim Order or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, subject to the entry of the Final Order, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b) of the Bankruptcy Code, and solely in the case of payments made or proceeds remitted after the delivery of a Carve Out Notice, subject to the Carve Out in all respects. No payments authorized by this Interim Order shall be subject to recharacterization, avoidance, subordination or disgorgement.

26.    **No Marshaling / Applications of Proceeds**. Subject to entry of the Final Order, the DIP Lender and the Prepetition Lender shall not be subject to the equitable doctrine of 'marshaling' or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order and the DIP Financing Documents notwithstanding any other agreement or provision to the contrary.

27.     **Section 552(b)**. Subject to entry of the Final Order, the DIP Lender and the Prepetition Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or the Prepetition Lender in any respect.

28.     **Limitation of Liability**. Nothing in this Interim Order, the DIP Financing Documents, or the Prepetition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Financing Parties or the Prepetition Lender, or any of their successors or predecessors, of any liability for any claims arising from the prepetition or postpetition activities of the Debtor or any affiliate of the Debtor.

29.     **Indemnification**. The Debtor shall indemnify and hold harmless the DIP Financing Parties and their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, in accordance with the DIP Financing Documents, which indemnification is hereby authorized and approved.

30.     **Credit Bidding**. Subject to entry of the Final Order, the DIP Lender and the Prepetition Lender shall have the unqualified right to credit bid (i) up to the full amount of their respective obligations in any sale of the DIP Collateral (or any part thereof), (ii) with respect to the Prepetition Lender, any Prepetition Loan Obligations or the Adequate Protection Claim, and (iii) any unpaid amounts due and owing to the DIP Lender or the Prepetition Lender under this Interim Order, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under

section 725 of the Bankruptcy Code, or otherwise; provided, however, that the rights of the Participants to credit bid shall be governed by, and subject to, the terms of the Participations.

31. **Monitoring of Collateral**. During normal business hours and after advanced written notice to the Debtor's counsel (email shall suffice), the Prepetition Lender and the DIP Financing Parties, and their representatives, consultants and advisors, shall be given reasonable access to the Debtor's books, records, assets and properties for purposes of monitoring the Debtor's business and the value of the DIP Collateral.

32. **No Third Party Rights**. This Interim Order does not create any rights for the benefit of any party, creditor, equity holder or other entity other than the DIP Financing Parties, the Prepetition Lender, and the Debtor, and their respective successors and assigns.

33. **Rights Preserved**. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly the DIP Financing Parties' or the Prepetition Lender's right to seek any other or supplemental relief in respect of the Debtor, including the right to seek new, different or additional adequate protection, as applicable. Nothing contained in this Interim Order shall be deemed a finding by the Court or an acknowledgement by the Prepetition Lender that the adequate protection granted in this Interim Order does in fact adequately protect the Prepetition Lender against any diminution in value of the Prepetition Collateral.

34. **Protection under Section 364(e) of the Bankruptcy Code**. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations owing to the DIP Financing Parties or the Prepetition Lender, as applicable, incurred prior to the actual receipt by such entities of written notice of the effective date of such

reversal, modification, vacation or stay, or (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Financing Documents with respect to any DIP Obligations or Adequate Protection Obligations owing to the DIP Financing Parties or the Prepetition Lender, as applicable. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations or Adequate Protection Obligations owing to the Prepetition Lender by the Debtor prior to the actual receipt by the Prepetition Lender of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the Prepetition Lender shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order and the other DIP Financing Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and Adequate Protection Obligations owing to the Prepetition Lender.

35.    **Binding Nature of Order**. The provisions of this Interim Order shall be binding upon the Debtor and its successors and assigns (including, without limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of the Debtor's estate or with respect to its property).

36.    **Survival of Order**. Solely with respect to the DIP Financing Parties and the Prepetition Lender, the provisions of this Interim Order and any actions taken pursuant hereto (a) shall survive the entry of any order: (i) confirming any plan of restructuring in the Chapter 11 Case; (ii) converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or (iii) dismissing the Chapter 11 Case; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until (x) all of the DIP

Obligations are indefeasibly paid or otherwise satisfied in full and discharged in accordance with the DIP Financing Documents and (y) the obligations owed to the Prepetition Lender are paid or otherwise satisfied in full. The DIP Obligations shall not be discharged by the entry of any order confirming any plan in the Chapter 11 Case that does not provide for payment in full of the DIP Obligations or such other treatment of the DIP Obligations as may be agreed to by the DIP Financing Parties.

37.    **Priority of Terms**. To the extent of any conflict between or among the DIP Motion, the DIP Financing Documents, the terms of any "first day" or "second day" orders (including any provisions contained in such orders authorizing the Debtor to make any payments), and this Interim Order, the terms and provisions of this Interim Order (including the provisions hereof relating to the Budget) shall govern.

38.    **Disposition of Collateral**. The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, without the prior written consent of the DIP Financing Parties (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Financing Parties or an order of this Court), except as provided in the DIP Credit Agreement and this Interim Order and approved by the Court to the extent required under applicable bankruptcy law.

39.    **No Waivers or Modification of Interim Order**. The Debtor irrevocably waives any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Financing Parties and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Financing Parties.

40.    **Final Hearing**.

(a)    The Final Hearing to consider entry of the Final Order and final approval of the DIP Financing is scheduled for _____, 2019 at __:__ _.m. prevailing Eastern time at the United States Bankruptcy Court for the District of Delaware. If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtor and entered by this Court.

(b)    Within two (2) business days following entry of this Interim Order, the Debtor shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**"), together with copies of this Interim Order and the DIP Motion, on: (i) the parties having been given notice of the Interim Hearing, (ii) any party which has filed prior to such date a request for notices with this Court, (iii) counsel for the Committee, if any, (iv) the U.S. Trustee, (v) the Internal Revenue Service, (vi) counsel to the DIP Lender, (vii) counsel to the Participants, and (viii) the Securities and Exchange Commission. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than _____, 2019 at 4:00 p.m. prevailing Eastern time which objections shall be served so that the same are received on or before such date by: (i) bankruptcy counsel for the Debtor, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Michael R. Nestor, Esq. and Joseph Barry, Esq., (ii) counsel for the DIP Lender, Morrison & Foerster LLP, 200 Clarendon St., Boston, MA 02116, Attn: Alexander Rheaume, Esq., and Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019, Attn: Todd M. Goren Esq. and Benjamin W. Butterfield, Esq., (iii) counsel to the Participants, Gibson, Dunn &

Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attn: Matthew J. Williams, Esq., J. Eric

Wise, Esq., and Jason Zachary Goldstein, Esq., (iv) counsel to the Committee, and (v) the U.S.

Trustee, Attn: Jane Leamy, Esq. and shall be filed with the Clerk of the Court, in each case to allow

actual receipt of the foregoing no later than _____, 2019, at 4:00 p.m. prevailing Eastern

time. Notwithstanding the terms of this Interim Order, this Court is not precluded from entering a

Final Order containing provisions that are inconsistent with, or contrary to any of the terms in this

Interim Order, subject to the protections under Section 364(e) and the rights of the DIP Financing

Parties to terminate the DIP Credit Agreement if such Final Order is not acceptable to them. In the

event this Court modifies any of the provisions of this Interim Order or the DIP Financing

Documents following such further hearing, such modifications shall not affect the rights and

priorities of the DIP Financing Parties pursuant to this Interim Order with respect to the DIP

Collateral, and any portion of the DIP Obligations which arises or is incurred, advanced or paid

prior to such modifications (or otherwise arising prior to such modifications), and this Interim

Order shall remain in full force and effect except as specifically amended or modified at such Final

Hearing.

(c)        Nunc Pro Tunc Effect of this Interim Order.  This Interim Order

shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall

take effect and be enforceable nunc pro tunc to the Petition Date immediately upon execution

thereof.

(d)      Retention of Jurisdiction. The Court has and will retain jurisdiction to

enforce this Interim Order and over all matters, including, without limitation, disputes, relating to

the DIP Financing Documents, including, for the avoidance of doubt, the Participations.

Dated: _____, 2019        _____
           Wilmington, Delaware                    United States Bankruptcy Judge

38

**Exhibit A**

**DIP Credit Agreement**

## SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION TERM LOAN AND SECURITY AGREEMENT

**THIS SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION TERM LOAN AND SECURITY AGREEMENT** (this "**Agreement**") dated as of September [ ], 2019, between Silicon Valley Bank, a California corporation ("**Bank**"), and **UBIOME, INC.**, a Delaware corporation and a debtor and debtor in possession (the "**Borrower**" or "**Debtor**"; each of Bank and Borrower, a "**Party**" and, together, the "**Parties**"), provides the terms on which Bank shall lend to Borrower and Borrower shall repay Bank.

### WITNESSETH:

WHEREAS, on September 4, 2019 (the "**Petition Date**"), Debtor filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") initiating its pending case under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Case**") and has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Debtor has requested that Bank provide up to an aggregate amount of $13,830,000.00 in a multiple-draw, non-amortizing term loan facility pursuant to a senior secured, super priority, debtor in possession term loan agreement;

WHEREAS, Bank has agreed to provide such loans on the terms and the conditions contained in this Agreement;

WHEREAS, Bank has agreed to sell an interest in such loans and commitments to the Participant and the Participant has agreed to assume the funding obligations under the Participation Agreement; and

WHEREAS, Borrower has agreed to secure all of its Obligations under the Loan Documents by granting to Bank a security interest in and lien upon all of its existing and after-acquired personal and real property (subject to the limitations contained in the Loan Documents and the Financing Order, as applicable).

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants contained herein and for other good and valuable consideration, the Parties hereto hereby agree as stated above and as follows:

## 1    ACCOUNTING AND OTHER TERMS

Accounting terms not defined in this Agreement shall be construed following GAAP. Calculations and determinations must be made following GAAP. Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in Section 13. All other terms contained in this Agreement, unless otherwise indicated, shall have the meanings provided by the Code to the extent such terms are defined therein.

## 2      LOAN AND TERMS OF PAYMENT

**2.1      Promise to Pay**.  Borrower hereby unconditionally promises to pay Bank the outstanding principal amount of all DIP Advances and accrued and unpaid interest thereon and any other Obligations, in each case, as and when due in accordance with this Agreement and the other Loan Documents and, in any event in full no later than the Maturity Date.

### 2.1.1   **DIP Advances**.

(a)      Availability.  Subject to the terms and conditions of this Agreement and to the Budget (subject to the Variance), Bank agrees to make advances to Borrower (each, a "**DIP Advance**" and, collectively, the "**DIP Advances**"), on any Funding Date, in an aggregate amount not to exceed the DIP Commitment as follows:

(i)      Three Million Five Hundred Thousand Dollars ($3,500,000.00) of the DIP Commitment (the "**Initial DIP Advance**") shall be available within one (1) Business Day of the entry of the Interim Order;

(ii)      One Million Five Hundred Thousand Dollars ($1,500,000.00) plus the Final Roll-Up Amount of the DIP Commitment (the "**Second DIP Advance**") shall be available within three (3) Business Days of the entry of the Final Order; and

(iii)      Up to Three Million Dollars ($3,000,000) (the "**Third DIP Advance**"), which DIP Advance is uncommitted and shall be made solely to the extent that Borrower elects to make an Extension Request and delivers the Sale LOI and Bank approves the making of the Third DIP Advance.

Borrower acknowledges and agrees that Bank shall have no obligation or liability to fund any DIP Advance or portion thereof that is subject to a Participation.

(b)      Interest Payments in respect of DIP Advances.  For each DIP Advance, Borrower shall make monthly cash payments in arrears in respect of accrued and unpaid interest commencing on the first (1st) Business Day of the first (1st) month following the month in which the Funding Date occurs with respect to such DIP Advance and continuing thereafter on the first (1st) Business Day of each successive month.  In addition, the accrued and unpaid interest due under this Agreement shall be payable in arrears, (x) simultaneously with repayment or prepayment of any DIP Advances (on the principal amount of DIP Advances so repaid or prepaid) and (y) on the Maturity Date.

(c)      Voluntary Prepayment.  Borrower shall have the option to prepay, without premium or penalty, all DIP Advances in full, provided Borrower (i) shall provide written notice to Bank of its election to prepay the DIP Advances at least ten (10) Business Days prior to such prepayment and (ii) pays, on the date of such prepayment, (A) all outstanding principal and accrued but unpaid interest, plus (B) all other sums, including Bank Expenses, if any, that shall have become due and payable.

(d)      Mandatory Prepayments.

(i)     If the DIP Advances are accelerated following the occurrence and during the continuance of an Event of Default, Borrower shall immediately pay to Bank an amount equal to the sum of (i) all outstanding principal and accrued but unpaid interest, plus (ii) all other sums, including Bank Expenses, if any, that shall have become due and payable.

(ii)    If at any time the aggregate outstanding principal amount of the DIP Advances exceeds the DIP Commitment, within one (1) Business Day of notice thereof from Bank, Borrower shall pay to Bank the amount of such excess.

(iii)   Within two (2) Business Days of receipt of Net Asset Sale Proceeds from any Transfer by Debtor or any Subsidiary of Debtor, Borrower shall deliver, or cause to be delivered, 100% of such Net Asset Sale Proceeds to Bank to the extent necessary to prepay the DIP Advances.

(iv)    If Debtor or any Subsidiary of Debtor shall at any time or from time to time suffer an Event of Loss, within two (2) Business Days upon receipt of net cash proceeds from such Event of Loss, Borrower shall deliver, or cause to be delivered, 100% of the received net cash proceeds to Bank to the extent necessary to prepay the DIP Advances.

(e)     Borrowing Requests. Upon and subject to the entry of the Interim Order, the Final Order, as applicable, and the prior satisfaction of all other applicable conditions to the making of a DIP Advance set forth in this Agreement, to obtain a DIP Advance, Borrower shall notify Bank (which notice shall be irrevocable) by electronic mail, facsimile, or telephone by 12:00 p.m. Pacific time at least three (3) Business Days prior to the proposed Funding Date of the DIP Advance, provided that Borrower may notify Bank at least one (1) Business Day prior to the Funding Date of the Initial DIP Advance. Together with any such electronic or facsimile notification, Borrower shall deliver to Bank by electronic mail or facsimile a completed Payment/Advance Form executed by an Authorized Signer. Bank may rely on any telephone notice given by a person whom Bank reasonably believes is an Authorized Signer. Bank shall credit the DIP Advances to the Designated Deposit Account. Bank may make DIP Advances under this Agreement based on instructions from an Authorized Signer or without instructions if the DIP Advance s are necessary to meet Obligations which have become due. Borrower shall be permitted to make up to one (1) request for a DIP Advance in any consecutive two (2) week period. Notwithstanding anything herein to the contrary, the Final Roll-Up Amount shall be incurred hereunder automatically with the entry of the Final Order, as provided therein and no Payment/Advance Form or other administrative requirements shall apply to the incurrence of the Final Roll-Up Amount.

(f)     Use of Proceeds. The proceeds of the DIP Advances shall be used solely (i) to pay interest, fees and expenses associated with this Agreement, (ii) for Debtor's working capital and general corporate purposes in accordance with the Budget (subject to the Variance), (iii) to pay costs and expenses associated with the Bankruptcy Case to the extent consistent with the Budget (subject to the Variance, and including professional costs incurred (including, costs incurred in respect of Case Professionals) and paid in accordance with the Budget), and (iv) with respect to the Final Roll-Up Amount, the payment of all remaining obligations outstanding at the time of the entry of the Final Order under the Prepetition SVB Facility. In no event shall the proceeds of any DIP Advance be used to bring any claim or suit against Bank or Participants or

to challenge the liens or claims of Bank or Participants; provided, however, notwithstanding anything to the contrary herein, an aggregate of $25,000 of the DIP Advances or any Carve-Out may be used by the Committee to investigate (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of Borrower owing to Bank or any Participant; and (ii) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of Bank or any Participant with respect thereto.

      **2.1.2**   **Extension Request; Third DIP Advance**.  If Borrower delivers, at least five (5) days prior to the Original Maturity Date, a binding Letter of Intent for the sale of all or substantially all of the assets and other property of Borrower and its Subsidiaries which would upon consummation thereof generate Net Asset Sale Proceeds sufficient to pay the Obligations and any outstanding obligations under the Prepetition SVB Facility in full in cash at closing (the "**Sale LOI**"), Borrower may request one (1) extension of the term of the DIP Commitment (the "**Extension Request**") beyond the Original Maturity Date for a period of up to an additional forty-five (45) days, which Bank may in its sole and absolute discretion elect to grant, condition, or deny after review of the Sale LOI and evaluation of the circumstances thereof.

      **2.2**   **Payment of Interest on the Credit Extensions**.

      (a)   <u>Interest Rate</u>.  Subject to Section 2.2(b), the principal amount outstanding for each DIP Advance shall accrue interest at a rate per annum equal to ten and one half of one percent (10.50%), which interest shall be payable monthly in cash.

      (b)   <u>Default Rate</u>.  Immediately upon the occurrence and during the continuance of an Event of Default, all outstanding Obligations shall bear interest at a rate per annum which is five (5) percentage points (5.0%) above the rate per annum that is otherwise applicable thereto on and after to the Maturity Date (the "**Default Rate**").  Fees and expenses which are required to be paid by Borrower pursuant to the Loan Documents (including, without limitation, Bank Expenses) but are not paid when due shall bear interest until paid at a rate per annum equal to the highest rate applicable to the Obligations.  Payment or acceptance of the increased interest rate provided in this Section 2.2(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Bank.

      (c)   <u>Payment; Interest Computation</u>.  Interest shall be payable monthly in arrears at the times set forth in Section 2.1.1(b) and shall be computed on the basis of a 360-day year for the actual number of days elapsed.  In computing interest, (i) all payments received after 12:00 p.m. Pacific time on any day shall be deemed received at the opening of business on the next Business Day, and (ii) the date of the making of any DIP Advance shall be included and the date of payment shall be excluded; provided, however, that if any DIP Advance is repaid on the same day on which it is made, such day shall be included in computing interest on such DIP Advance.

2.3    **Fees and Expenses**.  Borrower shall pay to Bank the following:

(a)    Commitment Fee.  Bank shall be entitled to receive a non-refundable commitment fee of One Hundred Fifty Thousand Dollars ($150,000.00) (the "**Commitment Fee**"), which shall be deemed fully earned as of entry of the Interim Order and shall be due upon the consummation of a sale of all or substantially all of Borrower's assets.

(b)    Expenses.  All Bank Expenses (including reasonable attorneys' fees and expenses, plus expenses for documentation and negotiation of this Agreement and the other Loan Documents) incurred through and after the Closing Date, when due (or, if no stated due date, upon demand by Bank); provided, however, that, notwithstanding anything herein to the contrary, all Bank Expenses incurred through the Closing Date shall be due and payable from the Initial DIP Advance.

(c)    Fees Fully Earned.  Unless otherwise provided in this Agreement or in a separate writing by Bank, Borrower shall not be entitled to any credit, rebate, or repayment of any fees earned by Bank pursuant to this Agreement notwithstanding any termination of this Agreement or the suspension or termination of Bank's obligation to make loans and advances hereunder.

2.4    **Payments; Application of Payments**.

(a)    All payments to be made by Borrower under any Loan Document shall be made in immediately available funds in Dollars, without setoff or counterclaim, before 12:00 p.m. Pacific time on the date when due.  Payments of principal and/or interest received after 12:00 p.m. Pacific time are considered received at the opening of business on the next Business Day.  When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.

(b)    Bank has the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied.  Borrower shall have no right to specify the order or the accounts to which Bank shall allocate or apply any payments required to be made by Borrower to Bank or otherwise received by Bank under this Agreement or any other Loan Document when any such allocation or application is not specified elsewhere in this Agreement or such other Loan Document.

2.5    **Withholding**.  Payments received by Bank from Borrower under this Agreement and any other Loan Document will be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority (including any interest, additions to tax or penalties applicable thereto).  Specifically, however, if at any time any Governmental Authority, applicable law, regulation or international agreement requires Borrower to make any withholding or deduction from any such payment or other sum payable hereunder to Bank, Borrower hereby covenants and agrees that the amount due from Borrower with respect to such payment or other sum payable hereunder will be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Bank receives a net sum equal to the

sum which it would have received had no withholding or deduction been required, and Borrower shall pay the full amount withheld or deducted to the relevant Governmental Authority. Borrower will, upon request, furnish Bank with proof reasonably satisfactory to Bank indicating that Borrower has made such withholding payment; provided, however, that Borrower need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings and as to which payment in full is bonded or reserved against by Borrower.  The agreements and obligations of Borrower contained in this Section 2.5 shall survive the termination of this Agreement and the other Loan Documents.

## 3    CONDITIONS OF LOANS

    **3.1    Conditions Precedent to Closing Date and the Initial DIP Advance**.  Bank's obligation to make the Initial DIP Advance is subject to the condition precedent that Bank shall have received, in form and substance satisfactory to Bank, such documents, and completion of such other matters, as Bank may reasonably deem necessary or appropriate, including, without limitation:

    (a)    duly executed signatures to the Loan Documents;

    (b)    Borrower shall have executed all documents required by Bank to reduce Borrower's existing business credit card availability to $200,000.00;

    (c)    the Operating Documents and long-form good standing certificate of Borrower certified by the Secretary of State (or equivalent agency) of Borrower's jurisdiction of organization or formation and short-form good standing certificate of Borrower certified by the Secretary of State (or equivalent agency) of each jurisdiction in which Borrower is qualified to conduct business, each as of a date no earlier than ten (10) days prior to the Closing Date;

    (d)    certified copies, dated as of a recent date, of financing statement searches, as Bank may request, accompanied by written evidence (including any UCC termination statements) that the Liens indicated in any such financing statements either constitute Permitted Liens, or have been, or in connection with the Initial DIP Advance will be, terminated or released;

    (e)    evidence satisfactory to Bank that the insurance policies and endorsements required by Section 6.5 hereof are in full force and effect, together with appropriate evidence showing lender loss payable and/or additional insured clauses and cancellation notice to Bank (or endorsements reflecting the same) in favor of Bank;

    (f)    payment of the fees and Bank Expenses then due as specified in Section 2.3 hereof;

    (g)    the initial Budget, in form and substance satisfactory to Bank in its sole and absolute discretion, having been approved by the Bankruptcy Court;

    (h)    determination by Bank to its satisfaction that, since the Petition Date, there has not been any material impairment in the general affairs, management, results of operation,

financial condition or the prospect of repayment of the Obligations as and when due; and there has not been any material adverse deviation by Borrower from the most recent business plan of Borrower presented to and accepted by Bank;

       (i)     entry by the Bankruptcy Court of the Interim Order, by no later than three (3) Business Days after the Petition Date, substantially in the form attached hereto as <u>Exhibit C</u> and otherwise in form and substance satisfactory to Bank, which Interim Order shall not have been reversed, modified, amended or stayed (other than with the written consent of Bank in its sole and absolute discretion);

       (j)     Debtor shall have established or maintained the cash management systems described in the cash management motion and shall have taken all steps necessary to comply with the Cash Management Order;

       (k)     all (i) "first day orders" and all related pleadings intended to be entered on or prior to the date of entry of the Interim Order (including, for the purposes of the "cash management order," a bridge order authorizing continued use of the Borrower's current cash management systems until a hearing with respect to a final cash management order) shall have been entered by the Bankruptcy Court and shall be reasonably satisfactory in form and substance to the Bank and (ii) to the extent available for Bank review at that time, forms of "second day orders" shall be reasonably satisfactory in form and substance to the Bank.

       (l)     all motions, orders (including the "first day" orders) and other documents to be filed with and submitted to the Bankruptcy Court shall be in form and substance reasonably satisfactory to Bank; and

       (m)     Bank shall have received such additional agreements, documents, certificates and/or instruments as it may reasonably request.

     **3.2**     **Conditions Precedent to Second Term Loan Advances.**  Unless otherwise waived by the Bank, the Bank's obligation to make the Second Term Loan Advance is subject to the condition precedent that Bank shall have received, in form and substance reasonably satisfactory to Bank, such documents, and completion of such other matters, as Bank may reasonably deem necessary or appropriate, including, without limitation:

       (a)     the entry of the Final Order shall have occurred not later than thirty (30) days following the Petition Date;

       (b)     all material "second day orders" and all related pleadings intended to be entered on or prior to the date of entry of the Final Order, including a final cash management order, shall have been entered by the Bankruptcy Court, and all pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be reasonably satisfactory in form and substance to the Bank; and

(c)      Bank shall have received when due a current Budget prepared in good faith based upon assumptions believed to be reasonable when made and when delivered, reasonably satisfactory in all respects to Bank.

**3.3      Additional Conditions Precedent to All DIP Advances**.  Bank's obligations to make each DIP Advance, including the Initial DIP Advance, are subject to the following conditions precedent:

(a)      Bank shall have received a Notice of Borrowing complying with this Agreement;

(b)      the Financing Order shall be in effect and shall not have been reversed, modified, amended or stayed (other than with the written consent of Bank in its sole and absolute discretion);

(c)      at the time of and immediately after giving effect to the making of such DIP Advance, Debtor shall be in compliance with the then-current Budget subject to the Variance; and

(d)      the representations and warranties in this Agreement and in any other Loan Document shall be true, accurate, and complete in all material respects on the date of the Notice of Borrowing and on the Funding Date of such DIP Advance;

(e)      no default or Event of Default shall have occurred and be continuing or could reasonably be expected to result from the making of such DIP Advance or the use of the proceeds thereof;

(f)      Bank determines in the exercise of its reasonable discretion that a Material Adverse Change has not occurred after the Petition Date; and

(g)      in the case of the Third DIP Advance, the following conditions shall also apply:

(i) the Sale LOI shall be satisfactory in all respects to Bank in their sole and absolute discretion;

(ii) Bank and the Participants shall have received a revised Budget covering the period of time through the Extended Maturity Date satisfactory to Bank in its sole and absolute discretion; and

(iii) Borrower shall have executed and delivered all documents reasonably required by Bank to effect the Extension Request, including any requested amendment to the Participation Agreement.

**3.4      Covenant to Deliver**.  Borrower agrees to deliver to Bank each item required to be delivered to Bank under this Agreement and any other Loan Document as a condition precedent to any DIP Advance.  Borrower expressly agrees that a DIP Advance made prior to the receipt by Bank of any such item shall not constitute a waiver by Bank of Borrower's obligation

to deliver such item, and any such DIP Advance in the absence of a required item shall be made in Bank's sole and absolute discretion.

## 4    CREATION OF SECURITY INTEREST

### 4.1    Grant of Security Interest.

Pursuant to Section 364 of the Bankruptcy Code and the Loan Documents, the Liens of Bank hereunder shall at all times be secured by, and Borrower hereby grants to Bank, to secure the payment and performance in full of all of the Obligations, and pledges to Bank, a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected priming First Priority post-petition Lien, which Lien shall be subject only to the payment of the Carve Out, on all existing and after acquired real and personal property and other assets of Borrower, tangible and intangible, whether now owned by or owing to, or hereafter acquired by or arising in favor of Borrower, whether owned or consigned by or to, or leased from or to Borrower and regardless of where located, including, without limitation, the items listed on the attached Exhibit A (collectively, the "**Collateral**").

If this Agreement is terminated, Bank's Lien in the Collateral shall continue until the Obligations (other than inchoate indemnity obligations) are satisfied in full, and at such time, Bank shall, at Borrower's sole cost and expense, terminate its security interest in the Collateral and all rights therein shall revert to Borrower.  In the event (x) all Obligations (other than inchoate indemnity obligations) are satisfied in full, and (y) this Agreement is terminated, Bank shall terminate the security interest granted herein.

Borrower acknowledges that it previously has entered, and/or may in the future enter, into Bank Services Agreements with Bank.  Regardless of the terms of any Bank Services Agreement, Borrower agrees that any amounts Borrower owes Bank thereunder shall be deemed to be Obligations hereunder and that it is the intent of Borrower and Bank to have all such Obligations secured by the first priority perfected Lien on the Collateral granted herein, subject to the Carve-Out.  The Collateral may also be subject to Permitted Liens.

### 4.2    Priority of Security Interest.  Borrower represents, warrants, and covenants that, subject in all cases to the Carve-Out and the Financing Order:

(a)    pursuant to section 364(c)(2) of the Bankruptcy Code, Bank shall have at all times a First Priority perfected security interest, Liens and mortgage on, all Collateral not subject to valid, perfected, enforceable and non-avoidable security interests, liens and mortgages as of the Petition Date, including upon entry of the Final Order, proceeds of avoidance actions under chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code) ("**Avoidance Actions**");

(b)    pursuant to section 364(c)(3) of the Bankruptcy Code, Bank shall have at all times a valid, perfected, enforceable, and non-avoidable junior security interest, Lien and mortgage on all Collateral that was subject to valid, perfected, enforceable, and non-avoidable security interests, Liens or mortgages in existence on the Petition Date or that is subject to valid Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as

Case 19-11938-LSS    Doc 13    Filed 09/04/19    Page 87 of 152

permitted by section 546(b) of the Bankruptcy Code and that have priority to the security interests, Liens, or mortgages under applicable law, in each case subject only to such valid, perfected, enforceable, and non-avoidable security interests, Liens or mortgages and any other Permitted Liens that, pursuant to this Agreement and the Financing Order, are permitted to be senior in priority to the security interests, Liens or mortgages, including Liens with respect to the Prepetition SVB Facility; and

(c)     for the avoidance of doubt, subject to the Carve-Out, Bank shall have at all times, valid, perfected, enforceable, and non-avoidable First Priority Liens and security interests in Debtor's bank accounts as well as the funds in such accounts, and no other party or entity shall have any Lien or security interest in such accounts or in any funds in such accounts; provided, that such liens and security interests shall be junior to the Bank's liens with respect to the Prepetition SVB Facility. All of the Obligations and Debtor's use of any cash collateral of Bank, pursuant to the Carve-Out or otherwise in accordance with the Final Order, will constitute an administrative expense under section 364(c)(1) of the Bankruptcy Code with priority, subject to the provisions of the Carve-Out, over all claims or costs or expenses of administration of the kinds specified in, or ordered pursuant to, any provision of the Bankruptcy Code and shall at all times be senior to the rights of Debtor or any successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Bankruptcy Code.

**4.3     Authorization to File Financing Statements**. Borrower hereby authorizes Bank to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Bank's interest or rights hereunder, including a notice that any disposition of the Collateral, by Borrower or any other Person, shall be deemed to violate the rights of Bank under the Code.

**4.4     Pledge of Collateral**. Borrower hereby pledges, assigns and grants to Bank a security interest in all the Shares, together with all proceeds and substitutions thereof, all cash, stock and other moneys and property paid thereon, all rights to subscribe for securities declared or granted in connection therewith, and all other cash and noncash proceeds of the foregoing, as security for the performance of all of the Obligations. The property referenced in the immediately prior sentence shall be "Collateral" for the purposes of this Agreement. On the Closing Date, or, to the extent not certificated as of the Closing Date, within ten (10) Business Days of the certification of any Shares, the certificate or certificates for the Shares will be delivered to Bank, accompanied by an instrument of assignment duly executed in blank by Borrower. To the extent required by the terms and conditions governing the Shares, Borrower shall cause the books of each entity whose Shares are part of the Collateral and any transfer agent to reflect the pledge of the Shares. Upon the occurrence and during the continuance of an Event of Default hereunder and Bank foreclosure on the Collateral, Bank may effect the transfer of any securities included in the Collateral (including but not limited to the Shares) into the name of Bank and cause new (as applicable) certificates representing such securities to be issued in the name of Bank or their transferee. Borrower will execute and deliver such documents, and take or cause to be taken such actions, as Bank may reasonably request to perfect or continue the perfection of Bank's security interest in, and Lien on, the Shares. Unless an Event of Default shall have occurred and be continuing, Borrower shall be entitled to exercise any voting rights with respect to the Shares and to give consents, waivers and ratifications in respect thereof; provided that no vote shall be cast or consent, waiver or ratification given or action taken which

01:25131928.1

10

ny-1742130 v6

would be inconsistent with any of the terms of this Agreement or the Financing Order or which would constitute or create any violation of any of such respective terms.  All such rights to vote and give consents, waivers and ratifications shall terminate upon the occurrence and continuance of an Event of Default.

**4.5    No Discharge; Survival of Claims.**  Pursuant to Section 1141(d)(4) of the Bankruptcy Code, Borrower hereby waives any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the payment in full in cash of the Obligations (other than contingent indemnification and reimbursement Obligations not yet due) under this Agreement.  Borrower hereby agrees that the Super-Priority Claims and Liens granted to the Bank pursuant to the Interim Order or the Final Order shall not be affected in any manner by the entry of an order confirming a plan of reorganization.

## 5    REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants on the Closing Date and on each Funding Date as follows:

**5.1    Due Organization, Authorization; Power and Authority**.  Borrower is duly existing and in good standing in its jurisdiction of formation and is qualified and licensed to do business and is in good standing in any jurisdiction in which the conduct of its business or its ownership of property requires that it be qualified except where the failure to do so could not reasonably be expected to cause a Material Adverse Change.

Subject to the entry of the Financing Order, the execution, delivery and performance by Borrower of the Loan Documents to which it is a party have been duly authorized and do not (i) conflict with any of Borrower's organizational documents, (ii) contravene, conflict with, constitute a default under or violate any material Requirement of Law, (iii) contravene, conflict with or violate any applicable order, writ, judgment, injunction, decree, determination or award of any Governmental Authority by which Borrower or any of its Subsidiaries or any of their property or assets may be bound or affected, (iv) require any action by, filing, registration, or qualification with, or Governmental Approval from, any Governmental Authority (except such Governmental Approvals that have already been obtained and are in full force and effect) or (v) conflict with, contravene, constitute a default or breach under, or result in or permit the termination or acceleration of, any material agreement by which Borrower is bound other than with respect to  Debtor, conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Bankruptcy Case.  Borrower is not in default under any agreement to which it is a party or by which it is bound in which the default could reasonably be expected to cause a Material Adverse Change.

**5.2    Collateral**.  Borrower has good title to, rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder, free and clear of any and all Liens except Permitted Liens.  Borrower has no Collateral Accounts at or with any bank or financial institution other than as described on Schedule 5.2.  The Accounts are bona fide, existing obligations of the Account Debtors. The Collateral (other than Offsite Collateral) is not in the possession of any third party bailee (such as a warehouse) except as otherwise set forth on Schedule 5.2.  None of the components of the Collateral (other than Offsite Collateral) shall be maintained at locations other than as provided on Schedule 5.2 or as permitted pursuant to

Section 7.2. All Inventory is in all material respects of good and marketable quality, free from material defects. Borrower is the sole owner of the Intellectual Property which it owns or purports to own except for (a) non-exclusive licenses granted to its customers in the ordinary course of business and licenses permitted by Section 7.1, (b) over-the-counter software that is commercially available to the public, and (c) material Intellectual Property licensed to Borrower as described on Schedule 5.2. Each Patent which it owns or purports to own and which is material to Borrower's business is valid and enforceable, and no part of the Intellectual Property which Borrower owns or purports to own and which is material to Borrower's business has been judged invalid or unenforceable, in whole or in part. To the best of Borrower's knowledge, no claim has been made that any part of the Intellectual Property violates the rights of any third party except to the extent such claim could not reasonably be expected to cause a Material Adverse Change. Except as described on Schedule 5.2, Borrower is not a party to, nor is it bound by, any Restricted License.

**5.3    Binding Obligation**.  Subject to the entry of the Financing Order, each Loan Document has been duly executed and delivered by Debtor and is the legally valid and binding obligation of Debtor, enforceable against Debtor in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (including, without limitation, the terms of the Financing Order).

**5.4    No Defaults**.  Other than as a result of the Bankruptcy Case or as set forth on Schedule 5.4, Debtor is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its contractual obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not be reasonably expected to cause a Material Adverse Change.

**5.5    Litigation**Except as set forth on Schedule 5.5, there are no actions or proceedings pending or, to the knowledge of any Responsible Officer, threatened in writing by or against Borrower or any of its Subsidiaries involving more than One Hundred Thousand Dollars ($100,000) individually or in the aggregate.

**5.6    No Material Deviation in Financial Statements**.  All consolidated financial statements for Borrower and any of its Subsidiaries delivered to Bank fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated results of operations.  Except as otherwise expressly disclosed to Bank prior to the Closing Date, there has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to Bank.

**5.7    Regulatory Compliance**.  Borrower is not an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended.  Borrower is not engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors). Borrower (a) has complied in all material respects with all Requirements of Law, and (b) has not violated any Requirements of Law the violation of which could reasonably be expected to cause a Material Adverse Change.  None of Borrower's or any of its Subsidiaries' properties or assets

has been used by Borrower or any Subsidiary or, to the best of Borrower's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than legally.  Borrower and each of its Subsidiaries have obtained, subject to the entry of the Financing Order, all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted.

      **5.8**    **Reserved**.

      **5.9**    **Tax Returns and Payments; Pension Contributions**.  Borrower has timely filed (taking into account all applicable extension periods) all required tax returns and reports required to be filed prior to the date hereof, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower except (a) to the extent such taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor, or (b) if such taxes, assessments, deposits and contributions do not, individually or in the aggregate, exceed Twenty-Five Thousand Dollars ($25,000).

      To the extent Borrower defers payment of any contested taxes, Borrower shall (i) notify Bank in writing of the commencement of, and any material development in, the proceedings, and (ii) post bonds or take any other steps required to prevent the Governmental Authority levying such contested taxes from obtaining a Lien upon any of the Collateral that is other than a "Permitted Lien." Borrower is unaware of any claims or adjustments proposed for any of Borrower's prior tax years which could result in additional taxes becoming due and payable by Borrower in excess of Twenty-Five Thousand Dollars ($25,000).  Borrower has paid all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms, and Borrower has not withdrawn from participation in, and has not permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

      **5.10**    **Use of Proceeds**.  Borrower shall use the proceeds of the DIP Advances solely for the purposes specified in Section 2.1.1(f).

      **5.11**    **Reserved**.

      **5.12**    **Full Disclosure**.  No written representation, warranty or other statement of Borrower in any certificate or written statement given to Bank, as of the date such representation, warranty, or other statement was made, taken together with all such written certificates and written statements given to Bank, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not misleading (it being recognized by Bank that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results).

**5.13    Super-Priority Nature of Debtor's Obligations and Bank's Security Interests and Liens**.

(a)    Subject to the terms of the Financing Order, all Obligations of Debtor hereunder and under the other Loan Documents, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall be:

(i)    Claims, entitled to the benefits of sections 364(c)(l) and 507(b) of the Bankruptcy Code, having a super-priority over any and all administrative expenses of the kind specified in sections 105,326,328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code ("**Super-Priority Claims**"), subject only to the Carve-Out. Subject to the Carve-Out, the Super-Priority Claims shall be payable from and have recourse to all prepetition and postpetition property of Debtor and all proceeds thereof, including, following entry of the Final Order, the proceeds of the Avoidance Actions.

(ii)    Secured, pursuant to section 364(c)(2) of the Bankruptcy Code, subject only to the Carve-Out, by a perfected First Priority Lien on all Collateral of Debtor that is not otherwise subject to a Lien (provided, that such lien shall not extend to the proceeds of Avoidance Actions until the entry of the Final Order).

(iii)    Secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, subject only to the Carve-Out, by valid, perfected, enforceable, and non-avoidable junior security interests, Liens and mortgages on all Collateral of Debtor that was subject to valid, perfected, enforceable, and non-avoidable security interests, Liens or mortgages in existence on the Petition Date (including, for the avoidance of doubt, the Liens securing the Prepetition SVB Facility, that, pursuant to this Agreement, are permitted to be senior in priority to the Liens granted under the Loan Documents) or that was subject to valid Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and that have priority to the Liens granted under the Loan Documents under applicable law, in each case subject only to such valid, perfected, enforceable, and non-avoidable security interests.

(b)    Subject only to the Carve-Out, no cost or expense of administration under sections 364(c)(1), 503(b), 506(c), 507(b) of the Bankruptcy Code or otherwise, and those resulting from the conversion of the Bankruptcy Case pursuant to section 1112 of the Bankruptcy Code, shall be senior to, or pari passu with, the Super-Priority Claims of Bank arising out of the DIP Advances.  Upon written notice by Bank to Borrower, Borrower shall be deemed to have authorized Bank to fund the Carve-Out in a segregated account, which account shall be maintained for the benefit of the Case Professionals (and any such amounts funded shall be Obligations hereunder).

(c)    Upon the entry by the Bankruptcy Court of the Interim Order and subject to the terms thereof, the perfected, First Priority Lien on, and security interest in, the Collateral described in the Loan Documents in favor of Bank shall continue to be valid and enforceable perfected First Priority Lien on, and security interest in, all right, title and interest of Debtor in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person, subject to the Carve-Out.

**5.14    Reorganization Matters**.

(a)    The Bankruptcy Case was commenced on the Petition Date and proper notice was given of (i) the motion seeking approval of the Loan Documents and the Interim Order, and (ii) the hearing for the approval of the Interim Order.  Debtor shall give, on a timely basis as specified in the Interim Order all notices required to be given to all parties specified in the Interim Order.

(b)    The Interim Order is in full force and effect has not been reversed, stayed, modified or amended (other than with the consent of Bank in its sole and absolute discretion).

**5.15    Payment of Obligations**.    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Bank shall be entitled to immediate indefeasible payment in full in cash of such Obligations without further application to or order of the Bankruptcy Court.

**5.16    No Discharge; Survival of Claims**.    To the extent that any Obligations (other than inchoate indemnity obligations) are then outstanding or Bank then has any commitment to make DIP Advances hereunder, Debtor agrees that (i) the Obligations hereunder shall not be discharged by the entry of an order confirming the sale of all or substantially all of the assets of Debtors in the Bankruptcy Case (and Debtor pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the security interests and Liens and priority granted to Bank pursuant to the Financing Order shall not be affected in any manner by the entry of an order confirming such sale in the Bankruptcy Case.

**5.17    Waiver of any Priming Rights**.    Upon the Closing Date and subject to the entry of the Final Order, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, other than as expressly set forth in the Financing Order, Debtor hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any security interest, Lien or mortgage of equal or greater priority than the security interests, Liens and mortgages securing the Obligations, or to approve a claim of equal priority to, or greater priority than, that of the Obligations.

**5.18    Compliance with the Budget**.    Debtor is in compliance with the then-current Budget subject to the Variance.

**5.19    Definition of "Knowledge"**.    For purposes of the Loan Documents, whenever a representation or warranty is made to Borrower's knowledge or awareness, to the "best of" Borrower's knowledge, or with a similar qualification, knowledge or awareness means the actual knowledge, after reasonable investigation, of any Responsible Officer.

**5.20    Financing Order.**    The Financing Order is in full force and effect is not subject to a pending appeal or motion for leave to appeal or other proceeding to set aside such order and has not been reversed, modified, stayed or vacated.

## 6      AFFIRMATIVE COVENANTS

Unless and until the DIP Commitment has been terminated and all of the Obligations (other than inchoate indemnity obligations) have been paid in full, Borrower shall do all of the following:

### 6.1      **Government Compliance**.

(a)      Maintain its and all its Subsidiaries' legal existence and good standing in their respective jurisdictions of formation and maintain qualification in each jurisdiction in which the failure to so qualify could reasonably be expected to cause a Material Adverse Change. Borrower shall comply, and have each Subsidiary comply, in all material respects, with all laws, ordinances and regulations to which it is subject.

(b)      Obtain all of the Governmental Approvals necessary for the performance by Borrower of its obligations under the Loan Documents to which it is a party and the grant of a security interest and Lien to Bank in all of the Collateral.  Borrower shall promptly provide copies of any such obtained Governmental Approvals to Bank.

### 6.2      **Financial Statements, Reports, Certificates**.  Provide Bank with the following:

(a)      Budget.  Not later than the second (2nd) Business Day of each week commencing after the Petition Date, (a) an updated Budget extending the initial Budget for an additional week and (b) a comparison of each line item set forth in the most recent Budget for the week most recently ended against the actual performance for such week with respect to each line item (and on a cumulative basis from the Petition Date to the date of such report), in each case in form and substance reasonably satisfactory to Bank and certified as complete and accurate by a Responsible Officer to the Responsible Officer's reasonable belief. Debtor shall not be permitted to change the Budget in any manner inconsistent with the Variance without the written consent of Bank in its sole and absolute discretion;

(b)      Notice of Litigation.  Promptly upon any officer of Debtor obtaining knowledge of any adverse proceeding not previously disclosed in writing by Debtor to Bank, provide written notice thereof;

(c)      Monthly Operating Reports.  Contemporaneously with delivery to the United States Trustee, copies of all monthly operating reports and supporting documentation.

(d)      Other Statements.  Within five (5) Business Days of delivery, copies of all statements, reports and notices made available to Borrower's security holders;

(e)      Legal Action Notice.  A prompt report of any legal actions pending or threatened in writing against Borrower or any of its Subsidiaries that could result in damages or costs to Borrower or any of its Subsidiaries of, individually or in the aggregate, One Hundred Thousand Dollars ($100,000) or more; and

(f)      Other Financial Information.  Other financial information reasonably requested by Bank.

**6.3    Inventory; Returns**.  Keep all Inventory in good and marketable condition, free from material defects.  Returns and allowances between Borrower and its Account Debtors shall follow Borrower's customary practices as they exist at the Closing Date.  Borrower must promptly notify Bank of all returns, recoveries, disputes and claims that involve more than Ten Thousand Dollars ($10,000).

**6.4    Taxes; Pensions**.  Timely file (taking into account all applicable extension periods, if any), and require each of its Subsidiaries to timely file (taking into account all applicable extension periods, if any), all required tax returns and reports and timely pay (taking into account all applicable extension periods, if any), and require each of its Subsidiaries to timely pay (taking into account all applicable extension periods, if any), all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower and each of its Subsidiaries, except for deferred payment of any taxes contested pursuant to the terms of Section 5.7 hereof, and shall deliver to Bank, on demand, appropriate certificates attesting to such payments, and pay all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms.

**6.5    Insurance**.

(a)    Maintain, with financially sound and reputable insurers, the same insurance that it has in effect on the date immediately prior to the Petition Date as set forth on Schedule 6.5; and keep its business and the Collateral insured for risks and in amounts standard for companies in Borrower's industry and location and as Bank may reasonably request.  Insurance policies shall be in a form, with financially sound and reputable insurance companies that are not Affiliates of Borrower, and in amounts that are satisfactory to Bank in its good faith discretion.  All property policies shall have a lender's loss payable endorsement showing Bank as lender loss payees.  All liability policies shall show, or have endorsements showing, Bank as an additional insured.  Bank shall be named as lender loss payees and/or additional insured with respect to any such insurance providing coverage in respect of any Collateral.  Bank acknowledges that the insurance maintained by Borrower as of the Closing Date is acceptable to Bank as of the Closing Date.

(b)    Proceeds payable under any property policy are, at Bank's option, payable to Bank on account of the Obligations.

(c)    At Bank's request, Borrower shall deliver certified copies of insurance policies and evidence of all premium payments with respect to all property policies and liability policies.  Each provider of any such insurance required under this Section 6.5 shall agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to Bank, that it will give Bank thirty (30) days prior written notice before any such policy or policies shall be materially altered or canceled.  If Borrower fails to obtain insurance as required under this Section 6.5 or to pay any amount or furnish any required proof of payment to third persons and Bank, Bank may make all or part of such payment or obtain such insurance policies required in this Section 6.5, and take any action under the policies Bank deems prudent.

**6.6    Operating Accounts**.  Subject to the Cash Management Order, maintain all domestic banking, investment management, letters of credit and foreign exchange, including,

without limitation, all of its domestic operating and other deposit accounts, securities accounts and commodities accounts in the Collateral Accounts set forth on Schedule 5.2, provided that Borrower may maintain one (1) deposit account with JP Morgan Chase Bank, National Association solely for use as an adequate assurance account for Borrower's utility providers. With regard to its Foreign Subsidiaries, Borrower shall not hold more than One Hundred Thousand Dollars ($100,000) of its total consolidated cash in Foreign Subsidiaries, provided, however, that Borrower may hold up to Three Hundred Fifty Thousand Dollars ($350,000.00) of its total consolidated cash in Foreign Subsidiaries for not more than five (5) consecutive days in any calendar month.

**6.7    Bankruptcy Milestones**.

(a)    No later than three (3) Business Days after the Petition Date, or such later date as may be consented to by Bank, Borrower will have filed a motion seeking approval of bidding and sale procedures;

(b)    No later than thirty (30) days after the Petition Date or such greater period agreed to by Bank in its sole and absolute discretion, the Bankruptcy Court shall have entered the Final Order, and such Final Order shall be in effect and shall not have been reversed, modified, amended or stayed (other than with the written consent of Bank in its sole and absolute discretion); and

(c)    No later than thirty (30) days after the Petition Date, or such greater period agreed to by Bank in its sole and absolute discretion, Borrower will have obtained entry of an order that approves bidding procedures in respect of the process associated with a Permitted Sale which procedures are in form and substance acceptable to Bank in its sole and absolute discretion.

**6.8    Protection of Intellectual Property Rights**.

(a)    (i) Protect, defend and maintain the validity and enforceability of its Intellectual Property with any material value to Borrower's business; (ii) promptly advise Bank in writing of infringements or any other event that could reasonably be expected to adversely affect the value of its Intellectual Property with any material value to Borrower's business; and (iii) not allow any Intellectual Property material to Borrower's business to be abandoned, forfeited or dedicated to the public without Bank's written consent.

(b)    To the extent not already disclosed in writing to Bank, if Borrower (i) obtains any Patent, registered Trademark, registered Copyright, registered mask work, or any pending application for any of the foregoing, whether as owner, licensee or otherwise, or (ii) applies for any Patent or the registration of any Trademark, then Borrower shall immediately provide written notice thereof to Bank and shall execute such intellectual property security agreements and other documents and take such other actions as Bank may request in its good faith business judgment to perfect and maintain a first priority perfected Lien in favor of Bank in such property. If Borrower decides to register any Copyrights or mask works in the United States Copyright Office, Borrower shall: (x) provide Bank with at least fifteen (15) days prior written notice of Borrower's intent to register such Copyrights or mask works together with a copy of the

application it intends to file with the United States Copyright Office (excluding exhibits thereto); (y) execute an intellectual property security agreement and such other documents and take such other actions as Bank may request in its good faith business judgment to perfect and maintain a first priority perfected Lien in favor of Bank in the Copyrights or mask works intended to be registered with the United States Copyright Office; and (z) record such intellectual property security agreement with the United States Copyright Office contemporaneously with filing the Copyright or mask work application(s) with the United States Copyright Office. Borrower shall promptly provide to Bank copies of all applications that it files for Patents or for the registration of Trademarks, Copyrights or mask works, together with evidence of the recording of the intellectual property security agreement required for Bank to perfect and maintain a first priority perfected Lien on such property.

(c)     Provide written notice to Bank at least ten (10) days prior to entering or becoming bound by any Restricted License (other than over-the-counter software that is commercially available to the public). Borrower shall take such commercially reasonable steps as Bank requests to obtain the consent of, or waiver by, any person whose consent or waiver is necessary for (i) any Restricted License to be deemed "Collateral" and for Bank to have a security interest in it that might otherwise be restricted or prohibited by law or by the terms of any such Restricted License, whether now existing or entered into in the future, and (ii) Bank to have the ability in the event of a liquidation of any Collateral to dispose of such Collateral in accordance with Bank's rights and remedies under this Agreement, the other Loan Documents and the Financing Order.

**6.9     Litigation Cooperation**.  From the date hereof and continuing through the termination of this Agreement, make available to Bank, without expense to Bank, Borrower and its officers, employees and agents and Borrower's books and records, to the extent that Bank may deem them reasonably necessary to prosecute or defend any third-party suit or proceeding instituted by or against Bank with respect to any Collateral or relating to Borrower.

**6.10     Access to Collateral; Books and Records**.  Allow Bank, or its agents, at reasonable times, on three (3) Business Days' notice (provided no notice is required if an Event of Default has occurred and is continuing), to inspect the Collateral and audit and copy Borrower's Books. The foregoing inspections and audits shall be at Borrower's expense.

**6.11     Formation or Acquisition of Subsidiaries**.  Borrower shall not, and shall not permit its Subsidiaries, to form any new Subsidiaries.

**6.12     Further Assurances**.  Execute any further instruments and take further action as Bank reasonably requests to perfect or continue Bank's Lien in the Collateral or to effect the purposes of this Agreement and the Financing Order.

**6.13     Permitted Sale Information**.  Borrower shall notify Bank of its receipt of any Permitted Sale Information, and, if written, deliver copies of the same to Bank, within twenty-four (24) hours of its receipt thereof. Borrower shall notify Bank of any substantive discussion involving the Permitted Sale Information and deliver a reasonably detailed (satisfactory to Bank) summary of the same to Bank, within twenty four (24) hours of the occurrence of such discussion. In addition, Borrower shall (i) make its and its Subsidiaries' management, officers,

employees, professionals, agents and consultants, available to Bank upon request to answer any questions regarding the Permitted Sale Information (ii) hold a weekly conference call (or more frequently if requested by Bank) with Bank and Participant to discuss the Permitted Sale Information. For the purposes of this Agreement, "**Permitted Sale Information**" is, collectively, updates and summaries of all discussions and inquiries (whether such inquiries are in-bound or out-bound), whether formal or informal, and all material information, correspondence, agreements, documents, reports or definitive documentation or any modifications or amendments or correspondence related thereto, whether in oral or written form, including, without limitation, any commitments, offers, letters of intent or expressions of interest, concerning or related to any Permitted Sale. Notwithstanding anything herein to the contrary, Bank will only share any information provided under this Section 6.13 to any Participant in accordance with the Participation Agreement.

   **6.14 Bankruptcy Matters.  Borrower will:**

     (a) contemporaneously with the filing thereof, deliver to Bank copies of all pleadings, motions, applications, financial information and other papers and documents filed by Borrower in the Case, which copies of such papers and documents may be provided to or served on Bank's counsel; and

     (b) as long as Bank is not a bidder for such Collateral, contemporaneously with the receipt thereof, deliver to Bank copies of all letters of intent, expressions of interest, offers to purchase or draft purchase agreements (together with subsequent drafts) with respect to any of the Collateral; provided, however, that notwithstanding anything herein to the contrary, Bank will only share information provided under this Section 6.14(b) to any Participant in accordance with the Participation Agreement.

   **6.15 Payment of Post-Petition Obligations.**  Pay all actual and necessary material business expenses in accordance with the Budget, to the extent of funds available in the Budget for such purpose, as and when due.

   **6.16 Borrower's Leases.**  Within 90 days of the Petition Date, Borrower shall submit, and shall use commercially reasonable efforts to ensure that the Bankruptcy Court shall grant, a motion to extend the period in which Borrower can assume or reject its leases of non-residential real property until at least 210 days from the Petition Date, unless Borrower determines, in its reasonable business judgment to reject its leases.

**7  NEGATIVE COVENANTS**

   Unless and until the DIP Commitment has been terminated and all of the Obligations (other than inchoate indemnity obligations) have been paid in full, Borrower shall not do any of the following without Bank's prior written consent:

   **7.1 Dispositions**.  Convey, sell, lease, transfer, assign, or otherwise dispose of (collectively, "**Transfer**"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, except for: (a) Borrower's use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents; (b) pursuant to non-exclusive licenses existing on the Petition Date for the use of the property of Borrower or its Subsidiaries in the ordinary course of business and licenses that could not result in a legal transfer of title of the licensed property but that may be exclusive in respects other than

territory and that may be exclusive as to territory only as to discreet geographical areas outside of the United States; (c) pursuant to exclusive licenses existing on the Petition Date within the United States for the use of Intellectual Property of Borrower or its Subsidiaries; (d) a Permitted Sale; and (e) Transfers of Inventory in the ordinary course of business.

**7.2**    **Changes in Business, Management, Control or Business Locations**. (a) Engage in or permit any of its Subsidiaries to engage in any business other than the businesses currently engaged in by Borrower and such Subsidiary, as applicable, or reasonably related thereto; (b) liquidate or dissolve; or (c) permit or suffer any Change in Control.  Borrower shall not, without at least twenty (20) days prior written notice to Bank:  (1) add any new offices or business locations, including warehouses or deliver any portion of the Collateral to a bailee with respect to which Bank and such bailee are not already parties to a bailee agreement governing both the Collateral and the location to which Borrower intends to deliver the Collateral, without the written consent of Bank.

**7.3**    **Mergers or Acquisitions**. Except in connection with a Permitted Sale, (a) merge or consolidate, or permit any of its Subsidiaries to merge or consolidate, with any other Person, or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the capital stock or property of another Person (including, without limitation, by the formation of any Subsidiary); or (b) enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution) except pursuant to approval of the Bankruptcy Court and with the consent of Bank.  A Subsidiary may merge or consolidate into another Subsidiary or into Borrower.

**7.4**    **Indebtedness**.  Create, incur, assume, be liable for or suffer to exist any Indebtedness (including any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(h) of the Bankruptcy Code, and Indebtedness under Section 364 of the Bankruptcy Code), or permit any Subsidiary to do so, other than the Permitted Indebtedness.

**7.5**    **Encumbrance**.  Create, incur, allow, or suffer any Lien on any of its property, or assign or convey any right to receive income, including the sale of any Accounts, or permit any of its Subsidiaries to do so, except for Permitted Liens; permit any Collateral not to be subject to the First Priority security interest granted herein; or enter into any agreement, document, instrument or other arrangement (except with or in favor of Bank) with any Person that directly or indirectly prohibits, or has the effect of prohibiting, Borrower from assigning, mortgaging, pledging, granting a security interest in or upon, or encumbering any of Borrower's Intellectual Property, except as is otherwise permitted in Section 7.1 hereof and the definition of "Permitted Liens" herein.

**7.6**    **Approved Budget**.  Make any expenditure other than in accordance with the Budget, subject to the Variance.  Subject to the Variance, Debtor shall not make any material change to the amounts indicated in the Budget without the prior written consent of Bank in its sole and absolute discretion.  In no case shall Debtor use any proceeds of Collateral or any DIP Advance to bring any claim or suit against Bank or any of their Affiliates; provided, however, notwithstanding anything to the contrary herein, an aggregate of $25,000 of the proceeds of Collateral or any DIP Advance may be used by the Committee to investigate (i) the amount,

extent, priority, validity, perfection or enforcement of the indebtedness of Borrower owing to Bank or any Participant; and (ii) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of Bank or any Participant with respect thereto.

**7.7    Distributions; Investments**. (a) Pay any dividends or make any distribution or payment (including any payment in respect of any other indebtedness existing on or prior to the Petition Date) or redeem, retire or purchase any capital stock or other equity interests; (b) directly or indirectly make any Investment (including, without limitation, by the formation of any Subsidiary) other than Permitted Investments, or permit any of its Subsidiaries to do so, or (c) directly or indirectly make any payment in respect of any other Indebtedness existing on or prior to the Petition Date, except in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the Budget, or otherwise approved by Bank in writing.

**7.8    Transactions with Affiliates**.  Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower, except for transactions that are in the ordinary course of Borrower's business and consistent with its past practice, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

**7.9    Critical Vendor and Other Payments; Certain Receipts**.  Make (i) any payments on account of any creditor's claims against Debtor, (ii) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the Budget, or otherwise approved by Bank in writing.

**7.10    Exercise of Remedies**.  Obtain, or seek to obtain, any stay on the exercise of the remedies of Bank hereunder, under any other Loan Document or the Financing Order.

**7.11    Bankruptcy Related Covenants**.  Seek, consent to, or permit to exist any of the following:

(a)    any modification, stay, vacation or amendment to the Financing Order or any "first day order" as to which Bank has not consented in writing;

(b)    a priority claim or administrative expense claim or unsecured claim against Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority claim of Bank in respect of the Obligations, except with respect to the Carve-Out;

(c)    any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, other than with respect to the Carve-Out or Permitted Liens;

(d)    [reserved]

(e)    any order which authorizes the payment of any Indebtedness incurred prior to the Petition Date, unless such payments are in compliance with the Budget or expressly authorized by the Financing Order;

(f)    any order which would have the effect of impairing the nature, priority or terms of the Obligations or the Liens securing the Obligations pursuant to the terms of the Loan Documents; or

(g)    any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents, or the Financing Order, or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents, or the Financing Order.

**7.12    Compliance**.  Fail to (a) meet the minimum funding requirements of ERISA, (b) prevent a Reportable Event or Prohibited Transaction, as defined in ERISA, from occurring, or (c) comply with the Federal Fair Labor Standards Act, the failure of any of the conditions described in clauses (a) through (c) which could reasonably be expected to cause a Material Adverse Change; or violate any other law or regulation, if the violation could reasonably be expected to cause a Material Adverse Change, or permit any of its Subsidiaries to do so; withdraw or permit any Subsidiary to withdraw from participation in, permit partial or complete termination of, or permit the occurrence of any other event with respect to, any present pension, profit sharing and deferred compensation plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

# 8    EVENTS OF DEFAULT

Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or any notice to Debtor, any one of the following shall constitute an event of default (an "**Event of Default**") under this Agreement:

**8.1    Payment Default**.  Borrower fails to (a) make any payment of principal or interest on any DIP Advance when due, or (b) pay any other Obligations within three (3) Business Days after such Obligations are due and payable (which three (3) Business Day cure period shall not apply to payments due on the Maturity Date).  During the cure period, the failure to make or pay any payment specified in clause (b) hereunder is not an Event of Default (but no DIP Advance will be made during such cure period);

**8.2    Covenant Default**.

(a)    Borrower fails or neglects to perform any obligation in Sections 6.2, 6.4, 6.5, 6.6, 6.7, 6.9, 6.10, 6.13, or 6.14 or violates any covenant in Section 7; or

(b)    Borrower fails or neglects to perform, keep, or observe any other term, provision, condition, covenant or agreement contained in this Agreement or any Loan

Documents, and as to any default (other than those specified in this Section 8) under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure the default within ten (10) days after the occurrence thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) day period or cannot after diligent attempts by Borrower be cured within such ten (10) day period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional period (which shall not in any case exceed ten (10) days) to attempt to cure such default, and within such reasonable time period the failure to cure the default shall not be deemed an Event of Default (but no DIP Advances shall be made during such cure period).  Cure periods provided under this Section 8 shall not apply, among other things, to financial covenants or any other covenants set forth in clause (a) above;

8.3  **Failure to Obtain Interim Order or Final Order**.  Borrower fails to obtain the entry of (i) the Interim Order by the Bankruptcy Court in form and substance acceptable to Bank in its sole and absolute discretion within three (3) days of the Petition Date or such greater period agreed by Bank in its sole and absolute discretion, or (ii) the Final Order by the Bankruptcy Court in form and substance acceptable to Bank in its sole and absolute discretion within thirty (30) days of the Petition Date or such greater period agreed by Bank in its sole and absolute discretion;

8.4  **Failure to Obtain Bidding Procedures Order**.  Borrower fails obtain the entry of an order by the Bankruptcy Court in form and substance acceptable to Bank in its sole and absolute discretion within thirty (30) days of the Petition Date or such greater period agreed by Bank in its sole and absolute discretion which order approves bidding procedures in respect of the process associated with a Permitted Sale which procedures are in form and substance acceptable to Bank in its sole and absolute discretion.

8.5  **Challenge to Liens**.  Debtor institutes any proceeding or investigation or supports same by any other Person who may challenge the status and/or validity, and/or perfection and/or priority of the security interests, Liens and mortgages on the Collateral created by the Loan Documents or the Financing Order, in each case, securing the Obligations, or any order is entered by the Bankruptcy Court sustaining any objection or challenge of any kind or nature to the validity, priority, or amount of the Liens or the Obligations or the Prepetition SVB Facility, including with respect to an action to recharacterize or subordinate any Liens or claims of Bank against Borrower.

8.6  **Certain Debtor Filings**.  Debtor without the consent of Bank, files a plan of reorganization or liquidation or a disclosure statement, or any amendment to any such plan or disclosure statement, that does not provide for the payment in full in cash of all of the Obligations upon, and as a condition to, consummation of such plan of reorganization or liquidation;

8.7  **Enlarged Powers**.  The entry of an order appointing a trustee in the Bankruptcy Case or an examiner having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code);

**8.8      Dismissal or Conversion**.  The entry of an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

**8.9      Superior Claims**.  The entry of an order granting any other super-priority claim or Lien equal or superior in priority to the Lien securing the Obligations granted to Bank, other than the Carve-Out, without Bank's prior written consent;

**8.10      Relief from Automatic Stay**.  The entry of one or more orders granting relief from the automatic stay so as to allow third parties to proceed against any asset of Debtor having a fair market value in excess of Fifty Thousand Dollars ($50,000) in the aggregate;

**8.11      Financing Order; Cash Management Order**.  The entry of an order staying, reversing, vacating or otherwise modifying the DIP Advances, any Liens securing the Obligations (or the validity or First Priority status thereof) or the Financing Order or the Cash Management Order;

**8.12      Collateral Surcharge**.  (i) Bank or the Collateral are surcharged or (ii) Borrower seeks to surcharge Bank or the Collateral, pursuant to Sections 105, 506(c), 552 or any other section of the Bankruptcy Code or (iii) the extent of the Liens on Collateral are otherwise limited pursuant to any such section of the Bankruptcy Code;

**8.13      Third Party Adequate Protection.**  Payment of or granting adequate protection with respect to pre-petition debt (other than to Bank);

**8.14      Insufficient Liquidity.**  Borrower shall fail to maintain sufficient projected borrowing capacity under this Agreement to pay all accrued administrative obligations and other administrative claims when due, subject to funds being included in the Budget for such purpose;

**8.15      Reserved.**

**8.16      Adequate Assurance.**  (i) Borrower deposits any funds (or allow any funds to be deposited) into the "Adequate Assurance Account" (as defined in any order approving adequate assurance procedures under § 366 of the Bankruptcy Code, which must be in form and substance acceptable to Bank and may only be amended or modified with Bank's prior consent (the "Utilities Order") unless such funds are deposited for purposes of adequate assurance deposits in favor of utilities providers or are otherwise required by the Utilities Order and contemplated by the Budget or (ii) Borrower uses any funds deposited in the Adequate Assurance Account in a manner inconsistent with the Utilities Order or the Budget without Bank's prior consent;

**8.17      Consummation of a Permitted Sale**.  Borrower fails to (i) obtain the entry of an order by the Bankruptcy Court in form and substance acceptable to Bank in its sole and absolute discretion within seventy-five (75) days of the Petition Date or such greater period agreed by Bank in its sole and absolute discretion (including the granting of an Extension Request) which order approves the consummation of a Permitted Sale and (ii) concurrently with the consummation of a Permitted Sale, apply all of the Net Asset Sale Proceeds received by Borrower in connection therewith to pay in whole or in part (if such Net Asset Sale Proceeds are insufficient to repay the Obligations in whole), in cash, all of the Obligations;

**8.18    Investor Abandonment; Priority of Security Interest**.  If there is a material impairment in the perfection or priority of Bank's security interests, Liens and mortgages in the Collateral;

**8.19    Attachment; Levy; Restraint on Business**.

(a)    (i) The service of process seeking to attach, by trustee or similar process, any funds of Borrower or of any entity under the control of Borrower (including a Subsidiary) in excess of Fifty Thousand Dollars ($50,000), or (ii) a notice of lien or levy is filed against any of Borrower's assets by any Governmental Authority, and the same under subclauses (i) and (ii) hereof are not, within ten (10) days after the occurrence thereof, discharged or stayed (whether through the posting of a bond or otherwise); provided, however, no DIP Advances shall be made during any ten (10) day cure period; or

(b)    (i) any material portion of Borrower's assets is attached, seized, levied on, or comes into possession of a trustee or receiver, or (ii) any court order enjoins, restrains, or prevents Borrower from conducting all or any material part of its business;

**8.20    Dissolution**.  Any order, judgment or decree shall be entered against Debtor decreeing the dissolution or split up of Debtor and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days;

**8.21    Other Agreements**.  Other than defaults caused by the filing of the Bankruptcy Case, there is, under any agreement to which Borrower is a party with a third party or parties, (a) any default resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount individually or in the aggregate in excess of One Hundred Thousand Dollars ($100,000); or (b) a default under any agreement which either generates revenues for Borrower or which Borrower pays fees in an amount, individually or in the aggregate, in excess of One Hundred Thousand Dollars ($100,000);

**8.22    Judgments; Penalties**.  One or more fines, penalties or final judgments, orders, or decrees for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000) (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier) shall be rendered against Borrower by any Governmental Authority, and the same are not, within ten (10) days after the entry, assessment or issuance thereof, discharged, satisfied, or paid, or after execution thereof stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay (provided that no DIP Advances will be made prior to the satisfaction, payment, discharge, stay, or bonding of such fine, penalty, judgment, order, or decree);

**8.23    Misrepresentations**.  Borrower or any Person acting for Borrower makes any representation, warranty or other statement now or later in this Agreement, any Loan Document or in any writing delivered to Bank or to induce Bank to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is incorrect in any material respect when made;

**8.24    Governmental Approvals**.  Any material Governmental Approval shall have been (a) revoked, rescinded, suspended, modified in an adverse manner or not renewed in the

ordinary course for a full term, in each case such that it could reasonably be expected to cause a Material Adverse Change or (b) subject to any decision by a Governmental Authority that designates a hearing with respect to any applications for renewal of any of such material Governmental Approval or that could reasonably be expected to result in the Governmental Authority taking any of the actions described in clause (a) above, and such decision or such revocation, rescission, suspension, modification or non-renewal (i) causes, or could reasonably be expected to cause, a Material Adverse Change, or (ii) adversely affects the legal qualifications of Borrower or any of its Subsidiaries to hold such material Governmental Approval in any applicable jurisdiction and such revocation, rescission, suspension, modification or non-renewal could reasonably be expected to affect the status of or legal qualifications of Borrower or any of its Subsidiaries to hold any material Governmental Approval in any other jurisdiction.

## 9    BANK'S RIGHTS AND REMEDIES

**9.1    Rights and Remedies.**  Five (5) Business Days after the delivery by Bank to the Debtor and its counsel (via email or otherwise) of a written notice (a "**Remedies Notice**") of the occurrence of an Event of Default (the "**Remedies Notice Period**"), in each case delivered in accordance with the Financing Order, unless the Bankruptcy Court orders otherwise provide, the automatic stay under Section 362 of the Bankruptcy Code will be automatically lifted as of 12:00 a.m. prevailing Eastern Time on the sixth (6th) day after the date on which the Remedies Notice is delivered to allow Bank to take any and all actions permitted by the Loan Documents and applicable law, as if no case were pending under the Bankruptcy Code. Borrower, the United States Trustee, and/or the Committee may contest the existence or continuation of an Event of Default during the Remedies Notice Period by filing an expedited motion in the Bankruptcy Court requesting a determination that an Event of Default has not occurred or is not continuing. Nothing in this paragraph shall limit the ability of Borrower and other parties-in-interest to timely request any such expedited hearing on a motion seeking such a finding, and Bank shall consent to the conduct of such expedited hearing (but not to the relief being sought therein). Upon the delivery of a Remedies Notice, (x) Borrower shall have no right to use any proceeds of the Collateral other than to satisfy the Obligations and the Carve Out, provided, that, during the Remedies Notice Period, the Debtor may use Cash Collateral solely to meet payroll obligations (other than severance) and pay expenses that the DIP Financing Parties approve as critical to keeping the Debtor's business operating in accordance with the Budget, or as otherwise agreed by the DIP Financing Parties in their sole discretion, and (y) Bank shall be entitled to:

(a)    declare all Obligations to be immediately due and owing, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower;

(b)    declare the DIP Commitment to be terminated and stop advancing money or extending credit for Borrower's benefit under this Agreement;

(c)    verify the amount of, demand payment of and performance under, and collect any Accounts and General Intangibles, settle or adjust disputes and claims directly with Account Debtors for amounts on terms and in any order that Bank consider advisable, notify any Person owing Borrower money of Bank's security interest in such funds;

(d)    make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its security interest in the Collateral.  Borrower shall assemble the Collateral if Bank requests and make it available as Bank designates.  Bank may enter premises where the Collateral is located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any Lien that appears to be prior or superior to its security interest and pay all expenses incurred.  Borrower grants Bank a license to enter and occupy any of its premises, without charge, to exercise any of Bank's rights or remedies;

(e)    apply to the Obligations (i) any balances and deposits of Borrower it holds, or (ii) any amount held by Bank owing to or for the credit or the account of Borrower;

(f)    ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale and sell the Collateral.  Bank is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, Borrower's labels, Patents, Copyrights, mask works, rights of use of any name, trade secrets, trade names, Trademarks, and advertising matter, or any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Bank's exercise of their rights under this Section 9, Borrower's rights under all licenses and all franchise agreements inure to Bank's benefit;

(g)    deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any agreement providing control of any Collateral;

(h)    demand and receive possession of Borrower's Books; and

(i)    exercise all rights and remedies available to Bank under the Loan Documents or at law or equity, including all remedies provided under the Code (including disposal of the Collateral pursuant to the terms thereof).

Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without any application, motion, or notice to, hearing before or order from, the Bankruptcy Court,upon the occurrence of any Event of Default (x) the DIP Commitment shall terminate, (y) all Obligations shall become immediately due and payable, and (z) subject to the expiration of the Remedies Notice Period (as applicable), Bank may enforce any and all Liens created pursuant to this Agreement and otherwise exercise any and all rights and remedies provided under the Loan Documents and/or applicable law, all without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Debtor.

Upon the occurrence of an Event of Default and the exercise by Bank of its rights and remedies under this Agreement and the other Loan Documents and applicable law, Debtor shall assist Bank in effecting a disposition of the Collateral upon such terms as are reasonably acceptable to Bank.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

**9.3    Power of Attorney**.  Borrower hereby irrevocably appoints Bank as its lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of

Default, to:  (a) endorse Borrower's name on any checks or other forms of payment or security; (b) sign Borrower's name on any invoice or bill of lading for any Account or drafts against Account Debtors; (c) settle and adjust disputes and claims about the Accounts directly with Account Debtors, for amounts and on terms Bank determines reasonable; (d) make, settle, and adjust all claims under Borrower's insurance policies; (e) pay, contest or settle any Lien, charge, encumbrance, security interest, and adverse claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; and (f) transfer the Collateral into the name of Bank or a third party as the Code permits.  Borrower hereby appoints Bank as its lawful attorney-in-fact to sign Borrower's name on any documents necessary to perfect or continue the perfection of Bank's security interest in the Collateral, regardless of whether an Event of Default has occurred, until all Obligations have been satisfied in full and Bank is under no further obligation to make DIP Advances hereunder.  Bank's foregoing appointment as Borrower's attorney in fact, and all of Bank's rights and powers, coupled with an interest, are irrevocable until all Obligations have been fully repaid and performed and Bank's obligation to provide DIP Advances terminates.

**9.4    Reserved**.

**9.5    Application of Payments and Proceeds Upon Default**.  If an Event of Default has occurred and is continuing, Bank shall have the right to apply in any order any funds in their possession, whether from Borrower account balances, payments, proceeds realized as the result of any collection of Accounts or other disposition of the Collateral, or otherwise, to the Obligations.  Bank shall pay any surplus to Borrower or to other Persons legally entitled thereto; Borrower shall remain liable to Bank for any deficiency.  If Bank, directly or indirectly, enter into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Bank shall have the option, exercisable at any time, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Bank of cash therefor.

**9.6    Bank's Liability for Collateral**.  Beyond the exercise of reasonable care in the custody and preservation thereof to the extent required by applicable law, including Article 9 of the UCC, Bank will have no duty as to any Collateral in its possession or control or in the possession or control of any sub-agent or bailee or any income therefrom or as to the preservation of rights against prior parties or any other rights pertaining thereto. Bank will be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equal to that which it accords its own similar property, and shall not be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral; or (d) any act or default of any carrier, warehouseman, bailee, or other Person. Borrower bears all risk of loss, damage or destruction of the Collateral.

**9.7    No Waiver; Remedies Cumulative**.  Bank's failure, at any time or times, to require strict performance by Borrower of any provision of this Agreement or any other Loan Document shall not waive, affect, or diminish any right of Bank thereafter to demand strict performance and compliance herewith or therewith.  No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for which it is given.  Bank's rights and remedies under this Agreement and the

other Loan Documents are cumulative.  Bank has all rights and remedies provided under the Code, by law, or in equity.  Bank's exercise of one right or remedy is not an election and shall not preclude Bank from exercising any other remedy under this Agreement or other remedy available at law or in equity, and Bank's waiver of any Event of Default is not a continuing waiver.  Bank's delay in exercising any remedy is not a waiver, election, or acquiescence.

**9.8    Demand Waiver**.  Borrower waives demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees held by Bank on which Borrower is liable.

## 10    NOTICES

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered:  (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, or email address indicated below.  Bank or Borrower may change its mailing or electronic mail address by giving the other party written notice thereof in accordance with the terms of this Section 10.

| | |
|---|---|
| If to Borrower: | uBiome, Inc.<br>360 Langton Street, No. 301<br>San Francisco, CA 94103<br>Attn:  Curtis Solsivig III<br>Email:  [_____] |
| With a copy to: | Young Conaway Stargatt & Taylor, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19382<br>Attn:    Joseph M. Barry, Esquire<br>            Andrew L. Magaziner, Esquire<br>Email: jbarry@ycst.com<br>            amagaziner@ycst.com |
| If to Bank: | Silicon Valley Bank<br>505 Howard Street, 3rd Floor<br>San Francisco, California 94105<br>Attn:    Justin Mauch<br>Email: jmauch@svb.com |
| With a copy to: | Morrison & Foerster LLP<br>200 Clarendon Street, 20th Floor |

Boston, Massachusetts 02116
Attn:   David A. Ephraim, Esquire
        Alexander G. Rheaume, Esquire
        Todd M. Goren, Esquire
Email: DEphraim@mofo.com
        arheaume@mofo.com
        tgoren@mofo.com

## 11    CHOICE OF LAW, VENUE, JURY TRIAL WAIVER AND JUDICIAL REFERENCE

Except as otherwise expressly provided in any of the Loan Documents, New York law and the Bankruptcy Code governs the Loan Documents without regard to principles of conflicts of law.

**EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN DEBTOR AND BANK PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT BANK AND DEBTORS ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE BANK FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF BANK.**

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, DEBTOR AND BANK EACH WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS.   THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH PARTY TO ENTER INTO THIS AGREEMENT.   EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

This Section 11 shall survive the termination of this Agreement and the DIP Commitment.

## 12    GENERAL PROVISIONS

**12.1    Termination Prior to Maturity Date; Survival**.  All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Obligations have been satisfied.  So long as Borrower has satisfied

the Obligations (other than inchoate indemnity obligations and any other obligations which, by their terms, are to survive the termination of this Agreement), this Agreement may be terminated prior to the Maturity Date by Borrower in accordance with Section 2.1.1(c). Those obligations that are expressly specified in this Agreement as surviving this Agreement's termination shall continue to survive notwithstanding this Agreement's termination.

**12.2    Successors and Assigns**.  This Agreement binds and is for the benefit of the successors and permitted assigns of each Party.  Borrower may not assign this Agreement or any rights or obligations under it without Bank's prior written consent (which may be granted or withheld in Bank's sole and absolute discretion).  Bank has the right, without the consent of or notice to Borrower, to sell, transfer, assign, negotiate, or grant participation in all or any part of, or any interest in, Bank's obligations, rights, and benefits under this Agreement and the other Loan Documents.  Bank has the right to sell participations under this Agreement and the other Loan Documents, including to the Participants under the Participation Agreement.

**12.3    Indemnification**.  Borrower agrees to indemnify, defend and hold Bank and each Participant and their respective directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing Bank or any Participant (each, an "**Indemnified Person**") harmless against:  (i) all obligations, demands, claims, and liabilities (collectively, "**Claims**") claimed or asserted by any other party in connection with the transactions contemplated by the Loan Documents; and (ii) all losses or expenses (including Bank Expenses) in any way suffered, incurred, or paid by such Indemnified Person as a result of, following from, consequential to, or arising from transactions between Bank and Borrower (including reasonable attorneys' fees and expenses), except for Claims and/or losses directly caused by such Indemnified Person's gross negligence or willful misconduct, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

This Section 12.3 shall survive until all statutes of limitation with respect to the Claims, losses, and expenses for which indemnity is given shall have run.

**12.4    Time of Essence**.  Time is of the essence for the performance of all Obligations in this Agreement and any note executed by Borrower for the benefit of Bank.

**12.5    Severability of Provisions**.  Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**12.6    Correction of Loan Documents**.  Bank may correct patent errors and fill in any blanks in this Agreement and the other Loan Documents consistent with the agreement of the parties so long as Bank provides Borrower with written notice of such correction and allows Borrower at least ten (10) days to object to such correction.  In the event of such objection, such correction shall not be made except by an amendment signed by both Bank and Borrower.

**12.7    Amendments in Writing; Waiver; Integration**.  No purported amendment or modification of any Loan Document, or waiver, discharge or termination of any obligation under any Loan Document, shall be enforceable or admissible unless, and only to the extent, expressly set forth in a writing signed by the party against which enforcement or admission is sought. Without limiting the generality of the foregoing, no oral promise or statement, nor any action,

inaction, delay, failure to require performance or course of conduct shall operate as, or evidence, an amendment, supplement or waiver or have any other effect on any Loan Document. Any waiver granted shall be limited to the specific circumstance expressly described in it, and shall not apply to any subsequent or other circumstance, whether similar or dissimilar, or give rise to, or evidence, any obligation or commitment to grant any further waiver. The Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of the Loan Documents merge into the Loan Documents.

**12.8    Counterparts**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement.

**12.9    Confidentiality**. In handling any confidential information, Bank shall exercise the same degree of care that it exercises for its own proprietary information, but disclosure of information may be made: (a) to Bank's Subsidiaries or Affiliates (such Subsidiaries and Affiliates, together with Bank, collectively, "**Bank Entities**"); (b) to prospective transferees or purchasers of any interest in the DIP Advances (provided, however, Bank shall use its best efforts to obtain any prospective transferee's or purchaser's agreement to the terms of this provision); (c) as required by law, regulation, subpoena, or other order; (d) as Bank considers appropriate in exercising remedies under the Loan Documents; and (e) to third-party service providers of Bank so long as such service providers have executed a confidentiality agreement with Bank with terms no less restrictive than those contained herein. Confidential information does not include information that is either: (i) in the public domain or in Bank's possession when disclosed to Bank, or becomes part of the public domain (other than as a result of its disclosure by Bank in violation of this Agreement) after disclosure to Bank; or (ii) disclosed to Bank by a third party if Bank do not know that the third party is prohibited from disclosing the information.

Bank Entities may use anonymous forms of confidential information for any uses not expressly prohibited in writing by Borrower. The provisions of the immediately preceding sentence shall survive termination of this Agreement.

**12.10    Electronic Execution of Documents**. The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**12.11    Captions**. The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

**12.12    Construction of Agreement**. The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement. In cases

of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**12.13  Relationship**.  The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement.  The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

**12.14  Third Parties**.  Nothing in this Agreement, whether express or implied, is intended to:  (a) confer any benefits, rights or remedies under or by reason of this Agreement on any persons other than the express parties to it and their respective successors and permitted assigns; (b) relieve or discharge the obligation or liability of any person not an express party to this Agreement; or (c) give any person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

**12.15  Expenses**.    Whether or not the transactions contemplated hereby are consummated, Debtor agrees to pay promptly (a) all the actual and reasonable costs and expenses of Bank incurred in connection with the negotiation, preparation and execution of the Loan Documents, the Interim Order, the Final Order, the "first day orders," any sale or disposition of the Debtor's assets, and any other documents in connection with the Bankruptcy Case and any consents, amendments, waivers or other modifications thereto (whether or not any of the transactions contemplated hereby or thereby shall be consummated); (b) all the actual and reasonable fees, costs and expenses of counsel to Bank in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Debtor; (c) all the actual and reasonable costs and expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of Bank, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to  Bank; (d) all the actual and reasonable costs and expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Bank and their counsel) in connection with the custody or preservation of any of the Collateral; (e) all other actual and reasonable costs and expenses incurred by Bank in connection with the transactions contemplated by the Loan Documents and any consents, amendments, waivers or other modifications thereto; and (f) all the costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by Bank in enforcing any Obligations of or in collecting any payments due from Debtor hereunder or under the other Loan Documents, including fees and expenses incurred by such parties in connection with the monitoring and participating in the Bankruptcy Case.

**12.16  Release**.  Capitalized terms used but not refined in this Section 12.16 shall have the meaning ascribed to them in the Interim Order.  Subject to entry of the Final Order, Borrower hereby stipulates and agrees that it forever, unconditionally and irrevocably releases, discharges and acquits the Prepetition Lender and the DIP Financing Parties and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, and agents, past, present, and future, and their respective heirs, predecessors, successors, and assigns (collectively, the "**Releasees**") of and from any and all claims,

controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every kind whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the DIP Financing, the DIP Financing Documents, the Prepetition Facility, and the Prepetition Loan Documents, and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Lender and the Prepetition Lender; provided that the forgoing shall not release any claims against a Releasee that a court of competent jurisdiction determines results from the bad faith, gross negligence, or willful misconduct of such Releasee. Borrower further waives and releases any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Loan Obligations and the Obligations, which Borrower now has or may claim to have, directly or indirectly against the Releasees, arising out of, connected with or relating to any and all acts, omissions, or events occurring prior to the Bankruptcy Court entering the Interim Order.

**12.17    Parties Including Trustees; Bankruptcy Court Proceedings**. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon Debtor, the estate of Debtor, and any trustee, other estate representative or any successor in interest of Debtor in the Bankruptcy Case or any case under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Bank and its assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Bankruptcy Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Bank file financing statements or otherwise perfect its Liens under applicable law. Debtor may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of Bank. Any such purported assignment, transfer, hypothecation or other conveyance by Debtor without the prior express written consent of Bank shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of Debtor and Bank with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

**12.18    Financing Order**. In the event of any conflict between the terms of this Agreement or any other Loan Document and any applicable Financing Order, the terms of the applicable Financing Order shall govern and control. Notwithstanding anything to the contrary herein, the security interests and Liens granted herein and pursuant to the other Loan Documents, shall be subordinate in all respects (including, without limitation, payment, priority, and performance) to any security interests and Liens with priority pursuant to the applicable Financing Order.

## 13    DEFINITIONS

**13.1    Definitions**.  As used in the Loan Documents, the word "shall" is mandatory, the word "may" is permissive, the word "or" is not exclusive, the words "includes" and "including" are not limiting, the singular includes the plural, and numbers denoting amounts that are set off in brackets are negative.  As used in this Agreement, the following capitalized terms have the following meanings:

"**Account**" is any "account" as defined in the Code with such additions to such term as may hereafter be made, and includes, without limitation, all accounts receivable and other sums owing to Borrower.

"**Account Debtor**" is any "account debtor" as defined in the Code with such additions to such term as may hereafter be made.

"**Affiliate**" is, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

"**Agreement**" is defined in the preamble hereof.

"**Authorized Signer**" is any individual listed in Borrower's Borrowing Resolution who is authorized to execute the Loan Documents, including any DIP Advance request, on behalf of Borrower.

"**Avoidance Actions**" is defined in Section 4.2(a).

"**Bank**" is defined in the preamble hereof.

"**Bank Expenses**" are all invoiced audit fees and expenses, costs, and expenses (including reasonable attorneys' fees and expenses) of Bank and the Participants for preparing, amending, negotiating, administering, defending and enforcing the Loan Documents and the Financing Order (including, without limitation, those incurred in connection with appeals or the Bankruptcy Case and those identified as Bank Expenses in Section 12.15 hereof) or otherwise incurred with respect to Borrower.

"**Bank Services**" are any products, credit services, and/or financial accommodations previously, now, or hereafter provided to Borrower or any of its Subsidiaries by Bank or any Bank Affiliate, including, without limitation, any letters of credit, cash management services (including, without limitation, merchant services, direct deposit of payroll, business credit cards, and check cashing services), interest rate swap arrangements, and foreign exchange services as any such products or services may be identified in Bank's various agreements related thereto (each, a "**Bank Services Agreement**").

"**Bank Services Agreement**" is defined in the definition of Bank Services.

"**Bankruptcy Case**" is defined in the recitals hereto.

"**Bankruptcy Code**" means Title 11 of the United States Code, as now and hereafter in effect, or any applicable successor statute.

"**Bankruptcy Court**" is defined in the recitals hereto.

"**Borrower**" is defined in the preamble hereof.

"**Borrower's Books**" are all Borrower's books and records including ledgers, federal and state tax returns, records regarding Borrower's assets or liabilities, the Collateral, business operations or financial condition, and all computer programs or storage or any equipment containing such information.

"**Budget**" is the cash flow budget of Borrower attached hereto as <u>Exhibit D</u> as the same may be updated from time to time with the consent of Bank.

"**Business Day**" is any day that is not a Saturday, Sunday or a day on which commercial banks in San Francisco are authorized or required by law to remain closed.

"**Carve-Out**" is an amount equal to:  (i) any unpaid fees required to be paid pursuant to Section 1930 of title 28 of the United States Code section 1930(a)(6) (the "**U.S. Trustee Fees**"), together with any interest thereon pursuant to applicable law and any fees payable to the Clerk of the Court; (ii) the fees actually earned by the Debtor's directors on account of the period prior to the delivery of a Carve Out Notice; (iii) until the issuance of a Carve-Out Notice (as defined in the Financing Order) to the extent provided for in the Budget and allowed at any time, all unpaid fees and expenses allowed by the Court of professionals or professional firms retained pursuant to Section 327 or 1103, or appointed pursuant to section 363, of the Bankruptcy Code (the "**Case Professionals**") less the amount of any prepetition retainers received by such Case Professionals and not previously returned or applied to fees and expenses; and (iv) following the delivery of a Carve-Out Notice, to the extent provided for in the Budget allowed at any time, the payment of the fees and expenses of Professional Persons in an aggregate amount not to exceed $150,000.00 less the amount of any prepetition retainers received by such Cash Professionals and not previously returned or applied to fees and expenses (the "**Residual Carve Out**").  The Carve-Out excludes any fees and expenses incurred in connection with (a) any action or inaction that is in violation of, or a default under, any of the Loan Documents or the Final Order, or (b) the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (x) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the Obligations, including, for the avoidance of doubt, pursuant to the Participations, and/or the Prepetition SVB Facility, (ii) the DIP Liens and/or the Prepetition Liens (as such terms are defined in the Financing Order)  granted by the Debtor under the Loan Documents and the Prepetition SVB Facility, or (iii) any of Bank's or the Participants' rights under the Loan Documents, including, for the avoidance of doubt, the Participations, and/or the Bank's rights under the Prepetition SVB Facility, or (y) preventing, hindering, or delaying, whether directly or indirectly, Bank's assertion or enforcement of the DIP Liens or Prepetition Liens or realization upon any Collateral or Prepetition Collateral (as defined in the

Financing Order).  The Residual Carve Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Notice in respect of fees and expenses incurred after delivery of the Carve Out Notice.

"**Cash Equivalents**" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency or any State thereof having maturities of not more than one (1) year from the date of acquisition; (b) commercial paper maturing no more than one (1) year after its creation and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc.; and (c) money market funds at least ninety-five percent (95%) of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) and (b) of this definition.

"**Cash Management Order**" means an order of the Bankruptcy Court, in form and substance acceptable to Bank in its sole and absolute discretion, which among other matters authorizes Debtor to maintain their existing cash management and treasury arrangements or such other arrangements as shall be acceptable to Bank in all respects.

"**Change in Control**" means (a) at any time, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) shall become, or obtain rights (whether by means of warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of forty-nine percent (49%) or more of the ordinary voting power for the election of directors of Borrower (determined on a fully diluted basis) other than by the sale of Borrower's equity securities in a public offering or to venture capital or private equity investors so long as Borrower identifies to Bank the venture capital or private equity investors at least seven (7) Business Days prior to the closing of the transaction and provides to Bank a description of the material terms of the transaction; (b)  a majority of the members of the Board of Directors or other equivalent governing body of Borrower cease to be composed of individuals (i) who were members of that Board or equivalent governing body on the Petition Date, (ii) whose election or nomination to that Board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that Board or equivalent governing body or (iii) whose election or nomination to that Board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that Board or equivalent governing body; or (c) at any time, Borrower shall cease to own and control, of record and beneficially, directly or indirectly, one hundred percent (100%) of each class of outstanding capital stock of each Subsidiary of Borrower free and clear of all Liens (except Liens created by this Agreement and the Prepetition SVB Facility).

"**Claims**" is defined in Section 12.3.

"**Closing Date**" means the date on which each of the conditions set forth in Section 3.1 shall have been satisfied or waived in accordance with the terms hereof.

"**Code**" is the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of New York; provided, that, to the extent that the Code is used to define any term herein or in any other Loan Document and such term is defined differently in

different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Bank's Liens on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"**Collateral**" is defined in Section 4.1.

"**Collateral Account**" is any Deposit Account, Securities Account, or Commodity Account.

"**Committee**" means, to the extent formed, appointed, or approved in the Bankruptcy Case, any official committee of unsecured creditors appointed pursuant to Section 1102 of the Bankruptcy Code.

"**Commodity Account**" is any "commodity account" as defined in the Code with such additions to such term as may hereafter be made.

"**Contingent Obligation**" is, for any Person, any direct or indirect liability, contingent or not, of that Person for (a) any indebtedness, lease, dividend, letter of credit or other obligation of another such as an obligation, in each case, directly or indirectly guaranteed, endorsed, co-made, discounted or sold with recourse by that Person, or for which that Person is directly or indirectly liable; (b) any obligations for undrawn letters of credit for the account of that Person; and (c) all obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; but "Contingent Obligation" does not include endorsements in the ordinary course of business. The amount of a Contingent Obligation is the stated or determined amount of the primary obligation for which the Contingent Obligation is made or, if not determinable, the maximum reasonably anticipated liability for it determined by the Person in good faith; but the amount may not exceed the maximum of the obligations under any guarantee or other support arrangement.

"**Copyrights**" are any and all copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret.

"**Default Rate**" is defined in Section 2.2(b).

"**Deposit Account**" is any "deposit account" as defined in the Code with such additions to such term as may hereafter be made.

"**DIP Advance**" means has the meaning assigned to such term in Section 2.1.1(a).

"**DIP Commitment**" means, with respect to Bank, the commitment of Bank to make DIP Advances on each Funding Date, expressed as an amount representing the maximum principal

amount of the DIP Advances to be made by Bank. The initial aggregate amount of Bank's DIP Commitments is $5,000,000 plus the Final Roll-Up Amount. Such aggregate amount of Bank's DIP Commitments may be increased by Bank, in its sole and absolute discretion, in accordance with the terms of Sections 2.1.2 and 3.2, by up to $3,000,000.

"**Dollars**," "**dollars**" or use of the sign "$" means only lawful money of the United States and not any other currency, regardless of whether that currency uses the "$" sign to denote its currency or may be readily converted into lawful money of the United States.

"**Domestic Subsidiary**" means a Subsidiary organized under the laws of the United States or any state or territory thereof or the District of Columbia.

"**Equipment**" is all "equipment" as defined in the Code with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"**ERISA**" is the Employee Retirement Income Security Act of 1974, and its regulations.

"**Event of Default**" is defined in Section 8.

"**Event of Loss**" means, with respect to any Property, any of the following: (a) any material loss, destruction or damage of such Property; (b) any pending proceedings for the condemnation or seizure of such material Property or for the exercise of any right of eminent domain; or (c) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such material Property, or confiscation of such material Property or the requisition of the use of such material Property. For purposes of this definition, "material" shall mean having a value, individually or in the aggregate, in excess of $200,000.

"**Exchange Act**" is the Securities Exchange Act of 1934, as amended.

"**Extended Maturity Date**" means the date that is ninety (90) days after the Closing Date (or such earlier date that occurs after the Original Maturity Date, as mutually agreed by Borrower and Bank).

"**Final Order**" means an order of the Bankruptcy Court, in form and substance acceptable to Bank in its sole and absolute discretion, approving this Agreement and the DIP Advances up to an aggregate principal amount, together with the DIP Advances made under the Interim Order, of $13,830,000.00 (including the Final Roll-Up Amount) and the other Loan Documents and the Liens granted hereunder and thereunder and the other transactions contemplated hereby and thereby on a final basis as contemplated by the Interim Order, following a hearing as required by Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure or such other procedures so approved by the Bankruptcy Court that are acceptable to Bank in its sole and absolute discretion, which shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of Bank in its sole and absolute discretion).

"**Final Roll-Up Amount**" means the remaining obligations outstanding at the time of the entry of the Final Order under the Prepetition SVB Facility in amount of approximately $5,830,000.00.

"**Financing Order**" means the Interim Order or the Final Order, as applicable.

"**First Priority**" means, with respect to any security interest or other Lien on assets or other property, that such security interest or other Lien is superior to all other security interests and other Liens on such assets or other property, subject to Permitted Liens.

"**Foreign Subsidiary**" means any Subsidiary which is not a Domestic Subsidiary.

"**Funding Date**" is any date prior to the Maturity Date on which a DIP Advance is made to Borrower, which shall be a Business Day.

"**GAAP**" is generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession, that are applicable to the circumstances as of the date of determination.

"**General Intangibles**" is all "general intangibles" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation, all Intellectual Property, claims, income and other tax refunds, security and other deposits, payment intangibles, contract rights, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"**Governmental Approval**" is any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"**Governmental Authority**" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Indebtedness**" is (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, and (d) Contingent Obligations.

"**Indemnified Person**" is defined in Section 12.3.

"**Initial DIP Advance**" is defined in Section 2.1.1(a).

"**Intellectual Property**" means, with respect to any Person, all of such Person's right, title, and interest in and to the following:

(a)      its URLs, domain names, Copyrights, Trademarks and Patents;

(b)      any and all trade secrets and trade secret rights, including, without limitation, any rights to unpatented inventions, know-how, operating manuals;

(c)      any and all source code;

(d)      any and all design rights which may be available such Person;

(e)      any and all claims for damages by way of past, present and future infringement of any of the foregoing, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the Intellectual Property rights identified above; and

(f)      all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents.

"**Interim Order**" means the order of the Bankruptcy Court, in the form attached hereto as Exhibit C, entered at the initial emergency hearing in the Bankruptcy Case, approving this Agreement, the DIP Advances up to $3,500,000.00, the other Loan Documents and the Liens granted hereunder and thereunder and the other transactions contemplated hereby and thereby on an interim basis, which shall be in full force and effect until the entry of the Final Order, the other Loan Documents and the Liens granted hereunder and thereunder and the other transactions contemplated hereby and thereby, and which shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of Bank in its sole and absolute discretion).

"**Inventory**" is all "inventory" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"**Investment**" is any beneficial ownership interest in any Person (including stock, partnership interest or other securities), and any loan, advance or capital contribution to any Person.

"**IP Agreement**" is that certain Intellectual Property Security Agreement by and between Borrower and Bank dated as of the date hereof, as may be amended, modified, supplemented and/or restated from time to time.

"**Letter of Intent**" means a bona fide letter of intent from an unaffiliated third party that reflects a binding offer to acquire either (a) all or substantially of the assets and other property of Borrower or (b) all of the equity interests in Borrower for a purchase price that is an amount which is sufficient to repay the entire aggregate outstanding principal amount of the DIP

Advances (for the avoidance of doubt, including the principal amount of any proposed Third DIP Advance and the amount outstanding under the Prepetition SVB Facility to the extent not included in the DIP Advances), and is otherwise acceptable to Bank in all respects, as determined by Bank in its sole discretion.

"**Lien**" is a claim, mortgage, deed of trust, levy, charge, pledge, security interest or other encumbrance of any kind, whether voluntarily incurred or arising by operation of law or otherwise against any property.

"**Loan Documents**" are, collectively, this Agreement, the IP Agreement, the Budget, the Financing Order, and any schedules, exhibits, certificates, notices, and any other agreements, documents, certificates or instruments related to this Agreement, any subordination agreement, any note or notes to be executed by Borrower, and any other present or future agreement by Borrower with or for the benefit of Bank in connection with this Agreement or any other Loan Document, all as amended, restated, amended and restated, supplemented or otherwise modified; provided, however, that no agreement entered into (other than this Agreement) regarding the Prepetition SVB Facility or the equity securities of Borrower or any rights or obligations of Bank regarding such equity securities (including but not limited to any investors' rights agreement, subscription agreement, or "lock up" agreement) shall constitute Loan Documents.

"**Material Adverse Change**" is (a) a material impairment in the perfection or priority of Bank's Lien in the Collateral or in the value of such Collateral; (b) a material adverse change in the business, operations, or condition (financial or otherwise) of Borrower; or (c) a material impairment of the prospect of repayment of any portion of the Obligations; provided, however, that the filing of the Bankruptcy Case itself and any impairments or changes resulting therefrom will not constitute, or be considered in determining whether there has been, a material impairment or material adverse change.

"**Maturity Date**" is the earliest of (i) the Original Maturity Date, unless extended in accordance with Sections 2.1.2 and 3.2, in which case the Maturity Date shall be the Extended Maturity Date, if Borrower's option to extend the Original Maturity Date is properly exercised pursuant to Section 2.1.2, (ii) the effective date of a plan of reorganization for Debtor, (iii) the date of the consummation of a Permitted Sale, and (iv) such earlier date on which the Obligations are accelerated following the occurrence of an Event of Default.

"**Net Asset Sale Proceeds**" means, with respect to any Transfer, an amount equal to: (i) cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Debtor from such Transfer, minus (ii) any bona fide direct costs incurred in connection with such Transfer satisfied with cash payments, including income, sales, gains, or other taxes payable as a result of a Transfer.

"**Notice of Borrowing**" is that certain form attached hereto as Exhibit B.

"**Obligations**" are the DIP Advances, the Commitment Fee, and any obligation of any nature of Debtor and any other obligations from time to time owed to Bank under this Agreement or any other Loan Document, whether for principal, interest, payments for fees, Bank Expenses,

indemnification or otherwise, whether or not for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"**Offsite Collateral**" means computer equipment and cell phones and related equipment in the possession of employees in the ordinary course of business with an aggregate value not to exceed One Hundred Thousand Dollars ($100,000).

"**Operating Documents**" are, for any Person, such Person's formation documents, as certified by the Secretary of State (or equivalent agency) of such Person's jurisdiction of organization on a date that is no earlier than thirty (30) days prior to the Closing Date, and, (a) if such Person is a corporation, its bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership, its partnership agreement (or similar agreement), each of the foregoing with all current amendments or modifications thereto.

"**Original Maturity Date**" means the date that is forty-five (45) days after the date of this Agreement.

"**Participant**" means a "Participant" under the Participation Agreement.

"**Participation**" and "**Participations**" shall have the meanings given in the Participation Agreement.

"**Participation Agreement**" means the Participation Agreement attached hereto as <u>Exhibit E</u> providing for the participation in the Obligations, fundings, consents and approvals hereunder for the participants thereunder, including 8VC Fund I, L.P., a Delaware limited partnership, and 8VC Entrepreneurs Fund I, L.P., a Delaware limited partnership.

"**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**Payment/Advance Form**" is that certain form attached hereto as <u>Exhibit B</u>.

"**Permitted Indebtedness**" is:

(a)     Borrower's Indebtedness to Bank under this Agreement and the other Loan Documents;

(b)     Indebtedness under the Prepetition SVB Facility;

(c)     Indebtedness existing on the Petition Date and listed on Schedule 7.4;

(d)     any Indebtedness incurred after the Petition Date used to fully satisfy all of the Obligations.

"**Permitted Investments**" are:

(a)    Investments (including, without limitation, Subsidiaries) existing on the Petition Date and listed on Schedule 7.7;

(b)    any other Investments specifically provided for in the Budget, subject to the Variance, and permitted by the Financing Order; and

(c)    Investments consisting of Cash Equivalents.

"**Permitted Liens**" are:

(a)    Liens existing on the Petition Date and shown on Schedule 7.5 or arising under this Agreement and the other Loan Documents;

(b)    Liens securing the Prepetition SVB Facility;

(c)    Liens for utilities and taxes not yet due and payable; and

(d)    Liens incurred in connection with any Indebtedness used to fully satisfy all of the Obligations and all amounts outstanding under the Prepetition SVB Facility.

"**Permitted Sale**" is the sale of all or substantially all of Debtor's assets and other property, as a going concern or otherwise in a series of transactions consummated substantially contemporaneously, as approved by the Bankruptcy Court pursuant to applicable provisions of the Bankruptcy Code for cash consideration and not subject to any financing contingencies for which the Net Asset Sale Proceeds thereof are sufficient to pay the Obligations and all amounts outstanding under the Prepetition SVB Facility in full in cash upon the consummation of such sale.

"**Permitted Sale Information**" is defined in Section 6.13.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**Petition Date**" is defined in the recitals hereto.

"**Prepetition SVB Facility**" is the Loan and Security Agreement, dated as of February 24, 2017, between Bank and the Borrower, as amended prior to the Petition Date.

"**Property**" is any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Remedies Notice Period**" has the meaning ascribed to such term in the Financing Order.

"**Requirement of Law**" is as to any Person, the organizational or governing documents of such Person, and any law (statutory or common), treaty, rule or regulation or determination of

an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**" is any of the Chief Executive Officer, President, Chief Financial Officer, Chief Operating Officer, Chief Technical Officer, Controller or Chief Restructuring Officer of Borrower.

"**Restricted License**" is any material license or other similar agreement relating to the use of Intellectual Property with respect to which Borrower is the licensee (a) that prohibits or otherwise restricts Borrower from granting a security interest in Borrower's interest in such license or agreement or any other property, or (b) for which a default under or termination of could interfere with Bank's right to sell any Collateral.

"**Sale LOI**" is defined in Section 2.1.2.

"**Second DIP Advance**" is defined in Section 2.1.1(a).

"**Securities Account**" is any "securities account" as defined in the Code with such additions to such term as may hereafter be made.

"**Shares**" is one hundred percent (100%) (sixty-five percent (65%) in the case of a first tier Foreign Subsidiary) of the issued and outstanding capital stock, membership units or other securities owned or held of record by Borrower, in any Subsidiary.

"**Subsidiary**" is, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Borrower.

"**Super-Priority Claims**" has the meaning assigned to such term in Section 5.13(a)(i).

"**Third DIP Advance**" is defined in Section 2.1.1(a)(iii).

"**Trademarks**" is any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by such trademarks.

"**Transfer**" is defined in Section 7.1.

"**Variance**" is, with respect to the Budget, a percentage variance with respect to total projected disbursements in each then-current Budget; provided that the Variance shall not exceed (i) 10% on an individual basis of actual disbursements for a specific line item and (ii) 5% on an aggregate basis of total actual disbursements, in each case, on a cumulative four-week rolling basis; provided, that for the first two measuring periods following the Petition Date, the

percentage variance with respect to projected disbursements in each then-current Budget shall not exceed (a) 15% on an individual basis of actual disbursements for a specific line item and (b) 10% on an aggregate basis of total actual disbursements.

[Signature page follows.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Closing Date.

BORROWER:

**UBIOME, INC.**


By:_____
    Name: _____
    Title: _____


BANK:

**SILICON VALLEY BANK**


By: _____
    Name:    Justin Mauch
    Title:    Director

[Signature Page to DIP Loan and Security Agreement]

## SCHEDULE 5.2

## COLLATERAL; OPERATING ACCOUNTS

Operating Bank Accounts:

| Institution Name and Address | Accounts Number | Average Monthly Balance in Account | Name of Account Owner |
|---|---|---|---|
| Silicon Valley Bank | various | $10,000,000; Last 3 months | uBiome, inc. |
| Chase | 222253889 | De minimus, Pass through account for third-party checks | uBiome, inc. |
| Scotiabank | 97-36811-84 (Chilean pesos) | $350K; approximately one month's expenses | uBiome, SA |
| Scotiabank | 0-9097-37231-22 (US dollar) | Zero; used for transfers from US | uBiome, SA |
| ITAU | 210384026 (Chilean pesos) | Zero; keeping account open for convenience | uBiome, SA |

Intellectual Property that is licensed or otherwise not owned by uBiome:

| Third-Party Software | | | | |
|---|---|---|---|---|
| Name | Associated Paper | Software Link | Link to license | Pipeline |
| Swarm | https://peerj.com/articles/593/ | https://github.com/torognes/swarm | https://github.com/torognes/swarm/blob/master/LICENSE | Clustering of reads in 16S pipeline |
| VSEARCH | https://peerj.com/articles/2584/ | https://github.com/torognes/vsearch | https://github.com/torognes/vsearch/blob/master/LICENSE.txt | Annotation in 16S pipeline |
| CutAdapt | https://journal.embnet.org/index.php/embnetjournal/article/view/200 | https://github.com/marcelm/cutadapt | https://github.com/marcelm/cutadapt/blob/master/LICENSE | Remove adapters in metagenomics pipeline |
| KrakenUnique | https://genomebiology.biomedcentral.com/articles/10.1186/s13059-018-1568-0 | https://github.com/fbreitwieser/krakenuniq | https://github.com/fbreitwieser/krakenuniq/blob/master/LICENSE | Taxonomic classification in metagenomics clinical pipeline |

| Centrifuge | https://genome.cshlp.org/content/early/2016/11/16/gr.210641.116.abstract | https://github.com/DaehwanKimLab/centrifuge | https://github.com/DaehwanKimLab/centrifuge/blob/master/LICENSE | Taxonomic classification in metagenomics ExplorerPlus pipeline |
|---|---|---|---|---|
| BWA | https://academic.oup.com/bioinformatics/article/25/14/1754/225615 | https://github.com/lh3/bwa | https://github.com/lh3/bwa/blob/master/README.md | Mapping step in metatranscriptomics (Probes pipeline) |
| Bowtie2 | https://www.nature.com/articles/nmeth.1923 | https://github.com/BenLangmead/bowtie2 | https://github.com/BenLangmead/bowtie2/blob/master/LICENSE | Detection human reads in Human ancestry pipeline |
| iAdmix | https://bmcbioinformatics.biomedcentral.com/articles/10.1186/s12859-014-0418-7 | https://github.com/vibansal/ancestry | https://github.com/vibansal/ancestry/blob/master/LICENSE | Ancestry inference in Human ancestry pipeline |
| MAFFT | https://academic.oup.com/nar/article/30/14/3059/2904316 | https://mafft.cbrc.jp/alignment/software/ | https://mafft.cbrc.jp/alignment/software/license.txt | Multiple alignment step for probes and primer design |
| FreeBayes | https://arxiv.org/abs/1207.3907 | https://github.com/ekg/freebayes | https://github.com/ekg/freebayes/blob/master/LICENSE | Variant calling in SNP pipeline |
| PICRUSt | https://www.nature.com/articles/nbt.2676 | https://github.com/picrust/picrust | https://github.com/picrust/picrust/blob/master/LICENSE | Functional prediction in 16S pipeline |

Restricted Licenses to which uBiome is party:

N/A

**SCHEDULE 5.4**

**NO DEFAULTS**

1. Lease with S-E, Inc. - 18110 SE 34th Street, Building Two, Suite ZZZ, Vancouver, WA 98683, dated October 31, 2018.

2. Master Lease Agreement dated September 15, 2014 with Illumina Capital, a program of De Lage Financial Services.

3. Canon unified lease agreement, #ULS 5067 | 450 01, dated September 4, 2018.

4. SalesForce Order form, Quote number Q-01745793, dated 5/11/18.

5. SalesForce Order form, Quote number Q-01901878, dated 5/11/18.

6. SalesForce Order form, Quote number Q-02278389, dated 5/11/18.

### **SCHEDULE 5.5**

**LITIGATION**

The Federal Bureau of Investigation (the "<u>FBI</u>") opened an investigation into Borrower's business practices on April 26, 2019.  Certain other federal and state agencies, including the U.S. Department of Justice and the Securities and Exchange Commission, have similarly commenced investigations                into                Borrower's                business                practices.

## SCHEDULE 6.5

### INSURANCE

| Policy | Insurer | Policy Number | Effective Date; Months Covered |
|---|---|---|---|
| General Liability | Federal Insurance Company | 3605-90-97 | 04/28/2019; 18 months |
| Umbrella Liability | Federal Insurance Company | 7819-03-67 | 04/28/2019; 18 months |
| Auto Liability | Federal Insurance Company | 7360-89-27 | 04/28/2019; 18 months |
| Cyber Liability | Travelers Bond & Specialty Insurance | 107094842 | 5/21/2019; 17 months |
| Kidnap, Ransom & Extortion Liability | Great American Insurance Company | KR E376858 02 00 | 8/21/2019; 12 months |
| Crime Liability | Great American Insurance Company | SAAE3769010000 | 8/21/2018; 15 months |
| Products Liability | Lloyd's of London | W25251180101 | 11/1/2018; 12 months |
| Property | Federal Insurance Company | 3605-90-97 | 04/28/2019; 18 months |
| Directors and Officers Liability | Lloyd's of London | FSUSC1903036 | 7/10/2019; 12 months |
| Directors and Officers Supplemental Extended Reporting Period | Starstone Specialty Insurance Company | H89319180ASP | 7/10/2019; 36 months |
| Management Liability; Fiduciary; and Employment Practices Liability | The Hartford Insurance Company | 57-KB-0336679-19 | 04/28/2019; 18 months |
| Workers' Compensation | Chubb Indemnity Insurance Company | 7177-14-40 | 04/28/2019; 18 months |

**<u>SCHEDULE 7.4</u>**

**PERMITTED INDEBTEDNESS**

None, other than Prepetition SVB Facility

**SCHEDULE 7.5**

**PERMITTED LIENS**

Liens, if any, securing or arising under or in connection with any of the following:

1. Commercial Multi-Tenant Lease for 360 Langton Suite 301 to 305, between uBiome Inc. and Laurance O and Jeannette O Matthews Family Trust, dated June 2, 2014.

2. Commercial Single-Tenant Lease for 1201 25th St, San Francisco, CA, 94107, between uBiome, Inc. and Nicholas L. Bates, trustee of the Susan M. Bates 2001 Revocable Trust dated 7.31.2001, dated December 1, 2017.

3. Taxing authorities:

   a. California Department of Tax and Fee Administration, 450 N. St, San Francisco, CA, 95814, USA.

   b. Delaware Division of Revenue, 820 N. French Street, Wilmington, DE 19801.

   c. Internal Revenue Service, P.O. Box 7704, San Francisco, CA, 94120.

   d. Massachusetts Department of Revenue, 100 Cambridge Street, Boston, MA, 02114.

   e. San Francisco Tax Collector, P.O. Box 7427, San Francisco, CA 94120.

4. Government Regulatory Entities for uBiome, Inc.

   a. US Federal Government, CMS: Federal Clinical Laboratory Regulation.

   b. CA Laboratory Filed Services: CA state clinical laboratory regulation (for samples processed from that state)

   c. RI Department of Health: RI state clinical laboratory regulation (for samples processed from that state)

   d. PA Department of Health: PA state clinical laboratory regulation (for samples processed from that state)

**SCHEDULE 7.7**

**PERMITTED INVESTMENTS**

1.  Investment in uBiome Chile SPA (subsidiary) for $1,347,987.71.

2.  Investment in uBiome Arg SAS (subsidiary) for $910,459,22.

3.  Investment in SoilGene, Inc. for $200,000.

## EXHIBIT A

The Collateral consists of all of Borrower's right, title and interest in and to the following personal property:

All tangible and intangible property and assets, whether real or personal, of the Debtor, including, without limitation, all goods, Accounts (including health-care receivables), Equipment, Intellectual Property, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles (except as provided below), commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, interests in leases and leaseholds, interests in real property, and fixtures, whether now owned or hereafter acquired, wherever located, whether existing on the Petition Date or thereafter acquired;

and all Borrower's Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing; and

the          proceeds          of          all          Avoidance          Actions.

<u>EXHIBIT B</u>

**EXHIBIT B –PAYMENT/ADVANCE REQUEST FORM**

**DEADLINE FOR SAME DAY PROCESSING IS NOON PACIFIC TIME**

Fax To: _____    Date: _____

---

**LOAN PAYMENT:**    uBiome, Inc.

From Account #_____    To Account #_____
            (Deposit Account #)                                      (Loan Account #)

Principal $_____    and/or Interest $_____

Authorized Signature:_____    Phone Number: _____

Print Name/Title: _____

---

**LOAN ADVANCE:**

Complete *Outgoing Wire Request* section below if all or a portion of the funds from this loan advance are for an outgoing wire.

From Account #_____    To Account #_____
            (Loan Account #)                                   (Deposit Account #)

Amount of Advance $_____

All Borrower's representations and warranties in the Senior Secured, Super Priority Debtor In Possession Term Loan and Security Agreement are true, correct and complete in all material respects on the date of the request for an advance; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date:

Authorized Signature:_____    Phone Number: _____

Print Name/Title: _____

---

**OUTGOING WIRE REQUEST:**

**Complete only if all or a portion of funds from the loan advance above is to be wired.**

Deadline for same day processing is noon, Pacific Time

Beneficiary Name: _____    Amount of Wire: $_____

Beneficiary Bank: _____    Account Number: _____

City and State: _____

Beneficiary Bank Transit (ABA) #: _____    Beneficiary Bank Code (Swift, Sort, Chip, etc.): _____

                                               **(For International Wire Only)**

Intermediary Bank: _____    Transit (ABA) #: _____

For Further Credit to: _____

Special Instruction: _____

*By signing below, I (we) acknowledge and agree that my (our) funds transfer request shall be processed in accordance with and subject to the terms and conditions set forth in the agreements(s) covering funds transfer service(s), which agreements(s) were previously received and executed by me (us).*

Authorized Signature: _____    2nd Signature (if required): _____

Print Name/Title: _____    Print Name/Title: _____

Telephone #: _____    Telephone #: _____

---

01:25115193.2

**<u>EXHIBIT C</u>**

**INTERIM ORDER**

(See attached)

**<u>EXHIBIT D</u>**

**INITIAL BUDGET**

(See attached)

# **EXHIBIT E**

## **PARTICIPATION AGREEMENT**

(See attached)

**Exhibit E to DIP Loan Agreement**

<u>FORM OF PARTICIPATION AGREEMENT</u>

This PARTICIPATION AGREEMENT (this "<u>Agreement</u>") is entered into as of September __, 2019, by and among Silicon Valley Bank, a California corporation (in its capacity as the lender under the DIP Loan Agreement (as defined below), "<u>SVB</u>" or the "<u>Seller</u>") and 8VC Fund I, L.P., a Delaware limited partnership, and 8VC Entrepreneurs Fund I, L.P., a Delaware limited partnership (together the "<u>Participants</u>", and each a "<u>Participant</u>") and agreed and consented to by uBiome, Inc, a Delaware corporation and a debtor and debtor in possession.

W I T N E S S E T H :

WHEREAS, on September 4, 2019 (the "<u>Petition Date</u>"), uBiome, Inc, a Delaware corporation and a debtor and debtor in possession filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") initiating its pending case under Chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") and has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Debtor has requested that Seller provide an aggregate amount of up to $13,830,000.00, in a multiple-draw, non-amortizing term loan facility pursuant to a senior secured, super priority debtor in possession term loan and security agreement dated as of the date hereof (the "<u>DIP Loan Agreement</u>"); and

WHEREAS, Each Participant hereby agrees to acquire from the Seller and the Seller agrees to sell to each Participant, a participation interest in the DIP Advances, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants contained herein, the Seller and the Participants hereby agree as follows:

1.    <u>Definitions</u>.   All capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the DIP Loan Agreement.  The following terms have the meanings set forth below:

"<u>Other Participant</u>" is any person who becomes a participant hereunder by assignment, participation, sub-participation, sale or transfer as provided in Section 10.

"<u>Paid in Full</u>" and "<u>Payment in Full</u>" is (i) with respect to all Obligations that are subject to the Participations, the repayment in full by Borrowers to the Seller in cash or immediately available funds of the aggregate outstanding amount of such Obligations, and (ii) with respect to the Senior Obligations, the payment in full by Borrowers to the Seller in cash or immediately available funds of all Senior Obligations held by Seller (other than unasserted contingent indemnification obligations).

"Pari Passu Obligations" are (a) 50% of all amounts owed to Seller pursuant to the Prepetition SVB Facility, including without limitation, principal, accrued interest, fees, and unreimbursed costs and expenses, and (b) 50% all DIP Advances used following the entry of the Final Order to  refinance or repay amounts owed to Seller pursuant to the Prepetition SVB Facility, including without limitation, principal, accrued interest, fees, and unreimbursed costs and expenses.  The Pari Passu Obligations shall not include the Senior Obligations.

"Participant Share" with respect to 8VC Fund I, L.P., a Delaware limited partnership, is 98.4%, and with respect to 8VC Entrepreneurs Fund I, L.P., a Delaware limited partnership, is 1.6%.

"Senior Obligations" are, collectively, (a) all DIP Advances and interest and fees thereon (including DIP Advances used to refinance and repay any obligations under the Prepetition SVB Facility following the entry of the Final Order) that are not Pari Passu Obligations and are not subject to the Participations; (b) all amounts owed to Seller pursuant to the Prepetition SVB Facility, including without limitation, principal, accrued interest, fees, and unreimbursed costs and expenses  that are not Pari Passu Obligations, and (c) all amounts owed to Seller for Bank Services.

2.    Agreement to Purchase the Participation.

(a)    The Seller hereby sells, transfers and assigns to the Participants at par, and the Participants hereby purchase from the Seller at par, without recourse or representation of any kind provided by the Seller (except as expressly set forth herein), and each Participant agrees to fund as and when required hereunder, its Participant Share of a participation in an amount up to $6,500,000 of the DIP Advances as follows:

| | |
|---|---|
| **Initial DIP Advance:** | $2,800,000.00 |
| **Second DIP Advance:** | $1,200,000.00 |
| **Third DIP Advance:** | 83.33% of funded amount of Third DIP Advance. |

(b)    The participations purchased by the Participants hereunder in the DIP Advances and the obligation to fund each Participant Share are sometimes referred to herein collectively as the "Participation" or "Participations" as the context may require.  Except as otherwise set forth below, the Participations shall have the consent rights hereunder

(c)    Although the Participants may be entitled to receive, subject to the terms and conditions of the DIP Loan Agreement and this Agreement, payments of principal and interest in respect of the Participation, the Participants shall not be entitled to receive any payments of principal and interest under the DIP Loan Agreement, unless the Senior Obligations have been Paid in Full.  The Participants shall, however, in all events be entitled to receive indemnification, costs, fees and expenses as provided in the DIP Loan Agreement and any Financing Order without regard to the subordination provided in this Agreement.

3.     Payment by the Each Participant.  Each Participant shall pay to the Seller in immediately available funds, as consideration of the purchase of the Participation, its Participant Share of each DIP Advance on the first Business Day following notice from the Seller of the Borrower's request for a DIP Advance, up to an aggregate amount of $6,500,000, which payments shall be wired to the Seller to the following account:

Bank:         Silicon Valley Bank
ABA #:
Account #:
Account Name:
Reference:     uBiome, Inc.

The Seller and the Participants agree that the Participants may fund their respective Participant Share of the DIP Advances directly to the Borrower on the date of the funding of such DIP Advances. No party hereunder shall have the obligation to fund any other party's respective portion of a DIP Advance, and no Participant shall have any obligation to purchase or fund the Third Advance without such Participant's express consent.

4.     Subordination and Pari Passu Treatment; Payments.  It is understood and agreed that, for all purposes and in all respects, without limitation, the Participation (and any other participation interest purchased from time to time by the Participants in any of the other Obligations (collectively, the "Other Participations"; the Other Participations shall constitute Participations hereunder) shall at all times be and hereby are (a) subordinated in right and time of payment to the Senior Obligations, and no payment shall be made in respect of, the Participations (including, without limitation, any payments of principal or interest) unless the Senior Obligations have been Paid in Full. Each Participant acknowledges that interest in respect of the DIP Advances subject to the Participations shall accrue (which accrued interest shall not be capitalized and shall not accrue interest) and shall be paid to each Participant once the Senior Obligations have been Paid in Full, and (b) entitled to equal and pari passu treatment and priority in right of payment with the Pari Passu Obligations, and all payments in respect of the Pari Passu Obligations shall be made, and received and retained by the Seller, only with an equal and ratable payment on the Participations (including, without limitation, any payments of principal or interest).

Except as expressly set forth above with respect to the subordination and "last-out" and equal and ratable "*pari passu*" payment with respect to the Obligations subject to the Participations, the provisions of this Section 4 are intended solely for the purpose of defining the relative rights of the Seller on the one hand and each Participant on the other hand. Nothing contained in this Section 4 or elsewhere in this Agreement is intended to or shall (i) impair, as among the Borrower and the Seller, the obligation of the Borrower, which is absolute and unconditional, to pay to Seller the principal of, interest or premium (if any) on and any other amount payable by the Borrowers in connection with, the Obligations under the DIP Loan Agreement or the obligations under the Prepetition SVB Facility, as and when the same shall become due and payable in accordance with their respective terms; or (ii) impair, as among the Seller and the Participants, upon Payment in Full of all Senior Obligations, the obligation of the Seller to pay to the Participants all amounts of principal of and interest or premium (if any) on, and any other amount paid by the Borrowers on account of, the Obligations to the extent

01:25131940.1
US_117562570v8
ny-1743543 v7

collected by the Seller and relating to the Participations sold by the Seller.  No provision of this Agreement shall be deemed to subordinate, to any extent, any claim or right of any Participant against the Borrowers to any claim by any creditor or any other Person (other than the Seller) against the Borrowers.

5.    <u>Repayment by Seller.</u>  In the event that the Seller is required, for any reason, to return or disgorge to the Borrower or any other person all or any portion of any payment received by the Seller and with respect to which the Seller made a payment to a Participant, then the Seller shall provide written notice thereof to Participant and Participant shall promptly remit to the Seller such Participant's share of the payment required to be repaid by the Seller in accordance with the priorities set forth in this Agreement.

6.    <u>Rights and Responsibilities</u>.  Except as set forth herein, each Participant agrees that at any time that Senior Obligations or the Pari Passu Obligations are outstanding, the Seller may service the Obligations, and take any action (or refrain from taking any action) under the DIP Loan Agreement or any Financing Order as Seller deems appropriate in its sole discretion, except that (i) the Seller shall not undertake any enforcement of rights, approval, or consent under the DIP Loan Agreement, any Loan Document or any Financing Order (including, without limitation, any change, supplement or modification to, or waiver of compliance with, the Budget, any approval of the Sale LOI, and any determination of the amount and approval the making of any Third DIP Advance), without the affirmative written consent of each Participant, (ii) the Seller shall not, without the prior or written consent of each Participant agree to the modification, amendment or waiver of any of the terms of the DIP Loan Agreement, any Loan Document or any Financing Order, (iii) after an Event of Default, the Seller will not enforce its rights or remedies against the Borrower or the Collateral without the prior consent of the Participants, (iv) the Seller shall not credit bid in connection with any sale of the Collateral without the prior written consent of the Participants, (v) the Seller shall to the extent in accordance with its rights under the DIP Loan Agreement, any Loan Document or any Financing Order request any information or meetings with the Borrower as the Participant shall reasonably request in writing, and (vi) the Seller shall share all material documents and information provided by the Borrower to the Seller under the DIP Loan Agreement, any Loan Document or any Financing Order to each Participant promptly upon receipt, provided that the Seller shall have no obligation to share documents and information concerning a sale of the Borrower's assets unless each Participant first confirms in writing that such Participant will not directly or indirectly be a bidder in such sale. No Participant shall have any consent rights under this Agreement if such Participant is in material default of its obligations under this Agreement, including without limitation, failing to comply with the funding obligations under Section 3 above, at the time such consent right is to be exercised, except that no Participant under any circumstances shall be obligated to fund or purchase any portion of the Third Advance without such Participant's express consent.  The Seller and the Borrower each agree that each Participant, by virtue this Agreement and the Participation is a party in interest in the Bankruptcy Case and shall not object to any appearance or right to be heard any Participant in the Bankruptcy Case on any matter, provided that such Participant's rights shall at all times be subject to this Agreement, and no Participant shall take a position that is inconsistent with this Agreement, or that breaches or would result in a breach of this Agreement.  With respect to the approval by the Seller of a Sale LOI, the Seller and the Participants acknowledge and agree that a Sale LOI that provides for the Payment in Full in cash at closing of all Obligations of Participants, all Senior Obligations, and all Pari Passu

Obligations, and all other amounts owed under the Prepetition SVB Facility, prior to the Maturity Date shall be acceptable to the Seller and all Participants unless the Seller and all Participants agree otherwise; notwithstanding, regardless of whether such Sale LOI is acceptable on the foregoing basis, no Participant shall have any obligation to purchase or fund the Third Advance without such Participant's express consent which may be withheld in such Participant's sole and absolute discretion.

7.    <u>Participant Credit Bid</u>. In the event that any one or more Participants desires to credit bid its interest in the DIP Advances and the Obligations, such Participants shall have the right to do so provided that the cash component of such bid would pay in full in cash at closing all unparticipated Obligations of the Seller and all outstanding Prepetition SVB Facility obligations, including without limitation, all Senior Obligations and all Pari Passu Obligations (a "<u>Qualified Credit Bid</u>").  In connection with such Qualified Credit Bid, immediately prior to the consummation of the sale pursuant to such Qualified Credit bid, the Seller shall pursuant to documents reasonably satisfactory to the Seller and such bidding Participants, transfer and assign to such Participants on an as is, no representations or warranties basis, the Seller's interest in the Liens under the DIP Loan Agreement to effect such Qualified Credit Bid directly. The Borrower hereby consents to such assignment without the requirement of any further action by the Borrower.

8.    <u>Standard of Care</u>.  Notwithstanding anything to the contrary set forth herein, in making and handling the participation, the Seller shall act in good faith and shall exercise the same care as it normally exercises with respect to its other loans and commitments; provided, the Seller shall have no liability to any Participant other than (i) disbursing proceeds of its Participant Share of the DIP Advances participated hereunder, but only to the extent that the Seller receives such proceeds, (ii) for the Seller's material breach of this Agreement, or (ii) for the Seller's fraud, gross negligence or willful misconduct. The Seller shall have no responsibility to Participant for the failure by the Seller to make any loan or other extension of credit to the Borrower or to comply with any of the Seller's other obligations to the Borrower or any other party under the Loan Documents or otherwise, or for any other action taken or omitted hereunder or under any Loan Documents or in connection herewith or therewith.  In addition, the Seller shall have no obligation to take any action which the Seller determines in good faith could violate applicable law, rule, regulation, order, the Loan Agreement or other Loan Documents or, in the Seller's reasonable judgment, prejudice the Seller's continuing relationship with any regulatory authority or damage Seller's reputation or, unless and until it shall have been provided adequate indemnity therefor, expose the Seller to any material obligation, liability or expense.  In connection with this Agreement, the Seller may consult with legal counsel (including counsel for the Borrower), independent accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in reliance on the advice of any such person or entity.  The Seller shall not by reason of this Agreement have a fiduciary relationship with Participant.

9.    <u>The Participants' Independent Investigation</u>. Each Participant acknowledges and agrees to and for the benefit of the Seller that:

(a)    such Participant has performed and will continue to perform (i) its own credit and other analysis of the Borrowers and any other entity which may have liability for the Loans and (ii) its own investigation of the risks involved in the transactions contemplated by (A) the DIP Loan Agreement and (B) entering into this Agreement and purchasing an interest in the DIP Advances hereunder, and such Participant is not relying and will not rely the Seller with respect thereto;

(b)    such Participant, in its capacity as a Participant, has reviewed and approved the form and substance of the DIP Loan Agreement to the extent deemed necessary or advisable by such Participant;

(c)    each Participant has reviewed this Agreement, the DIP Loan Agreement, and the Financing Order with counsel of its own choosing; and

(d)    the Seller has not made, the Seller shall not at any time be deemed to make, any representation or warranty to such Participant, express or implied, with respect to (i) the due execution, authenticity, legality, accuracy, completeness, delivery, validity or enforceability of the DIP Loan Agreement, (ii) the financial condition, solvency or creditworthiness of the Borrower or any other Person which may have liability for the Obligations, or the collectibility of all or any portion of the Obligations, (iii) the validity, perfection, enforceability, value or sufficiency of, or title to any security for the Obligations, or the filing, or recording or taking of any other actions with respect to the DIP Loan Agreement, or the collateral security for the Obligations, or (iv) any other matter having any relation to this Agreement, the Participations, the DIP Advances, the DIP Loan Agreement.

Each Participant represents and warrants to the Seller that: (i) it is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware; (ii) it has full corporate power, authority and legal right to execute and deliver, and to perform its obligations under, this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement; and (iii) this Agreement has been duly executed and delivered by such Participant and constitutes a legal, valid and binding obligation of such Initial Participant enforceable against such Participant in accordance with its terms, except to the extent that such enforceability is subject to applicable bankruptcy, insolvency, reorganization, fraudulent conveyance and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally, or the availability of equitable remedies, which are subject to the discretion of the court before which an action may be brought.

10.    Assignments.    Neither Seller nor any Participant shall encumber, assign, participate, pledge, sell or otherwise transfer its interest in the Participations, any Loan Documents relating to the Participations, or this Agreement, or any part of any of the foregoing, or its duties and obligations hereunder, without the other's prior written consent (not to be unreasonably withheld or delayed).  No Participant shall assign, participate, sell or otherwise transfer its interest hereunder to any Other Participant without, so long as there is no Event of Default continuing under the DIP Loan Agreement, the consent of the Borrower (not to be unreasonably withheld or delayed).  Subject to the foregoing, all of the terms, covenants, conditions, rights and remedies of this Agreement shall inure to the benefit of, and be binding upon, the successors and permitted assigns of the Seller and each Participant.  Any sale,

01:25131940.1
US_117562570v8
ny-1743543 v7

assignment or transfer in violation of this Section shall be null and void.

11.    <u>Relationship of Parties; Default by a Party</u>.  The Seller and the Participants specifically agree that in the negotiation, administration, and servicing of the Participation, the Seller has been and shall be an independent contractor.  Neither the execution of this Agreement, nor the sharing in the Participation or the collateral or any Loan Documents, nor any agreement to share in profits or losses resulting from any transaction governed by this Agreement, nor the Seller's holding of any Loan Documents, nor any other right or duty of the Seller under or pursuant to this Agreement, is intended to be, nor shall it be construed to be, the formation of a partnership or joint venture between the Seller and the Participants, or the creation of any express, implied or constructive trust relationship between the Seller and the Participants.  The parties agree that the Seller is not acting as a trustee for Participant, other than as expressly set forth herein.  A default by a party under this Agreement shall not relieve the other party of its obligations under any separate agreements entered into by such parties.  Nothing contained in this Agreement shall relieve the Seller or any Participant of its liability, if any, to the other for damages occasioned by its default hereunder.

12.    <u>Withholding Taxes</u>.  By its confirmation and acceptance of this Agreement, each Participant represents that it is entitled to receive any payments to be made to it hereunder without the withholding of any tax and that, upon the Seller's request, such Participant will furnish the Seller such certifications, statements and other documents deemed reasonably necessary or appropriate by the Seller to evidence such Participant's exemption from the withholding of any tax imposed by any applicable jurisdiction or to enable the Seller to comply with any applicable laws or regulations relating thereto.

13.    <u>Indemnification</u>.  Each Participant shall indemnify, defend, and hold Seller and its officers, directors, agents, partners, members, parents and employees (collectively, "<u>Seller Indemnitees</u>") harmless from and against any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that Seller Indemnitees incur or suffer as a result of or arising out of such Participant's breach of any of such Participant's representations, warranties, covenants, or agreements in this Agreement.  Seller shall indemnify, defend, and hold each Participant and its officers, directors, agents, partners, members, parents and employees (collectively, "<u>Participant Indemnitees</u>") harmless from and against any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that Participant Indemnitees incur or suffer as a result of or arising out of such Participant's breach of any of such Participant's representations, warranties, covenants, or agreements in this Agreement.

14.    <u>Release</u>.  The Borrower has no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's liability to repay Seller as provided in the DIP Loan Agreement or the other Loan Documents or any of the Obligations thereunder participated to the Participants, or to seek affirmative relief or damages of any kind or nature from Seller or Participant relating to this Agreement, the DIP Loan Agreement or the other Loan Documents or any of the Obligations participated to the Participants.  Subject to entry of the Financing Order, the Borrower, on behalf of its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through

01:25131940.1
US_117562570v8
ny-1743543 v7

them, hereby fully, finally and forever release and discharge Participants and all of Participant's past and present officers, directors, servants, agents, attorneys, assigns, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, DIP Loan Agreement, the other Loan Documents, the Financing Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing. The Borrower waives the provisions of California Civil Code section 1542, which states:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

15.    <u>Notices</u>.  Except as otherwise provided herein, all notices, requests and demands to or upon a party hereto, to be effective, shall be in writing (which may be transmitted by electronic mail) and shall be delivered in accordance with Section 10 of the Loan Agreement addressed as follows:

| | |
|---|---|
| if to the Seller: | Silicon Valley Bank<br>505 Howard Street, 3rd Floor<br>San Francisco, California 94105<br>Attn:   Justin mauch<br>Email: jmauch@svb.com |
| With a copy to: | Morrison & Foerster LLP<br>200 Clarendon Street, 20th Floor<br>Boston, Massachusetts 02116<br>Attn:   David A. Ephraim, Esquire<br>          Alexander g. Rheaume, Esquire<br>Email: DEphraim@mofo.com<br>          arheaume@mofo.com |

8

US_117562570v8
ny-1743543 v7

if to any Participant:                8VC
                                      Pier 5, Suite 101
                                      San Francisco, California 94111
                                      Attention:  Ian M. Shannon
                                      E-mail: ian@8vc.com

                                      and

                                      Gibson, Dunn & Crutcher LLP
                                      200 Park Avenue
                                      New York, New York  10166
                                      Attention:  Matthew Williams, Esquire
                                                  J. Eric Wise, Esquire
                                                  Jason Goldstein, Esquire
                                      email:  MJWillliams@gibsondunn.com
                                              EWise@gibsondunn.com
                                              JGoldstein@gibsondunn.com

16.    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties hereto.  There are no other agreements between the parties in connection with the subject matter hereof except as specifically set forth herein or contemplated hereby.  No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by each of the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.  No delay on the part of the Seller in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Seller of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

17.    <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.  ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT MAY BE BROUGHT AND MAINTAINED, EXCLUSIVELY IN THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK COUNTY, CITY OF NEW YORK, NEW YORK STATE.  THE PARTICIPANTS AND THE SELLER HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK COUNTY, CITY OF NEW YORK, NEW YORK STATE FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE.  THE PARTICIPANTS AND EACH LOAN PARTY FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK.  THE PARTICIPANTS AND EACH LOAN PARTY HEREBY EXPRESSLY AND

IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

18.    WAIVER OF JURY TRIAL.  EACH OF THE PARTICIPANTS, THE SELLER AND THE BORROWER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

19.    Severability.  In case any provision of or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

20.    Headings.  Headings and captions used in this Agreement (including the Exhibits, Schedules and Annexes hereto, if any) are included for convenience of reference only and shall not be given any substantive effect.

21.    Counterparts; Integration.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Signatures by facsimile or electronic transmission shall bind the parties hereto.  This Agreement constitutes the entire agreement and understanding among the parties hereto and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

[remainder of page intentionally left blank; signature page follows]

IN WITNESS WHEREOF, the respective parties hereto have executed and delivered this Agreement as of the day and year first above written.

PARTICIPANTS:

**8VC FUND I, L.P.**

By:      _____
Name:  _____
Title:   _____

**8VC ENTREPRENEURS FUND I, L.P.**

By:      _____
Name:  _____
Title:   _____

SELLER:

**SILICON VALLEY BANK**, as the Seller

By:      _____
Name:  Justin Mauch
Title:   Director

AGREED AND CONSENTED
AS OF THE DATE
FIRST WRITTEN ABOVE:

BORROWER:

**UBIOME, INC.**

By: _____
Name:
Title:

**<u>Exhibit B</u>**

**Budget**

**DIP Budget - 13-Week Cash Flow Forecast**

| Week Beginning ($ 000s) | 9/2/2019 Week 1 | 9/9/2019 Week 2 | 9/16/2019 Week 3 | 9/23/2019 Week 4 | 9/30/2019 Week 5 | 10/7/2019 Week 6 | 10/14/2019 Week 7 | 10/21/2019 Week 8 | 10/28/2019 Week 9 | 11/4/2019 Week 10 | 11/11/2019 Week 11 | 11/18/2019 Week 12 | 11/25/2019 Week 13 | Total 13-Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| North America Cash | $262 | $2,463 | $2,115 | $1,364 | $984 | $1,089 | $664 | $38 | $2,310 | $855 | $389 | $163 | ($63) | $262 |
| South America Cash | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| **Total Cash Balance Beginning of Week** | **$275** | **$2,476** | **$2,128** | **$1,377** | **$997** | **$1,102** | **$677** | **$51** | **$2,323** | **$868** | **$402** | **$176** | **($50)** | **$275** |
| **Revenue** | | | | | | | | | | | | | | |
| Explorer Sales | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | - | - | - | 100 |
| Other Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Revenue** | **10** | **10** | **10** | **10** | **10** | **10** | **10** | **10** | **10** | **10** | **-** | **-** | **-** | **100** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| North American Payroll | - | - | (189) | - | (172) | - | (172) | - | (172) | - | - | - | - | (703) |
| South American Payroll | (294) | - | - | - | (199) | - | - | (199) | (323) | - | - | - | - | (1,015) |
| Total Payroll (including Employer Taxes) | (294) | - | (189) | - | (371) | - | (172) | (199) | (495) | - | - | - | - | (1,718) |
| Healthcare and Retirement Benefits | (134) | - | - | - | (119) | - | - | - | (119) | - | - | - | - | (372) |
| Other Employee Benefits (Food / Travel) | (17) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | - | - | - | (107) |
| Total HR Expenses | (151) | (10) | (10) | (10) | (129) | (10) | (10) | (10) | (129) | (10) | - | - | - | (479) |
| Lease Expenses | (88) | - | - | - | (73) | - | - | - | (73) | - | - | - | - | (233) |
| Other Facilities Expenses | (22) | - | - | - | (22) | - | - | - | (22) | - | - | - | - | (65) |
| Utilities | (14) | - | - | - | (14) | - | - | - | (14) | - | - | - | - | (41) |
| Total Lease / Facilities Expenses | (123) | - | - | - | (108) | - | - | - | (108) | - | - | - | - | (340) |
| Illumina, Inc. | - | - | - | - | - | - | (18) | - | - | (9) | - | - | - | (27) |
| Kapa Biosystems | (4) | - | (5) | - | - | - | - | (5) | - | (3) | - | - | - | (18) |
| TFS*Thermo Fisher Scientific | (11) | - | (1) | - | - | - | - | (1) | - | (0) | - | - | - | (12) |
| Other Lab Expenses | (9) | - | (14) | - | - | - | (10) | - | (16) | (10) | - | - | - | (59) |
| Total Lab Expenses | (24) | - | (20) | - | - | - | (28) | (6) | (16) | (23) | - | - | - | (116) |
| Texas Novachem Corporation | (18) | - | (18) | - | - | - | (18) | - | - | (9) | - | - | - | (63) |
| Stamps.com | - | - | (5) | - | - | - | (5) | - | - | (3) | - | - | - | (13) |
| Other Fulfillment Expense | (7) | - | (15) | - | - | - | (10) | (5) | - | (8) | - | - | - | (44) |
| Total Fulfillment Expenses | (25) | - | (38) | - | - | - | (33) | (5) | - | (19) | - | - | - | (120) |
| Marketing and Reviews | - | (3) | (1) | - | - | - | (1) | - | - | (1) | - | - | - | (5) |
| ECCN and Patient Refunds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| AWS | (45) | - | - | - | (45) | - | - | - | (45) | - | - | - | - | (135) |
| Other IT | (3) | - | (24) | - | - | - | (12) | - | (12) | (12) | - | - | - | (63) |
| Total IT | (48) | - | (24) | - | (45) | - | (12) | - | (57) | (12) | - | - | - | (198) |
| Corporate Insurance | - | - | - | - | - | - | - | (85) | - | - | - | - | - | (85) |
| Billing | (4) | - | - | - | (12) | - | - | - | (12) | - | - | - | - | (28) |
| Accounting | (7) | - | - | - | (5) | - | - | - | (5) | - | - | - | - | (17) |
| Taxes and Registrations | (49) | - | - | - | (59) | - | - | (20) | (44) | - | - | - | - | (172) |
| Total Corporate | (60) | - | - | - | (76) | - | - | (105) | (61) | - | - | - | - | (302) |
| Other Legal | (49) | - | - | - | (30) | - | - | - | (30) | - | - | - | - | (109) |
| ERP | (31) | - | - | - | - | - | - | - | - | - | - | - | - | (31) |
| CRA International | - | - | (100) | - | - | - | - | - | - | - | - | - | - | (100) |
| Other Consultant / Contractor | (105) | (16) | (16) | (16) | (16) | (16) | (16) | (16) | (16) | (16) | - | - | - | (249) |
| Total Ordinary Course Legal / Consultant | (185) | (16) | (116) | (16) | (46) | (16) | (16) | (16) | (46) | (16) | - | - | - | (489) |
| Other | (22) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | - | - | - | (112) |
| Contingent Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | **(931)** | **(39)** | **(407)** | **(36)** | **(785)** | **(36)** | **(281)** | **(351)** | **(922)** | **(91)** | **-** | **-** | **-** | **(3,878)** |



Goldin

**DIP Budget - 13-Week Cash Flow Forecast**

| Week Beginning ($ 000s) | 9/2/2019 Week 1 | 9/9/2019 Week 2 | 9/16/2019 Week 3 | 9/23/2019 Week 4 | 9/30/2019 Week 5 | 10/7/2019 Week 6 | 10/14/2019 Week 7 | 10/21/2019 Week 8 | 10/28/2019 Week 9 | 11/4/2019 Week 10 | 11/11/2019 Week 11 | 11/18/2019 Week 12 | 11/25/2019 Week 13 | Total 13-Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Reorganization Expenses** | | | | | | | | | | | | | | |
| Restructuring Legal | (255) | (204) | (204) | (204) | (204) | (204) | (204) | (204) | (204) | (146) | (146) | (146) | (146) | (2,472) |
| GLC Advisors | - | (125) | - | - | (125) | - | - | - | - | (125) | - | - | - | (375) |
| Goldin Associates | (120) | (140) | (140) | (140) | (140) | (140) | (140) | (140) | (140) | (105) | (70) | (70) | (70) | (1,555) |
| Directors Fees | (70) | - | - | - | (60) | - | - | - | (60) | - | - | - | - | (190) |
| Donlin | - | - | - | - | (30) | - | - | - | - | (30) | - | - | - | (60) |
| Creditors Committee Budget | - | - | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (110) |
| US Trustee Fees | - | - | - | - | - | (45) | - | - | - | - | - | - | (44) | (89) |
| Retainer Draws | 150 | 150 | - | - | - | - | - | - | - | - | - | - | - | 300 |
| **Professional Carve-Out Account Funding** | (295) | (319) | (354) | (354) | (569) | (399) | (354) | (354) | (444) | (386) | (226) | (226) | (270) | (4,551) |
| IB Transaction Fees | (56) | - | - | - | - | - | - | - | (34) | - | - | - | - | (90) |
| **Total Reorganization Expenses** | (351) | (319) | (354) | (354) | (569) | (399) | (354) | (388) | (444) | (386) | (226) | (226) | (270) | (4,641) |
| **Net Cash Flow before Funding** | (1,273) | (348) | (751) | (380) | (1,344) | (425) | (625) | (728) | (1,356) | (467) | (226) | (226) | (270) | (8,419) |
| **Funding** | | | | | | | | | | | | | | |
| **Sale Proceeds[1]** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Prepetition SVB Facility[2]** | | | | | | | | | | | | | | |
| Beginning Balance | $5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 |
| Increases | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 | 5,230 |
| SVB Prepetition Facility Cash Interest | (26) | - | - | - | (26) | - | - | - | (47) | - | - | - | - | (100) |
| New Money DIP Facility Cash Interest | - | - | - | - | (25) | - | - | - | (51) | - | - | - | - | (76) |
| **New Money DIP Facility[3]** | | | | | | | | | | | | | | |
| Beginning Balance | - | 3,500 | 3,500 | 3,500 | 3,500 | 5,000 | 5,000 | 5,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | |
| Advances[4] | 3,500 | - | - | - | 1,500 | - | - | 3,000 | - | - | - | - | - | 8,000 |
| Repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Ending Balance | 3,500 | 3,500 | 3,500 | 3,500 | 5,000 | 5,000 | 5,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | |
| **Total Funding Inflows / (Disbursements)** | 3,474 | - | - | - | 1,449 | - | - | 3,000 | (99) | - | - | - | - | 7,825 |
| **Net Disbursements (Operating + Financing)** | 2,201 | (348) | (751) | (380) | 105 | (425) | (625) | 2,272 | (1,455) | (467) | (226) | (226) | (270) | (594) |
| **Cash Balance End of Week** | $2,476 | $2,128 | $1,377 | $997 | $1,102 | $677 | $51 | $2,323 | $868 | $402 | $176 | ($50) | ($320) | |
| **Memo: Professional Fee Carve-Out Account** | | | | | | | | | | | | | | |
| Beginning Balance | - | 225 | 544 | 898 | 1,253 | 1,762 | 2,116 | 2,470 | 2,824 | 3,208 | 2,294 | 2,520 | 2,746 | |
| Weekly Funding | 295 | 319 | 354 | 354 | 569 | 399 | 354 | 354 | 444 | 386 | 226 | 226 | 270 | |
| Payments | (70) | - | - | - | (60) | (45) | - | - | (60) | (1,300) | - | - | (44) | |
| Ending Balance | 225 | 544 | 898 | 1,253 | 1,762 | 2,116 | 2,470 | 2,824 | 3,208 | 2,294 | 2,520 | 2,746 | 2,972 | |
| **Memo: Total Professional Retainers** | | | | | | | | | | | | | | |
| Beginning Balance | 339 | 189 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | |
| Weekly Draw | (150) | (150) | - | - | - | - | - | - | - | - | - | - | - | |
| Ending Balance | 189 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | 39 | |

**Notes:**
1. Does not include proceeds from an anticipated sale transaction.
2. Balance does not reflect Final Payment of $600,000.
3. Does not reflect the $150,000 DIP Commitment fee, which would be paid out of sale proceeds.
4. The Third DIP Advance will be available only upon the satisfaction of certain conditions.

