1

1                  UNITED STATES BANKRUPTCY COURT
                     DISTRICT OF DELAWARE

2

                            .   Chapter 11

3  IN RE:                        .
                            .   Case No. 19-11938 (LSS)

4  UBIOME, INC.,              .
                            .   Courtroom No. 2

5                           .   824 N. Market Street
                           .   Wilmington, Delaware 19801

6                           .
                           .   September 5, 2019

7                 Debtor.     .   3:00 P.M.
  . . . . . . . . . . . . . . . . .

8

                    TRANSCRIPT OF HEARING

9         BEFORE HONORABLE LAURIE SELBER SILVERSTEIN
            UNITED STATES BANKRUPTCY JUDGE

10

  APPEARANCES:

11

  For the Debtors:            Andrew Magaziner, Esquire

12                        Jordan Sazant, Esquire
                        Joseph Barry, Esquire

13                        YOUNG CONAWAY STARGATT & TAYLOR
                        1000 North King Street

14                        Wilmington, Delaware 19801

15  For U.S. Trustee:           Jane Leamy, Esquire
                        OFFICE OF UNITED STATES TRUSTEE

16                        844 King Street
                        Wilmington, Delaware 19801

17

18

19  Audio Operator:            MICHAEL MILLER

20  Transcription Service:      Reliable
                        1007 N. Orange Street

21                        Wilmington, Delaware 19801
                        Telephone: (302) 654-8080

22                        E-Mail: gmatthews@reliable-co.com

23  Proceedings recorded by electronic sound recording:
  transcript produced by transcription service.

24

25

```
 1  APPEARANCES (Continued):

 2
    For U.S. Dept. of Justice:    Leah Lerman, Esquire
 3                                U.S. DEPARTMENT OF JUSTICE
                                  950 Pennsylvania Avenue
 4                                Washington, D.C. 20530

 5  For Silicon Valley Bank:      Benjamin Butterfield, Esquire
                                  MORRISON FOERSTER
 6                                250 West 55th Street
                                  New York, New York 10019
 7
    For 8VC:                      Eric Wise, Esquire
 8                                GIBSON DUNN
                                  200 Park Avenue
 9                                New York, New York 10166

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

INDEX

2

#3) Debtor's Application for an Order Appointing Donlin Recano & Company, Inc. as Claims and Noticing Agent for the Debtor Pursuant to 28 U.S.C. § 156(c), Nunc Pro Tunc to the Petition Date [Docket No. 3; 9/4/19].

3

4

**Ruling: 15**

5

6
#4) Debtor's Motion for Interim and Final Orders Authorizing (A) the Maintenance of the Cash Management System; (B) Maintenance of the Existing Bank Accounts;  (C) Continued Use of Existing Business Forms; (D) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expense Status for Postpetition Intercompany Claims, and (E) Granting Related Relief [Docket No. 4; 9/4/19].

7

8

9

**Ruling: 24**

10

11
#5) Debtor's Motion for Entry of an Order Authorizing Payment of (A) Certain Prepetition Wages, Salaries, and Other Compensation and (B) Certain Employee Benefits and Other Associated Obligations [Docket No. 5; 9/4/19].

12

13

**Ruling: 27**

14

15
#6) Debtor's Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; (B) Approving the Debtor's Proposed Adequate Assurance of Payment for Postpetition Services; and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment [Docket No. 6; 9/4/19].

16

17

**Ruling: 31**

18

19
#7) Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing, but not Directing, the Debtor to Pay Certain Prepetition Taxes and Obligations and (B) Granting Related Relief [Docket No. 7; 9/4/19].

20

**Ruling: 33**

21

22
#8) Debtor's Motion for Entry of Interim and Final Orders Authorizing (A) Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Various Insurance Policies, Including Payment of Policy Premiums and Broker Fees, and (B) Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto [Docket No. 8; 9/4/19].

23

24

25

**Ruling: 35**

1   #9) Debtor's Motion for Entry of an Order Authorizing the Debtor to
    Pay Claims for Prepetition Customs, Shipper, Warehousemen, and
2   Common Carrier Obligations [Docket No. 9; 9/4/19].

3   **Ruling: 38**

4   #10) Debtor's Motion for Entry of Interim and Final Orders,
    Pursuant to Sections 105(a), 363, 1107(a), and 1108 of the
5   Bankruptcy Code (I) Authorizing the Debtor to Pay Certain
    PrePetition Claims of Critical Vendors and (II) Authorizing and
6   Directing Financial Institutions to Honor and Process Checks and
    Transfers Related to Such Claims [Docket No. 10; 9/4/19].
7
    **Ruling: 29**
8
    #11) Debtor's Motion for Entry of an Order Authorizing Certain
9   Procedures to Maintain the Confidentiality of Patient Information
    as Required by Applicable Privacy Rules [Docket No. 11; 9/4/19].
10
    **Ruling: 42**
11
    #12) Debtor's Motion for Entry of Interim and Final Orders (I)
12  Authorizing the Debtor to Obtain Postpetition Secured Financing,
    (II) Authorizing the Use of Cash Collateral, (III) Granting Liens
13  and Superpriority Administrative Expense Status, (IV) Granting
    Adequate Protection, (V) Modifying the Automatic Stay, and (VI)
14  Scheduling a Final Hearing [Docket No. 13; 9/4/19]

15  **Ruling: 43**

16  <u>EXHIBITS:</u>                           ID    Rec'd

17  Declaration of Curtis Solsvig                   13

18

19

20

21

22

23

24

25

1          (Proceedings commence at 3:04 p.m.)

2               THE COURT:  Please be seated.

3               MR. MAGAZINER:  Good afternoon, Your Honor.

4               For the record, Drew Magaziner of Young Conaway

5    Stargatt & Taylor on behalf of uBiome, Inc.

6               Your Honor, thank you for scheduling the hearing

7    today. We're certainly cognizant of the obligations on the

8    court and other conflicts that you had today, so we

9    appreciate the flexibility from both you and your staff.

10              Your Honor, before I dive into my brief overview

11   and presentation, I wanted to make a few introductions. With

12   us in the courtroom today is the debtor's acting CEO, Curtis

13   Solsvig, who's a managing director at Goldin Associates, as

14   well as Robin Chiu who is the debtor's acting chief financial

15   officer and also a managing director at Goldin.

16              As noted in the first day declaration, Goldin has

17   been engaged by the company since May of this year and Mr.

18   Solsvig and Ms. Chiu have been acting in management capacity

19   since early July.  And, of course, Mr. Solsvig is our first

20   day declarant.

21              Your Honor, from Young Conaway Joe Barry and

22   Jordan Sazant.

23              UNIDENTIFIED SPEAKER:  Good afternoon.

24              THE COURT:  Good afternoon.

25              MR. MAGAZINER:  Your Honor, we delivered

1  substantially all of the first day pleadings to Ms. Leamy on

2  the Thursday before Labor Day. And to the extent there were

3  any changes to those, we were able to share them with Ms.

4  Leamy prior to filing.

5         With respect to the DIP, given the holiday and

6  negotiations leading up to the filing, we did send that to

7  Ms. Leamy immediately after the filing. As always, Ms. Leamy

8  was gracious with her time and able to review all of the

9  pleadings including the DIP, and I'm happy to report that

10 we've resolved the limited number of issues that the U.S.

11 Trustee has raised with respect to all pleadings.

12        So, it goes without saying, always grateful to

13 work with the trustee in such a collaborative way and

14 especially over a holiday weekend, so we thank Ms. Leamy for

15 her efforts and responsiveness.

16        Your Honor, with those introductory remarks, I

17 would like to give the court a brief overview of how we got

18 here, where we are and where we hope to head in this case.

19        Given the unique background of the company and the

20 surrounding circumstances of this filing, we certainly

21 endeavored to file a very comprehensive first-day declaration

22 that outlines all of the relevant facts that color the

23 commencement of this proceeding.

24        And to the extent I gloss over anything, I

25 certainly would refer to the court to that declaration and,

1  of course, Mr. Solsvig is in the courtroom today.

2             I would also that I am by no means a biology

3  expert, so the extent I mispronounce any words, I ask for the

4  court's indulgence and that of my ninth-grade biology teacher

5  as well.

6             THE COURT:  Okay.  I probably wouldn't know this.

7             MR. MAGAZINER:  I'll do my best or, otherwise,

8  just stay away from them.

9             uBiome is a San Francisco based company that was

10 founded in 2012 to provide a product that consumers could use

11 to monitor their gut microbes.  In a nutshell, customers

12 purchase mail order kits to collect small stool samples from

13 home and they send those samples to uBiome for analysis,

14 together with a survey answering questions that may be

15 relevant to understanding the data that that analysis

16 generates.

17            The company, in turn, processes and analyses the

18 samples and identified bacteria are compared to a proprietary

19 database of catalogue bacteria.  The results that that

20 analysis produces, for lack of a better word, connects the

21 dots between a particular microbe and certain GI medical and

22 wellness conditions.

23            Ultimately, the customer receives his or her

24 results by email or by logging onto a web portal.

25            Historically, the company has had both consumer

1  and clinical operations.  On the consumer side, the debtor's

2  flagship products is its Explorer kits which are sold online

3  for under $100 dollars.  It's as simple as receiving the

4  necessary equipment and instructions, collecting the sample,

5  and mailing it back in.

6          After analyzing the sample, the company provides

7  consumers with certain suggestions on matters such as diet,

8  weight control, gut inflammation, and sleep disorders.

9          On the clinical side, the company has certain

10  products that are prescribed by a doctor and billed to a

11  customer's insurance carrier.  And these products include one

12  called SmartGut, which we refer to in the first-day

13  declaration which is an extension of Explorer.

14          As discussed in the declaration, the clinical side

15  of the company's business has been suspended in response to

16  certain investigations and business practices that focused on

17  the conduct of the company's founders who are no longer

18  associated with uBiome, and I will elaborate on those

19  investigations shortly.

20          As I mentioned, the company was founded in 2012 on

21  the heels of significant research development on matters

22  related to the micro which at a high-level addresses an

23  individual's need to learn more about what some refer to as

24  gut health without invasive and costly procedures.

25          The company's business model was largely the same

1 as it is now in terms of consumer interface and the company

2 was, what we believe, a true pioneer in that area.

3 　　　　　Given its posture in this space, the company was

4 able to raise multiple rounds of venture financing as

5 recently as October of last year and, at one point, had

6 approximately 300 employees.  They had space in Vancouver,

7 Washington which was a dedicated lab and they opened an

8 office in New York, as well.

9 　　　　　As Mr. Solsvig details in his declaration, the

10 company has substantial and value intellectual property and

11 various other commercial assets including a certified San

12 Francisco lab, a flourishing research and development

13 facility in Chile, medical fairs deemed with significant

14 research experience and expertise, and an engineering team in

15 Argentina.

16 　　　　　We believe we have the largest sample data base in

17 the industry and over forty-five patents.

18 　　　　　The company conducts its operations through a

19 network of non-debtor affiliates, each of which is directly

20 or indirectly owned uBiome, Inc.  Specifically, Your Honor,

21 there are two South America nondebtor subsidiaries that are

22 absolutely invaluable to the debtor's operations, one in

23 Chile and Argentina.

24 　　　　　Mr. Barry will describe the debt structure in more

25 detail, but at a high level.  The debtor is party to a

1  prepetition secured facility with Silicon Valley Bank under

2  which approximately $5.3 million dollars is outstanding as of

3  the filing date.  With respect to unsecured debt, the debtor

4  has roughly $3.5 million dollars outstanding as of the

5  filing.

6           In addition to various contingent liabilities

7  arising from inadvertent billings, potential obligations to

8  private pay insurers and potential fines arising out of

9  certain civil and criminal investigations.

10          The investigations, Your Honor, and the business

11 practices that trigger those inquires are why we are here

12 today.  It's why the company needs the production of the

13 court and the remedies available to it under the Bankruptcy

14 Code.

15          Mr. Solsvig describes these investigations in

16 great detail in his declaration but at a high level, the

17 former founder has implemented certain business strategies

18 that were, as we describe it, highly problematic including,

19 among other things, improper insurance provider billing

20 practices.

21          As a result, the FBI opened an investigation in

22 late April and the United States Attorney in the Northern

23 District of California subpoena the debtor for records and

24 documents.

25          To be clear, and in no uncertain terms, since the

1  investigation began, the company, its board, and management

2  have been fully cooperating with each investigating authority

3  including the DOJ and SEC and have remained absolutely

4  transparent with those parties regarding the potential need

5  for this proceeding and the commencement of this case.

6          In response to the investigation, Your Honor, the

7  three board members in place at the time immediately created

8  a special committee to investigate the allegations against

9  the company and retained Milbank to assist and advise that

10 special committee with that investigation.

11         The special committee conducted an exhaustive

12 investigation into business practices implemented by the

13 founders and conveyed these findings to the board.

14         The founders I referenced earlier were replaced

15 and all clinical operations were suspended.  The founders

16 have resigned from the board.  The Goldin members have been

17 placed into management and the founders themselves have no

18 relationship with the company, at this time.

19         With the consent of its shareholder, the company

20 also appointed two new independent directors in early July,

21 Jan Baker and Spencer Wells, both of whom have tremendous

22 experience assisting -- or excuse me; acting in fiduciary

23 capacities and as distressed advisors.  Their assistance over

24 the last few months has been invaluable and we believe has

25 played a pivotal role in allowing the company to level set in

1  advance of this filing.

2          In sum, Your Honor, as we stand here today, the

3  company has responded to each and every investigation

4  development with prompt action that we believe demonstrates

5  the proper exercise of corporate responsibility and we are

6  confident that this case will provide the company with a

7  fresh start it requires to flourish in the future.

8          That future, Your Honor, we believe, will come at

9  the conclusion of a marketing and sale process that commenced

10 prepetition.  As outlined in Mr. Solsvig's declaration, the

11 company has retained an experienced investment banker, GLC,

12 to market uBiome to a wide array of potential buyers and we

13 have secured the financing needed to implement a sale process

14 over the next few months.

15         The goal, Your Honor, is simple -- to find a buyer

16 and consummate a sale that will save approximately 100 jobs,

17 maximize value for a business that has sound science,

18 valuable intellectual property and an actionable business

19 plan.

20         The timeline is outlined on page 20 of Mr.

21 Solsvig's declaration and contemplates securing a letter of

22 intent by October 14th and closing on a sale in the weeks

23 prior to Thanksgiving.

24         With that, Your Honor, I will pause.  I realize I

25 just spoke at some length and my preview that it would be

1  brief, may be incorrect.  But I will pause to answer any

2  questions that the court may have before presenting the first

3  day relief.

4          THE COURT:  I do not have any questions on the

5  background.

6          MR. MAGAZINER:  Thank you, Your Honor.

7          I probably should have asked that at the outset.

8          THE COURT:  No, this is helpful.

9          MR. MAGAZINER:  As a preliminary matter, I did

10 mention Mr. Solsvig is in the courtroom and we would like to

11 move his declaration into evidence in support of the relief

12 before the court today.

13         THE COURT:  Does anyone object?

14     (No verbal response)

15         THE COURT:  Okay.  I hear no objections.  Mr.

16 Solsvig's declaration is admitted without objection.

17     (Declaration of Curtis Solsvig received into evidence)

18         MR. MAGAZINER:  Thank you, Your Honor.

19         My understanding from your clerk is that you would

20 prefer that we go in order, so I'm happy to do that.  The way

21 I would propose proceeding is I'll address items, I think, 3,

22 4, and 5.  If we could take critical vendors out of order,

23 I'll present that as well.

24         My colleague, Mr. Sazant, will present items 6, 7,

25 8, 9, and 11 and Mr. Barry will present the DIP motion which

1   appears at item number 12.

2           THE COURT:  Okay.

3           MR. MAGAZINER:  Your Honor, I should ask would you

4   prefer that we hand up orders as we go through or at the

5   conclusion of the presentations?

6           THE COURT:  As we go through.

7           MR. MAGAZINER:  Okay.  The first matter, Your

8   Honor, is the application to retain Donlin Recano & Company

9   as the claims agent under Section 156(c) 28 U.S.C. 156(c).

10          We did, of course comply with the protocol to get

11  proposals from, at least, three claims agents. Donlin has

12  vast experience in many jurisdictions including this one.  We

13  believe that the terms are market and the retention is

14  appropriate and, indeed, required given the number of

15  creditors that we believe the company has.

16          We did share this application with Ms. Leamy prior

17  to filing and there were no comments to the form of order.

18  Unless Your Honor has questions, we would ask that that order

19  be entered.

20          THE COURT:  I do not have any questions.  Does

21  anyone wish to be heard with respect to the retention of

22  Donlin Recano?

23      (No verbal response)

24          THE COURT:  I hear none.

25          MR. MAGAZINER:  May I approach?

1        THE COURT:  You may.  Thank you.

2        I reviewed the motion and agree that it's

3   appropriate to enter an order retaining Donlin Recano.  The

4   debtor followed the correct procedures.  And it may be

5   required in this case given the number of creditors.  I'm

6   signing that order.

7        MR. MAGAZINER:  Thank you, Your Honor.

8        The next matter is the debtor's motion seeking

9   authority -- bear with me for one second.  Sorry.  Seeking

10  authority to use its existing cash management system

11  authorizing the continuation and satisfaction of certain

12  intercompany transactions and granting an interim suspension

13  of the deposit and investment requirements under Section

14  345(b) of the Bankruptcy Code.

15       The cash management system is outlined in the

16  motion and we believe is pretty straightforward and it offers

17  appropriate mechanisms for the collection, concentration and

18  disbursement of funds used in the debtor's operations.

19       The debtor has seven bank accounts and a PayPal

20  account. Six of the accounts are maintained with Silicon

21  Valley Bank and they are as follows:  a concentration

22  account; a sweep account where funds from the concentration

23  account are swept overnight; a zero balance payroll account

24  used to make disbursements to employee; a zero balance

25  disbursement account used to satisfy certain financial

1  obligations; a customer deposit account used to receive
2  customer payment and; a collections only clinical deposits
3  account used to receive and hold clinical payments.

4  　　　　The PayPal account we agree with the trustee will
5  hold amounts that do not exceed $20,000 dollars on a post-
6  petition basis, and we will report to the trustee as outlined
7  in accordance with or excuse me to keep the U.S. Trustee
8  apprised of the status of that PayPal account.

9  　　　　We also propose to use the dormant Chase account
10 which is referenced in the motion as a repurpose utility
11 deposit account.

12 　　　　Again, at a high-level, Your Honor, the
13 concentration account receives funds from the consumer
14 deposit account and the clinical deposit account as
15 applicable, of course.  The concentration account funds the
16 disbursement's accounts as needed and, as noted, balances in
17 the concentration account over half a million dollars are
18 swept nightly into the sweep account.

19 　　　　We do fund our nondebtor affiliate operations in
20 South America through the intercompany transactions that are
21 described in the motion. As noted, these foreign affiliates
22 provide, what we believe, to be absolutely critical services
23 to the debtor and submit monthly budgets for primarily
24 employee and employee related benefits tax and taxes.

25 　　　　Once that budget is approved, the funds are

1  transferred to the foreign entities and its booked as an

2  expense on uBiome's books.  To the extent there are funds

3  remaining that are unspent at the end of the month, these

4  amounts are netted against the subsequent month's budget.

5          The debtor seeks authority to continue engaging in

6  those intercompany transactions in order to preserve the

7  South American operations and the analytical and scientific

8  capabilities that those operations offer.

9          We did discuss the intercompany transaction

10 specifically with the trustee and there's language that's

11 been incorporated into the order which reflects the agreement

12 we reached with Ms. Leamy.

13         There was one change, Your Honor, that came in

14 very late, and I don't mean that in any disparaging way, but

15 we heard from the United States about thirty minutes prior to

16 the hearing.  They basically have a reservation of rights

17 with respect to certain Medicare and TRICARE programs, to the

18 extent they apply.  We've incorporated the language into the

19 form of order which I can present by tendering a blackline.

20         THE COURT:  Okay.

21         MR. MAGAZINER:  May I approach?

22         THE COURT:  Yes.

23         MR. MAGAZINER:  Your Honor, that is the only

24 change to the form of order except for inserting the second

25 day hearing. That language we simply came in, you know, close

1  to the hearing date so we have inserted as applicable into

2  that paragraph but it, otherwise, is viewed as a reservation

3  of rights.  And I did discuss this with SVB and they are okay

4  with the language.

5           THE COURT:  Yeah, I was a little surprised.  I

6  don't see Mrs. Slights here, so.  Okay.

7           Well, let me ask you this.  Is the expense for the

8  nondebtor entities, I see in the budget the South American

9  payroll so I assume that's the big expense that's being

10 incurred in this interim period in connection with the

11 nondebtor operations? Are there other expenses in the budget

12 that are directly attributable to those operations?

13          MR. MAGAZINER:  My understanding, and I can

14 consult with Ms. Chiu, to the extent I misstate this, but it

15 is primarily payroll.  There are some taxes.  The reason, in

16 party, why we need to get in here today was to fund that

17 payroll. So, that's the significant substantial portion of

18 it.

19          Let me just ask Ms. Chiu.

20      (Participants conferring)

21          MR. MAGAZINER:  Ms. Chiu advises that there's also

22 some lease expenses, just general operational needs.

23          THE COURT:  Okay.

24          MR. MAGAZINER:  Your Honor, you know, certainly as

25 noted, we believe it's imperative that the cash management

1  system be maintained to avoid immediate and irreparable harm

2  and to the extent implicated, we do submit that its satisfied

3  -- that we satisfied the standard under Bankruptcy Rule 6003.

4           Again, this motion was shared with the trustee

5  prior to filing and we were able to reach resolution on the

6  terms of the proposed form of order.

7           THE COURT:  Does anyone wish to be heard with

8  respect to the cash management system motion?

9           MS. LERMAN:  Yes, Your Honor, I do, if I may be

10 heard?

11          THE COURT:  Yes.

12          MS. LERMAN:  Good afternoon, Your Honor.  Leah

13 Lerman on behalf of the United States of America.

14          I just wanted to confirm that I did send language

15 to debtor's counsel.  I appreciate that they're adding it.

16 As I understand the only change is apparently the addition of

17 the words if applicable.

18          MR. MAGAZINER:  Correct.  This is Drew Magaziner,

19 again, for the record.

20          It's simply at the end of the first sentence.  We

21 added as applicable.  And then in the second sentence

22 furthermore, custody and control over those deposits, as

23 applicable.

24          We weren't able to necessarily determine that this

25 -- we are implicating -- this language is implicated, so we

1  just reserved that right but, otherwise, we're fine with the

2  language.

3          MS. LERMAN:  All right, counsel, thank you very

4  much.  That is fine with me for an interim order, as I

5  understand this one will be.

6          Now, I'm still collecting a lot of information

7  from my clients, so I'll be able to better assert which

8  rights are implicated.

9          THE COURT:  Yes, this is an interim order.

10         Anyone else?

11     (No verbal response)

12         THE COURT:  Let me ask a question.  Paragraph

13  eleven, well now it's paragraph twelve.

14         MR. MAGAZINER:  Sure.

15         THE COURT:  Why is this paragraph in the cash

16  management order?

17         MR. MAGAZINER:  This was language that was

18  requested by SVB and I'll let Mr. Butterfield address the

19  court, to the extent I don't capture this accurately.

20         But my understanding is it relates to company

21  credit cards that would be used post-petition.  The facility

22  -- the existing facility prepetition require the company to

23  pay the cards down to zero every month.  And prior to the

24  filing, the bank had used cash to deposit to pay the cards

25  down that the company failed to do so.  So, this language is

1  meant, I believe, to preserve that ability.

2          In terms of why it's in the cash management, I

3  guess we can have an academic discussion whether it's more

4  appropriate somewhere else.  Is your question more about is

5  the relief appropriate or does it belong in this order

6  specifically?

7          THE COURT:  Is the relief appropriate.

8          MR. MAGAZINER:  Okay.  I will defer to Mr.

9  Butterfield, to the extent you would like to discuss.

10          MR. BUTTERFIELD:  Good afternoon, Your Honor.  Ben

11  Butterfield of Morris & Foerster on behalf of Silicon Valley

12  Bank.

13          You know, the ability to liquidate this cash that

14  secures these credit cards is part of the terms of the credit

15  card facility.  I understand that the debtor intends to

16  continue using these credit cards after the petition date.

17  And it would be burdensome for the debtor to go out and get a

18  new credit card facility.  So, this is part of the terms of

19  the agreement and we think it's reasonable under the

20  circumstances.

21          THE COURT:  Okay.  But the language in this

22  paragraph doesn't refer at all to the credit card agreement.

23  So if you want some limited language, this suggests that the

24  automatic stay is just lifted, period, with respect to all

25  collateral and that SVB can liquidate funds or securities for

1  its reimbursement obligations which is not defined to SVB.

2  So, this makes it sound like it's just a complete relief from

3  stay so you can liquidate your collateral.

4          MS. LERMAN:  So, okay, so if we were to insert

5  after the reference to SVB in connection with the debtor's

6  credit card program, would that acceptable?

7          THE COURT:  I thought you ought to -- remind me.

8  Maybe it was in this motion.  I don't recall it.  What's the

9  monthly run rate on the credit card -- a couple hundred

10 thousand?

11         MR. MAGAZINER:  I think the credit agreement

12 lowers the limit to $200k.  We think it's probably under 100k

13 in practice.  But the credit agreement, as I understand it,

14 has lowered the limit to $200,000 dollars.

15         THE COURT:  Okay.  And basically, you want

16 permission for the credit card to be paid on a monthly basis?

17 That's basically what's happening, right?

18         MR. BUTTERFIELD:  Right.  And so, my understanding

19 is that Silicon Valley Bank has the ability to debit the

20 debtor's account in order to pay the credit cards, so that's

21 the authority that we want going forward.

22         THE COURT:  Okay.  Well why don't we say that in

23 here rather than this language.  I'd like something in here

24 that specifically addresses that.  And if the idea is that as

25 part of the cash management system, you're entitled to debit

1  the account to pay the monthly credit card charges, I don't

2  have a problem with that.  They should be paid on an ongoing

3  basis, certainly.

4           So, I don't have a problem with that.  But I think

5  the language needs to be revised to specify that.

6           MR. MAGAZINER:  That's fine, Your Honor. We

7  certainly weren't trying to -- again, Drew Magaziner for the

8  record.  That was the intent.  The language is maybe a

9  consequence of some late nights, so we'll convene and get you

10 the appropriately narrow language.

11          THE COURT:  Okay.  I have one other question.

12          MR. MAGAZINER:  Sure.

13          THE COURT:  Paragraph -- it's now sixteen.

14          MR. MAGAZINER:  Yes, Your Honor.

15          THE COURT:  Any claim arising from the post-

16 petition intercompany transactions hall be given

17 administrative expense priority.  How does that apply in a

18 one-debtor case?

19          MR. MAGAZINER:  Yeah, we noodled over this and

20 we're happy to strike.

21          THE COURT:  Okay.  With the change that's been

22 discussed with respect to paragraph, now paragraph 12, with

23 respect to the credit cards, I will approve the request from

24 the debtors with respect to continuation of the cash

25 management system, existing bank accounts, et cetera.

1          It's appropriate for the reasons set forth in the

2    motion to continue the system uninterrupted and with changes

3    that I'm sure were made at the request of the office of the

4    United States Trustee before this form was filed, I will

5    approve it once I receive a revised form of order.

6          MR. MAGAZINER:   Thank you, Your Honor. We will

7    mark that up and tender at the conclusion of the hearing

8    today.

9          The next matter that I'm handling, Your Honor, is

10   the employee wage motion.  That's agenda item number five.

11         Your Honor, as always, the debtor and its advisors

12   want to ensure that the Chapter 11 case does not adversely

13   affect or harm the employees who are certainly critical to

14   the go forward viability and success of the sale.

15         Through this motion, we seek authority to pay

16   prepetition wages and salaries and related employee benefits

17   to the company's remaining employees of which there are

18   thirty-four in California.

19         We also supplement the workforce with five

20   independent contractors who we also seek authority to pay

21   consistent with arrangements with those individuals.

22         As outlined in the motion, these employees provide

23   critical functions for the debtor including sales, research

24   and development, lab engineering, business development,

25   market, legal and finance support.

1          We request authority to pay up to $85,000 dollars

2     in unpaid wage obligations to these absolutely critical

3     individuals and, as noted, no one individual will receive

4     more than the applicable statutory cap of $13,650 dollars.

5          We also seek authority to continue the PTO program

6     in an amount not to exceed $10,000 dollars and to reimburse

7     employees for reimbursable expenses incurred on behalf of the

8     company in an amount not to exceed $65,000 dollars.

9          Your Honor, I won't walk through each of the items

10    of relief unless the court would prefer I do. But generally

11    speaking, we seek authority to preserve the status quo in

12    terms of compensation, benefit and reimbursement packages

13    offered to our employees, all subject to the individual caps

14    which we've set forth in the respective paragraphs in the

15    form of order.

16         And, again, for the avoidance of doubt, we are not

17    seeking authority through this motion to pay the individuals

18    in South America.  They are employed by the nondebtor

19    affiliates and then the employee costs are as we just

20    described to the cash management context.

21         As Mr. Solsvig states in his declaration, these

22    employees are critical to the ability to preserve and

23    maximize value, especially given the sale process and the

24    institutional knowledge that they hold.

25         Bankruptcy Rule 6003 is, of course, implicated and

1  we believe for the reasons baked on the record and before the

2  court that we have satisfied the applicable standards because

3  the company would suffer immediate and irreparable harm if

4  the authority to pay these wages and related benefits is not

5  granted.

6           This motion was shared, again, with Ms. Leamy and

7  the order has not changed.  Happy to answer any questions

8  that the court may have.

9           THE COURT:  Well, let me ask first if anyone would

10  like to be heard with respect to the employee wage motion?

11      (No verbal response)

12           THE COURT:  I hear no one.

13           I reviewed the motion.  I agree that the relief is

14  appropriate, that the employees should not be made to suffer

15  for the bankruptcy of the company.  I did think some of the

16  expense reimbursements seemed high relative to the number of

17  employees.  But I'll let somebody scrub that if we have a

18  committee.

19           MR. MAGAZINER:  Absolutely, Your Honor.  And we

20  did discuss this with the lenders.  The budget, as you'll

21  hear, was poured over.  The expense reimbursements are

22  foreign to me in some respect.  This is a startup, that once

23  was a startup.  California seems to operate in a different

24  world than us Northeasterns.

25           THE COURT:  Lunch, cell phones, all kinds of

1  wonderful reimbursements.

2           MR. MAGAZINER:  They got to keep people fit.  So,

3  understood, Your Honor, and noted.  And we'd be happy to

4  discuss that issue, to the extent it arises.

5           THE COURT:  These, I take it, they're historical

6  expenses that this company incurs and its employees expect to

7  be reimbursed for them.  So on first day, I'm not going to

8  change that expectation. And, again, for the reasons I've

9  already said, I do think it's appropriate and it's necessary

10 to keep the employees retained to avoid immediate and

11 irreparable harm to the company, so I will sign the order.

12          MR. MAGAZINER:  Thank you, Your Honor.  May I

13 approach?

14          THE COURT:  You may.

15          MR. MAGAZINER:  Your Honor, the last motion that I

16 will be presenting is actually item number ten on the agenda,

17 so, again, apologies for jumping a little ahead.

18          THE COURT:  Okay.

19          MR. MAGAZINER:  This motion seeks authority to pay

20 certain prepetition claims of a very limited number of

21 critical vendors in an aggregate amount not to exceed

22 $181,000 upon entry of a final order and $121,000 payable

23 under the interim order before the court today.

24          These vendors provide the debtor with certain lab

25 materials, supplies, equipment and related services, all as

1  further detailed in paragraph four of the motion.

2          As set forth in Ms. Solsvig's declaration, the

3  debtor examined a variety of factors, as we always do in

4  creating the critical vendor list, including whether the

5  vendor was sole source, whether alternative providers were

6  available and whether a vendor was likely to refuse goods and

7  services, absent satisfaction of these claims.

8          The debtor believes that any disruption in

9  receiving the goods or services in question would materially

10  damage the debtor's operations and undercut the ongoing sale

11  process.  Consequently, Your Honor, the debtor seeks

12  authority to pay the vendor claims in the amounts recited

13  which the debtor believes are modest given the importance of

14  these vendors and service providers.

15          The debtor submits that absent the relief

16  requested, the company would suffer immediate and irreparable

17  harm and, of course, for that reason, we believe the standard

18  in Bankruptcy Rule 6003 has been satisfied.

19          This motion was shared with Ms. Leamy prior to

20  filing and, again, she did advise that her office did not

21  have any objection to this proposed form of order.

22          I did want to note which I neglected to say

23  earlier that we have secured a second day hearing on October

24  2nd and that date has been incorporated into these forms of

25  order, to the extent there's a final order looming and we set

1  the objection deadline as September 23rd.

2          THE COURT:  Okay.

3          Does anyone wish to be heard with respect to the

4  critical vendor motion?

5       (No verbal response)

6          THE COURT:  I hear no one.  I reviewed it.  I

7  should also indicate I reviewed Mr. Solsvig's declaration and

8  rely on that in connection with the findings that I'm making

9  with respect to these motions.  I rely on it here to with

10 respect to the debtor's process it undertook to determine

11 which vendors are critical and agree that in the scheme of

12 things, the request is modest, so I will approve it as

13 necessary to avoid immediate and irreparable harm.

14         MR. MAGAZINER:  Thank you, Your Honor.  May I

15 approach?

16         THE COURT:  You may.  Thank you.

17         MR. MAGAZINER:  With that, Your Honor, I will cede

18 the podium to my colleague.  Thank you for your time today.

19         MR. SAZANT:  Good afternoon, Your Honor.

20         THE COURT:  Good afternoon.

21         MR. SAZANT:  Jordan Sazant, for the record, of

22 Young Conaway Stargatt & Taylor, on behalf of the debtor.

23 I'd like to echo the gratitude shown by Mr. Magaziner for the

24 Court's time in hearing us on such short notice.

25         First, I will covering Item Number 6 on the

1    agenda, which is the debtor's request for interim and final

2    orders prohibiting utility providers from altering, refusing,

3    or discontinuing services, deeming utility providers to be

4    adequately assured by the debtor's proposed adequate

5    assurance listed in the motion, and establishing procedures

6    for resolving any additional adequate assurance requests that

7    may come from such utility providers.

8          The debtor has consolidated its operations in San

9    Francisco where it receives certain standard utility services

10   from the providers listed on Exhibit C to the motion.  The

11   debtor has historically paid just under $10,000 per month.  I

12   believe the exact number is approximately 9,620 for these

13   utility services and proposed to pay an adequate assurance

14   payment deposit equal for half of that amount into the

15   segregated Chase account that was mentioned in connection

16   with cash management to provide adequate assurance to the

17   utility providers in accordance with Section 366 of the

18   Bankruptcy Code.

19         The debtor also proposes certain standard adequate

20   assurance procedures, whereby the utility providers may

21   request additional adequate assurance at which time the

22   debtor and their counsel will attempt to consensually resolve

23   the dispute without a hearing.  And if that proves

24   infeasible, a hearing may be held in this court to resolve

25   any disputes.

1           The debtor respectfully, unless Your Honor has any

2   questions, the debtor respectfully requests entry of the

3   interim order.

4           THE COURT:  Does anyone wish to be heard with

5   respect to the utility motion?

6       (No verbal response)

7           THE COURT:  I hear no one.

8           The only comment I have with respect to the order

9   is Paragraph 12.

10          MR. SAZANT:  Yes?

11          THE COURT:  I think this is okay, I guess, as long

12  as the post-petition invoices are -- or invoices for post-

13  petition services are paid.  Does "the conclusion of the

14  case" mean when the case is closed?

15          MR. SAZANT:  I understand Your Honor's contention

16  with that and I think we can clarify that just like with the

17  adequate assurance procedures, the post-petition invoices

18  must be paid and the utility provider must agree that they've

19  been paid in full.

20          THE COURT:  That'd be fine.

21          MR. SAZANT:  Okay.  We will mark that one up.

22          THE COURT:  Okay.  With that clarification and

23  change to be made to the order, I will approve the requested

24  adequate assurance for utility providers is consistent with

25  Section 366 of the Code and necessary to avoid potential

1  disruption of utility service to the debtor.

2          MR. SAZANT:  Thank you, Your Honor.

3          That will take us to the next item on the agenda,

4  which is Item 7, the debtor's motion to pay certain

5  prepetition taxes and fees related to obligations in an

6  amount not to exceed $15,000.

7          These taxes were incurred in the ordinary course

8  of the debtor's business for such things as income taxes,

9  sales taxes, et cetera.  Some of these taxes may also impose

10 director and officer liability or other issues that would

11 serve to distract the debtor and interfere with the debtor's

12 ability to manage its business at this crucial time.

13         Rule 6003 of the Bankruptcy Code is implicated and

14 the debtor submits that without paying these taxes, it will

15 cause immediate and irreparable harm to the debtor's estate

16 and the standard has been satisfied.

17         Unless Your Honor has any questions, we

18 respectfully request the Court enter the interim order.

19         THE COURT:  Anyone wish to be heard, with respect

20 to the taxes motion?

21     (No verbal response)

22         THE COURT:  I hear no one.

23         The only comment I have here is that Paragraph 7

24 of the motion states that there may be some unspecified pre-

25 petition obligations that exist that are similar to those

1  described and included within the definition of taxes.  I'm

2  not sure I've actually seen that before in a tax -- in a

3  prepetition taxes motion.  Maybe I have and haven't caught it

4  before, but I don't think that something unspecified and

5  unidentified should be approved and I don't recall if this is

6  an interim -- it is an interim order --

7          MR. SAZANT:  It is interim.  Yes, Your Honor.

8          THE COURT:  I don't think it should be approved on

9  an interim basis.  If you -- if something pops up, come back

10  and we'll have a hearing with respect to whatever falls in

11  that category, but I don't think unspecified expenses,

12  perhaps in the nature of a tax should be included in this

13  interim order.

14          MR. SAZANT:  Understood, Your Honor.  And should

15  anything arise, we will certainly come back to the Court.

16          THE COURT:  Okay.

17          MR. SAZANT:  With that caveat, we request that the

18  Court enter the order.

19          THE COURT:  Okay.  Let's indicate in the order, in

20  Footnote 2 capitalize, Terms not otherwise defined herein,

21  which includes the word "taxes" --

22          MR. SAZANT:  Yes, ma'am.

23          THE COURT:  -- shall have the meaning ascribed to

24  such term in the motion except as stated by the Court at the

25  interim hearing.  That would probably be better-worded, but

1  everyone knows what I mean.  And with that, I will sign the

2  order.

3          MR. SAZANT:  Having written that in, may I

4  approach?

5          THE COURT:  You may.  Thank you.

6          MR. SAZANT:  That will lead us next to Item 8 on

7  the agenda, which is the debtor's motion for interim and

8  final orders authorizing the debtor to continue and, if

9  necessary, to renew its insurance policies and to pay charges

10 incurred therewith in the ordinary course of business.

11         The debtor maintains certain insurance programs,

12 such as property, directors and offers liability, employment

13 practices liability, et cetera, and incurs approximately

14 $930,000 on an annual basis on account for these insurance

15 policies.  The majority of that amount has been paid for 2019

16 and accordingly, the debtor requests authority to pay up to

17 $225,000 on account of its insurance obligations, including

18 115,000 in the interim period.

19         The debtor requires insurance to operate its

20 business and is required in this district under the U.S.

21 Trustee guidelines.  This request implicates Bankruptcy Rule

22 6003 and the debtor submits that the inability to pay its

23 insurance obligations would cause the debtor and its estate

24 immediate and irreparable harm and that they have satisfied

25 this standard.

1          The debtor would respectfully request entry of the

2     interim order, subject to any questions that Your Honor might

3     have.

4          THE COURT:  I have no questions.

5          Does anyone wish to be heard with respect to the

6     insurance motion?

7        (No verbal response)

8          THE COURT:  Okay.  I hear no one.

9          I've reviewed it.  I agree with the presentation

10    that the insurance is required to insure the assets, meet

11    requirements of the United States Trustee, and perhaps State,

12    and other authorities, and is appropriate under the

13    circumstances, and I will give that relief on an interim

14    basis, as requested, and find it meets Rule 6003.

15         MR. SAZANT:  Thank you.  I have a form of order

16    here, may I approach?

17         THE COURT:  You may.

18         MR. SAZANT:  Thank you.

19         THE COURT:  Thank you.

20         MR. SAZANT:  This will lead us next to Item 9 on

21    the agenda, the debtor's motion for an order authorizing the

22    debtor to pay prepetition amounts owed to certain shipping,

23    warehousing, and customs charges, including the broker fees

24    associated therewith.

25         The debtor uses the shippers to import products

1  from foreign countries, primarily Mexico, to deliver their

2  microbiome testing kits to their customers, and to receive

3  from such customers, by a pre-paid post, the kits that they

4  have prepared for testing.

5        The broker fees are paid to a customs broker who

6  assists the debtor with the payment of certain customs

7  charges and the debtor also frequently stores its products in

8  warehouse facilities and incurs costs in doing so.

9        The debtor further requests the authority to

10 condition the payment of these prepetition amounts on certain

11 customary trade terms.  In terms of amounts, the debtor

12 requests the authority to pay approximately $300 in Customs

13 charges and broker fees, approximately $15,000 in shipping

14 expenses, and approximately $45,000 in warehousing expenses.

15       The parties traditionally have liens on the

16 debtor's products that are in their possession and may refuse

17 service if these amounts are not paid.  The debtor submits

18 that these amounts, all of which come due in the interim

19 period, are minimal, in comparison to the value that would be

20 lost if the shippers refused to continue providing the debtor

21 with these services.  The debtor and its customers rely upon

22 the expedient transport of these kits and the samples

23 provided so the debtor can accurately provide results to

24 their customers.

25       This order implicates rule -- Bankruptcy Rule 6003

1  and the debtor respectfully submits that it has satisfied

2  this standard and requests that the order be entered.

3          THE COURT:  Does anyone wish to be heard with

4  respect to the customs, shippers, warehousemen motion?

5      (No verbal response)

6          THE COURT:  I hear no one.

7          The only question I have is with respect to

8  Paragraph 12 of the order.

9          MR. SAZANT:  Yes, Your Honor?

10         THE COURT:  So, how I'm reading this -- although,

11 I'm not sure it states this exactly -- but I take the intent

12 of it is I'm giving authorization for these charges to be

13 paid, but that doesn't create an obligation on the part of

14 the debtor or its officers to do so and that nothing, by

15 virtue of this order or a decision made by virtue of this

16 order is increases, decreases, elevates, or otherwise.

17         But the way I'm reading it, it looks like it could

18 change whatever liability that is out there that exists.

19         MR. SAZANT:  I believe the intent of this

20 paragraph is to maintain the status quo such that this

21 paragraph is not directing the debtor or its officers to do

22 or take any such action and is not intending to change the

23 priority scheme that would otherwise exist outside of

24 bankrupt -- that would otherwise exist regardless of this

25 order.

1    (Pause)

2         MR. SAZANT:  I believe the paragraph is intending

3    to ensure that in their business judgment, should the company

4    or any of its officers not pay such fees, this order, itself,

5    does not impose any liability.

6         THE COURT:  And I'm fine with that, that this

7    order, itself, doesn't direct anything so that if one of

8    these charges is not paid, the fact that this order is

9    entered doesn't change anything.  I'm not quite sure it says

10   that, but I guess as long as we all have the understanding

11   that that's what we're doing here, then I'm okay.

12        But you should explain this to your officers and

13   directors.

14        MR. SAZANT:  Understood, Your Honor.

15        Subject to that, with your --

16        THE COURT:  I will sign it.

17        MR. SAZANT:  I have a form of order.  May I

18   approach?

19        THE COURT:  You may.  Thank you.

20        Okay.  I've reviewed the motion.  I do think it's

21   appropriate to authorize the debtor to make the requested

22   payments in order to ensure the services of the shippers and

23   warehousemen and the ability to transport the kits back and

24   forth between the company and customers.  And with the

25   comment that I had and the clarification, with respect to

1  Paragraph 12, I will approve it as meeting the requirements

2  of Rule 6003 and I'm signing the order.

3          MR. SAZANT:  And this takes us -- I want to head

4  to Item 11 --

5          THE COURT:  Yes.

6          MR. SAZANT:  -- on the agenda, which is the

7  debtor's motion due to the nature of its business for an

8  order establishing certain procedures to maintain patient

9  confidentiality, as required by certain privacy rules

10  including the Health Insurance Portability and Accountability

11  Act of 1996, also known as "HIPAA."

12          The debtor's business of analyzing patient DNA and

13  microbiome data naturally provides the debtor with access to

14  certain protected health information under HIPAA and is

15  important to both, the debtor and the debtor's customers,

16  that the customer's confidential medical information remain

17  protected.  This motion seeks to balance the privacy

18  requirements of HIPAA with the disclosure requirements of the

19  Chapter 11 process.

20          By this motion, the debtor requests authority and

21  has omitted references to the patients in the creditor matrix

22  that it filed with the Court yesterday evening.  Second, the

23  debtor proposes to identify with only a code number, such as

24  "Patient 1" or "Patient 2," any patients listed on the

25  debtor's schedules and statements, and this full information

1  may be made available to the Court or to the U.S. Trustee's

2  Office upon request.  It also may be made available to

3  counsel to the DIP financing parties and counsel to any

4  committee appointed in this case upon entry into a mutually

5  acceptable nondisclosure agreement.  And, finally, this full

6  information may be made available to any other party, upon a

7  motion by such party and the Court entering an order

8  authorizing the debtor to do so.  Finally, the debtor will

9  note on its certificates of service that the patient list was

10  served, but not provide information about each individual

11  patient.

12        Subject to any questions that Your Honor may have,

13  the debtor respectfully requests entry of an order approving

14  these confidentiality procedures.

15        THE COURT:  Does anyone wish to be heard with

16  respect to the patient-information motion?

17     (No verbal response)

18        THE COURT:  I guess the one question that I have

19  is whether patients are creditors?

20        MR. SAZANT:  I mean patients are required to pay

21  the debtor for the services that they provide, so it's

22  possible that some patients may be creditors.

23        MR. MAGAZINER:  May I be heard, Your Honor?

24        THE COURT:  Yes.

25        MR. MAGAZINER:  For the record, Andrew Magaziner,

1  of Young Conaway.

2          So, my guess is, by reading Your Honor's body

3  language, the term "patient" is throwing you off to some

4  degree, but generally not -- they are not creditors.  There

5  might be some instances where they do pay.  They pass on the

6  payment from the carrier to us.

7          This motion is driven by the fact that we do get

8  HIPAA-protected information.  I think "patient" is probably a

9  misleading term, but that's the term in the HIPAA, so that's

10 why we seek this relief.

11         But to Your Honor point about are they

12 creditors -- generally not.

13             THE COURT:  Okay.

14             MR. MAGAZINER:  But, certainly, to the extent

15 they're entitled to notice in this case, we want to give --

16 you know, we always endeavor to give as much notice as

17 possible.

18             THE COURT:  Okay.  I'm not sure that the persons

19 who buy the kits from the debtor are creditors or that --

20 and I don't know whether they're required to be listed on the

21 schedules somewhere.  It doesn't seem intuitive to me that

22 they are, but I understand the HIPAA concerns and certainly

23 believe it's appropriate to protect the information that

24 HIPAA protects.  So, I don't have a problem with the request,

25 per se.

1               I'm not sure exactly where it applies or
2    understand exactly how it applies, but I certainly don't have
3    any problem protecting confidential, medical information --
4               MR. SAZANT:  Thank you, Your Honor.
5               THE COURT:  -- which customers expect to be
6    private.
7               MR. SAZANT:  We're not stating one way or the
8    other at this moment that this information is required to be
9    in these schedules and statements.
10              THE COURT:  Uh-huh.
11              MR. SAZANT:  It's more of a protective order at
12   this time, that given the nature of the debtor's business and
13   the information that they receive, we're requesting this
14   authority from the Court.
15              THE COURT:  That's fine.  I think more
16   appropriately, and as I read in the papers, the debtor is
17   going to continue to follow the guidelines that it has, with
18   respect to information that it receives --
19              MR. SAZANT:  Yes.
20              THE COURT:  -- from its customers, and that, I
21   think is critical and nothing in the Bankruptcy Code would
22   obviate the need to comply with HIPAA.
23              So, yeah, I'm not exactly sure how this applies,
24   but I read through it.  I don't have a problem with it and
25   I'm going to enter the order.

1              If there's some party that has some concern with

2      respect to this, they can ask me to reconsider it, but I'm

3      going to enter the order, as requested.

4              MR. SAZANT:  Thank you, Your Honor.

5              May I approach the bench?

6              THE COURT:  You may.  Thank you.

7              MR. SAZANT:  I will cede the podium to my

8      colleague, Mr. Magaziner.

9              MR. MAGAZINER:  Thank you, Your Honor.  For the

10     record, Drew Magaziner from Young Conaway.

11             With respect to cash management, just circling

12     back to that, we did incorporate language, which I believe

13     satisfies the Court's concerns in Paragraph 12.

14             If I may approach?

15             THE COURT:  Yes.  Thank you.

16             MR. MAGAZINER:  And, Your Honor, we also did

17     strike the other language that the Court requested be

18     stricken.

19             THE COURT:  That's fine.

20             MR. MAGAZINER:  Thank you, Your Honor.

21             MR. BARRY:  Good afternoon, Your Honor.

22             THE COURT:  Give me a second here.

23             MR. BARRY:  I don't want to get ahead of you.

24             Thank you for entering that, by the way.  You

25     can't unviolate HIPAA once you do, which is sort of the

1  point, right?

2            THE COURT:  Yep.

3            MR. BARRY:  Joe Barry of Young Conaway, for the

4  debtors, Your Honor.  A couple of housekeeping items on the

5  DIP, if I could?

6            THE COURT:  Yes.

7            MR. BARRY:  The first is, the last time I appeared

8  before you on a DIP, you observed that I made my own blowup

9  of the DIP order and I promised you next time I would bring

10 you one of mine.  So, if you would like one of mine, may I

11 approach?

12           THE COURT:  Oh, your budget?

13           MR. BARRY:  My budget, yes.

14           THE COURT:  Your budget?  I got my own.

15      (Laughter)

16           MR. BARRY:  Okay.  All right.  All right.

17           I think I used the phrase "BYOB" bring your own

18 budget --

19           THE COURT:  Yes.

20           MR. BARRY:  -- or bring your own blowup, it was.

21           Second, Your Honor, we did send over some

22 blackline change pages this morning resolving the U.S.

23 Trustee's outstanding issues on the DIP.  We, frankly, wanted

24 to be as convenient as possible, given this morning's events.

25 Hopefully Your Honor has had a chance to review those.  And

1  of course it's not lost on us that we're in Judge Walsh's

2  courtroom appearing today.

3           THE COURT:  We are.

4           MR. BARRY:  We also, Your Honor, we did, as

5  Mr. Magaziner indicated, we did receive some comments from

6  the U.S. Government.  Ms. Lerman is on the phone.  We agreed

7  to -- we exchanged emails during the hearing.  We've agreed

8  on a rider to the DIP order.

9           If I may approach?

10          THE COURT:  You may.  Thank you.  Okay.

11          MR. BARRY:  I understand the Government may have

12  some tweaks to this language for the final order, but for

13  purposes of today, we, and the lender have agreed to this

14  language.

15          So, Your Honor, with respect to the DIP, the Court

16  has admitted Mr. Solsvig's declaration as the evidentiary

17  basis for all of the relief today.

18          Paragraphs 50 to 53 provide the evidentiary basis

19  for the DIP, including the debtor's attempt to shop for

20  alternatives, the negotiation, and entry into the DIP, the

21  terms of the DIP, the debtor's critical need for the

22  financing to finance operations, these cases, and its sale

23  process, the inability to obtain alternative funding sources

24  on better terms, and the facility being the only option

25  available under the circumstances, and the entry into the DIP

1  being in the best interests of the debtors.

2        I will note, Your Honor, that Mr. Solsvig's

3  declaration attests to all of the facts that are set forth in

4  the DIP motion, itself, providing, we think, the evidentiary

5  support for entry into the DIP.  And on that basis, we

6  believe that the evidentiary burdens have been met.

7        The DIP is being put up by Silicon Valley Bank,

8  who was the debtor's prepetition secured lender, only

9  prepetition secured lender.  They're owed approximately $5.83

10  million.  The they have collaborated with 8VC Fund.  They are

11  a significant investor in the debtor to collaborate so that

12  we would have sufficient liquidity to make it through these

13  cases.

14        The initial funding is $3.5 million on an interim

15  basis.  That's all new money.  There is essentially an

16  intercreditor priority arrangement between 8VC and SVB,

17  whereby SVB's new money will be prior to 8VC's junior DIP.

18  And the final order, we'll be asking for another $1.5 million

19  in financing and we will be rolling-up SVB's prepetition

20  facility of 5.8.

21        THE COURT:  In this first -- I did have -- I

22  didn't quite follow --

23        MR. BARRY:  Okay.

24        THE COURT:  -- the difference between what you

25  call the first and second tranche and then the interim and

1  final.

2           MR. BARRY:  So, let me explain it to you way.

3  There's Tranche 1(a) and Tranche 1(b) and Tranche 2 -- it's

4  also, I think, described as Tranche 1, 2, and 3 in the DIP

5  credit agreement (indiscernible) agreement --

6           THE COURT:  Yes.

7           MR. BARRY:  Here's how it works.  Today, we'll be

8  asking Your Honor to approve 3.5.  That will take us to our

9  final DIP hearing.  What is inside the 45-day LOI deadline

10  that would trigger our ability to potentially borrow on what

11  is considered the third tranche.  So, an interim borrowing of

12  3.5 today gets us to the second and final hearing.  The next

13  leg up 1.5 gets us to, hopefully, the 45-day period by then.

14  Hopefully we have an LOI to acquire, substantially, all of

15  the debtor's estates that will clear the debt.  Then, on a

16  permissive basis, we may be able to get the extra $3 million

17  if we need it to get us across the goal line on a sale.

18           THE COURT:  Okay.  I get that.

19           MR. BARRY:  Okay.

20           THE COURT:  But of the 3.5 million that's being

21  borrowed today how much is coming from Silicon Valley Bank

22  and how much is coming from the participants?

23           MR. BARRY:  Seven hundred from Silicon Valley Bank

24  and 2.8 from 8VC.  I'm sorry.  I think I answered five

25  questions you didn't ask me and I probably could have given

1   you the very simple answer.

2           THE COURT:  That's okay.

3           MR. BARRY:  And for the record, Your Honor, the

4   final order, the 1.5, that will be split three hundred by

5   Silicon Valley Bank, 1.2 from 8VC.  All of that is new money.

6           THE COURT:  And all of that is in the first

7   tranche.

8           MR. BARRY:  That is what is considered the first

9   tranche, correct.

10          THE COURT:  Okay.

11          MR. BARRY:  Yes.

12          THE COURT:  Okay.  And I take it that SVB it's not

13  a backstop.  So, the participants have to come through with

14  their funding.

15          MR. BARRY:  Correct.

16          THE COURT:  Okay.

17          MR. BARRY:  Mr. Butterfield would jump up very

18  quickly if I said anything to the contrary.

19          THE COURT:  Okay.

20          MR. BARRY:  I think I would --

21          THE COURT:  Okay.  And the super-senior secured

22  basis is the 700,000 Silicon Valley Bank and then the 2.8 is

23  the fifty percent that's senior to the prepetition facility

24  and the fifty percent that's *pari passu*.

25          MR. BARRY:  So, not quite.

1          THE COURT:  Okay.

2          MR. BARRY:  The new money, break it down into the

3 following; the new money and the roll-up.  So, the -- by the

4 way, we're not asking you to roll this up today, but I

5 understand you wanting to understand all the mechanics of the

6 DIP before you approve the interim.  All of Silicon Valley

7 Bank's new money is first priority.

8          THE COURT:  Right.

9          MR. BARRY:  All of 8VC's new money is first

10 priority below Silicon Valley Bank's new money.  Does that

11 make sense?  Essentially, it's a junior DIP from 8VC.

12          THE COURT:  Okay.  And what is the provision in

13 the documents that talks about the junior to fifty percent of

14 the prepetition facility and the *pari passu* with fifty

15 percent?

16          MR. BARRY:  So, that's the roll-up.  And if Your

17 Honor authorizes a roll-up of the prepetition credit facility

18 fifty percent of that will be *pari* with SVB's new money.  So,

19 it will have that first super-priority tranche above all of

20 8VC's new money and fifty percent of that will be *pari* with

21 8VC's junior DIP money.

22          THE COURT:  Say that again?  If the roll-up is

23 approved --

24          MR. BARRY:  Yeah.

25          THE COURT:  -- then --

1   MR. BARRY:  Fifty percent of the roll-up will

2   constitute DIP obligations with that same priority that SVB's

3   new money DIP gets.  So, they're the first priority, first

4   dollars out.  Then you have the junior DIP that's 8VC's new

5   money and the other half of SVB's rolled up money will be

6   *pari* with that in that junior position.

7   THE COURT:  Okay.  I'm not sure I -- well, I'm

8   sure I didn't get that from the documents.  As for the

9   interim then tell me what's happening with the -- what do

10  people get on the interim?

11  MR. BARRY:  Okay.  I think that's easy.  The

12  debtor is borrowing $700,000 dollars from Silicon Valley Bank

13  on a first-priority new money DIP basis.  They are borrowing

14  $2.8 million dollars from 8VC on a second lien DIP priority

15  new money basis.

16  THE COURT:  Okay.  And everything today is priming

17  the prepetition facility?

18  MR. BARRY:  Yes.  With the consent of SVB who is

19  the prepetition lender.

20  THE COURT:  Okay.

21  MR. BARRY:  They're priming themselves.

22  THE COURT:  Okay.

23  MR. BARRY:  And they will get -- pre-roll up they

24  will get adequate protection on their prepetition liens

25  partially in the form of contract rate interest under the

1 prepetition credit agreement.

2          THE COURT:  I saw that.  Okay.

3          And the -- that was a question I had.  The

4 adequate protection is for until the roll-up?

5          MR. BARRY:  Correct.

6          THE COURT:  If that's approved.

7          MR. BARRY:  Correct.

8          THE COURT:  Okay.

9          MR. BARRY:  You know, the roll-up and the 50/50

10 and the relative priorities its seemingly complicated but for

11 purposes of the interim its two tranches of new money DIP and

12 per the inter-creditor they have agreed one is junior to the

13 other.  It's that simple on an interim basis.

14          THE COURT:  Okay.

15          MR. BARRY:  Maybe our papers could have been

16 artful on this point.

17          THE COURT:  I didn't have as much time as I would

18 have liked with them, but the -- well, as we go through the

19 order we will see then because I think that's reflected in

20 the interim order, this 50/50, but maybe it's not.  Maybe I

21 just got that from the motion.

22          MR. BARRY:  So, there is one point of

23 clarification.  Half -- forgive me, half of the prepetition

24 facility has a dollar one provision in the participation

25 agreement which means if before the roll-up cash comes in it

1  gets paid on account of fifty percent of the prepetition SVB

2  liabilities.  Again, that is an inter-creditor arrangement.

3            THE COURT:  I don't think I understand that.

4            MR. BUTTERFIELD:  Ben Butterfield, Morrison &

5  Foerster on behalf of Silicon Valley Bank.

6            So, the new money that's provides by SVB always

7  has first-priority priming over all other money, right.  Then

8  we have the roll-up.  So, the roll-up is of the entire

9  prepetition debt and it's divided into two pieces.  One piece

10 of it always has priority over all other DIP money and the

11 participant's investment.  The other half of it shares *pari*

12 *passu* with the participant's cash.

13            So, when you think about the waterfall its SVB new

14 money than half of SVB's prepetition loan and then on a *pari*

15 *passu* basis the rest of SVB's prepetition loan and all of the

16 participant's new money.

17            THE COURT:  Okay.  Say that again.  At the top of

18 the waterfall is SVB new money.

19            MR. BUTTERFIELD:  New money.

20            THE COURT:  Then half of SVB prepetition loan.

21            MR. BUTTERFIELD:  Correct.

22            THE COURT:  Then what?

23            MR. BUTTERFIELD:  Then the other half of SVB's

24 prepetition loan and the participant's new money.

25            THE COURT:  Plus, new money.  That is *pari passu*,

1  8VC's new money.

2          MR. BUTTERFIELD:  And this is true now and it's

3  true upon the roll-up.  All that happens when we do the roll-

4  up is the entire prepetition loan from SVB is converted to

5  DIP obligations, but we still have this 50/50 concept where

6  half of it is senior to the participants new money and the

7  other half is *pari passu* with the participants new money.

8          MR. BARRY:  So, today -- if Your Honor approves

9  this today half of -- on an inter-creditor basis half of the

10  prepetition debt is priming 8VC's new money, but, again,

11  that's not a debtor issue.  That's an inter-creditor issue.

12          MR. BUTTERFIELD:  Inter-creditor, correct.

13          MR. BARRY:  So, essentially, Silicon Valley Bank

14  has agreed -- excuse me, 8VC has agreed if they were,

15  otherwise, entitled to payment on account of its DIP

16  obligations that cash would actually go on account of the

17  prepetition obligations owed to Silicon Valley Bank.

18          THE COURT:  That's a debtor issue.  That's just

19  not an inter-creditor issue.  How is that not a debtor issue

20  if you would pay off prepetition obligation ahead of a DIP

21  loan?  How is that not a debtor issue?

22          MR. BARRY:  Well, perhaps it is, but I mean we're

23  still priming the same debt.  I mean they're still our only

24  secured obligations.

25          THE COURT:  Isn't that effecting a roll-up on

1  first day?

2          MR. BARRY:  No, I don't think so.

3          THE COURT:  Why not if it gets paid ahead?

4          MR. BUTTERFIELD:  Your Honor, Ben Butterfield from

5  Morrison & Foerster.

6          The way I would think about it is you essentially

7  have a lender who has consented to the priming of its loan on

8  a fifty percent basis, right.  So, if you had a lender that

9  didn't consent to the priming of its loan and you had a

10 junior DIP that would be a similar concept, right.  So, it's

11 possible that the debtor could take on a junior DIP.

12         THE COURT:  It could take on a junior DIP, but you

13 can't pay it.  It's the payment of it.  It's not the junior

14 DIP piece of it.  If money came out -- if we were in this

15 waterfall today and there were money, which there isn't, I

16 recognize, but if there were money to be paid on the loans

17 you're telling me, I think, that the order of priority would

18 be the SVB $700,000 dollars first and then you pay a

19 prepetition loan; fifty percent of SVB's prepetition loan,

20 you'd pay it.  It's the payment of it.  It's not the granting

21 of a junior lien or a *pari passu* lien, it's the payment of it

22 that's a problem on an interim basis.  That is, essentially,

23 a roll-up.  Paying a prepetition lien on an interim basis is

24 a roll-up.

25         MR. BARRY:  I think -- isn't it more of a pay-over

1  provision in an inter-creditor?  I mean, they're agreeing to

2  be --

3          THE COURT:  If they're agreeing to pay-over are

4  they agreeing to reduce their post-petition amounts so it's

5  not a DIP and it becomes a prepetition amount?

6          MR. WISE:  Your Honor, Eric Wise, Gibson Dunn &

7  Crutcher, for 8VC the participant.

8          So, what we've done in the participation

9  agreement, and this is where you will see the substance of

10  what we're talking about in the definition and the

11  participation agreement of prepetition obligations, *pari*

12  *passu* obligations and senior obligations.

13          What it says, basically, is when SVB, who's the

14  bank under the credit agreement, right, and we're

15  participating in it with some consent rights, et cetera, that

16  are articulated there, when they receive a payment, they then

17  pay themselves first with respect to the senior obligations.

18  We agree that they can apply the -- that we won't take any

19  money from the DIP until fifty percent of the prepetition

20  SVB, even if it's not rolled, is paid.  Then we share *pari*

21  *passu* afterwards pursuant to a contractual arrangement.

22          So, SVB has to receive the money under its various

23  facilities for us to receive any payment in accordance with

24  that waterfall.

25          THE COURT:  Okay.  So, I understand the

1 intercompany arrangement where 8VC is saying if I get paid,

2 I'm going to turn over my money to SVC or SVC is just going

3 to pay itself first, whichever way you want to look at it.

4        MR. WISE:  Correct.  In theory, we won't get paid

5 because we're not the lender, the bank is, and the bank will

6 receive the -- any payment that comes on the prepetition or

7 the post-petition will be paid to SVB because they're the

8 prepetition and post-petition lender.  We purchased a

9 participation from them and then they'll make distributions

10 to us in accordance with the waterfall and the participation

11 which is setup under those definitions if *pari passu*

12 obligations and senior obligations.  So, it's an inter-

13 creditor thread that's baked into the participation.

14        THE COURT:  Well, that's interesting, but vis-à-

15 vis the debtor and lender then, forget the participation for

16 a moment, between the debtor and lender the debtor pays SVB,

17 Silicon Valley Bank, Silicon Valley Bank then determines, per

18 its inter-creditor agreement, how it's going to -- the

19 waterfall that it's going to use to repay the various

20 obligations.

21        My understanding is when SVB gets the money, even

22 today, on an interim basis, if there were money, SVB, as

23 lender, who gets all the money would pay itself first for the

24 $700,000 dollars and then as DIP lender.  Then it would pay

25 itself second as prepetition lender on half of the 5.3 or

1  8.3, whatever that number is, it would pay itself second.

2  Then, third, it would pay, on a *pari passu* basis, itself as a

3  prepetition lender for the other half of the 5.83 and 8VC's

4  new money.

5          MR. WISE:  Right.  So, they would distribute it

6  ratably.

7          THE COURT:  The third piece of the waterfall.

8          MR. WISE:  The third piece, yes.

9          THE COURT:  So, what's happening today, even

10  without the roll-up, the payment priority elevates the

11  prepetition loan over the 8VC new money in payment.

12          MR. WISE:  I hadn't conceived of it that way in

13  the sense that what we were thinking of is you have the DIP

14  money that's funded through the participation and through

15  SVB, but SVB is the party that's doing all of the funding

16  because we're buying a participation that we are going to

17  fund directly to the debtor for purposes of convenience so

18  that we don't have a gap in wires, what not.

19          Then when money comes into pay the only

20  prepetition secured creditor of, you know, significance, not

21  to diminish other smaller, but the prepetition bank lender is

22  SVB and the post-petition lender is SVB.  So, any payment

23  that is coming on those two pieces will come to SVB and

24  through the participation there's an agreement as to who gets

25  what when of that with the participant 8VC.

1      THE COURT:  I understand that, but the

2  participants are deciding that the debtor is going to pay the

3  prepetition loan above a DIP.  So, it's going to pay the

4  prepetition off leaving a DIP that still has to be paid

5  before other people can get money.  I could be missing this;

6  you may have to explain it to me a different way because I'm

7  not getting how that's not a roll-up on the first day.

8      MR. BUTTERFIELD:  Your Honor, Ben Butterfield from

9  Morrison & Foerster on behalf of Silicon Valley Bank.

10      So, you could think of it -- I think maybe an easy

11  way to conceive it would be as two DIP's.  So, one DIP is a

12  senior DIP that primes --

13      THE COURT:  I did think of it as two DIP's, but

14  you've changed that with the payment.

15      MR. BUTTERFIELD:  So, imagine a situation where

16  you have two DIP's.  One is a senior DIP that primes all

17  other debt and the other DIP is a junior DIP that does not

18  prime prepetition debt.

19      So, now collateral of the debtor is liquidated and

20  needs to be distributed.  The first place is going to stop is

21  the senior priming DIP.  The second place it's going to stop

22  is the prepetition lender that did not agree to be primed.

23  And the third place it's going to stop is the junior DIP.

24  That is what we're trying to achieve here.

25      UNIDENTIFIED SPEAKER:  Except there will be *pari*

1  *passu* sharing on fifty percent of that prepetition that's not

2  rolled.

3            MR. BUTTERFIELD:  Right.  Correct.  But just to

4  simplify it, right, its, essentially, two DIP's.

5            MR. BARRY:  So, I think that's the answer to your

6  question, Your Honor, is that if they came in with a junior

7  DIP to SVB it would be functionally the same thing as this

8  inter-creditor priority situation which is if they came in

9  and said SVB is putting in a million dollars of brand new

10  money over ours, but we won't consent to priming of our

11  existing debt, but 8VC came in and said we're willing to put

12  in a junior DIP to that the waterfall would be the same.

13            I'm not trying to, sort of, dodge the issue on why

14  this isn't a debtor issue, but I think Mr. Butterfield is

15  correct in his analysis, but I also think they structured

16  this through an inter-creditor arrangement rather then, you

17  know the, sort of, practical application that Ben just

18  mentioned.

19            THE COURT:  So, what's the benefit of the roll-up?

20  What is the roll-up going to do that just keeping it in this

21  way doesn't do?

22            MR. BARRY:  Well, number one, it's a condition to

23  all of this financing.

24            THE COURT:  Yeah, I get that.  What does it do?

25  What is the benefit of the roll-up versus this senior, junior

1  two loans that you just described to me?  What is the benefit

2  of it?

3           MR. BUTTERFIELD:  Your Honor, Ben Butterfield of

4  Morrison & Foerster.

5           So, I mean one benefit certainly would be in the

6  plan context.  Having DIP claims is better than having not

7  rolled up prepetition loan claims.

8           THE COURT:  That's true.

9           MR. BUTTERFIELD:  And then -- I mean there is a

10 small benefit as far as how interest accrues.  Prior to entry

11 of the final order interest only accrues on the principal

12 amount of the prepetition loans, but we're rolling up not

13 just the principal amount, but also loan fees.  So, interest

14 is going to accrue on a bigger balance post-rollup because

15 they're two right off the bat.

16          MR. WISE:  Eric Wise for 8VC.

17          I think the origin also helps to understand is we

18 were contemplating putting in DIP financing, but, of course,

19 we had a prepetition lender that we had to think about how do

20 we address that.  Obviously, a priming loan would present its

21 challenges without the consent of that prepetition lender.

22 So, we were thinking of various structures.

23          So, what you are seeing in the participation in

24 this order is the product of a discussion of how do we come

25 in on a partly *pari passu* basis with a prepetition lender

1  with their consent and what to do they need in order to come

2  in because they're providing new money as well.  And the

3  check wasn't big enough if we didn't have SVB in there.

4         You know, 8VC, obviously from the structure you

5  can see is supportive of uBiome and, you know, wants to put

6  something together that works.  It has made a number of

7  concessions to make that happen.  I think the structure is

8  part of that including the roll and the seniority of half of

9  the prepetition and the *pari passu* also reflects compromises

10  that SVB made in order to help get this deal done as we

11  worked, you know, around the clock to get it done.

12         I think there are probably a number of

13  permutations in which the same economics could work out, but

14  this is what we landed on through, you know, the process of

15  negotiating on a short fuse and trying to figure out, well,

16  what will work, how do we come in, can we get an agent, is

17  there time to get an agent; no, let's do a participation, et

18  cetera.  This is where we landed after, really, the

19  cooperation of all the parties.

20         THE COURT:  Okay.  So, I haven't had a junior DIP

21  in so long that I'm having to play through the waterfall.

22  Maybe it doesn't matter on an interim basis in the sense that

23  we're not going to have any proceeds to have to figure out if

24  this is advantageous or not.  I will have to think of it as I

25  go through the order, but --

1          MR. WISE:  If I may, Eric Wise for 8VC.  One way

2 to think about it is when you're thinking about it is why is

3 this not a roll-up.  The proceeds that would come in that

4 would end up paying the prepetition would be money that 9VC

5 put out the door in that circumstance.  So, the debtor is

6 getting proceeds.  So, for example, if we never got beyond

7 the interim financing, they still get all of those proceeds

8 of the loan.

9          So, what ends up getting paid to 8VC's prepetition

10 if there were any in that circumstance would be from new

11 money that went to the debtor and it's just as between these

12 post-petition, you know, new money and the prepetition agreed

13 to by the parties that are owed that money.  So, the impact,

14 I think, on any other constituent in the case would be --

15 there would be no impact because it comes in to pay for new

16 money or pays down new money that went out the door after the

17 interim and then it gets allocated to different creditors as

18 between themselves, but from another creditor's perspective

19 it shouldn't have an impact.

20          THE COURT:  That was my question.  Does it come

21 back to pay new money or it paying old money.  Some of its

22 paying old money.  Some of its paying half of the SVB

23 prepetition loan.  So, it's paying old money.

24          MR. WISE:  But the admin claim representing the

25 interim advance is now gone because it's been paid.

1           THE COURT:  Say that again.

2           MR. WISE:  So, from the debtor's perspective they

3  make a repayment of the loan on the interim advance.  Let's

4  just come-up with a hypothetical.  So, there is a reason why

5  the DIP is paid off.  It then flows through that waterfall

6  that way, but from the perspective of the debtor they've

7  paid-off all the post-petition money.

8           THE COURT:  How does that work?  How did they pay-

9  off all of the post-petition money if it's being allocated

10  differently?

11          MR. WISE:  I think because there's one creditor

12  there, SVB, who had a claim in the amount of the interim and

13  they paid that claim.  So, it's gone.  But because they had

14  the participation 8VC they retain some of that money that,

15  otherwise, would go to 8VC.  And they use it and apply it to

16  their --

17          THE COURT:  And then what is 8VC's claim?  So,

18  when Silicon Valley Bank retained some of that money to pay

19  its prepetition obligation what is 8VC's claim priority

20  against the debtors?

21          MR. WISE:  Well, to the extent of their

22  subrogation they would stand in the shoes of the debt that

23  hadn't been paid if it ended there. I mean, I think in this

24  case -- if you really had a situation where the interim were

25  being paid off, except in the case of a refinancing, that

1    would be a tough situation and we didn't get to a final here.

2    Thinking hypothetically about it or kind of factually if that

3    happened, I think we would then stand in the shoes of what

4    remained under the prepetition, right, which got the money in

5    connection with the participation.

6              THE COURT:  So, the debtor is paying DIP dollars,

7    but the claim --

8              MR. WISE:  So, say they paid the DIP and paid

9    nothing to the prepetition then I think from the debtor's

10   perspective the prepetition would still all be outstanding.

11   To the extent of any subrogation rights 8VC would stand in

12   the shoes of that remaining portion that they didn't get paid

13   for.  The inter-creditor rights would determine what else we

14   would be able to do with that, you know, subrogation to the

15   extent that it existed.

16             From the debtor's perspective their capital

17   structure, post-petition would be altered exactly the way

18   they made the payment which was to SVB and the post-petition

19   debt is gone and paid off.  It doesn't resurrect the debt

20   that through the -- it's not the intention that it would

21   resurrect the post-petition debt by virtue of taking proceeds

22   that we would have, otherwise, received if we had been a

23   direct lender in applying it to their prepetition claims

24   which we have agreed to as part of this negotiation so that

25   we could have, you know, a partnership in the DIP financing

1  to come in and provide the debtor with the money it needed in

2  accordance with the budget.

3         THE COURT:  Okay.  So, why am I blessing the

4  inter-creditor agreement between the two of you?  If that's

5  the case then why am I blessing that?  If you had an inter-

6  creditor prepetition agreement, I wouldn't bless that in the

7  context of a DIP and certainly not on a first day.  So, if

8  it's not going to affect the debtor why am I blessing it

9  because I don't -- I'm not sure what that means in terms of

10  what you just said about subrogation.

11         MR. WISE:  So, one reason for that -- this is Eric

12  Wise for the record -- from 8VC's perspective is if there

13  were a dispute over the participation agreement or the

14  arrangement because it would be resolved here rather than

15  getting pushed out to another forum where a third-party

16  doesn't have -- a third-party bench doesn't have an

17  understanding of what we put together.  That is one reason.

18         Two, the participation had its origin in -- partly

19  in the convenience of how do we structure this.  We could,

20  for example, go out and find an agent and put a waterfall.

21  That would have changed the order.  We decided to do a

22  participation primarily as a vehicle to get two lenders in

23  and have a cooperating relationship without having to bring

24  in a third-party who is unfamiliar with the circumstances of

25  the debtor.  So, we settled on that and in the process of

1  negotiation we settled on working out these rights

2  contractually in the participation.

3          MR. BUTTERFIELD:  Your Honor, Ben Butterfield from

4  Morrison & Foerster.

5          Just one more point.  Silicon Valley Bank did not

6  -- would not have -- Silicon Valley Bank is, essentially,

7  being primed here and they would not have agreed to it on any

8  other terms.  So, I mean there -- if 8VC wanted to offer a

9  junior DIP, an entirely junior DIP you'd be in a situation

10 where the first dollars of collateral proceeds that come in

11 would have gone to pay Silicon Valley Bank.  And Silicon

12 Valley Bank would be fine with that, but in order to agree to

13 be primed, not only by its own new money, but also with

14 respect to fifty percent of its prepetition loan on a *pari*

15 *passu* basis with the junior DIP lender, essentially, not

16 actually, but essentially these are the terms Silicon Valley

17 Bank required.

18          If we need to change the terms now, I need to go

19 back to Silicon Valley Bank.  I mean this is a whole new

20 conversation.

21          THE COURT:  I have lots of thoughts about that,

22 but I'm trying to understand the deal.  Okay.  I'm trying to

23 understand the deal, that's why I'm asking questions.  And

24 I'm trying to understand its impact on the debtors and the

25 debtor's other creditors and what we're doing here first day.

1          Having had this conversation if I went now and

2    spent another few hours with these papers maybe I'd

3    understand it better, okay, but it didn't jump off the page

4    the way we're discussing it now.  So, I'm trying to

5    understand it.  What Silicon Valley Bank will do or not do is

6    not my concern.  My concern is understanding what is being

7    put in front of me and the impact it has on the debtor and

8    the estate, how much needs to be borrowed in this interim

9    period, how much -- what the fees are, what you do want to

10   talk about, but more importantly what the impact is.

11         When you come to the court and say I want a roll-

12   up, not now, but on final, and then we're talking about how

13   we're distributing the funds in a way, which to me -- maybe I

14   don't understand the roll-up in the context of a junior DIP,

15   okay.  So, some of these comments are not mentioned.  Okay.

16   I am just trying to understand it.  I think this is a little

17   unusual.  Maybe it's fine and that's what I'm trying to

18   figure out is if it's fine and if the order that you've put

19   in front of me reflects this arrangement or not.

20         I'm not sure all the concepts mesh the way we

21   colloquially think of some of these concepts.  So, that is

22   what I am struggling with.

23         MR. BARRY:  I want to address Your Honor's

24   question about how are other creditors impacted.  I don't

25   think -- if you structured this any other way I honestly

1  don't think other creditors are going to be impacted at all

2  because if this  was just a fresh brand new money DIP and SVB

3  was consenting to be primed we'd still need to clear their

4  prepetition debt to put any other creditors in the money.

5          So, I don't think the inter-creditor issues that

6  we're describing here and the inter-creditor waterfall issues

7  we're describing here I don't think that impacts any other

8  creditor at all.  I don't think it matters how you would

9  structure it.  I think their rights are neutral as to this

10 particular construct.  You mentioned the need for the DIP.

11         THE COURT:  How does a challenge period effect

12 this construct?

13         MR. BARRY:  The challenge period is in there and,

14 in fact, I think there's a -- well, I have to look, but I

15 think that the --

16         THE COURT:  Or better said, how does this

17 construct effect the challenge period?

18         MR. WISE:  Eric Wise for 8VC.  I think if there's

19 a payment on the portion of the DIP that we are participated

20 in, which by agreement they take and apply to the

21 prepetition, I think under common law rights of subrogation

22 we would be subrogated to the prepetition that they have now

23 paid themselves, retained from what they collected on the DIP

24 that we funded and, otherwise, would go to 8VC.

25         So, from the perspective of the debtor and the

1 challenge period we'd now be holding part of that claim.  And

2 if the liens with respect to that claim were challenged

3 successfully then we would be holding a claim with that

4 defect.  I think that's the way it would end up working.

5           I realize the documents have their quirks because

6 of the way they -- you know, the new process of the

7 negotiation, but I think that's how I would articulate what I

8 think the effect of that waterfall is with respect to the

9 prepetition and the post-petition.  So, when you're looking

10 at it from the debtor's perspective and they pay just the

11 post-petition and not the unrolled prepetition the fact that

12 we've passed money between ourselves in that inter-creditor

13 agreement doesn't impact the debtor with respect to its

14 remaining liabilities.  That is the way --

15           THE COURT:  The way you envision it.

16           MR. WISE:  Yes.  I think it reflects our support

17 for the enterprise because, obviously, there are a lot of

18 different things and a lot of compromises that SVB made too

19 to be part of this DIP, but that is what we came up with and

20 that's what we think works.  That is my articulation for why

21 what's happening between SVB and 8VC in the participation

22 doesn't impact the other constituents.

23           THE COURT:  So, let me ask a bigger picture

24 question.  Do we have any sense of what the value of this

25 company is vis-à-vis the debt?  Are we expecting the sale to

1 clear the debt?

2       MR. BARRY:  Your Honor, we're in the market right

3 now.  We're not standing before you with a stalking horse.

4 So, I don't have any indicia to give you, to offer you,

5 anecdotal or by evidence.

6       THE COURT:  Do you think -- so, the debtor doesn't

7 have a position about whether Silicon Valley Bank is

8 currently over-secured.

9       MR. BARRY:  Again, Your Honor, we don't have any

10 valuation evidence.  I think we're in a scenario here where

11 absent some evidence as to valuation and the fact that the

12 largest investor in the company and our only secured creditor

13 have collaborated to see if we can exploit what value is

14 there.  And all three of us have worked in a way to -- again,

15 this may be a construct that optically seems curious, but as

16 I said before, and I think as Mr. Butterfield said before, if

17 we rejigger this into a new money senior secured DIP and a

18 junior subordinated DIP in between or after SVB I think the

19 relative priority scheme would be the same.  I don't think

20 other creditors would be impacted.

21       This took quite a heavy lift to pull together and

22 that's not your problem, that's our problem.  With respect to

23 the cost of getting this DIP done this is what creative minds

24 put together, it's the conditions in which 8VC was willing to

25 put in new money.  These are the conditions under which SVB

1  was willing to be primed to some degree and put in new money.

2         So, again, it may have an odd look, but its -- I

3  think if you think about it the way that Ben had described it

4  earlier it's a construct you've seen before which is a senior

5  DIP, an existing prepetition loan and a junior DIP.  We just

6  don't see junior DIP's anymore.

7         Again, I think that the fact that we were able to

8  get these two parties to put up this much cash to fund a

9  process to see what the value is, you know, they're putting

10 up a lot of risk and I think that this is the best hope for

11 the debtor to get this across the goal line.

12        THE COURT:  Okay.  Let me ask -- and I just may

13 have to -- I had comments on the order and I want to hear

14 from anybody else, but I'm going to have to, as we go through

15 the order, think about this discussion we've had as we go

16 through the order.

17        Let me ask about the commitment fee.

18        MR. BARRY:  So, the commitment fee I was going to

19 address that, sort of, out of the gate which is the

20 commitment fee is not payable until the sale under the credit

21 agreement.  So, we put it in the -- it's in the budget, the

22 $150,000 dollar commitment fee.

23        THE COURT:  But it's being approved in full today.

24        MR. BARRY:  It's being approved in full today, but

25 it's only payable if we sell all of the assets of the

1 company.  So, that's not a DIP -- it's a DIP cost, but it's

2 not a cash outlaid by the estate.

3 　　　　　THE COURT:  Right, but its committed today.

4 　　　　　MR. BARRY:  Correct.

5 　　　　　THE COURT:  And if I'm right it is ten percent of

6 the amount of new money that Silicon Valley Bank is putting

7 in.

8 　　　　　MR. BARRY:  Well, of the new money, right.

9 　　　　　THE COURT:  New money.

10 　　　　　MR. BARRY:  They're, obviously, getting rolled up

11 and those are going to become if you do roll it up.  So,

12 that, I think, dilutes the percentage to some degree.  They

13 have agreed, again, to defer this under 2.3 of the credit

14 agreement.  It's due upon consummation of a sale of all or

15 substantially all the borrower's assets.  So, yes, that is

16 correct, Your Honor.

17 　　　　　Again, I think in the totality of the economics

18 here, isolating that seems, obviously, large, but these are

19 commercial parties that have agreed to take a shot to see if

20 we can't get value for this company through a sale process.

21 　　　　　There is one other note, Your Honor.  The budget,

22 there's also a $600,000 dollar final fee that's in the budget

23 notes.  I just wanted to note that's not a -- likewise,

24 that's not necessarily a cash outlay by the estate.  That is

25 going to be part of the rolled-up prepetition facility.

1            THE COURT:  What is that?

2            MR. BARRY:  It's a fee that's payable under the

3 prepetition credit agreement.  It's a percentage of the total

4 availability under that facility that's essentially payable

5 upon prepayment or repayment.

6            THE COURT:  It's a prepayment fee.

7            MR. BARRY:  I think it's characterized a couple of

8 different ways, but I'll look at the credit agreement and

9 tell you specifically what it is.

10           THE COURT:  Am I blessing that today?  I mean if

11 there is such a fee in the document there's such a fee in the

12 document.

13           MR. BARRY:  Yeah.

14           THE COURT:  Whether it's enforceable or not I

15 don't know.  So, the question is am I blessing that today?

16           MR. BARRY:  No, I don't think so because that's

17 only getting paid as a part of the roll-up.

18           THE COURT:  I don't care how it gets paid.  I'm

19 asking if I'm blessing it today.

20           MR. BARRY:  I don't know.  There is not a

21 provision in the interim order that I'm aware of that says

22 the final fee is hereby approved.

23           THE COURT:  Well, I know there's not that.  The

24 question is, is there something else? I would have picked up

25 on that.  Is there something else -- does anybody think, and

1  I guess I should ask Silicon Valley Bank if they think I'm

2  blessing the $600,000 dollar fee today?

3           MR. BUTTERFIELD:  Your Honor, Ben Butterfield of

4  Morrison & Foerster on behalf of Silicon Valley Bank.

5           We'd be willing to expressly say that the approval

6  of that fee is deferred to the final hearing, if that would

7  make you more comfortable.

8           THE COURT:  Since I don't know what it is, yes,

9  that would make me more comfortable.  If that's an issue -- I

10 mean your prepetition documents have the fees they have in

11 it, but why isn't that -- well, it's got to be subject to

12 challenge, right.  It's got to be part of the subject to

13 challenge period.

14          MR. BARRY:  The roll-up itself is subject to the

15 challenge.  So, this fee would be subject to the challenge.

16          THE COURT:  Okay.

17          MR. BARRY:  That is expressly in the interim order

18 that the roll-up is subject to the challenge period in 23 of

19 the DIP order.  Its -- I can point to the specific provision,

20 Your Honor.  It's on Page 9 of the order, the very last

21 sentence says, "Because the DIP roll-up loans are subject to

22 the reservation of rights in Paragraph 23 below," which is

23 the challenge period, it does not prejudice any party's

24 rights.

25          THE COURT:  Well, I had a question about that

1  paragraph.  Why am I making findings with respect to the

2  roll-up in the interim order when I'm not approving the roll-

3  up in the interim order?

4          MR. BUTTERFIELD:  Your Honor, Ben Butterfield from

5  Morrison & Foerster on behalf of Silicon Valley Bank.

6          We'd be willing to qualify those findings with a

7  proviso that says subject to entry of the final order.

8          THE COURT:  Subject to entry of a final order and

9  I don't know if Ms. Leamy remembers the words we've come up

10  in other cases, I don't.  That provides for what you're

11  asking for, right.  So --

12          MR. BUTTERFIELD:  Your Honor, that would be fine

13  with us.

14          THE COURT:  Okay.  Let's go through the order.

15          So, the first question I have, a bigger picture

16  question, are there any -- does the debtor believe there are

17  any unencumbered assets of this estate?

18          MR. BARRY:  We are not aware of any.  In the DIP

19  credit agreement -- excuse me, in the prepetition credit

20  agreement there is a concept that to the extent the -- to the

21  extent to be perfected in all the other collateral they have

22  to be perfected in the intellectual property.  Perfected in

23  the intellectual property, it's a springing lien, but they

24  also have a lien on the proceeds of the intellectual

25  property.  So, the answer is technically maybe, but in all

1 likelihood not.

2          Did that make sense?  I don't want to further

3 confuse you.

4          Let me say it again.  There is a provision in the

5 prepetition DIP credit agreement that says in order for the

6 debtor -- if it's required under law, State or Federal Law,

7 for the debtor to have a lien on this whole collateral

8 package it also has to have a lien on the intellectual

9 property.  It then has a lien on the intellectual property,

10 but in its collateral package, itself, it has a lien on the

11 proceeds of intellectual property.

12          THE COURT:  But not the intellectual property,

13 itself?

14          MR. BARRY:  On a springing basis if it's required

15 to have a lien on the rest of the assets.

16          THE COURT:  Interesting arrangement.  Is the

17 intellectual property owned by this debtor or is it owned by

18 some of the non-debtor affiliates?

19          MR. BARRY:  It's owned by the debtor.

20          THE COURT:  Okay.  Paragraph -- on Page 8, no

21 control, this seems to me a broad provision and a prospective

22 provision in terms of future conduct that either the DIP

23 financing parties or the prepetition lender may take.  I

24 don't know how I make a prospective statement about actions

25 you haven't taken.  If what you're getting at here is that by

1  entering into these agreements you are not controlling the

2  debtor, or its operations, or its conduct. I am okay with

3  that, but I don't know what you're going to do in the future,

4  for example, if you start foreclosing.

5          MR. BUTTERFIELD:  Your Honor, Ben Butterfield of

6  Morrison & Foerster.

7          So, this is in the debtor's stipulation section.

8  So, we're just asking the debtor to stipulate to that

9  subject, of course, to the challenge.

10         THE COURT:  How does the debtor stipulate to

11 future events?

12         MR. BUTTERFIELD:  Understood, Your Honor.  If you

13 would like we could qualify this to say something like as of

14 the date hereof or something like that.

15         THE COURT:  Okay.  Paragraph (f), right

16 underneath, cash collateral.  Shouldn't this be in the

17 stipulation section?

18         MR. BUTTERFIELD:  Your Honor, we're going to move

19 it to the stipulation section.

20         THE COURT:  Okay.  So, we talked about Romanette

21 (III), (f)(III).

22         MR. BARRY:  Again, we'll say its subject to entry

23 of a final order that provides for the roll-up.

24         THE COURT:  Page 11, Paragraph (i), the 364(e)

25 language in the last sentence needs to mirror 364(e).

1          MR. BUTTERFIELD:  Your Honor, that works for the

2 bank.

3          MR. BARRY:  And the debtors.

4          THE COURT:  I'm thinking on Page 12, Paragraph 2,

5 first sentence, the DIP financing including the

6 participations is hereby approved.  I don't have a problem

7 with the concept of acknowledging the participations are part

8 of the deal.  I actually don't know how that term is defined,

9 participations, but I'm still mulling over whether I should

10 be -- because the debtor is not -- well, has the debtor

11 signed off on that?  Is the debtor a party to that?  They

12 are.

13          MR. WISE:  The debtor is consenting to it because

14 it's, sort of, a hybrid.  Just to point out, for example, the

15 participants are entitled to expense reimbursement and

16 indemnity under the DIP agreement. So, that's one of the

17 features that's different from other participations and it's

18 a function of this participation being born, really, of the

19 administrative convenience in getting two lenders together.

20          THE COURT:  Okay.  On Page 14, bottom five lines

21 it starts notwithstanding.  So, we're talking about here's

22 all your collateral.  Then it says notwithstanding the

23 foregoing the DIP collateral shall not include.  Are there

24 particular issues expected here?  Are there particular

25 parties that this is directed at?

1          MR. BARRY:  No.

2          THE COURT:  It's a little unusual to have that

3  language in here which is why I'm asking.

4          MR. BARRY:  I mean, we wouldn't -- I mean, absent

5  this language we would be taking a lien on contracts or

6  leases without notice. I think that's why this is in here,

7  Your Honor.  This was intended, I think, as kind of a due

8  process measure for people that aren't here today.  If

9  somebody has a provision in the contract that says you can't

10  put a lien on my contract, obviously, we're not asking you

11  to, despite that provision, put a lien on their contract and

12  we don't want to create a breach under a contract, but this

13  isn't designed for any specific contract we have in mind.

14          THE COURT:  Okay.  Page 15, Sub (e), DIP lien

15  priority.  The second parenthetical, it being agreed and

16  understood that the final order shall grant liens on, what

17  you're calling, bankruptcy recoveries.  I'm not going to --

18  that doesn't make it sound like its subject to a final order.

19  That makes it sound like it shall be granted.

20          MR. BARRY:  Shall we say it being understood that

21  the final order will request a lien on those recoveries or

22  something like that?

23          THE COURT:  Yes, you can say it that way.

24     (Pause in proceedings)

25          THE COURT:  Okay.  Let's look at, on Page 17, Sub

1  (i).  There's a provision entitled "DIP Financing Documents."

2  Certain rights relating to the participations.

3        (Pause in proceedings)

4        THE COURT:  Okay.  The -- I don't understand the

5  parenthetical:

6        "Provided for the avoidance of doubt that any

7  repayment of the DIP financing or other proceeds of the DIP

8  collateral shall be applied first to satisfy 50 percent of

9  the pre-petition loan obligations."

10       That's not right, is it?  Doesn't it go to Silicon

11 Valley Bank's new dollars?

12       MR. WISE:  Your Honor, I think what we should

13 probably say there -- that's correct.  It goes to Silicon

14 Valley and then they pay it over, so I think should be --

15 shall be applied after payment to the -- what would be the

16 term?  I think we would say the pre-petition lender.

17       MR. BUTTERFIELD:  We could just say -- Ben

18 Butterfield of Morrison & Foerster.  We could say, after the

19 payment of the interim loans provided by Silicon Valley Bank,

20 comma.

21       THE COURT:  It should reflect the deal.  I don't

22 think it reflects the deal --

23       MR. WISE:  Eric Wise for --

24       THE COURT:  -- at least not as explained to me.

25       MR. WISE:  Eric Wise for 8VC.  I think what we say

1  there is that the proceeds of the DIP collateral shall be

2  paid to SVB and then applied in accordance with the

3  participation as between the two of them or --

4         THE COURT:  Yeah.  Maybe you don't want to say

5  "for the avoidance of doubt" because I don't think your "for

6  the avoidance of doubt" reflects the deal.  It still -- once

7  paid to SVB -- isn't going to be paid first, the repayment of

8  50 percent of the pre-petition loan.  That's not my

9  understanding of what you all said.

10        MR. WISE:  Yeah, I agree.  That's not what I --

11  that said.

12        MR. BARRY:  Do you want to tinker with that and

13  we'll keep going through the order?

14        MR. WISE:  Yeah, yeah.

15        MR. BARRY:  And then we'll come ...

16     (Participants confer)

17        MR. BARRY:  Can we do that, Your Honor?  Mr. Wise

18  can tinker with that and we'll come back to --

19        THE COURT:  Well, you all need to -- or probably -

20  - yes, you need -- I think you need to look through the whole

21  agreement because, if I'm catching things and I'm just --

22  from just what you are saying, I don't know what else is in

23  here that I'm not catching.

24        MR. BARRY:  We will.

25     (Pause in proceedings)

1          THE COURT:  And the roll-up, again, needs to be

2   qualified in the second parenthetical.  Yeah, I don't think

3   this paragraph is at all correct.

4        (Pause in proceedings)

5          THE COURT:  Okay.  You all will work on that.

6          The next paragraph, 3, the last sentence:

7          "The debtor and the DIP financing parties may

8   agree in writing to modify the budget in their discretion at

9   any time the DIP financing remains outstanding."

10         No, you don't get to modify the budget.  And I

11  think you have a subsequent provision that talks about when

12  you can modify it.  If it's material, that needs to come out

13  on notice and to the Court.  You don't get to modify the

14  budget.  You can extend the budget, you can do the normal

15  things, but you can't modify the entire budget and say, well,

16  I'm not going to pay the -- you know, this group, and now I'm

17  going to pay some other group.  No.  Other people look at the

18  budget.

19         MR. BUTTERFIELD:  Ben Butterfield of Morrison &

20  Foerster.

21         So, just to be clear, so, if we want to modify the

22  existing budget in a material way with respect to the exist -

23  - the weeks that have already been approved, then we will

24  provide notice to the Court and it's with the DIP order, and

25  to provide new budgets that extend, that's totally fine.

1          THE COURT:  You can provide new budgets --

2          MR. BUTTERFIELD:  Okay.

3          THE COURT:  -- sure.

4          MR. BUTTERFIELD:  Thank you.

5       (Pause in proceedings)

6          THE COURT:  Okay.  4, I guess it can be in here.

7  I'm not sure why it's necessary, but upon entry of a final

8  order so providing, or something like that.

9       (Pause in proceedings)

10         THE COURT:  Okay.  The adequate protection

11 provisions that carry over to Page 20(c), I just don't like

12 the wording "until the roll-up contemplated has occurred."  I

13 think you can have as adequate protection -- or maybe just

14 say if it's approved.  I don't know.  But if what you're

15 saying is you want interest as part of adequate protection on

16 your pre-petition secured loan, I'm okay with that.

17         MR. WISE:  Your --

18         THE COURT:  You can deal with what happens with

19 the adequate protection if and when it's rolled up, you need

20 to do something about that.

21         MR. BARRY:  I -- okay.  Just to be clear, I think

22 this was trying to say the obligation to pay adequate

23 protection, this adequate protection ends upon the approval

24 of the roll-up, if that makes sense.  I think there were --

25 this is intended to be temporal.  But I don't mind changing

1  it, I just wanted to explain I think that's what it was

2  trying to say.

3          THE COURT:  Well, I guess then you can say --

4          MR. BARRY:  I'm fine taking out that initial

5  proviso, Your Honor.

6          THE COURT:  You can make it temporal, but ...

7  well, you can leave it in the interim.

8       (Participants confer)

9          MR. BARRY:  One moment, Your Honor.

10      (Participants confer)

11         MR. BARRY:  Sorry, Your Honor.

12      (Pause in proceedings)

13         THE COURT:  Okay.  It says in (d) that, as

14 adequate protection for the pre-petition lender, they're

15 going to get their fees and expenses incurred paid, incurred

16 in connection with the DIP financing.  Why is that adequate

17 protection for the pre-petition liens?

18         MR. BARRY:  Well, they're --

19         THE COURT:  Aren't you getting them paid somewhere

20 else?

21         MR. BARRY:  I mean, yeah, they're going to get

22 paid no matter what.  I understand what you're saying.  But

23 as a consequence of them priming themselves, it's -- isn't it

24 six of one, half dozen of another?  They're negotiating the

25 DIP against themselves as the pre-petition lender and

1   agreeing to priming themselves, so --

2          THE COURT:  I don't think they're negotiating

3   against themselves.

4          MR. BARRY:  Well, you know, I guess I'm being a

5   little overly flippant, but happy to slice and dice that if -

6   -

7          THE COURT:  Well, they need to be -- if --

8   whatever the pre-petition lender is getting paid in

9   connection with its pre-petition loan or maybe even as

10  adequate protection, has to all be subject to challenge,

11  recharacterization, et cetera, in case this pre-petition loan

12  is not fully secured.  So I guess you could put it wherever

13  you want.  If you put it here, subject to recharacterization.

14         MR. BARRY:  I just -- not that -- I don't want to

15  belabor it.  But in a situation where a lender is negotiating

16  a DIP facility to prime itself, granted, they're rolling up

17  their DIP, but it would seem to me to make sense for -- that

18  they would get as adequate protection, because they're

19  slotting their own debt and subordinating themselves to a

20  portion of ABC's new money, that it would -- it could

21  constitute adequate protection.  But I'm okay making it

22  subject to Paragraph 23, I just -- that --

23         THE COURT:  It could.

24         MR. BARRY:  That's the rationale.

25         THE COURT:  It's just subject to challenge.

1          (Pause in proceedings)

2              THE COURT:  Paragraph 11 is just broad.  If what

3    you're saying is they're valid and binding obligations,

4    that's fine, the DIP financing documents.  They ...

5              "No obligation, payment, transfer, or grant of

6    security shall be stayed."

7              I don't know if it will be stayed in the future.

8    "Restrained," I don't know what that means.  "Voided,

9    voidable, or recoverable," under the Bankruptcy Code, I get

10   that; that's a 549 concept.  But the first two -- the

11   "stayed," if somebody appealed it, that -- they could get a

12   stay, if they got one.  And "restrained," I don't even know

13   what that means, as a legal term.

14             MR. BUTTERFIELD:  Ben Butterfield of Morrison &

15   Foerster, on behalf of Silicon Valley Bank.

16             So this order is effective immediately upon entry,

17   right?

18             THE COURT:  Uh-huh.

19             MR. BUTTERFIELD:  So I think that's the concept

20   we're trying to capture here is that, tomorrow morning, when

21   Silicon Valley Bank makes the loan to the debtor, it is

22   making that loan a secured basis and it's fully perfected and

23   secured by the DIP collateral, right?  So I think that's what

24   "stayed" is getting at.  If there's a different word that we

25   can use to describe that --

1          THE COURT:  I think you probably say it elsewhere,

2   too.  But yes, I don't think that those words have a meaning

3   in that paragraph because it's also prospective, no

4   "transfer."  You've got a lot of things in that para -- in

5   that sentence, a lot of things going on, some are -- look

6   like they're past, like a grant of security; some look like

7   they're forward-looking, like a transfer, all kinds of things

8   going on in there, payment.

9          MR. BUTTERFIELD:  Your Honor, I propose to

10  separate it into two parts.  The first thing -- the first

11  sentence will say that the grants of the -- of security under

12  the DIP financing documents is effective immediately upon

13  entry of the interim order.

14          THE COURT:  Uh-huh.

15          MR. BUTTERFIELD:  Right?

16          THE COURT:  Yes.

17          MR. BUTTERFIELD:  And then we'll take out the

18  words "stayed" and "restrained."  And then the rest will form

19  a second sentence.

20          THE COURT:  That might work.

21          MR. BUTTERFIELD:  Okay.

22      (Participants confer)

23          THE COURT:  Okay.  Paragraph 13, the remedies

24  notice period doesn't provide for me to give a remedy.  If

25  you look at the sentence at the bottom of Page 23 that

1  starts:

2          "Five business days after the delivery by the DIP

3  financing parties to the debtor or its counsel of a written

4  notice, the DIP financing parties may exercise all their

5  rights."

6          MR. BUTTERFIELD:  Your Honor, Ben Butterfield of

7  Morrison & Foerster.  Can we say subject to any order of this

8  Court?

9          THE COURT:  Yes.

10          MR. BUTTERFIELD:  Okay.

11          THE COURT:  And I don't understand the proviso --

12  you can.  I don't understand the proviso after that remedies

13  notice period.  Maybe it just doesn't go there.  But I don't

14  understand how it relates to the remedies notice period.  But

15  I think, if that's just related to use of cash collateral

16  during that period, I don't have a problem with it.

17          MR. BUTTERFIELD:  Your Honor, that's what it's

18  intended to address.

19      (Pause in proceedings)

20          THE COURT:  Okay.  Paragraph 14, the fees and

21  expenses, I'm okay with the debtor paying the DIP financing

22  parties, qua DIP financing parties, their fees, with the

23  appropriate notice.  The last sentence of that paragraph,

24  nothing is subject to recharacterization, avoidance, et

25  cetera, is okay with respect to DIP financing fees, qua DIP

1  financier, but not qua pre-petition lender.  So just --

2            MR. BARRY:  I think we fixed that in --

3            THE COURT:  -- to -- just to be clear.

4            MR. BARRY:  -- 7(d), where we talk about adequate

5  protection and the comment you just made, Your Honor.  I

6  think that fixes that, but ...

7            MR. BUTTERFIELD:  Ben Butterfield of Morrison

8  Foerster.

9            We can say -- I mean, it does say payments of any

10 amounts set forth in this paragraph.  But we can say, for the

11 avoidance of doubt, fees and expenses of the DIP financing

12 parties, on account of the DIP loans.

13            THE COURT:  Okay.  Okay.  Paragraph 16, I'm fine

14 with the DIP financing parties and the pre-petition lenders

15 not having to file a proof of claim.

16            The second sentence, I've started seeing this crop

17 up in orders, this sentence or something like it.  And the

18 problem I have with this sentence is that it seems to bless

19 the statement of the claim as the debtor has stipulated to,

20 but that's all subject to challenge and it would give that

21 prima facie evidence or validity, and I don't see a need for

22 the second sentence.  Is there a reason why it's there?

23        MR. BUTTERFIELD:  Your Honor, Ben Butterfield, Morrison

24 & Foerster.

25            So the lenders just don't want to have to file

1   proofs of claim.  So, if we put something -- if we change the

2   second sentence to say the statements of claim, in respect of

3   the DIP obligations and the pre-petition loan obligations,

4   shall have the same effect as filing a proof of claim?

5           THE COURT:  No, because it gives them prima facie

6   validity and I'm not going to do that.  If you don't want to

7   have to file a proof of claim, you don't have to.  Okay?  And

8   that's fine.  But I'm not blessing your claims by virtue of

9   this order, and that would essentially do it, would be --

10          MR. BUTTERFIELD:  Your Honor --

11          THE COURT:  -- would be blessing your claim.

12          MR. BUTTERFIELD:  Your Honor, I mean, so we will

13  then file proofs of claim.

14          THE COURT:  Fine.

15          MR. BUTTERFIELD:  And I mean, that comes at an

16  expense to the estate.  And it's basically going to say

17  exactly what's in this order, right?  And when we file those

18  --

19          THE COURT:  So it shouldn't really cost that much

20  to just cut and paste and put it in a professional fees.

21          MR. BUTTERFIELD:  When we file that claim, it will

22  have prima facie validity.  So I don't think of prima facie

23  validity as blessing our claims.  Of course, they're subject

24  to challenge.  And of course, the debtor is stipulating to

25  the validity of our DIP obligations.  So, if you want us to

1   file proofs of claim, we'll do it.

2           THE COURT:  I just said you don't have to.  That's

3   up to you.  But what I'm not going to say is that the -- I'm

4   accepting the statements here as sufficient to constitute and

5   do constitute proofs of claim because I'm not blessing them.

6   But if you don't have to, you don't have to.

7           MR. BUTTERFIELD:  Okay, Your Honor.  We'll take

8   that comment.

9       (Pause in proceedings)

10          THE COURT:  Okay.  The carveout, paragraph -- Page

11  26.

12      (Pause in proceedings)

13          THE COURT:  "The carveout excludes," like two-

14  thirds of the way down.

15          "The carveout excludes any fees and expenses

16  incurred in connection with ... any action or inaction that

17  is in violation of or a default."

18          I'm not sure I know what means, but that's okay.

19      (Pause in proceedings)

20          THE COURT:  "-- invalidating, setting aside,

21  avoiding, or subordinating, in whole or in part, the DIP

22  obligations, including, for the avoidance of doubt, pursuant

23  to the participations and/or the pre-petition loan

24  obligations."

25          What does that mean?  You can't use money for

1  what?

2         MR. BARRY:  For later challenging the DIP or the

3  pre-petition loan obligation.

4         THE COURT:  Well, doesn't the debtor want the

5  right to subordinate the DIP obligations, to the extent that

6  the participation party is now subordinated, too?  The debtor

7  pays it off and the -- ABC is going to be subordinated to

8  whatever the pre-petition was?

9         MR. BARRY:  They're be subrogated to it, but I --

10         THE COURT:  Subrogated --

11         MR. BARRY:  -- they're not --

12         THE COURT:  -- to it.

13         MR. BARRY:  -- they're not going to be

14  subordinated to it.  So it's -- the answer is no because

15  we're -- our stipulation is subject to the -- obviously,

16  subject to the committee's challenge.  We've given our

17  stipulations on that debt.

18         THE COURT:  Well, the carveout is not just the

19  debtor; the carveout is also the committee, right?

20         MR. BARRY:  Right.  And there is an investigation

21  budget for the committee in --

22         THE COURT:  Well, this is not -- this has nothing

23  to do with the investigation budget.

24         MR. BARRY:  Well, there's a budget for them to

25  investigate and then it allows -- it permits for

1  investigating, but not challenging.

2            THE COURT:  The pre-petition liens.

3            MR. BARRY:  Right.

4            THE COURT:  This isn't the pre-petition liens.

5  These provisions start to go way too far.  They haven't, all

6  of them.  They start saying the committee can't use funds to

7  -- for example, in the next one.  The implicates the remedies

8  notice period.  Why shouldn't the committee be able to use

9  funds to ask for a remedy during the remedies notice period?

10 These things start going way too far.  They started out as,

11 yeah, you get $25,000 to investigate --

12           MR. BARRY:  Uh-huh.

13           THE COURT:  -- the pre-petition liens and you

14 can't sue us.

15           MR. BARRY:  Right.

16           THE COURT:  And now they've gotten into you can't

17 do anything that we don't like, basically.  That's what this

18 looks like to me.  "Preventing, hindering, or delaying" --

19 this is (y):

20           "Preventing, hindering, or delaying, directly or

21 indirectly, the DIP lender's and the pre-petition lender's

22 assertion or enforcement of the DIP liens or the pre-petition

23 liens or realization upon any DIP collateral or pre-petition

24 collateral."

25           So that's almost anything, that's like the

1  bankruptcy case.  It prevents, hinders, or delays you from

2  foreclosing on your collateral.  That's -- the entire

3  bankruptcy case is keeping you from doing that.

4          MR. BUTTERFIELD:  Your Honor, Ben Butterfield of

5  Morrison & Foerster.

6          So just recall that this only relates to the

7  carveout, right?  So we're in a world where the debtors have

8  defaulted on their DIP obligations, right?  And so, at that

9  point in time, we don't think it would be appropriate for the

10  debtors to use cash that the lender is funding to challenge

11  the DIP lender's liens or the DIP obligations.

12          THE COURT:  No, this goes -- the carveout includes

13  --

14          MR. BARRY:  It's all carveout.

15          MR. BUTTERFIELD:  Okay.

16          THE COURT:  Again, this is different.  These

17  provisions keep evolving, right?

18      (Participants confer)

19          THE COURT:  Your carveout includes all unpaid fees

20  and expenses allowed by the Court of professionals and

21  professional firms retained pursuant to 327 or 1103.  So

22  that's what's been incurred before a default, but not paid.

23  It's not what's after a default.

24          MR. BUTTERFIELD:  Your Honor, so then why don't we

25  make this provision subject to the paragraph on the

1  committee's challenge rights.

2          THE COURT:  How does that change it?

3          MR. BUTTERFIELD:  Well, so, if your concern is

4  that, because the carveout includes pipeline, plus the

5  reserve, right?  If your concern is that part of that

6  pipeline is investigation fees --

7          THE COURT:  No, it's other stuff.  It's all --

8  it's anything else.  The investigation fees you'll negotiate

9  with the committee.  Right now, they're $25,000.  Okay?  But

10 what you're saying is you can't -- as I'm reading this, this

11 is saying, debtor and committee, you cannot use any money at

12 all to do pretty much anything we don't like that could be,

13 in any way, construed as even just delaying your foreclosure

14 rights, which, as I said, is really the whole bankruptcy

15 case, but okay.  So, if they came to the Court during the

16 remedies notice period and said, you know what, Judge, don't

17 let them foreclose, this says they don't get paid for that.

18         MR. BUTTERFIELD:  Your Honor, we would be willing

19 to carve out fees relating to the debtors' or the committee's

20 seeking of a hearing to -- relating to the existence of event

21 of default.  I think that's the standard carveout for this

22 type of thing.

23         THE COURT:  Well ...

24         MR. BUTTERFIELD:  So, if they want to come -- if

25 they want to -- if we sent them a remedies notice and they

1  want to come to you and say there can't be a remedies notice

2  because there was no event of default or there was no

3  termination event, fees incurred by them solely in connection

4  with seeking that hearing would be an acceptable carveout to

5  the bank.

6        THE COURT:  Okay.  I'll -- you can do that and

7  I'll let that go for the interim.  But if I don't have a

8  committee, I want someone bringing this provision to my

9  attention because I think these are getting overly broad and

10 restricting estate fiduciaries from doing their job, as

11 opposed to suing the lender, which is how they started out.

12       (Pause in proceedings)

13       THE COURT:  Okay.  Page 31, in the middle:

14       "To the extent any such challenge proceeding is

15 timely and properly commenced, the pre-petition lender shall

16 be entitled to payment of the related costs and expenses in

17 defending any such proceeding as adequate protection."

18       Are you entitled to that under your current pre-

19 petition documents?

20       MR. BUTTERFIELD:  Your Honor, well, we are

21 entitled to fees in the -- fees incurred by the bank in

22 connection with the default by the borrower, right?  But this

23 is also adequate protection for agreeing to be primed.

24       THE COURT:  Well, subject to challenge and

25 recharacterization because, if there's a successful

1 challenge, then you're not entitled to, perhaps, adequate

2 protection.

3          MR. BUTTERFIELD:  That's acceptable to the bank.

4          MR. BARRY:  Would we just say to the extent any

5 unsuccessful challenge --

6          MR. BUTTERFIELD:  To the extent of any

7 unsuccessful challenge.

8      (Participants confer)

9          MR. BARRY:  We'll come up with something.

10          MR. BUTTERFIELD:  Your Honor, we --

11          THE COURT:  I don't know.  I just -- you know, if

12 your documents don't say that you get this, I don't know that

13 it's appropriate adequate protection, but -- because it

14 basically says the debtor has to pay for you to be defended

15 in a lawsuit, and that has nothing to do with a default or

16 anything.  I don't know that I think it is appropriate

17 adequate protection.  Why is it appropriate adequate

18 protection?

19          MR. BUTTERFIELD:  Your Honor, under the pre-

20 petition loan documents, if the borrower breaches, fees

21 incurred by the lenders would be reimbursable by the

22 borrower.

23          THE COURT:  How is this a breach?  How is the

24 bank's liens being challenged a breach?

25          MR. BUTTERFIELD:  If the bank's liens were granted

1 and are legitimate liens and survive a challenge, then the

2 borrower seeking to avoid its obligations to repay valid debt

3 is a breach.

4         THE COURT:  The borrower isn't doing it, the

5 committee is.

6         MR. BUTTERFIELD:  Your Honor, the committee is

7 doing it in the borrower's shoes, right?

8         THE COURT:  They're doing it for the estate.  They

9 are exercising a fiduciary duty.

10         MR. BUTTERFIELD:  The -- Your Honor, the estate

11 should not benefit -- the benefit to the estate shouldn't

12 change based on whether the claims are asserted by the

13 committee or by the debtor.

14         THE COURT:  This is another one you should put on

15 your list that needs to be brought to my attention if there

16 is not a committee.

17      (Participants confer)

18         THE COURT:  Paragraph 25, "Payments Free and

19 Clear," so:

20         "Payments remitted to the pre-petition lender are

21 subject to challenge, they are not irrevocable, received free

22 and clear of any claim, charge, assessment, or other

23 liability."

24      (Participants confer)

25         MR. BARRY:  Okay.

1                 THE COURT:  The last sentence, also.

2                 MR. BARRY:  Your Honor, I think we would suggest,

3    in Paragraph 25, deleting "or the pre-petition lenders" in

4    the second line, so it's just referencing the DIP -- payments

5    to the DIP lender, and then just deleting all together the --

6                 MR. BUTTERFIELD:  No, we would just call --

7                 MR. BARRY:  The --

8                 MR. BUTTERFIELD:  We would just make that

9    applicable only to the DIP financing parties.

10                MR. BARRY:  Well, I think what you do is you leave

11   that in because we're now taking it out as it pertains to the

12   pre-petition.

13                MR. BUTTERFIELD:  Or you could say "authorized by"

14   -- yeah.  Yeah, okay.

15                MR. BARRY:  So is that clear, Your Honor?

16                THE COURT:  I'll read it when you send it over.

17                Paragraph 29, "Indemnification."  That's a pretty

18   broad statement and it goes to a lot of people and it goes to

19   people who are a pre-petition lender, to people who are

20   investors.  Why is the debtor indemnifying the DIP financing

21   parties and all of their -- and everyone who ever touched

22   them?

23                MR. BUTTERFIELD:  Your Honor, Ben Butterfield of

24   Morrison & Foerster.

25                And this is standard language, you know, outside

1  of bankruptcy, and it's something the bank wanted to -- we

2  basically took the pre-petition loan agreement and converted

3  it into the DIP loan agreement, and they wanted this to stay

4  in.

5              THE COURT:  It's amazing what you can do outside

6  of bankruptcy.  But this extends to, for example, not just

7  your clients in their pre-petition capacity, but to 8VC, who

8  is an equity holder, right?  They're a large equity holder.

9  And all of their related parties, et cetera.  And it's not

10 limited in time or scope or anything.  I don't know what your

11 provision is in your DIP financing agreement.

12             But yeah, 8VC owns 21.7 percent of shares across

13 Series B and Series C preferred.  I'm not saying that they

14 have done anything improper, I'm not implying that.

15             MR. BUTTERFIELD:  Uh-huh.

16             THE COURT:  My question is:  Why, for example,

17 should they be indemnified just because they're a DIP

18 financing party?

19             MR. WISE:  Eric Wise for 8VC.

20             I think we're comfortable with it being in

21 connection with the DIP financing.  So, to the -- our actions

22 in connection with the DIP financing and the scope of the

23 various parties, I think, is part of that.  But it's with

24 respect to the DIP financing, so it's not to cover unrelated

25 pre-petition whatever.

1            THE COURT:  Okay.  So it can be limited to the DIP

2   financing and with the regular indemnification outs for

3   fraud, intentional acts, et cetera, that you can't be

4   indemnified for --

5            MR. BARRY:  Your Honor --

6            THE COURT:  -- and future acts, which I don't

7   know.

8            MR. BARRY:  Let's redraft this because the

9   carveouts are -- again, the carveouts are in the

10  indemnification, it's in the DIP loan documents.  But I would

11  suggest we just redraft this in here to say the DIP lenders,

12  solely in their capacity as such, and then add the proviso

13  that Mr. Wise just mentioned, which is solely in connection

14  with the DIP financing.

15           THE COURT:  Okay.

16           MR. BUTTERFIELD:  Your Honor, Ben Butterfield of

17  Morrison & Foerster.

18           So, for the pre-petition lender, I think we would

19  need the indemnity to extend to transactions that relate to

20  the pre-petition loan agreement; however, we would make that,

21  of course, subject to recharacterization.

22           THE COURT:  Do you have it in your pre-petition

23  loan agreement?

24           MR. BUTTERFIELD:  Yes, this --

25           THE COURT:  Then why do you need it in the order?

1  You have -- if it's already -- if you have it, then you have

2  presumably a claim for it.  So why do you need it in this

3  order?  What does it give you if I'm adding it to this order

4  that you don't have?

5          MR. BUTTERFIELD:  Well, I think, Your Honor, you

6  know, it's also in the DIP credit agreement.  And so the --

7  using that logic, this, you know, maybe doesn't need to be in

8  here at all.  But we feel that, you know, given the fact that

9  the order overrides contrary provisions in the pre-petition

10 loan documents and the DIP credit agreement, it should be

11 here for the avoidance of doubt and so the parties are

12 comfortable.

13         THE COURT:  I haven't seen your pre-petition loan

14 document, I don't know what it says.  I'm not blessing it.

15 What are we doing, we're overriding it in this document?

16         MR. BUTTERFIELD:  So the -- we are comfortable

17 with the indemnification rights that exist in the DIP credit

18 agreement, but those indemnification rights extend beyond

19 just the DIP loans and to transactions between the debtor and

20 the bank that occurred prior to the petition date.

21         THE COURT:  Why do they do that?  Why, in your --

22         MR. BUTTERFIELD:  Be --

23         THE COURT:  -- DIP loan, do you get

24 indemnification for obligations that are not encompassed in

25 the DIP financing?

1          MR. BUTTERFIELD:  Your Honor, the -- those

2   provisions were in the pre-petition credit agreement, right?

3   They are in the DIP credit agreement with respect to the DIP

4   lenders, right?  This is just the standard type of indemnity

5   that banks require to make these kids of loans.

6          THE COURT:  I said I -- that I'm okay with

7   indemnification for the DIP lenders, qua DIP lenders.  But

8   why would they get indemnification and why do they need

9   indemnification if they already have it in their pre-petition

10  --

11         MR. BUTTERFIELD:  Okay.  So then --

12         THE COURT:  -- loan agreement?

13         MR. BUTTERFIELD:  So then, with respect to the

14  pre-petition loan documents, can we say that this DIP order

15  shall not abrogate the -- any indemnification rights that do

16  exist under the pre-petition loan documents, subject, of

17  course, to recharacterization?

18         THE COURT:  Yeah, because I don't think it does.

19  I don't see how -- am I affecting your pre-petition loan

20  documents --

21         MR. BUTTERFIELD:  Well --

22         THE COURT:  -- substantively in this order?

23         MR. BUTTERFIELD:  Your Honor, there's always a

24  risk and we like to avoid that.  And the reason why is

25  because this interim order supersedes the terms of any of

1  those documents, so -- to the extent of a conflict, so that's

2  why we want it in here.  But I think we would be completely

3  happy if we just said that this -- expressly said that this

4  order does not abrogate the rights of -- to indemnification

5  of the pre-petition loan parties under the pre-petition loan

6  agreement.

7           THE COURT:  I -- Ms. Leamy, am I missing something

8  there?  I don't see the downside to that language because,

9  you know, I feel like I'm really --

10          MS. LEAMY:  (indiscernible)

11          THE COURT:  -- negotiating from the bench, which I

12  don't normally do.  But I don't see a downside to that

13  particular language because you have the claims you have

14  under your agreement.

15          MS. LEAMY:  Yeah.  Jane Leamy for the U.S.

16  Trustee.

17          Your Honor, I mean, I -- looking at it, it looks

18  like it may go beyond what's in the document or DIP credit

19  agreement, so I don't -- normally, what we see in these

20  orders is what's in the DIP credit agreement.

21          THE COURT:  Right.  I --

22          MS. LEAMY:  So I would --

23          THE COURT:  I don't think --

24          MS. LEAMY:  -- suggest it --

25          THE COURT:  -- I'm abrogating --

1          MS. LEAMY:  -- be revised.

2          THE COURT:  -- anybody's rights in anybody's pre-

3     petition agreements.  If I am, maybe I should be told where -

4     - what I'm -- what it is I'm doing.

5          MR. BARRY:  Well, the -- I think the pre-petition

6     indemnification obligations would be the secured obligations

7     of the debtor, so ...

8          THE COURT:  Yeah.  They're -- if they're there,

9     they're there.

10          MR. BARRY:  Correct.

11          THE COURT:  And if they're secured, they're

12     secured.

13          MR. BARRY:  Right.

14          THE COURT:  And if they're not, they're not, on

15     both fronts.  So I don't think -- I guess I don't have a

16     problem with that provision that you're suggesting.

17          MR. BARRY:  Okay.

18          MR. BUTTERFIELD:  Okay.

19          THE COURT:  Paragraph 34 needs to mirror 364(e).

20        (Pause in proceedings)

21          THE COURT:  "Survival of Order," Paragraph 36,

22     little paragraph, Sub (y).  So I don't have a problem with

23     the provisions of this order surviving, confirming a plan,

24     dismissal probably is in here, your DIP obligations are

25     defeasibly paid in full.  But the obligations owed to the

1   pre-petition lender are paid or otherwise satisfied in full.

2   Is there an assumption here that the pre-petition obligations

3   are fully secured?

4       (Pause in proceedings)

5           MR. BUTTERFIELD:  So -- Ben Butterfield of

6   Morrison & Foerster.  So I'm not sure I understand the

7   concern.

8           THE COURT:  Well, people want the order to survive

9   so that their liens, right?  Are in place.  In case this case

10  gets dismissed, you still want your liens --

11          MR. BUTTERFIELD:  Uh-huh.

12          THE COURT:  -- on your DIP financing --

13          MR. BUTTERFIELD:  Uh-huh.

14          THE COURT:  -- et cetera --

15          MR. BUTTERFIELD:  Uh-huh.

16          THE COURT:  -- to be effective --

17          MR. BUTTERFIELD:  Uh-huh.

18          THE COURT:  -- in full force and effect and I

19  understand that.  But -- and you want those liens to survive

20  until your DIP obligations are paid.  But I don't usually see

21  the pre-petition obligation in here.  I guess, to the extent

22  that you have adequate protection liens that are worth

23  something --

24          MR. BUTTERFIELD:  Your Honor, so I think adequate

25  protection is part of it.  But let's say there was a roll-up

1  of the pre-petition loans --

2         THE COURT:  Uh-huh.

3         MR. BUTTERFIELD:  -- and then the case terminated.

4  Would -- we just want to make sure that the pre-petition

5  lender would be restored to its -- the position that it was

6  in pre-petition.

7         THE COURT:  Well, if there's a roll-up, why

8  wouldn't you get the benefit of the roll-up.  Why do you want

9  to be restored to your pre-petition position?

10         MR. BARRY:  There are DIP obligations.  I think

11  there are DIP obligations at that point, right?

12         MR. BUTTERFIELD:  If it's clear that they would

13  remain DIP obligations, I think it would be okay with that.

14         THE COURT:  Okay.  I'm not sure what this

15  paragraph means.  Let's just leave it the way it is.  You can

16  look at it and decide if you need -- and the debtors can look

17  at it.

18         Okay.  Paragraph 37.  Are there any

19  inconsistencies between this order and any other order that

20  you just had me enter, debtors?

21      (Participants confer)

22         MR. BARRY:  Excuse me, Your Honor.  May I have a

23  moment.

24         THE COURT:  Uh-huh.

25      (Participants confer)

1          MR. BARRY:  My colleague is going to address this

2   one, Your Honor.

3          THE COURT:  Okay.

4          MR. MAGAZINER:  For the record, Drew Magaziner

5   from Young Conaway, on behalf of the debtors.

6          Your Honor, this language -- so there are judges

7   in this district -- and you may be one of them -- that strike

8   the language in these orders.  This language is to address

9   that, to make it clear that the DIP order and the budget, et

10  cetera, controls.  We're just trying to address feedback

11  we've received from the Court.

12         There is no inconsistency, and I can say that on

13  the record, that we don't believe there's any inconsistency.

14  That language is in some orders, in routine first-day orders.

15  We had struck it, given feedback, again, from the Court.  So

16  that's what -- the genesis of this language and probably why

17  it stuck out to you in this order.

18         THE COURT:  Okay.

19      (Participants confer)

20         MR. BARRY:  And all of the payments that I have

21  approved are in the budget?

22         MR. MAGAZINER:  Confirmed, Your Honor.

23         MR. BARRY:  They are.  So I guess the idea is,

24  instead of having in every first-day order anything

25  inconsistent in this order, the DIP order controls, there's -

1 | - this is now a catchall provision in the DIP order.

2 | THE COURT:  I know, but what all of these do is

3 | they make other orders not dependable.

4 | MR. BARRY:  Right.

5 | THE COURT:  So, if somebody is looking at the

6 | docket and they --

7 | MR. BARRY:  Right.

8 | THE COURT:  -- want to see --

9 | MR. BARRY:  Right.  And I get -- I get your point,

10 | yeah.

11 | THE COURT:  -- the critical vendor order, they

12 | know, boom, that's it.  And they don't have to go look and

13 | see, well, does some other order countermand this order.

14 | (Participants confer)

15 | THE COURT:  And that's what this language does

16 | with respect to first- and second-day orders.  It provides

17 | the possibility that we've just countermanded the order that

18 | I just entered.  I -- that's why I don't -- I appreciate that

19 | the lender wants to know that what it negotiated for is what

20 | it's getting.  But isn't the ability to do that is, if you've

21 | monitored all these proceedings, you know what's in the

22 | budget, you know what's in the order, you've done your

23 | diligence?  And so you know that every order that's been

24 | entered, first day, complies with your requirements of this

25 | debtor.

1          MR. BUTTERFIELD:  Your Honor, Ben Butterfield of

2    Morrison & Foerster.

3          So I take your point, particularly with respect to

4    pre-petition obligations, where the debtors have proposed

5    limits for what they are going to pay on a pre-petition

6    basis.  But the orders -- all of these orders authorize the

7    debtors to make payments on a post-petition basis.  It's

8    important for the lender to have it be very clear that those

9    payments are subject to the budget.

10          So, if, for example, the wages order authorizes

11    the debtor to pay wages in the ordinary course of the case,

12    right?  And they pay wages that aren't in the budget, they

13    could come to us and say, look, we have an order that

14    authorizes us to pay these wages, and that order -- who knows

15    what order controls, right?  But we're going to pay them

16    because it's authorized by this order.

17          We wanted to make it clear, rather than -- we want

18    to make it clear that the budget controls, first.  And also,

19    we tried to simplify it by putting it in this order, rather

20    than putting it in every other order because, like Joe said,

21    we've gotten feedback from other judges that it's annoying to

22    see this in every single order.

23          THE COURT:  It is.  I'll let it be in the interim

24    order, but put this one on the list.  I need to think about

25    that and lenders should think about it, too, because I hear

1   your go-forward and I understand that concern.  On the other

2   hand, I'm not sure that, even if there were no order in

3   place, that a debtor wouldn't have authority to pay its

4   employees for work in the ordinary course.  So I don't know

5   how that -- I don't know what the balance is there.

6           MR. BUTTERFIELD:  Employees might have been a poor

7   choice, Your Honor.

8           THE COURT:  So ... okay.  Our first -- our second-

9   day hearing is on the 2nd, you said?

10          MR. BARRY:  It is, October 2nd.

11          THE COURT:  Okay.  How much money is the debtor

12  using between now and the 2nd?

13          MR. BARRY:  May I consult with our CFO, Your

14  Honor?

15          THE COURT:  Yes.

16      (Participants confer)

17          MR. BARRY:  Your Honor, it's about two and a half

18  million dollars.

19          THE COURT:  Is there a reason then that we should

20  be drawing three and a half million?  I recognize the debtor

21  needs some cushion.  Is there a reason that the debtor is

22  drawing three and a half million to start with during this

23  interim period?

24          MR. BARRY:  Let me consult with the CFO.

25      (Participants confer)

1           MR. BARRY:  Your Honor, sorry.  Correct.  We do

2   need the full three five before -- around October 2nd.  And I

3   think that's where the next one and a half comes in.  Yeah,

4   the one and a half is slotted for that week; the week of

5   9/30, the next slug of one five comes in.

6           (Pause in proceedings)

7           THE COURT:  The next slot, the 5 million that

8   comes in that week -- or no.  Is it the one and a half?

9           MR. BARRY:  Yeah.

10          THE COURT:  That comes in that week is still in

11  the -- what's considered the first tranche?

12          MR. BARRY:  Correct.

13          THE COURT:  And then the 3 million that comes in

14  the week of October 21st, that's in the second --

15          MR. BARRY:  Yes, and --

16          THE COURT:  -- tranche?

17          MR. BARRY:  -- when you say "comes in," it's -- it

18  may come in.  It's contingent upon the letter of intent

19  qualification.

20          THE COURT:  Okay.  So that's not the third

21  tranche.  It's not the third tranche, but it's the contingent

22  tranche.

23          MR. BARRY:  Yeah, there -- I mean, there's three

24  advances:  There's an interim advance today, there's a final

25  advance at the final hearing, and then there's the sort of

1  permissive/optional third advance --

2           THE COURT:  Okay.

3           MR. BARRY:  -- that, if we hit that LOI, at the

4  LOI milestone, at day 40.

5           THE COURT:  Okay.  Well ...

6        (Pause in proceedings)

7           THE COURT:  Based on Mr. Solsvig's declaration,

8  I'm going to approve, on an interim basis, the DIP financing,

9  subject to seeing an order that reflects the discussion we've

10 had today.

11          I still have some concerns about the

12 participations and how they're reflected in the order and --

13 but I think Mr. Wise has convinced me that the structure of

14 the financing does not harm the parties who are in this room

15 today.  And of course the parties will have an opportunity at

16 final to make any objections that they have to the financing.

17          It's clear that the debtor needs financing in this

18 interim period and in order to pursue the sale process that

19 it would like to pursue, and there has been no question with

20 respect to that availability, of the need for the

21 availability.  And the budget, as reflected in the

22 representations, in consultation with the CFO, are that 3.5

23 million is needed during this interim period.  The debtor

24 should be given a chance to run this process.

25          From the -- again, from the first-day declaration,

1  the business itself is a viable business, the science is

2  good.  There were some unfortunate circumstances pre-

3  petition, apparently, that generated investigations which

4  have begun to be dealt with by current management.  So

5  there's no question that this business itself should be given

6  an opportunity to continue.

7        So, while I will say I did not fully appreciate

8  the intricacies of the financing from the papers, as it's

9  been discussed here today, I will approve it on this interim

10  basis.  And then, if we have a committee and the committee

11  has concerns, I will hear the committee with respect to the

12  structure of the financing.

13        MR. BARRY:  Understood.  Thank you, Your Honor.

14  We appreciate that.  I realize that it's a little unorthodox

15  and there's -- like I said, I think it's optically not

16  something you typically would see.  But we appreciate your

17  time and consideration.

18        I just wanted to take a minute to thank the folks

19  at both Gibson Dunn and Morrison & Foerster.  I can tell you

20  that a substantial amount of Labor Day weekends were ruined

21  put -- pulling this together and it was quite a slog, but it

22  was a collaborative effort and we appreciate everybody's

23  cooperation, so we could at least get to this point and see

24  where we can take this case.

25        I think we got a little wood to chop on the order

1  here.  Would you mind if I took a moment?  I think, during

2  the course of the hearing, as it became after 6, I think

3  maybe some arrangements have been made.  I just want to make

4  sure, timing-wise, for us to get you the order in the

5  morning, that everything is cued up, so that we can get the -

6  - we have to fund tomorrow.

7            THE COURT:  Uh-huh.

8            MR. BARRY:  So I want to make sure that we can get

9  you the order as soon as chambers open, hit -- that order

10 would hopefully hit the docket; or we can maybe, if Your

11 Honor has questions, have a short telephonic hearing or

12 something.  I just want to -- do you mind if I huddle with

13 the lenders and my client, just to make sure we all can

14 understand where we are?

15            THE COURT:  Yes.

16            MR. BARRY:  Thank you.

17            THE COURT:  Go ahead.

18       (Participants confer)

19            MR. BARRY:  All right.  Thank you, Your Honor.  It

20 seems we've got a consensus.  We'll work on the order

21 tonight, get it to you hopefully first thing tomorrow

22 morning.  I understand that we have a -- thankfully, have a

23 five o'clock eastern time wire deadline tomorrow, so,

24 hopefully, work will not expand to the time allotted and we

25 will get you this order posthaste tomorrow morning.

1           THE COURT:  Okay.

2           MR. BARRY:  Thank you, Your Honor.

3           THE COURT:  I will be here.

4           MR. BARRY:  Appreciate your time.

5           THE COURT:  Anything further?

6           MR. BARRY:  We have no further business for the

7    Court, Your Honor.

8           THE COURT:  Thank you.

9           MR. BARRY:  Thank you.

10          THE COURT:  We're adjourned.

11          UNIDENTIFIED:  Thank you, Your Honor.

12       (Proceedings concluded at 6:06 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATE

2

3          We, MARY ZAJACZKOWSKI, COLEEN RAND, and WILLIAM

4   GARLING, certify that the foregoing is a correct transcript

5   from the electronic sound recording of the proceedings in the

6   above-entitled matter.

7
    /s/Mary Zajaczkowski              September 6, 2019
8   Mary Zajaczkowski, CET**D-531

9

10
    s/ Coleen Rand                    September 6, 2019
11  Coleen Rand

12

13  /s/William J. Garling             September 6, 2019
    William J. Garling, CE/T 543
14

15

16

17

18

19

20

21

22

23

24

25