## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| uBiome, Inc., [1] | Case No. 19-11938 (LSS) |
| Debtor. | **Related to Docket Nos. 13, 47** |

## OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO ENTRY OF FINAL ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING

Dated:  September 27, 2019

PACHULSKI STANG ZIEHL & JONES LLP

 */s/ Bradford J. Sandler*
Bradford J. Sandler (DE Bar No. 4142)
John A. Morris (NY Bar No. 2405397)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile:  302-652-4400
E-mail:  bsandler@pszjlaw.com
         jmorris@pszjlaw.com
         mlitvak@pszjlaw.com
         crobinson@pszjlaw.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*

---

[1]  The Debtor's taxpayer identification number is:  uBiome, Inc. (0019).   The Debtor's headquarters are located at 360 Langton Street, Suite 301, San Francisco, CA 94103.

# TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................................... 1

Factual Background ......................................................................................................... 7

    A.    General Background ................................................................................ 7

    B.    Prepetition Secured Debt ........................................................................ 8

    C.    The Proposed Final Order / DIP Facility ............................................. 10

Objections to DIP Facility and Proposed Final Order .................................................. 15

    A.    The DIP Facility, Including the Roll-Up, Should Not Be Approved in Its Current Form Because It Primarily Benefits SVB and 8VC at the Expense of This Estate. .................................................................................. 15

    B.    Unencumbered Assets Must Not Become Collateral for SVB and 8VC and Should Be Preserved for Unsecured Creditors. ................................... 20

    C.    The Investigation Budget and Committee Carve Out Must Be Increased, and the Committee Must Be Granted Standing to Pursue All Available Claims Against SVB. ............................................................................ 23

    D.    The Estate Should Retain Section 506(c) Surcharge Rights,  Section 552(b) "Equities of the Case" Rights, and Marshaling Rights. ........................ 24

    E.    Other Miscellaneous Issues with the Proposed Final Order. .............................. 27

Reservation of Rights ..................................................................................................... 28

Conclusion ...................................................................................................................... 28

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partn. IV*, 229 F.3d 245 (3d Cir. 2000) ........................................................................ 21

*Delbridge* v. *Prod. Credit Ass'n & Fed. Land Bank*,
104 B.R. 824 (E.D. Mich. 1989) ..................................................................... 25

*DSP Acquisition, LLC v. Free Lance-Star Publishing Co. (In re Free Lance-Star Publishing Co.)*,
2014 Bankr. LEXIS 1644 at *22 (Bankr. E.D. Va. Apr. 14, 2014) .................... 17

*In re Ames Dept. Stores*,
115 B.R. 34 (Bankr. S.D.N.Y. 1990) .......................................................... 15, 23

*In re Aqua Assocs.*,
123 B.R. 192 (Bankr. E.D. Pa. 1991) ............................................................... 18

*In re Aralez Pharmaceuticals US Inc.*,
Case No. 18-12425 (MG), Docket No. 98 at ¶ 15(i)-(ii) (Bankr. S.D.N.Y. Sept. 14, 2018) .............................................................................................. 21

*In re Big Rivers Elec. Corp.*,
233 B.R. 726 (Bankr. W.D. Ky. 1998) ............................................................. 15

*In re Chief Executive Officers Clubs*,
359 B.R. 527 (Bankr. S.D.N.Y. 2007) ............................................................. 15

*In re Codesco, Inc.*,
18 B.R. 225 (Bankr. S.D.N.Y. 1982) ................................................................ 25

*In re Colad Group, Inc.*,
324 B.R. 208 (Bankr. W.D.N.Y. 2005) ............................................................ 25

*In re Crouse Group, Inc.*,
71 B.R. 544 (Bankr. E.D. Pa. 1987) ................................................................. 15

*In re FCX, Inc.*,
54 B.R. 833 (Bankr. E.D.N.C. 1985) ............................................................... 18

*In re Frank Theatres Bayonne/South Cove, LLC*,
Case No. 18-34808 (SLM), Docket No. 212 at ¶ 3(b)-(c) (Bankr. D. N.J. Jan. 28, 2019) ................................................................................................. 21, 27

*In re Free Lance-Star Publishing*,
512 B.R. 798 (Bankr. E.D. Va. 2014) .............................................................. 28

*In re Gymboree Group, Inc.*, Case No. 19-30258 (KLP), Docket No. 348 at ¶¶ 15, 18 (Bankr. E.D. Va. Feb. 15, 2019) ......................................................... 21

*In re Metaldyne Corp.*,
No. 09-13412 (MG), 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ......................................................................................................... 26

*In re Muma Servs.*,
322 B.R. 541 (Bankr. D. Del. 2005) ................................................................ 25

*In re Nine West Holdings, Inc.*,
Case No. 18-10947 (SCC), Docket No. 450 at ¶ 10(f) (Bankr. S.D.N.Y. June 28, 2018) ................................................................................................... 27

ii

*In re Philadelphia Newspapers*,
  599 F.3d 298 n.14 (3d Cir. 2010)......................................................................... 28

*In re Promise Healthcare Group, LLC*,
  Case No. 18-12491 (CSS), Docket No. 218 at ¶¶ 12, 14 (Bankr. D. Del. Dec.
  4, 2018) ................................................................................................................ 21

*In re Roblin Industries, Inc.*,
  52 B.R. 241 (Bankr. W.D.N.Y. 1985) ............................................................. 16, 17

*In re Samuel's Jewelers, Inc.*,
  Case No. 18-11818 (KJC), Docket No. 252 at ¶ 5 (Bankr. D. Del. Sept. 18,
  2018) .................................................................................................................... 26

*In re SFX Entertainment, Inc.*,
  Case No. 16-10238 (MFW), Docket No. 203 at ¶ 11(a)(i)-(ii) (Bankr. D. Del.
  Mar. 8, 2016)........................................................................................................ 22

*In re Sweetwater*, 55 B.R. 724, 735 (D. Utah 1985)
  *aff'd and rev'd, in part, on other grounds*, 884 F.2d 1323 (10th Cir. 1989) ........ 21

*In re Tenney Village Co.*,
  104 B.R. 562 (Bankr. D.N.H. 1989) ....................................................... 16, 18, 22

*In re Texlon*,
  596 F.2d 1092 (2d Cir. 1979)............................................................................... 18

*In re The Bon-Ton Stores, Inc.*,
  Case No. 18-10248 (MFW), Docket No. 352 at ¶ 7 (Bankr. D. Del. Mar. 12,
  2018) .................................................................................................................... 27

*In re The Weinstein Company Holdings LLC*,
  Case No. 18-10601 (MFW), Docket No. 267 at ¶ 12(d)-(e)(Bankr. D. Del.
  Apr. 19, 2018) ................................................................................................. 21, 27

*In re Vanguard Diversified, Inc.*,
  31 B.R. 364 (Bankr. E.D.N.Y. 1983)................................................................... 18

*In re Westmoreland Coal Co.*,
  Case No. 18-35672 (DRJ), Docket No. 520 at ¶ 37 (Bankr. S.D. Tex. Nov. 15,
  2018) .................................................................................................................... 27

*Official Comm. v. Hudson United Bankr. (In re America's Hobby Center)*,
  223 B.R. 275 (Bankr. S.D.N.Y. 1998) ................................................................. 26

*Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*,
  57 F.3d 321 (3d Cir. 1995).................................................................................... 24

*Ramette v. United States (In re Bame)*,
  279 B.R. 833 (8th Cir. BAP 2002) ....................................................................... 26

*Resolution Trust Group v. Swedeland Dev. Corp. (In re Swedeland Dev. Corp.)*,
  16 F.3d 552 (3d Cir. 1994).................................................................................... 20

*Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*,
  457 B.R. 254 (Bankr. S.D.N.Y. 2011) ................................................................. 26

## STATUTES

11 U.S.C. § 364(d) ...................................................................................................... 20

11 U.S.C. § 503(b) ............................................................................................... *passim*

11 U.S.C. § 506(c) ..................................................................................... 14, 24, 25

11 U.S.C. § 552(b) .......................................................................................... 17, 25

UCC § 9-315(c) ......................................................................................................... 17

DOCS_SF:101901.3 85648/002

The Official Committee of Unsecured Creditors (the "Committee") of uBiome, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), hereby files this objection (this "Objection")[1] to the entry of a *Final Order (i) Authorizing the Debtor to Obtain Postpetition Secured Financing, (ii) Authorizing the Use of Cash Collateral, (iii) Granting Liens and Superpriority Administrative Expense Status, (iv) Granting Adequate Protection, and (v) Modifying the Automatic Stay* (the "Proposed Final Order"),[2] pending the resolution of the objections set forth herein.  The Committee is currently conducting due diligence with respect to the DIP Facility (as defined below) and reserves all rights to amend or supplement this Objection as necessary.  For now, in support of this Objection, the Committee respectfully states as follows:

## Introduction

1.     The Committee believes that the Debtor has a valuable business that should be adequately marketed or restructured in a manner that maximizes returns for all constituents.  At the same time, it is essential to ensure the administrative solvency of this chapter 11 estate and to preserve for the benefit of unsecured creditors any unencumbered assets, including intellectual property, certain interests in foreign subsidiaries, avoidance actions, and whatever rights or claims may exist against the Debtor's founders or others (and any available insurance coverage) with respect to any improper actions taken prepetition.

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Interim Order (as defined below).

[2]  The Committee has not yet been provided with a form of Proposed Final Order and therefore reserves all rights with respect thereto.  For purposes herein, the Committee has assumed that the Proposed Final Order will follow along with the provisions of the Interim Order (as defined below).

2.      The Committee recognizes that the Debtor needs new money in order to maintain going concern value.  In fact, the Debtor may need more new money than is currently on the table given that the Debtor's budget reflects a negative cash balance beginning the week of November 18, 2019, without taking into account, among other items, the payment of section 503(b)(9) claims, a sufficient amount for Committee professional fees, or other potential administrative expenses.

3.      As currently proposed, the Debtor seeks approval of up to $13.83 million in debtor in possession financing (the "DIP Facility") ($3.5 million of which is now available on an interim basis) from its prepetition lender, Silicon Valley Bank ("SVB"), to be funded in part through participations by the Debtor's existing equity holders and insiders, 8VC Fund I, L.P. and 8VC Entrepreneurs Fund I, L.P (and may include additional participant parties) (together, "8VC").[3]  The DIP Facility contemplates only $5 million of committed new money advances, plus a possible final $3 million tranche that is entirely in the discretion of SVB and 8VC depending on whether the Debtor is able to deliver, prior to the original maturity date of October 21, 2019, a binding letter of intent for a sale of substantially all assets that repays the DIP Facility and SVB's prepetition debt in full.  The DIP Facility includes a proposed roll-up of SVB's prepetition debt in the aggregate principal amount of $5.83 million (without any evidence that such prepetition debt is oversecured), plus payment of various fees and interest.[4]

---

[3]  According to the Debtor, 8VC holds 21.7% of the Debtor's equity shares across two classes, Series B Preferred and Series C Preferred.

[4]  The Committee reserves all rights to argue at the appropriate time that SVB was undersecured as of the Petition Date (as defined below) and the DIP Facility should be partially unwound as to any rolled-up amounts to the extent of such undercollateralization.

2

4.      The Committee strenuously objects to the roll-up of SVB's prepetition debt because it will cross–collateralize SVB's prepetition claims with the Unencumbered Assets (as defined below) and further aggravates the already precarious solvency position of the Debtor, especially given the unnecessarily short original maturity date under the DIP Facility of October 21, 2019.  The Unencumbered Assets include, without limitation, potentially highly valuable intellectual property, 35% of the Debtor's interests in foreign subsidiaries, avoidance actions, and commercial tort claims, including claims against directors and officers and any available insurance coverage (together, the "Unencumbered Assets").  SVB's prepetition collateral expressly *excludes* the Debtor's intellectual property, but purports to include the proceeds of such intellectual property, which the Committee submits is ineffective to create a valid and enforceable security interest under the Uniform Commercial Code (the "UCC") or section 552(b) of the Bankruptcy Code.  There is no legal basis whatsoever for SVB's prepetition debt, which is not secured by the Unencumbered Assets, to suddenly become secured by such assets upon consummation of the roll-up to the extreme detriment of unsecured creditors.  The Unencumbered Assets must remain free and clear of any rolled-up debt, which is itself subject to challenge and possible disgorgement.

5.      To the extent that the roll-up is denied, there is no evidence that SVB should be entitled to adequate protection liens on, or superpriority claims payable from, the Unencumbered Assets (especially avoidance actions) to secure any diminution in value.  At a minimum, the Debtor's assets should be marshaled such that SVB and 8VC are only permitted to turn to the Unencumbered Assets (except avoidance actions) to the extent that their new money

3

claims under the DIP Facility are not otherwise satisfied from the proceeds of other assets that constitute the DIP Collateral (as defined in the Interim Order).  In this way, the Unencumbered Assets will be preserved primarily for the benefit of unsecured creditors.

6.      The roll-up also makes the DIP Facility exceedingly expensive by, among other things, obligating the estate to pay a $600,000 fee to SVB as an administrative expense.  As a percentage of the combined new money to be provided and the prepetition roll-up amounts, the annualized all-in cost of the DIP Facility ranges from 31.4% to 66.9% depending on whether the term of the facility is the original maturity date of 45 days or the extended maturity date of 90 days and whether SVB and 8VC agree to extend the last discretionary $3 million advance.[5] Compared to debtor-in-possession financing facilities in comparable cases, the proposed DIP Facility here is roughly two to three times more expensive than market.

7.      As noted above, the DIP Facility contains an unusually short maturity date of 45 days after execution of the DIP credit agreement (*i.e.*, October 21, 2019).  If the Debtor receives a letter of intent for the sale of its assets that will repay the DIP Facility and SVB's prepetition debt in full before that date, then SVB and 8VC may agree in their discretion to fund a final advance of $3 million, of which $500,000 would come from SVB and $2.5 million would come from 8VC.  The Committee submits that the Debtor must be provided with adequate time and funding to conduct a fulsome and robust marketing process.  Although the Committee is continuing its diligence, a deadline of October 21, 2019 to find an "acceptable" buyer does not

---

[5]  The all-in cost is calculated by adding the weighted-average (on the basis of respective debt amounts) (a) interest rates applicable to the new money DIP Facility and SVB's prepetition debt (10.5% per annum for the new money DIP Facility and 6.0% per annum for SVB's prepetition debt) and (b) commitment fees under the DIP Facility, on an annualized basis, as a percentage of the new money to be advanced, and (c) exit fees owing on SVB's prepetition debt, on an annualized basis, as a percentage of the prepetition roll-up amount, all over a specified time period.

seem reasonable under the circumstances and risks turning this case into a glorified foreclosure. If SVB and 8VC, in their sole discretion, decide not to lend the final $3 million tranche of the DIP Facility by October 21, 2019, then they can promptly proceed to foreclosure and this chapter 11 case is effectively over.  The Debtor needs an adequate opportunity to fully market its assets and a softer landing if no buyer materializes.

       8.     Further, the Committee must have an adequate budget to fulfill its statutory duties, including no less than $100,000 to conduct its investigation of SVB's prepetition liens and claims.[6]  The budget attached to the Interim Order proposed only $110,000 for the Committee's professional fees through November 2019, while the Debtor's and lenders' professional fees are budgeted at over $4.4 million for the same period (excluding any transaction fees that may be payable to the Debtor's investment banker).  The Committee's budget should be increased substantially.  The Carve Out must also expressly include expenses of the members of the Committee.  And the Committee should be granted standing to pursue any and all available claims that are within the scope of a Challenge (as defined in the Interim Order), especially given that the Debtor has already stipulated that there are no claims against SVB in its capacity as prepetition lender and its liens are valid and perfected.  Along these lines, the Proposed Final Order needs to include language reserving this Court's authority to disgorge amounts paid to SVB as part of any roll-up and to unwind the DIP Facility to the extent of a successful challenge to SVB's liens or claims or a determination that SVB was undersecured as of the Petition Date.

---

[6] The Interim Order caps the Committee's investigation budget with respect to SVB's prepetition liens and claims at an unreasonably small $25,000.

9.      Finally, the Debtor's estate should retain all available section 506(c) surcharge rights, section 552(b) "equities of the case" rights, and marshaling rights against SVB and 8VC until such time that all administrative expenses have been paid or adequately provided for, including any claims arising under section 503(b)(9) of the Bankruptcy Code and a sufficient amount for Committee professional fees.  SVB wants to have the best of both worlds – a roll-up of its prepetition debt and a waiver of any surcharge claims against it even if the Debtor is rendered administratively insolvent.  That is completely unfair and unjustified from the perspective of this estate.

10.      In sum, although the Debtor filed this case starved for cash, the Court should not approve a DIP Facility that may be insufficient in amount and that unfairly rewards SVB and 8VC at the expense of general unsecured creditors and this estate.  SVB's prepetition debt should remain a prepetition claim and the Unencumbered Assets (especially avoidance actions) should remain free and clear.  The Committee's remaining objections go to the overall fairness, cost, and propriety of the DIP Facility under the circumstances in an effort to make it more balanced from the perspective of the estate.  For these reasons and those set forth below, the Committee requests that this Court deny final approval of the DIP Facility and entry of the Proposed Final Order without the modifications necessary to address the Committee's objections herein.

**Factual Background**

**A.      General Background**

11.      On September 4, 2019 (the "Petition Date"), the Debtor commenced a voluntary case with this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

12.      On the Petition Date, the Debtor filed the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Secured Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* [Docket No. 13] (the "DIP Motion").  Pursuant to the DIP Motion, the Debtor sought approval of the DIP Facility under the terms of the *Senior Secured, Superpriority Debtor in Possession Term Loan and Security Agreement* dated as of September 6, 2019 (the "DIP Loan Agreement"), including subject to entry of a final order, the roll-up of SVB's prepetition debt.

13.      On September 6, 2019, this Court conducted an interim hearing on the DIP Motion (the "Interim Hearing") and entered its *Interim Order (I) Authorizing the Debtor to Obtain Postpetition Secured Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* [Docket No.

47] (the "<u>Interim Order</u>").  Pursuant to the Interim Order, the Debtor was authorized to borrow

up to $3.5 million under the DIP Loan Agreement.  The proposed roll-up of SVB's prepetition

debt was deferred to the final hearing to consider the DIP Facility, which is currently set for

October 2, 2019 (the "<u>Final Hearing</u>").

14.    On September 16, 2019, the Office of the United States Trustee appointed

the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 71].  The

Committee consists of the following three (3) members:  (i) Bioquimica.cl S.A., (ii) Ecare India

Private Limited, and (iii) Blue Cross Blue Shield Association.

15.    As disclosed in the Debtor's pleadings, the Debtor is the subject of

ongoing investigations by federal and state authorities into improper business practices employed

by the Debtor's founders.  These investigations forced the Debtor, prior to the Petition Date, to

remove the founders, appoint new directors and officers, terminate certain aspects of its

operations, and restructure its business.

**B.    <u>Prepetition Secured Debt</u>**

16.    The Debtor, as borrower, and SVB, as lender, are parties to a *Loan and*

*Security Agreement*, dated as of February 24, 2017, as amended (the "<u>SVB Loan Agreement</u>").

In total, the aggregate sum of $10.5 million was purportedly loaned by SVB to the Debtor under

the SVB Loan Agreement between February 2017 and August 2018.  The loans began to

amortize in July 2018.  As of the Petition Date, the Debtor has stipulated that approximately

$5.83 million in principal obligations remains outstanding under the SVB Loan Agreement.

17.     The obligations under the SVB Loan Agreement are purportedly secured by first priority liens on certain of the Debtor's assets, including, but not limited to, all goods, accounts, equipment, inventory, proceeds of intellectual property, contract rights, leases, general intangibles, commercial tort claims, cash, deposit accounts and letters of credit, all as set forth in the SVB Loan Agreement.

18.     Notably, the term "Collateral" as defined under the SVB Loan Agreement expressly **excludes** (a) more than sixty-five percent (65%) of the Debtor's interests in foreign subsidiaries, and (b) the Debtor's intellectual property, but purports to include the proceeds of such intellectual property, which the Committee submits is ineffective to create a valid and enforceable security interest under the UCC or section 552(b) of the Bankruptcy Code.

19.     The SVB Loan Agreement further clarifies the definition of Collateral as follows:

> If a judicial authority (including a U.S. Bankruptcy Court) would hold that a security interest in the underlying Intellectual Property is necessary to have a security interest in such Accounts and such property that are proceeds of Intellectual Property, then the Collateral shall automatically, and effective as of the Effective Date, include the Intellectual Property to the extent necessary to permit perfection of Bank's security interest in such Accounts and such other property of Borrower that are proceeds of the Intellectual Property.

The Committee submits that this "springing lien" on intellectual property is ineffective in the context of bankruptcy.

20.     SVB also failed to perfect its security interest in the Debtor's prepetition commercial tort claims because no such claims were specifically identified in any security grant by the Debtor in favor of SVB as required by the UCC.

C.       **The Proposed Final Order / DIP Facility**

21.      Through the DIP Motion, the Debtor sought approval of the DIP Facility in an amount up to $13.83 million, of which the sum of $5.83 million would consist of rolled-up prepetition debt due and owing under the SVB Loan Agreement.  8VC would extend up to $6.5 million and SVB would extend up to $1.5 million of new money financing under the DIP Facility.  However, only $5 million of this new money is committed.  The final tranche of $3 million is entirely discretionary on the part of SVB and 8VC depending on the Debtor's ability to deliver, prior to October 21, 2019, a binding letter of intent for a sale of substantially all assets that repays the DIP Facility and SVB's prepetition debt in full.  *See* DIP Loan Agreement at § 2.1.1(a).

22.      Under the Interim Order, the Debtor was authorized to borrow up to $3.5 million under the DIP Facility.

23.      The Debtor's budget reflects a negative cash balance beginning the week of November 18, 2019, without taking into account, among other items, the payment of section 503(b)(9) claims, a sufficient amount for Committee professional fees, or other potential administrative expenses.

24.      In connection with the DIP Facility, SVB, as seller, and 8VC, as participants, entered into a *Participation Agreement* dated as of September 6, 2019 (the "Participation Agreement").   Pursuant to the Participation Agreement, SVB and 8VC agreed to the following waterfall with respect to payments or other recoveries under the DIP Facility:  first, SVB gets repaid on its new money advances under the DIP Facility (up to $1.5 million); second,

SVB gets repaid on 50% of its rolled-up prepetition debt (one-half of $5.83 million = $2.915 million); and <u>third</u>, SVB and 8VC share *pro rata* in any remaining proceeds until SVB's remaining 50% of rolled-up prepetition debt ($2.915 million) and 8VC's new money advances (up to $6.5 million) are repaid.  In effect, 8VC has agreed to subordinate its new money advances to SVB's new money advances and one-half of SVB's prepetition debt.  Importantly, such subordination will apply as an intercreditor contractual matter between SVB and 8VC regardless of whether the Court approves the roll-up.[7]

25.    The DIP Facility bears interest at the rate of 10.5% per annum, which rate is payable monthly.  *See* DIP Loan Agreement at § 2.2(a).

26.    The DIP Facility contains an initial maturity date of 45 days after execution of the DIP credit agreement (*i.e.*, October 21, 2019).  If the Debtor delivers a binding letter of intent for the sale of its assets at least five business days prior to October 21, 2019 that will repay the DIP Facility and SVB's prepetition debt in full, then SVB may agree in its sole discretion to extend the maturity date by an additional 45 days and SVB and 8VC may agree in their respective sole discretion to fund a final draw of $3 million, of which $500,000 would come from SVB and $2.5 million would come from 8VC.  *See* DIP Loan Agreement at § 2.1.2.

27.    To secure the DIP Facility, the Debtor proposes to grant priming liens on all of the Debtor's assets (the "<u>DIP Collateral</u>"), including the previously Unencumbered Assets such as intellectual property, 35% of the interests in foreign subsidiaries, avoidance actions, and

---

[7]  The DIP Motion contains footnotes stating that the relative priorities of SVB and 8VC will apply regardless of whether the Court grants the roll-up of SVB's prepetition debt and this point was confirmed by counsel at the Interim Hearing.

breach of duty claims against directors and officers, subject only to a carveout and certain permitted liens. *See* Interim Order at ¶ 2(d) and (e). The DIP Facility will have superpriority administrative expense status payable from the proceeds of any assets of the estate, including the Unencumbered Assets. *Id.* at ¶ 2(h).

28.     The DIP Facility imposes various fees on the Debtor, including a $150,000 commitment fee payable upon the closing of a sale of substantially all of the Debtor's assets. *See* DIP Loan Agreement at § 2.3. In addition, under the SVB Loan Agreement, a $600,000 fee would be due and owing to SVB upon consummation of the roll-up. As a percentage of the combined new money to be provided and the prepetition roll-up amounts, the annualized all-in cost of the DIP Facility ranges from 31.4% to 66.9% depending on whether the term of the facility is the original maturity date of 45 days or the extended maturity date of 90 days and whether SVB and 8VC agree to extend the last discretionary $3 million advance.[8] Relative to debtor-in-possession financing facilities in comparable cases, the proposed DIP Facility here is roughly two to three times above market.

29.     In terms of adequate protection, the Debtor proposes the following adequate protection to SVB to the extent of any diminution in the value of its interests in the Debtor's assets: (a) additional and replacement liens on the DIP Collateral, which includes the Unencumbered Assets, (b) an allowed superpriority administrative expense claim, (c) until the roll-up has occurred, monthly payment of interest on $5.23 million of SVB's prepetition loan

---

[8] The all-in cost is calculated by adding the weighted-average (on the basis of respective debt amounts) (a) interest rates applicable to the new money DIP Facility and SVB's prepetition debt (10.5% per annum for the new money DIP Facility and 6.0% per annum for SVB's prepetition debt) and (b) commitment fees under the DIP Facility, on an annualized basis, as a percentage of the new money to be advanced, and (c) exit fees owing on SVB's prepetition debt, on an annualized basis, as a percentage of the prepetition roll-up amount, all over a specified time period.

obligations at 6% interest, and (d) payment of SVB's reasonable legal fees and expenses. *See* Interim Order at ¶ 7.

30.     Other salient terms of the DIP Facility and the Proposed Final Order include the following:

a)     <u>Stipulations, Waivers, Acknowledgments, Releases</u>:  The Debtor will make various broad-ranging stipulations, waivers, and acknowledgments, including releases of claims, in favor of SVB, subject to the Committee's challenge rights, regarding: (i) the amount and nature of the obligations under the SVB Loan Agreement; (ii) the validity, enforceability, and priority of the interests of SVB in prepetition collateral; and (iii) the lack of any viable estate claims or defenses with respect to the SVB Loan Agreement. *See* Interim Order at Recital E.

b)     <u>Challenge/Standing</u>.  The Committee and other parties in interest will face a relatively short Challenge Deadline (as defined in the Interim Order) of sixty (60) days following Committee formation, in order to commence a Challenge (as defined in the Interim Order).  No standing is conferred upon the Committee or any other party to commence a Challenge. *See* Interim Order at ¶ 23.

c)     <u>Carve Out</u>:  The Budget for Committee professional fees is only <u>$110,000</u> through November 2019.  This amount needs to be substantially increased.  By contrast, the Debtor's and lenders' professional fees are budgeted at over <u>$4.4 million</u> for this same period, without taking into account any transaction fees that may be payable to the Debtor's investment banker. *See* Interim Order at Exhibit B (Budget).

d)    <u>Investigation Budget</u>:  Only up to $25,000 of the DIP Facility and the DIP Collateral will be available to the Committee to fund an investigation into the prepetition liens and claims of SVB, and none of the Carve Out could be used to challenge SVB's liens or claims or to assert any affirmative claims against SVB.  *See* Interim Order at ¶¶ 17 and 20.

e)    <u>Section 506(c) / Marshaling / Equities of the Case Waivers</u>:  SVB and 8VC will be granted waivers insulating them from: (i) any surcharge rights that the Debtor's estate may have under section 506(c) of the Bankruptcy Code for the cost of preserving the prepetition collateral or the DIP Collateral, (ii) application of the equitable remedy of marshaling, and (iii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code, in each case with respect to the proceeds of any of the prepetition collateral or the DIP Collateral.  *See* Interim Order at ¶¶ 24, 25, 26, and 27.

f)    <u>Credit Bidding</u>:  SVB and 8VC will be granted automatic and unqualified rights to credit bid their claims, consistent with the terms of the Participation Agreement, during the sale of all or substantially all of the Debtor's assets, including in a sale under section 363 of the Bankruptcy Code or as part of a plan.  *See* Interim Order at ¶ 30.

g)    <u>Indemnity</u>:  The Debtor would indemnity SVB and 8VC, solely in their capacities as financing parties under the DIP Facility, and not with respect to their prepetition relationships with the Debtor.  *See* Interim Order at ¶ 29.  The Court clarified at the Interim Hearing that 8VC would not be indemnified by the Debtor in 8VC's capacity as an equity holder of the Debtor.

h)    Milestones:  The DIP Facility would be subject to the Debtor obtaining approval of the Proposed Final Order and entry of a bid procedures order within 30 days of the Petition Date.  *See* DIP Loan Agreement at § 6.7.

**Objections to DIP Facility and Proposed Final Order**

31.    The Committee's objections to the terms of the DIP Facility and the Proposed Final Order are set forth below.

**A.    The DIP Facility, Including the Roll-Up, Should Not Be Approved in Its Current Form Because It Primarily Benefits SVB and 8VC at the Expense of This Estate.**

32.    A proposed financing should not be approved where "it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *In re Ames Dept. Stores*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990).  "[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest. *Id*. at 40.

33.    Any proposed financing must be "fair, reasonable, and adequate." *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).  Additionally, a financing proposal that contemplates a delegation or compromise of the debtor's fiduciary responsibilities is especially problematic.  *See In re Chief Executive Officers Clubs*, 359 B.R. 527, 540 n.6 (Bankr. S.D.N.Y. 2007) (a debtor cannot excuse its fiduciary duties to its chapter 11 estate and its creditors for the sake of prompt DIP financing); *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998) (agreements requiring a debtor to breach its fiduciary duties are illegal under the Bankruptcy Code and applicable state law); *In re Tenney Village Co.*, 104 B.R.

15

562, 569 (Bankr. D.N.H. 1989) (denying approval of proposed debtor-in-possession financing

that was so onerous as to violate the debtors' fiduciary obligations to the estate); *In re Roblin*

*Indus.*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (denying approval of proposed debtor-in-

possession financing where, as a condition to extending the loan, the debtors were required to

waive avoidance actions against the lenders in violation of their fiduciary duties).

34.    Specifically with reference to a "cross-collateralization of a prepetition

loan with post-petition assets [that] may elevate an unsecured or undersecured loan to fully

secured status ahead of other similar claims, creditors are entitled to be heard on whether the

potential benefits of the arrangement in preserving a business outweigh the prejudice to them."

*Ames Dept. Stores*, 115 B.R. at 39.

35.    Here, the DIP Facility as proposed, particularly the roll-up of SVB's

prepetition debt, is wholly unfair and unreasonable from the perspective of unsecured creditors

and this estate because it will elevate SVB's prepetition debt to administrative status, while also

burdening the Unencumbered Assets with new liens and superpriority claims to secure SVB's

rolled-up debt.  The effect of these provisions is to literally strip the Debtor's unsecured creditors

of their most valuable means of maximizing recoveries in this case.  The Unencumbered Assets

include, among other items:  (a) avoidance actions, (b) commercial tort claims, (c) thirty-five

percent (35%) of the Debtor's interests in foreign subsidiaries, and (d) perhaps most importantly,

the Debtor's intellectual property.[9]

---

[9]  The Committee's investigation of potential Unencumbered Assets is ongoing and the Committee reserves all
rights with respect thereto.

36.     Although the prepetition security grant under the SVB Loan Agreement purports to include the proceeds of such intellectual property, the Committee submits that such grant is ineffective to create a valid and enforceable security interest under the UCC or section 552(b) of the Bankruptcy Code.  *See* UCC § 9-315(c) ("A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected."); *DSP Acquisition, LLC v. Free Lance-Star Publishing Co. (In re Free Lance-Star Publishing Co.)*, 2014 Bankr. LEXIS 1644 at *22 (Bankr. E.D. Va. Apr. 14, 2014) ("The Bankruptcy Code precludes [lender] from asserting a perfected lien on the proceeds of any assets the Debtor may sell unless [lender] had a perfected lien on the underlying asset being sold as of the Petition Date. 11 U.S.C. § 552(b)(1).").  Simply put, a "springing lien" on intellectual property is ineffective in the context of bankruptcy.

37.     The value of the Unencumbered Assets is undetermined.  However, given the critical importance of the Debtor's intellectual property to its business, the Committee anticipates that the Debtor's intellectual property will represent a substantial portion of the value of the Debtor's estate.  The Debtor's foreign subsidiaries in South America also hold a significant portion of the Debtor's employees and know-how.  The Debtor's commercial tort claims likewise could yield material value for this estate (potentially out of available insurance coverage) based on the asserted breaches of duty and negligence of the Debtor's founders and possibly others.

38.     The Court should approve a proposed debtor-in-possession financing only if such financing "is in the best interest of the general creditor body."  *Roblin*, 52 B.R. at 244

17

(citing *In re Texlon Corp.*, 596 F.2d 1092, 1098-99 (2d Cir. 1979) and *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983)); *see also Tenney Village*, 104 B.R. at 569  ("The Debtor's pervading obligation is to the Bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries.").  Postpetition financing should not be authorized if its primary purpose is to benefit or improve the position of a particular secured lender.  *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor"); *Tenney Village*, 104 B.R. at 568 (debtor-in-possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of [the secured creditor]").  Indeed, the law has long acknowledged the unequal bargaining power inherent in negotiations leading to proposed postpetition financing, as well as the very significant harm that can befall creditors if the proposed lender is permitted to exploit its position.  *See, e.g., In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

      39.     The Committee respectfully submits that the DIP Facility, as currently proposed in the Debtor's case, is primarily for the benefit of SVB and 8VC.  Through the DIP Facility -- without any evidence that SVB is oversecured[10] -- SVB's prepetition debt of $5.83

---

[10]  The Committee reserves all rights to argue at the appropriate time that SVB was undersecured as of the Petition Date and the DIP Facility should be partially unwound as to any rolled-up amounts to the extent of such undercollateralization.

million will be rolled-up in its entirety and secured by the DIP Collateral.  Pursuant to the

Participation Agreement, 8VC has agreed to subordinate its new money advances to SVB's new

money advances and one-half of SVB's prepetition debt, which subordination will apply as an

intercreditor contractual matter between SVB and 8VC regardless of whether the Court approves

the roll-up.  Nonetheless, SVB continues to insist that the roll-up is approved as part of the

Proposed Final Order.

    40. Such roll-up makes the DIP Facility unreasonably expensive and could

render the Debtor administratively insolvent by, among other things, obligating the estate to pay

a $600,000 fee to SVB as an administrative expense.  As a percentage of the combined new

money to be provided and the prepetition roll-up amounts, the annualized all-in cost of the DIP

Facility ranges from 31.4% to 66.9% depending on whether the term of the facility is the original

maturity date of 45 days or the extended maturity date of 90 days and whether SVB and 8VC

agree to extend the last discretionary $3 million advance.[11]  Compared to debtor-in-possession

financing facilities in comparable cases, the proposed DIP Facility here is roughly two to three

times more costly than market norms.

    41. The original maturity date of October 21, 2019 under the DIP Facility is

also unreasonably short, putting SVB and 8VC firmly in the driver's seat when it comes to

whether or not the Debtor's estate will be provided adequate time and funding to market its

assets and successfully conclude a going concern sale.  Indeed, the Debtor may need more new

---

[11]  The all-in cost is calculated by adding the weighted-average (on the basis of respective debt amounts) (a) interest rates applicable to the new money DIP Facility and SVB's prepetition debt (10.5% per annum for the new money DIP Facility and 6.0% per annum for SVB's prepetition debt) and (b) commitment fees under the DIP Facility, on an annualized basis, as a percentage of the new money to be advanced, and (c) exit fees owing on SVB's prepetition debt, on an annualized basis, as a percentage of the prepetition roll-up amount, all over a specified time period.

money than is currently available under the DIP Facility given that the Debtor's budget reflects a negative cash balance beginning the week of November 18, 2019, without taking into account, among other items, the payment of section 503(b)(9) claims, a sufficient amount for Committee professional fees, or other potential administrative expenses.

42.    Under these circumstances, final approval of the DIP Facility must be denied unless and until the offending provisions of the Proposed Final Order and DIP Loan Agreement have been revised and the Committee's objections have been adequately addressed.

**B.    Unencumbered Assets Must Not Become Collateral for SVB and 8VC and Should Be Preserved for Unsecured Creditors.**

43.    Section 364(d)(1) of the Bankruptcy Code provides that the bankruptcy court may authorize post-petition financing supported by a superpriority lien only if "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." *Resolution Trust Group v. Swedeland Dev. Corp. (In re Swedeland Dev. Corp.)*, 16 F.3d 552, 564 (3d Cir. 1994) (quoting the Bankruptcy Code). "A debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection." *Id*. "The Bankruptcy Code does not expressly define adequate protection, but section 361 states that it may be provided by (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured creditor's interest in such property." *Id*. The Debtor's adequate protection proposal "should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *Id*.

44.     Unlike other assets of a debtor's estate, avoidance powers are unique. They are intended to allow the debtor-in-possession to gain recoveries for the benefit of all unsecured creditors. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partn. IV*, 229 F.3d 245, 250 (3d Cir. 2000); *In re Sweetwater*, 55 B.R. 724, 735 (D. Utah 1985) (avoiding powers are meant to benefit creditors generally and promote equitable distribution among all creditors), *aff'd and rev'd, in part, on other grounds*, 884 F.2d 1323 (10th Cir. 1989). Further, bankruptcy courts across the country routinely exclude unencumbered assets from the scope of adequate protection liens and superpriority claims. *See, e.g., In re Aralez Pharmaceuticals US Inc.*, Case No. 18-12425 (MG), Docket No. 98 at ¶ 15(i)-(ii) (Bankr. S.D.N.Y. Sept. 14, 2018) (providing that adequate protection liens only attach to prepetition collateral and further providing that adequate protection claims cannot be paid out of the proceeds of avoidance actions); *In re The Weinstein Company Holdings LLC*, Case No. 18-10601 (MFW), Docket No. 267 at ¶ 12(d)-(e) (Bankr. D. Del. Apr. 19, 2018) (excluding avoidance actions and commercial tort claims from adequate protection liens and claims); *In re Gymboree Group, Inc.*, Case No. 19-30258 (KLP), Docket No. 348 at ¶¶ 15, 18 (Bankr. E.D. Va. Feb. 15, 2019) (excluding avoidance actions, commercial tort claims, and the proceeds thereof from adequate protection liens and claims); *In re Frank Theatres Bayonne/South Cove, LLC*, Case No. 18-34808 (SLM), Docket No. 212 at ¶ 3(b)-(c) (Bankr. D. N.J. Jan. 28, 2019) (same); *In re Promise Healthcare Group, LLC*, Case No. 18-12491 (CSS), Docket No. 218 at ¶¶ 12, 14 (Bankr. D. Del. Dec. 4, 2018) (excluding avoidance actions and the proceeds thereof and commercial tort claims and the proceeds thereof, in part, from adequate protection liens and

claims); *In re SFX Entertainment, Inc.*, Case No. 16-10238 (MFW), Docket No. 203 at ¶

11(a)(i)-(ii) (Bankr. D. Del. Mar. 8, 2016) (excluding avoidance actions and the proceeds thereof

from adequate protection liens and claims).

45.     Yet, the Debtor proposes to grant broad-reaching DIP liens, adequate

protection liens, and superpriority claims over its avoidance actions and other Unencumbered

Assets in favor of SVB and 8VC, so as to put those secured parties ahead of the line for payment

from previously unencumbered sources.  To the extent that the $5.83 million of SVB's

prepetition debt is rolled-up, the Unencumbered Assets should remain unencumbered and free of

any DIP liens and superpriority claims on account of such rolled-up debt.  There is no basis to

cross-collateralize what is otherwise prepetition debt with Unencumbered Assets, especially new

postpetition assets such as avoidance actions.

46.     In the event that the proposed roll-up is denied, the Debtor has offered no

evidence that SVB should be entitled to adequate protection liens against, or superpriority claims

payable from, the Unencumbered Assets (especially avoidance actions) to the extent of any

diminution in value.  Further, to allow the Debtor, as a fiduciary, to effectively assign the

benefits of avoidance actions to a lender rather than preserve them for the benefit of unsecured

creditors turns bankruptcy law on its head.  *See Tenney Village*, 104 B.R. at 568 (debtor-in-

possession financing terms must not "pervert the reorganizational process from one designed to

accommodate all classes of creditors and equity interests to one specially crafted for the benefit"

of the secured creditor).

47.     At a minimum, the Debtor's assets should be marshaled such that SVB and 8VC are only permitted to turn to the Unencumbered Assets (except avoidance actions) to the extent that their new money claims under the DIP Facility are not otherwise satisfied from the proceeds of other assets that constitute the DIP Collateral.  In this way, the Unencumbered Assets can be preserved primarily for the benefit of unsecured creditors.

## C.    The Investigation Budget and Committee Carve Out Must Be Increased, and the Committee Must Be Granted Standing to Pursue All Available Claims Against SVB.

48.     Under the Interim Order, the Budget for Committee professional fees for purposes of the Carve Out is only $110,000 through November 2019, of which up to $25,000 may be utilized to investigate the prepetition liens and claims of SVB.  By contrast, the Debtor's and lenders' professional fees are budgeted at over $4.4 million for this same period (excluding any transaction fees that may be payable to the Debtor's investment banker).  *See* Interim Order at Exhibit B (Budget).

49.     The budgeted amounts for Committee professionals must be substantially increased.  By itself, the Committee's investigation budget should be increased to no less than $100,000.  The Carve Out must also expressly include expenses of the members of the Committee.  *See Ames Dept. Stores*, 115 B.R. at 38 (insisting on "a carve out from a superpriority status and postpetition lien in a reasonable amount designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system.  Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

50.     Further, the Committee should be granted standing to pursue any available Challenge.  Given the relatively short time period of sixty (60) days from Committee formation until the Challenge Deadline, there is no reason to require the Committee to go through the extra step of seeking standing from this Court in order to pursue those claims or objections that the Debtor has already stipulated away.

51.     Consistent with the foregoing, the Proposed Final Order must include language reserving this Court's authority to disgorge amounts paid to SVB as part of any roll-up of prepetition debt and to unwind the DIP Facility to the extent of a successful Challenge to the liens or claims of SVB or a determination that SVB was undersecured as of the Petition Date.

**D.     The Estate Should Retain Section 506(c) Surcharge Rights,**
**Section 552(b) "Equities of the Case" Rights, and Marshaling Rights.**

52.     There should be no waiver of the estate's section 506(c) surcharge claims against SVB and 8VC unless and until all costs of administering this estate have been adequately provided for, including any unpaid claims arising under section 503(b)(9) of the Bankruptcy Code, sufficient amounts for Committee professional fees, and any other administrative expenses.  The elimination of the right to surcharge under section 506(c) of the Bankruptcy Code increases the risk that the costs of the bankruptcy will be borne by unsecured creditors, including administrative claimants, rather than the secured creditors that are likely the primary beneficiaries of the process.  This result contravenes the essential purpose of section 506(c).  *See Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured

party's collateral, which costs might otherwise be paid from the unencumbered assets of the

bankruptcy estate . . .") (citation omitted); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr.

S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses

of preserving or disposing of the secured collateral is that the general estate and unsecured

creditors should not be required to bear the cost of protecting what is not theirs.").  Indeed, courts

have rejected the waiver of surcharge rights under section 506(c) under similar circumstances.

*See, e.g., In re Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to

approve postpetition financing agreement to the extent that the agreement purported to modify

statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of

collateral under section 506(c)).

   53. The Debtor also proposes that the "equities of the case" exception under

section 552(b) not apply to SVB with respect to proceeds or profits of any of the prepetition

collateral.  The "equities of the case" exception in section 552(b) of the Bankruptcy Code allows

a debtor, committee, or other party in interest to exclude postpetition proceeds from prepetition

collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of

a secured lender's foreclosure.  "'The purpose of the equity exception is to prevent a secured

creditor from reaping benefits from collateral that has appreciated in value as a result of the

trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to

general creditors) to cause the appreciated value.'"  *In re Muma Servs.*, 322 B.R. 541, 558-559

(Bankr. D. Del. 2005) (quoting *Delbridge* v. *Prod. Credit Ass'n & Fed. Land Bank*, 104 B.R.

824, 826 (E.D. Mich. 1989)).  There is no reason to waive such rights here, especially given that

25

there has been no evidence offered that SVB is oversecured and, in any case, SVB's asserted

rights in the proceeds of the Debtor's intellectual property are not otherwise covered by section

552(b).  *See, e.g., In re Metaldyne Corp.*, No. 09-13412 (MG), 2009 WL 2883045, at *6 (Bankr.

S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an

argument that other parties in interest may make.  If, in the event, the Committee or any other

party [in] interest argues that the equities of the case exception should apply to curtail a

particular lender's rights, the Court will consider it."); *Sprint Nextel Corp. v. U.S. Bank Nat'l*

*Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (request

for section 552(b) waiver was premature because factual record not fully developed).

54.     Further, the Proposed Final Order would restrict this Court's ability to

implement equitable marshaling as to SVB and 8VC.  Equitable marshaling in this case may be

important in order to enable asset values to be maximized for this estate.  *See Official Comm. v.*

*Hudson United Bankr. (In re America's Hobby Center)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y.

1998); *Ramette v. United States (In re Bame)*, 279 B.R. 833 (8th Cir. B.A.P. 2002) (marshaling

doctrine invoked against taxing authorities to benefit of estate's unsecured creditors).  As noted

above, the Debtor's assets should be marshaled such that SVB and 8VC are only permitted to

turn to the Unencumbered Assets to the extent that their new money claims up to $8 million (net

of fees) are not otherwise satisfied from the proceeds of other assets that constitute the DIP

Collateral.  Such marshaling relief has been granted in various bankruptcy courts across the

country.  *See, e.g., In re Samuel's Jewelers, Inc.*, Case No. 18-11818 (KJC), Docket No. 252 at ¶

5 (Bankr. D. Del. Sept. 18, 2018); *In re The Weinstein Company Holdings LLC*, Case No. 18-

10601 (MFW), Docket No. 267 at ¶ 11(c) (Bankr. D. Del. Apr. 19, 2018); *In re The Bon-Ton*

*Stores, Inc.*, Case No. 18-10248 (MFW), Docket No. 352 at ¶ 7 (Bankr. D. Del. Mar. 12, 2018);

*In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC), Docket No. 450 at ¶ 10(f) (Bankr.

S.D.N.Y. June 28, 2018); *In re Frank Theatres Bayonne/South Cove, LLC*, Case No. 18-34808

(SLM), Docket No. 212 at ¶ 9 (Bankr. D. N.J. Jan. 28, 2019); *In re Westmoreland Coal Co.*,

Case No. 18-35672 (DRJ), Docket No. 520 at ¶ 37 (Bankr. S.D. Tex. Nov. 15, 2018).

**E.      Other Miscellaneous Issues with the Proposed Final Order.**

             55.      A few additional miscellaneous issues with the Proposed Final Order are

highlighted below:

             a)      <u>DIP Remedies</u>.  Given the very short original maturity date under

the DIP Loan Agreement of October 21, 2019 and the wide discretion that SVB has in terms of a

45-day extension, SVB and 8VC should not be permitted to immediately exercise remedies upon

the expiration of only a five-business day remedies period.  *See* Interim Order at ¶ 13.  The

Debtor's estate must be given more time in order to formulate an alternative strategy if a binding

letter of intent is not received prior to October 21, 2019.

             b)      <u>Milestones</u>.  The Committee is continuing to review the milestones

under the DIP Facility and reserves all rights with respect thereto.

             c)      <u>Credit Bidding</u>.  SVB and 8VC should not have an unfettered right

to credit bid in the context of any sale of the Debtor's assets.  Courts have previously recognized

that "[c]redit bidding . . . is not an absolute right [and] 'a court may deny a lender the right to

credit bid in the interest of any policy advanced by the Code, such as to ensure the success of

reorganization or to foster a competitive bidding environment.'" *In re Free Lance-Star Publishing Co.*, 512 B.R. 798, 805 (Bankr. E.D. Va. 2014) (quoting *In re Philadelphia Newspapers*, 599 F.3d 298, 316 n.14 (3d Cir. 2010). Here, credit bidding might not work given the extent of the Unencumbered Assets and, in any case, must be subject to the requirements of section 363(k) of the Bankruptcy Code in all respects.

               d)    <u>Budget Modifications</u>.  The Debtor should not be permitted to modify the Budget without advance notice to the Committee.

               e)    <u>Reporting</u>.  The Committee should concurrently receive the same information and reporting about the Debtor's operations, performance, and ongoing sale efforts as SVB and 8VC.

<strong><u>Reservation of Rights</u></strong>

56.    As noted, the Committee is currently conducting diligence with respect to the DIP Facility.  The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the DIP Motion and the form of Proposed Final Order, and to introduce evidence prior to or at any hearing regarding the DIP Motion in the event that the Committee's objections are not resolved prior to such hearing.

<strong><u>Conclusion</u></strong>

57.    For all of the foregoing reasons, the Committee respectfully requests that the Court deny approval of the DIP Facility and the Proposed Final Order in the form presented, pending the resolution of the objections raised by the Committee herein.

Dated:  September 27, 2019    PACHULSKI STANG ZIEHL & JONES LLP

        */s/ Bradford J. Sandler*

        Bradford J. Sandler (DE Bar No. 4142)
        John A. Morris (NY Bar No. 2405397)
        Maxim B. Litvak (CA Bar No. 215852)
        Colin R. Robinson (DE Bar No. 5524)
        919 North Market Street, 17th Floor
        P.O. Box 8705
        Wilmington, DE  19899 (Courier 19801)
        Telephone: 302-652-4100
        Facsimile:  302-652-4400
        E-mail:  bsandler@pszjlaw.com
           jmorris@pszjlaw.com
           mlitvak@pszjlaw.com
           crobinson@pszjlaw.com

        *Proposed Counsel for the Official Committee of*
        *Unsecured Creditors*